1
2
3
4
5                     UNITED STATES DISTRICT COURT
6                         DISTRICT OF NEVADA
7                               * * *
8    GREGORY D. BOLIN,                    Case No. 3:07-cv-000481-MMD-VPC
9                        Petitioner,                ORDER
10        v.
     RENEE BAKER, *et al.,*
11
                         Respondents.
12
13        Before the Court for a decision on the merits is an application for a writ of habeas
14   corpus filed by Gregory Dean Bolin, a Nevada prisoner sentenced to death. (Dkt. no.
15   138.)
16   I.    FACTUAL AND PROCEDURAL BACKGROUND
17        On the morning of July 15, 1995, the body of Brooklyn Ricks was found at a
18   residential construction site in Las Vegas, Nevada.[1] Ricks had been bound and gagged
19   and, based on autopsy findings, had suffered approximately a dozen puncture wounds
20   to the chest and back and multiple blunt force traumas to the head, neck, and
21   extremities. In addition, an analysis of a vaginal swab taken from Ricks detected trace
22   amounts of semen. The previous night, Ricks had worked at a video rental store (B & R
23   Video) located in a strip mall. After closing the store with Ricks at midnight, a co-worker
24   observed Ricks get into her pickup truck and drive past an adjacent Albertson's grocery
25   store. On July 18, 1995, Bolin was arrested and charged with Ricks' murder.
26   _____
27        [1]The construction worker who discovered Ricks testified that she was still alive,
     but unconscious, when he found her. By the time emergency personnel arrived at the
28   scene, she was dead.

On July 15, 1996, a jury sitting in the state district court for Clark County, Nevada, returned a verdict finding Bolin guilty of first-degree kidnaping, sexual assault, and first-degree murder. At the conclusion of the penalty phase, the jury found three aggravating circumstances and no mitigating circumstances. Bolin was sentenced to death.

On May 19, 1998, Bolin's convictions and death sentence were affirmed on direct appeal. *Bolin v. State*, 960 P.2d 784 (Nev. 1998). Bolin timely filed a motion for rehearing which was denied by the Nevada Supreme Court on August 27, 1998. His subsequent petition for a writ of certiorari to the U.S. Supreme Court was also denied. *Bolin v. Nevada*, 525 U.S. 1179 (1999).

Bolin initiated state post-conviction proceedings on April 22, 1999. On July 28, 2005, the state district court entered an Amended Findings of Facts, Conclusions of Law and Order denying Bolin's state district court petition. The Nevada Supreme Court affirmed that denial of relief on June 22, 2007, and issued its remittitur on July 17, 2007. On November 19, 2007, Bolin filed a petition for a writ of certiorari in the U.S. Supreme Court, which was denied on February 25, 2008. *Bolin v. Nevada*, 552 U.S. 1231 (2008).

On October 15, 2007, Bolin filed, *pro se*, a petition for writ of habeas corpus under 28 U.S.C §2254 that initiated this federal proceeding. On November 9, 2007, the district court appointed the Federal Public Defender's office (FPD) to represent Bolin during his federal habeas corpus proceedings. On April 30, 2008, Bolin filed an amended petition. The FPD was subsequently relieved as counsel due to an irreconcilable conflict. On February 6, 2009, Saor Stetler was appointed as new counsel.

On July 30, 2009, Bolin filed a second amended petition. In response to the respondents' motion to dismiss based, in part, on lack of exhaustion, Bolin filed a motion for stay and abeyance to allow him to return to state court. This Court denied that motion and, on September 27, 2011, entered an order ruling upon the motion to dismiss. Confirming that numerous claims in the petition had not been exhausted in the

state court, the order gave Bolin twenty (20) days to abandon his unexhausted claims and warned him that failure to do so would result in the dismissal of his second amended petition pursuant to *Rose v. Lundy*, 455 U.S. 509 (1982).

That order precipitated a conflict between Stetler and Bolin, with Bolin disagreeing with counsel's refusal to abandon the unexhausted claims. That conflict resulted in Stetler being dismissed as Bolin's counsel on June 13, 2012. After appointment of new counsel, David Neidert and Michael Charlton, Bolin filed a notice abandoning unexhausted claims and a third amended petition on November 27, 2012. Those filings were followed by a motion to amend and a proposed fourth amended petition filed on December 15, 2012. This Court granted the motion to amend on January 9, 2013.

On April 4, 2013, the respondents filed their answer to Bolin's remaining habeas claims. Briefing on the merits of those claims concluded on January 15, 2014. In addition, Bolin has filed a motion for an evidentiary hearing with respect to certain claims that, according to him, call for additional factual development.

## II.   STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a

1  question of law or if the state court decides a case differently than the Supreme Court
2  has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–
3  06 (2000). An "unreasonable application" occurs when "a state-court decision
4  unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case."
5  *Id.* at 409. "[A] federal habeas court may not "issue the writ simply because that court
6  concludes in its independent judgment that the relevant state-court decision applied
7  clearly established federal law erroneously or incorrectly." *Id.* at 411.

8      With respect to an "unreasonable determination of the facts" under § 2254(d)(2),
9  "[t]his is a daunting standard — one that will be satisfied in relatively few cases." *Taylor*
10  *v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). It is satisfied where a state court fails to
11  make an obvious factual finding, where it makes a factual finding under an incorrect
12  legal standard, where it plainly misapprehends or misstates the record, where it ignores
13  evidence that supports the petitioner's claim, and where the fact-finding process itself is
14  defective. *Id.* at 1001-02. However, the factual determinations of the state court cannot
15  be overturned unless they are "objectively unreasonable in light of the evidence
16  presented." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

17      The Supreme Court has explained that "[a] federal court's collateral review of a
18  state-court decision must be consistent with the respect due state courts in our federal
19  system." *Id.* The "AEDPA thus imposes a 'highly deferential standard for evaluating
20  state-court rulings,' and 'demands that state-court decisions be given the benefit of the
21  doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S.
22  320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). "A
23  state court's determination that a claim lacks merit precludes federal habeas relief so
24  long as 'fairminded jurists could disagree' on the correctness of the state court's
25  decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011) (citing *Yarborough v.
26  Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a
27  strong case for relief does not mean the state court's contrary conclusion was
28  unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen*

*v. Pinholster*, 131 S.Ct.1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1398. In *Pinholster*, the Court reasoned that the "backward-looking language" present in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made," and, therefore, the record under review must be "limited to the record in existence at that same time, i.e., the record before the state court." *Id.*

For any habeas claim that has not been adjudicated on the merits by the state court, the federal court reviews the claim *de novo* without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1). *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). *See also James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011) (noting that federal court review is *de novo* where a state court does not reach the merits, but instead denies relief based on a procedural bar later held inadequate to foreclose federal habeas review). In such instances, however, the provisions of 28 U.S.C. § 2254(e) still apply. *Pinholster*, 131 S.Ct at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); *Pirtle*, 313 F.3d at 1167-68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is *de novo*).

Lastly, the Court in *Lockyer* rejected a Ninth Circuit mandate for habeas courts to review habeas claims by conducting a *de novo* review prior to applying the "contrary to or unreasonable application of" limitations of 28 U.S.C. § 2254(d)(1). *Lockyer*, 538 U.S. at 71. In doing so, however, the Court did not preclude such an approach. "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) — whether a state court decision is
///

1  contrary to, or involved an unreasonable application of, clearly established Federal law."

2  *Id.*

3  **III.    ANALYSIS OF CLAIMS**

4      **A.    Claims Five, Six, and Seventeen**

5          Claims Five, Six, and Seventeen are all premised on the state court's admission

6  of prior bad act evidence relating to a kidnaping and sexual assault Bolin committed in

7  Colorado in 1975. In its decision on Bolin's direct appeal, the Nevada Supreme Court

8  recounted the circumstances related to the admission of this evidence:

9              Because the State sought to introduce evidence of Bolin's prior
   criminal history at trial in order to demonstrate intent and motive, a
10  *Petrocelli* hearing[2] was conducted on June 3, 1996. During this hearing,
   evidence of Bolin's prior criminal history, which consisted of a 1975
11  Colorado kidnapping and sexual assault for which Bolin had served nearly
   twenty years in prison, was established through the testimony of the
12  victims of these past crimes.

13             At Bolin's *Petrocelli* hearing, Renee Morriss (Morriss) testified that
   on April 15, 1975, she and her then husband John, were both Army
14  nurses stationed in Aurora, Colorado. After finishing their shift at
   approximately 11:00 p.m., the couple drove home together and exited
15  their car at the parking spot in front of their apartment. Two young males
   came out of the bushes, one holding a .22 handgun, and told them to get
16  back into the car. The older looking male, who was approximately
   nineteen years old and who was later identified as Bolin, ordered John to
17  drive or he would shoot Morriss.

18             Immediately upon driving off, Bolin demanded money from the
   couple. While they did not have any cash in their possession, John gave
19  Bolin his wallet and watch, and Morriss handed over her wedding ring.
   After driving approximately thirty minutes, Bolin forced John to stop the car
20  in a dark and secluded area and then forced him into the trunk of the car
   at gunpoint.
21
              During the next six hours, Bolin and his accomplice brutally raped
22  Morriss on several occasions at gunpoint. Additionally, at one point in the
   evening, Bolin forced Morriss to drive to her apartment so that Bolin and
23  his accomplice could rob her and John of their valuables. Morriss and
   John were eventually able to escape when Bolin forced her to drive to a
24  convenience store and cash a check for one hundred dollars. While Bolin

25  _____

26             [2]In *Petrocelli v. State*, 692 P.2d 503 (Nev. 1985), the Nevada Supreme Court
   concluded that, before admitting evidence of a prior bad act or collateral offense, the
27  trial court must conduct a hearing outside the presence of the jury, at which the state
   must prove by clear and convincing evidence that the defendant committed the
28  collateral offense, and the district court must weigh the probative value of the proffered
   evidence against its prejudicial effect.

and his accomplice were occupied in the store, Morriss ran back to her vehicle, drove off, and contacted the police.

Bolin was eventually apprehended and pleaded guilty to two counts of first degree kidnapping and two counts of rape. Bolin spent the next thirteen years in a Colorado prison before being paroled in July 1988. In February 1990, Bolin's parole was revoked, and he consequently went back to prison for an additional five years. Bolin was finally released from the Colorado prison system on June 29, 1995, approximately two weeks prior to Ricks' murder.

At the conclusion of the *Petrocelli* hearing, the district court concluded that evidence of Bolin's prior bad act was relevant to the crime charged, that it had been proven by clear and convincing evidence, and that its probative value was not substantially outweighed by the danger of unfair prejudice. Consequently, the district court concluded that evidence of Bolin's prior bad acts were admissible at trial pursuant to NRS 48.045(2) to demonstrate identity, plan, intent, similar modus operandi, and sexual aberration.

Bolin's trial commenced on June 10, 1996. During trial, the district court admitted evidence of Bolin's 1975 rape and kidnapping convictions over Bolin's objections. . . .

*Bolin*, 960 P.2d at 791-92 (footnote added).

In Claim Five, Bolin alleges that his conviction and sentence are unconstitutional because the prior bad act evidence was improperly admitted and, absent that evidence, there was insufficient evidence to support his conviction. In Claim Six, he alleges that the Nevada Supreme Court violated his constitutional rights by virtue of its decision upholding the trial court's admission of the prior bad act evidence. Based on the manner in which the Claim Five is presented in his petition, Bolin appears to be asking this Court to find that the state court erred in admitting the prior bad act evidence and to then apply the constitutional sufficiency of evidence test (*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) to the remaining evidence presented at trial. However, inquiry into whether evidence was correctly admitted under state law "is no part of a federal court's habeas review of a state conviction." *Estelle v. McGuire*, 502 U.S. 62, 67(1991). So, instead, this Court shall turn to the question whether the admission of the evidence violated Bolin's federal constitutional rights. *See id.* at 68.

///

///

Nev. Rev. Stat. § 48.045(2) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In addition, Nevada case law at the time of Bolin's trial contained an exception to § 48.045(2) that allowed for the admission of evidence of prior bad acts showing that a defendant possesses a propensity for sexual aberration. *Findley v. State*, 577 P.2d 867 (Nev. 1978); *McMichael v. State*, 577 P.2d 398 (Nev. 1978). As noted, the trial court determined that the evidence of the 1975 Colorado crimes was admissible to show identity, plan, intent, a similar modus operandi, and sexual aberration. (Dkt. no. 149-3 at 57.)[3]

On direct appeal, the Nevada Supreme Court limited its analysis to "the propriety of admitting evidence of Bolin's prior bad acts for the purpose of establishing identity pursuant to NRS 48.045(2)" and "decline[d] to address Bolin's arguments that his prior convictions were improperly admitted on other grounds such as intent, plan, similar modus operandi, or sexual aberration." *Bolin*, 960 P.2d at 796, n.5. After extensively reviewing Nevada case law on the matter, the Nevada Supreme Court concluded that "there were sufficient similarities between Bolin's 1975 rape and kidnaping convictions and Ricks' murder to warrant admission of Bolin's prior bad acts for the limited purpose of establishing identity." *Id*. at 795.

In 2002, the Nevada Supreme Court overruled *McMichael* and *Findley* with respect to the admissibility of evidence showing that the defendant possesses a propensity for sexual aberration. *Braunstein v. State*, 40 P.3d 413, 418 (Nev. 2002); *see also*, *Richmond v. State*, 59 P.3d 1249, 1256 (Nev. 2002) (disavowing jury instruction on sexual aberration). In his state post-conviction proceeding, Bolin again challenged the trial court's admission of prior bad act evidence. He also argued that the state

---

[3]Citations to page numbers in the court herein record are based on the CM/ECF pagination.

court's failure to apply *Braunstein* and *Richmond* to his case would violate his constitutional rights.

The Nevada Supreme Court decided the claim as follows:

> The State argues that this claim is barred by the law of the case doctrine. We disagree. In Bolin's direct appeal, we expressly declined to consider whether evidence of the prior bad act was improperly admitted to show sexual aberration. Thus the claim is not barred by the law of the case. [fn.4: *See Pellegrini v. State*, 117 Nev. 860, 879, 34 P.3d 519, 532 (2001); *Hall v. State*, 91 Nev. 314, 316, 535 P.2d 797, 799 (1975).] The claim was not waived because Bolin raised it in his direct appeal, and his petition is not successive, so the procedural bars of NRS 34.810 are not at issue. Bolin argues that our decisions in *Braunstein v. State* [fn.5: 118 Nev. 68, 40 P.3d 413 (2002).] and *Richmond v. State* [fn.6: 118 Nev. 924, 59 P.3d 1249 (2002).], which were both decided after his conviction became final, entitle him to relief on this claim.

> The State argues that Bolin is not entitled to application of *Braunstein* and *Richmond* because his conviction was final when those cases were decided and they do not demand retroactive application on collateral review. [fn.7: *See generally Colwell v. State*, 118 Nev. 807, 59 P.3d 463 (2002).] We need not reach this issue here because even if those cases were applied retroactively to Bolin, they would not entitle him to relief. *Braunstein* would not have barred admission of the prior bad act evidence; the evidence would still have been admissible to show identity, which we have already ruled was proper. And while *Richmond* would have rendered the sexual-aberration jury instruction improper, we conclude the error in giving the instruction would have been harmless in light of the weight of the evidence supporting Bolin's conviction. That evidence included Bolin's history of frequenting the victim's place of work and asking the victim and her sisters out on dates; surveillance videotape placing Bolin at the victim's place of work minutes before she arrived and approximately two hours before she departed on the night of her death; a witness who saw Bolin drive away from the crime scene in the victim's truck just before the witness discovered the dying victim; the victim's truck being found five blocks from Bolin's home with a bloody screwdriver inside; and evidence that Bolin was included among the one in every 2,400-2,600 African-Americans who could have been the donor of DNA evidence found on the victim's body. Thus, we conclude the district court did not err in denying this claim.

Dkt. no. 170-6 at 14-15.

As a starting point, this Court rejects Bolin's argument that § 2254(d) does not apply here because the Nevada Supreme Court did not address his federal law claim. When a federal claim has been presented to a state court, and the state court has denied relief without comment, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to

the contrary. *Richter*, 131 S.Ct. at 784-85. That same presumption applies when a state court opinion addresses some, but not all, of the petitioner's claims. *Johnson v. Williams*, 133 S.Ct. 1088, 1095-96 (2013) (citing *Richter*). In determining that the trial court did not error as a matter of state evidence law, the Nevada Supreme Court implicitly rejected Bolin's claim that his constitutional rights had been violated by the admission of the prior bad act evidence. Thus, Bolin's constitutional claims were adjudicated on the merits by the Nevada Supreme Court for the purposes of § 2254(d).

As for whether the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, the decision in *Alberni v. McDaniel*, 458 F.3d 860 (9th Cir. 2006), confirms that that question must be answered in the negative. As explained in *Alberni*, the Supreme Court has, to this point, reserved its opinion as to "'whether a state law would violate the Due Process Clause if it permitted the use of "prior crimes" evidence to show propensity to commit a charged crime.'" *Alberni*, 458 F.3d at 864 (quoting *Estelle*, 502 U.S. at 75 n.5). The *Alberni* court reasoned that, because the Supreme Court has expressly declared the issue an open question, there was no clearly established federal law for the state court to be in conflict with, or unreasonably apply, when it decided against the petitioner on such a claim. *Id.* at 866. Accordingly, that state court decision must be accorded deference under § 2254(d)(1). *Id.* at 867. In the absence of a convincing showing that *Alberni* does not control, this Court must likewise defer to the Nevada Supreme Court's rejection of Bolin's due process claim.

Bolin also argues, however, that the Nevada Supreme Court's decision was based on an unreasonable determination of the facts. He points to two findings the court made in concluding that the 1975 crimes were sufficiently similar to the Ricks crimes to justify admission of the prior offenses for the limited purpose of establishing identity. One is the court's finding that Renee Morriss, like Brooklyn Ricks, had blond hair at the time of the crime. *See Bolin*, 960 P.2d at 796 ("At the time of her abduction and rape, Morriss was a twenty-year-old slender white female with blond hair who was 5' 5" tall.")

1   The other is the court's implied finding that Bolin took Ricks' personal property. *See id.*

2   ("In the instant case, Ricks' wedding ring and purse were taken from her person and

3   never recovered.")

4        Where the allegation is that the state court misapprehended or misstated the

5   record in making its finding, the alleged factual error must "go[] to a material factual

6   issue that is central to petitioner's claim" for there to be an "unreasonable determination

7   of the facts" that justifies relieving a federal court of deference under § 2254(d)(2).

8   *Taylor*, 366 F.3d at 1001. The Nevada Supreme Court's finding as to the color of

9   Morriss's hair is belied by her testimony at the *Petrocelli* hearing, during which she

10  stated that her hair was brown at the time of the 1975 sexual assault. (Dkt. no. 149-3 at

11  9.) Even so, that finding was a relatively insignificant part of the court's analysis in

12  comparing the two crimes. *See Bolin*, 960 P.2d at 795-96.

13       Put another way, the court's decision was well-supported by other, more-

14  pertinent facts, such as the age, race, and build of the victims, the manner in which they

15  were abducted, and the fact that the victims' vehicles were used to take them to remote

16  locations where they were sexually assaulted. *See id.* at 796. Because the state court's

17  finding as to Morriss' hair color was not a material factual issue that is central to Bolin's

18  claim, it cannot be said the court's decision to reject his claim was based on an

19  unreasonable determination of the facts for the purposes of § 2254(d)(2).

20       As for the Nevada Supreme Court's finding that Ricks' wedding ring and purse

21  were taken from her, evidence presented at trial established that these items were in

22  her possession when she left for work on the night of the murder. (Dkt. no. 152-2 at 57,

23  dkt. no. 152-3 at 66-67.) They were not found with her body the following morning, nor

24  were they ever recovered. (Dkt. no. 155-3 at 7, 66; dkt. no. 158-1 at 43-44.) Under the

25  circumstances, it was not unreasonable for the Nevada Supreme Court to conclude that

26  they had been taken from her by the person who had kidnaped her. *See Torres v.*

27  *Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000) (holding that, to meet the § 2254(d)(2)

28  ///

standard, a state court's factual findings must be "clearly erroneous," not just merely debatable).

Based on the foregoing this Court must defer to the Nevada Supreme Court's decision denying Bolin relief on his claims alleging error in relation to the state court's admission of prior bad act evidence. Accordingly, Claims Five and Six are denied.

In Claim Seventeen, Bolin alleges that his conviction and sentence are unconstitutional because the prior bad act jury instruction issued at his trial invited the jury to consider inadmissible character evidence. In addressing Bolin's challenge to the jury instruction on direct appeal, the Nevada Supreme Court concluded, based on *McMichael* and *Findley*, that the instruction "accurately instructed the jury on the law of this state." *Bolin*, 960 P.2d at 801.  Bolin argues that *Garceau v. Woodford*, 275 F.3d 769 (9th Cir. 2001), establishes the grounds for relief on this claim.

*Garceau*, however, is a pre-AEDPA case. *Alberni*, 458 F.3d at 864. The court in *Alberni* explained as follows:

> We held in *Earp* [*v. Ornoski*, 431 F.3d 1158, 1182 (9th Cir. 2005)] that "the advent of AEDPA forecloses the option of reversing a state court determination because it conflicts with circuit law." [*Earp*, 431 F.3d at 1185.]  We cannot conclude that the Nevada Supreme Court acted in an objectively unreasonable manner in concluding that the propensity evidence introduced against Mr. Alberni did not violate due process, given that *Estelle* expressly left this issue an "open question."

*Id.* at 866. Likewise, this Court cannot conclude that the Nevada Supreme Court acted in an objectively unreasonably manner in concluding that the prior bad act jury instruction did not violate Bolin's right to due process. Thus, Claim Seventeen must be denied.

**B.    Claim Eight**

In Claim Eight, Bolin claims that his conviction and sentence violate his constitutional rights because his counsel were ineffective in failing to adequately challenge the introduction of illegally obtained evidence. After interviewing Bolin on July 15, 1995, Detective Morgan, of the Las Vegas Metropolitan Police Department (LVMPD), sought a search warrant in hopes of finding the "clothing that Bolin was seen

wearing on the B & R Video surveillance tape, Ricks' wedding ring and her black backpack, the keys to her gray pickup truck, and Bolin's photograph and fingerprints." *Bolin*, 960 P.2d at 789. Morgan also "sought permission to administer a serology kit in order to obtain samples of Bolin's blood, saliva, and hair for forensic testing." *Id.* The search warrant was signed later that day by a district court judge. *Id.*

The warrant was executed the following day, however, "[w]hen drawing Bolin's blood for laboratory analysis, Det. Tremel mistakenly used a DUI kit instead of the proper serological kit." *Id.*

> Because of the mistake, Sgt. Hefner contacted the district attorney's office to determine the necessary procedural steps in order to seize a second set of serological samples from Bolin. A representative of the district attorney's office informed Sgt. Hefner that the search warrant that was issued on July 15, 1995 was still valid, and thus a second warrant was not needed to obtain a second serology kit from Bolin.

*Id.* at 791. Based on that information, "Det. Tremel obtained a second serology kit from Bolin on July 18, 1995." *Id.*

According to Bolin, trial and appellate counsel were ineffective in failing to challenge the sufficiency of the affidavit supporting the July 15 warrant on the ground that it contained material misrepresentations and in failing to argue that the second search conducted pursuant to the same warrant violated the Fourth Amendment. Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief — deficient performance by counsel and prejudice. 466 U.S. at 687. With respect to the performance prong, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688. A reviewing court "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685, 702 (2002) (quoting *Strickland*, 466 U.S. at 689).

13

1    With respect to the prejudice prong, the court "must ask if the defendant has met

2    the burden of showing that the decision reached would reasonably likely have been

3    different absent [counsel's] errors." *Strickland*, 466 U.S. at 696. Put another way, a

4    habeas petitioner "must show that there is a reasonable probability that, but for

5    counsel's unprofessional errors, the result of the proceeding would have been different."

6    *Id.* at 694.

7    The Court in *Strickland* emphasized that the ultimate focus of an ineffective

8    assistance of counsel inquiry must be on the fundamental fairness of the proceeding

9    whose result is being challenged. *Id.* If the defendant makes an insufficient showing as

10   to either one of the two *Strickland* components, the reviewing court need not address

11   the other component. *Id.* at 697.

12           . . . In particular, a court need not determine whether counsel's
             performance was deficient before examining the prejudice suffered by the
13           defendant as a result of the alleged deficiencies. The object of an
             ineffectiveness claim is not to grade counsel's performance. If it is easier
14           to dispose of an ineffectiveness claim on the ground of lack of sufficient
             prejudice, which we expect will often be so, that course should be
15           followed. . . .

16   *Id.*

17   On direct appeal, the Nevada Supreme Court addressed, at length, the validity of

18   the searches and seizures. *Bolin*, 960 P.2d at 797-98. The court first concluded that the

19   information contained in the affidavit for search warrant provided a substantial basis for

20   a finding of probable cause. *Id.* The court also concluded that the second search for

21   serology evidence was a constitutionally valid search:

22           In relevant part, NRS 179.075(1) provides that "[t]he warrant may
             be executed and returned only within 10 days after its date.". . .
23
24           Bolin argues that the State failed to properly obtain a search
             warrant for the recovery of the second serology kit from him on July 18,
25           1995. Further, because none of the exceptions necessary for a
             warrantless search applied, Bolin argues that the search was
26           unconstitutional and, consequently, any evidence derived therefrom must
             be suppressed. In support of his argument, Bolin relies on *Barlow v.
27           Ground*, 943 F.2d 1132, 1134 (9th Cir. 1991), wherein police withdrew two
             samples of the defendant's blood, the first sample without a search
28           warrant, but the second sample with a valid search warrant. The Ninth
             Circuit concluded that the police violated the Fourth Amendment by

14

drawing the first blood sample from the defendant without a search warrant. *Id.* at 1137.

In response, the State argues that the second serology kit obtained from Bolin on July 18, 1995, constituted a valid search because it occurred within the ten-day time period provided by NRS 179.075. In further support for its argument, the State relies on our conclusion in *Smithart v. State*, 86 Nev. 925, 478 P.2d 576 (1970). In *Smithart*, the defendant argued that a search warrant was defective because it was not executed immediately after its issuance. *Id.* at 929, 478 P.2d at 579. We held that the warrant was valid because it was served within the ten-day statutory time limit prescribed by NRS 179.075(1). *Id.*

In the instant case, we conclude that Bolin's argument is belied by the plain language of NRS 179.075(1). Further, Bolin's reliance on *Barlow* is misplaced. Unlike the situation in that case, where police obtained the first sample of the defendant's blood without a search warrant, here, the serological kit executed on Bolin on July 16, 1995, was supported by a valid search warrant that had been signed by the district court the previous day. Accordingly, based on a plain reading of NRS 179.075 and our holding in *Smithart*, we conclude that the acquisition of the second serology kit from Bolin on July 18, 1995, was constitutionally valid because it was obtained within the ten-day statutory time period prescribed by NRS 179.075(1).

*Id.*

In his state post-conviction proceeding, Bolin again challenged the validity of the initial search warrant and the second blood draw, this time including allegations that Detective Morgan made material misrepresentations in the affidavit he used to apply for the warrant. The Nevada Supreme Court ruled that the claim was governed by the law of the case and, on that basis, denied it without addressing the misrepresentation allegations. (Dkt. no. 170-6 at 19-20.)  Having considered those allegations, this court concludes that they are wholly without merit.

One misrepresentation, according to Bolin, was that "the affidavit gave the impression that Mr. Bolin had no recollection of his activities on the night of July 14, 1995, by stating that Mr. Bolin did not know the names of any of the people he was with and could not give any details of what the vehicle he was in looked like." (Dkt. no. 138 at 49.)  The affidavit did note, however, that Bolin had told Detective Morgan that he was with some acquaintances and that he had gone to a party.  (Dkt. no. 25 at 3.) At trial, Detective Morgan explained his statement in the affidavit about Bolin not knowing the names of the

acquaintances was based on the fact that Bolin could not provide last names that would enable him (Morgan) to verify Bolin's alibi. (Dkt. 154-3 at 118-19.) Likewise, Detective Morgan's testimony indicates that Bolin could only describe the car to Morgan as an older white two-door, but could not identify the make of the car or any other details. (*Id.*)

The only other misrepresentation alleged by Bolin is that the affidavit indicated that he "refused to come to the station and promised to cooperate in two days," when, in reality, he "told Detective Morgan that he had to attend a family picnic on July 15, 1995, but was willing to come to the station the following day." (Dkt. no. 138 at 49.) When viewed in the context of the entire affidavit, these alleged misrepresentations are relatively insignificant and by no means would have they provided adequate grounds for challenging, much less invalidating, the search warrant. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) (holding that, to obtain a hearing on the validity of a warrant, a defendant must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit, and that the allegedly false statement was necessary to the finding of probable cause).

Bolin also raised in his state post-conviction proceeding the ineffective assistance of counsel claim that he now presents as Claim Eight. The Nevada Supreme Court concluded that, because it had already ruled that the warrant and searches were not improper, Bolin could not show that counsel's performance prejudiced him. (Dkt. no. 170-6 at 20.) As noted in the excerpt from *Strickland*, above, the Nevada Supreme Court, having found a lack of sufficient prejudice, was not required to address whether counsel's performance was deficient. Bolin has not shown that the Nevada Supreme Court applied the prejudice standard incorrectly or made an objectively unreasonable decision.[4]

Claim Eight is denied.

///

_____

[4]Bolin does not specifically address Claim Eight at all in his reply/traverse to respondents' answer. (Dkt. no. 200.)

16

### C.    Claim Nine

In Claim Nine, Bolin alleges that his sentence and conviction violate his constitutional rights due to the admission of improper scientific and statistical evidence. Bolin challenges the reliability of evidence the State presented in relation to the comparison of a foreign hair obtained from a pubic combing of Ricks' body with pubic hairs taken from Bolin and in relation to DNA material recovered from the foreign hair. He claims that the prosecution distorted the significance of this forensic evidence. He also argues that his counsel was ineffective in cross-examining the State's experts and challenging the evidence.

The State's hair analysis evidence consisted of the testimony of LVMPD criminalist Terry Cook. Cook testified that, based on his analysis, the hair found in the pubic combing of the victim was obviously dissimilar from Ricks' hair and had "Negro characteristics." (Dkt. no. 156-1 at 96-97.) He concluded that the hair was "microscopically similar" to hairs taken from Bolin and that he could not exclude Bolin as the source of the hair. (*Id.* at 108.) He further testified that, because Bolin could not be excluded as the source, the hair was a "candidate for DNA analysis, and that would be another chance at exclusion." (*Id.* at 113.)

Bolin's criticisms of Cook's testimony are supplied by Dr. John Thornton, a director of a forensics laboratory who testified for the defense at Bolin's trial, and Dr. Norah Rudin, a criminalist who provided a report in support of Bolin's state post-conviction petition. Thornton and Rudin both impugned Cook's methodology and failure to document his findings. (Dkt. no. 161-2 at 18-21, dkt. no. 168-1 at 25-28.) They also noted that hair analysis is highly subjective and very limited in terms of being able to identify the source of a given hair or the race of the hair's donor. (Dkt. no. 160-5 at 33-53, dkt. no. 168-1 at 26.) Thornton testified that, when compared to hairs obtained from Bolin, the hair found in the pubic combing of Ricks was "not a particularly good match," but he also testified that he could not "eliminate the possibility that Mr. Bolin is the person that delivered up that hair." (Dkt. no. 161-2 at 33, 35.)

1          With respect to the DNA evidence, the State presented the testimony of Paula

2    Yates, a DNA analyst with Cellmark Diagnostics, and Jeffrey Hardcastle, a city planner

3    for the Clark County Department of Comprehensive Planning. In her testimony, Yates

4    explained that, while the Restriction Fragment Length Polyorphism (RFLP) testing

5    technique can yield an "absolute identification," the Polymerase Chain Reaction (PCR)

6    technique that Cellmark used to test the sample hair provided by Cook can "narrow it

7    down to a very small number of people as being possible contributors." (Dkt. no. 156-1

8    at 159-61.)

9          Yates further explained that DNA suitable for PCR testing is found on the root of

10   the hair, but not the shaft portion of the hair. (*Id.* at 179-80.) Her testing revealed DNA

11   on both the root and the shaft, which indicated that there was "something on the hair

12   such as skin, tissue, or blood, or something of that nature, any other kind of biological

13   tissue on the hair that was responsible for those results and not the shaft itself." (*Id.* at

14   180.) And, because the DNA profile from the root portion was the same as the DNA

15   profile from shaft, she "could not tell whether or not that DNA that I typed was actually

16   from the root itself or from what was on the hair." (*Id.* at 190.)  She noted, however, that

17   because the results were the same, the DNA from each portion was either from the

18   same person or two people with exactly the same DNA types, with the latter consisting

19   of "a very small percentage of the population." (*Id.* at 193-94.)

20         When Yates compared the DNA found on the hair to known samples from Ricks

21   and Bolin, she was able to definitively exclude Ricks as the source of the DNA found on

22   the hair, but not Bolin. (*Id.* at 204-07.) She also testified about how frequently the DNA

23   profile she found on the hair occurs in three recognized population groups —

24   Caucasians, African-Americans, and Hispanics. (*Id.* at 212-13.) According to Yates'

25   testimony, the profile found on the hair can be found in one in 5,800 Caucasians, one in

26   2,600 African-Americans, and one in 15,000 Hispanics. (*Id.*) Thus, as to whether Bolin

27   was the source of the DNA found on the hair, Yates testified that "the extent of [her]

28   opinion is that he cannot be excluded and that the likelihood that another person

possesses all these genetic traits is one in approximately 2,600 in the African-American populations." (Dkt. no. 157-1 at 92.)

Hardcastle testified about population studies he had conducted on Clark County, including projections as to population numbers for a given race. According to his testimony, he estimated the total population of Clark County in July of 1995 to be 1,040,688. (Dkt. no. 157-1 at 127.) Based on his estimate that 9.5 percent of the population was African-American, he arrived at 98,856 as the number of African-Americans in Clark County at that time. (Dkt. no. 157-2 at 18-19.) Finally, his testimony included an estimate of 21,111 as the number of African-American males between the ages of 20 and 44. (*Id.* at 49.)

At trial, Bolin presented the testimony of Lisa Calandro, a DNA expert, and Dr. Thomas Caroll, a professor of economics. Calandro testified that the DNA testing employed by the State could not be used to determine the race, gender, or age of the sample source. (Dkt. no. 160-4 at 30-31.) She also objected to arriving at an absolute number of individuals in a given population who could have contributed a particular DNA type and to applying frequency numbers based on data from all over the country to a particular geographic location. (*Id.* at 32-34.) She did agree, however, that DNA found on the root and shaft of the hair was consistent with Bolin's DNA type. (*Id.* at 34.) With respect to the frequency numbers for the three groups identified by Yates, Calandro testified that her numbers were one in 7,800 for Caucasians, one in 2,400 for African-Americans, and one in 17,000 for Hispanics. (*Id.* at 35-36.)

In his testimony, Carroll stated that Hardcastle's calculation as to the population percentage of African-Americans in Clark County was low and noted Hardcastle's failure to account for the significant number of tourists visiting Las Vegas on a daily basis. (Dkt. no. 160-3 at 70-72.) He testified that, by his estimation, Hardcastle was "off by about 12 percent" with respect to the number of African-Americans in Clark County in July of 1995. (*Id.* at 72.)

///

19

In addition, Bolin relies upon information provided by Rudin to challenge the State's evidence on DNA and statistical probability. In her report used by Bolin in his state post-conviction proceeding, she pointed out that "[b]ecause a [DNA] type was obtained from the shaft, it is not possible to determine from the results of Ms. Yates' analysis if the type obtained represents the donor of the hair or extraneous material adhering to the hair." (Dkt. no. 168-1 at 17.)  She opined that the possibility that "the observed DNA profile represents a foreign contaminant . . . cannot be formally dismissed." (*Id.* at 29.)

Rudin also criticized the State's closing argument wherein it used "DNA population frequencies . . . combined with census data from Clark County, Nevada to argue only 9 individuals existed who could be potential donors of the evidence." (*Id.*) She states in her report that such a conclusion is "fundamentally incorrect" and "fatally flawed" because it is "based on a string of assumptions about the race, age, gender and county of residence of the perpetrator" and "assumes, with no supporting data, that census data and DNA profiles are independent variables and may be multiplied together to produce a statistically valid result." (*Id.*) She also obtained frequency estimates, based on the FBI database, that differed from those found by Cellmark — most notably a frequency of one in 1,100 for African-Americans for the DNA profile found on the hair. (*Id.* at 32.)

As for his claim that he received ineffective assistance of counsel, Bolin alleges that defense counsel, David Phillips and Patricia Erickson, were not prepared to address the State's presentation of scientific evidence. More specifically, he contends that Phillips did not understand DNA evidence at all and that Erickson was dilatory in bringing herself up to speed, obtaining relevant evidence, and communicating with defense experts. With respect to the evidence she did challenge, Bolin claims that Erickson failed, at critical times "to articulate why the evidence should be excluded or rebut the prosecution's allegations about the strength of their case." (Dkt. no. 200 at 124.)

Bolin further alleges that Erickson failed to attack the quality of the State's DNA evidence by making use of the FBI population database and by identifying possible errors in the collection and handling of evidence that might have resulted in a contaminated sample. He also claims that she failed to effectively object to the State's misuse of the population probabilities.

As for presenting his claims to the state court, Bolin argued on direct appeal that the trial court's admission of Cook's testimony regarding the hair comparison analysis and the DNA statistical probability testimony violated his constitutional rights to due process and a fair trial. The Nevada Supreme Court ruled upon the claims as follows:

> *The district court did not err in allowing the admission of testimony regarding the examination of Bolin's hair and testimony regarding the statistical probability of DNA evidence.*
>
> 1. *The district court did not err in allowing testimony regarding the examination of Bolin's hair samples.*
>
> Bolin argues that Cook's testimony that Bolin's pubic hair was "microscopically similar" to the foreign pubic hair found in the pubic hair combings of Ricks was irrelevant and unreliable as scientific evidence. Bolin argues that Cook's conclusions were unreliable because the testing procedures Cook employed allegedly yielded a 30.4 percent error rate. Further, Bolin argues that Cook's findings were unreliable because he took no notes detailing his examination findings, which is contrary to the practice of other forensic experts who find note taking a necessary component to hair comparison analysis.
>
> The determination of whether to admit evidence is within the sound discretion of the district court, and that determination will not be disturbed unless manifestly wrong. *Petrocelli v. State*, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985). Further, "it is the jury's function, not that of the court, to assess the weight of the evidence and determine the credibility of witnesses." *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992).
>
> The reliability of hair comparison analysis was testified to by Cook and was even more firmly established by Bolin's own expert witness, who indicated that Bolin could not be eliminated as the source of the foreign pubic hair found in the pubic combings taken from Ricks' body. Based on the testimony of both witnesses, which established hair comparison analysis as a reliable exculpatory tool, we conclude that the district court's admission of such evidence was not manifestly wrong.
>
> 2. *The district court did not err in admitting DNA statistical probability evidence.*
>
> Bolin argues that the statistical probability calculations used to determine the significance of the DNA match were neither trustworthy nor

reliable and thus should not have been admitted at trial. Specifically, Bolin argues that the DNA analysis in the instant case was flawed because the calculations employed by the various experts did not take into account population subgroupings.

In support of his argument that DNA statistical probability calculations must include population subgroupings for accuracy, Bolin relies on *People v. Pizarro*, 10 Cal.App.4th 57, 12 Cal.Rptr.2d 436, 452 (1992), and *Commonwealth v. Lanigan*, 413 Mass. 154, 596 N.E.2d 311, 315-16 (1992), wherein both courts concluded that because of the possibility of significant genetic subgroupings within the larger heterogenous [sic] Caucasian, African-American, and Hispanic populations, DNA statistical probability calculations that did not account for such population substructure were flawed.

In *Armstead v. State*, 342 Md. 38, 673 A.2d 221 (1996), the Maryland Court of Appeals considered a similar challenge to the reliability of DNA statistical probability calculations. In *Armstead*, the court recognized the scientific debate that existed until 1992 concerning whether genetic substructures within the larger heterogenous [sic] populations could cause considerable DNA variations in those subpopulations. *Id.*, 673 A.2d at 237. However the court indicated that by 1993, based on the publication of several prominent empirical studies, such debate had effectively ended because studies confirmed that

> [e]stimates of the likelihood of occurrence of a DNA profile using each of the major population group data bases (e.g. Caucasian and Black) provide a greater range of frequencies than would estimates from subgroups of a major population category. *Comparisons across major population groups provide reasonable, reliable, and meaningful estimates of DNA profile frequencies without forensically significant consequences.*

*Id.* at 238 (quoting U.S. Dep't of Justice, VNTR Population Data: A Worldwide Study, 6 (1993) (emphasis added). Additionally, the court noted that:

> Subdivision, either by ethnic group or by U.S. geographic region, within a major population group does not substantially affect forensic estimates of the likelihood of occurrence of a DNA profile. . . . Estimated frequencies among regional groups and several subgroups of a major population category are similar. . . . The most appropriate approach, therefore, is to estimate the likelihood of occurrence of a particular DNA profile in each major group. . . . [B]ased on empirical data, *there is no demonstrable need for employing alternative approaches . . . to derive statistical estimates. . . . [F]requency data from major population groups provide valid estimates of DNA profile frequencies without significant consequences for forensic inferences.*

*Id.* at 238-39 (quoting B. Budowle et at., The Assessment of Frequency Estimates of Hae III-Generated VNTR Profiles in Various Reference Databases, 39 J.Forensic Sci. 319, 349 (1994)(emphasis added).

22

        In concluding that DNA statistical probability calculations did not
need to account for genetic substructuring within the larger heterogenous
[sic] populations, the Maryland Court of Appeals held:

        Since the majority of scientists now believe that the effects of
        population substructuring are relatively insignificant, it has
        become unnecessary to develop data for very small
        population subgroups.

Id. at 240.

        We note that the authority on which Bolin relies predates all of the
scientific studies cited by the Maryland Court of Appeals in Armstead.
While in 1992 there may have been scientific debate concerning the
effects of population substructures on DNA statistical probability analysis,
recent empirical studies have demonstrated that such population
substructuring does not affect the validity of DNA statistical probability
calculations based on one of the major population groups. See Armstead,
673 A.2d at 235-40. Accordingly, we reject Bolin's contention that the DNA
probability evidence in the instant case was flawed because the various
experts did not take into account population substructure.

        This court has repeatedly assessed the admissibility of scientific
evidence in terms of trustworthiness and reliability. Santillanes v. State,
104 Nev. 699, 704, 765 P.2d 1147, 1150 (1988). Because the
overwhelming weight of authority has established that DNA analysis
utilizing the PCR technique is reliable and trustworthy for use within the
forensic context, See United States v. Hicks, 103 F.3d 837, 844-47 (9th
Cir.1996), cert. denied, 520 U.S. 1193, 117 S.Ct. 1483, 137 L.Ed.2d 694
(1997); United States v. Beasley, 102 F.3d 1440, 1444–48 (8th -Cir.1996),
cert. denied, 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997);
State v. Lyons, 324 Or. 256, 924 P.2d 802, 804-14 (1996); People v.
Pope, 284 Ill.App.3d 695, 220 Ill.Dec. 309, 672 N.E.2d 1321, 1325-28
(1996); State v. Gentry, 125 Wash.2d 570, 888 P.2d 1105, 1117-18
(1995), we hold that DNA results obtained through the use of the PCR
technique are admissible for use within the forensic context. Further,
based on the weight of scientific authority, we hold that DNA statistical
probability calculations need not take into account genetic population
substructure to be valid and admissible. Accordingly, the district court did
not err in admitting DNA statistical probability evidence.

Bolin, 960 P.2d at 799-800 (footnote omitted).

        In his state post-conviction proceeding, Bolin again assailed the trial court's

admission of the scientific and statistical evidence and also raised claims that his

counsel were ineffective in challenging that evidence. The Nevada Supreme Court

addressed Bolin's claims as follows:

        Bolin claims the district court erred by denying his claim that the
        DNA evidence should have been excluded as inconclusive and therefore
        irrelevant; Bolin also claims that the State's evidence and argument about

the related statistical probabilities should have been excluded as a result. We concluded in Bolin's direct appeal that the DNA evidence and related statistics were proper. That ruling is now the law of the case. [fn.10:  *See Pellegrini*, 117 Nev. at 879, 34 P.3d at 532.] The doctrine of the law of the case cannot be avoided by a more detailed and precisely focused argument made after reflection upon the prior proceedings. [fn.11: *Hall*, 91 Nev. at 316, 535 P.2d at 799.] Accordingly, we conclude the district court did not err in denying this claim.

Bolin also argues that his counsel were ineffective for failing to challenge the DNA and statistical probability evidence by arguing that its inconclusiveness rendered it irrelevant. Bolin failed to establish that counsel's performance was deficient or prejudiced him. The State's expert witness testified that she found DNA evidence on the root and shaft of a foreign pubic hair recovered from the victim's body. She testified that a hair root would contain DNA, while the shaft would not, and thus, the DNA on the shaft must have been deposited there. She further testified that the DNA profiles she obtained from the root and the shaft were the same, but she could not determine whether the DNA on the shaft had been deposited there by the root, had come from somewhere else on the donor, or came from an entirely different donor with the same profile. She also testified that 1 in approximately 2,600 African-American males, including Bolin, would fit that profile. Her testimony that she could not draw a conclusion on how the DNA got on the shaft of the hair did not render the whole of the DNA evidence inconclusive or irrelevant. The jury was capable of assessing the proper weight to give this evidence. We note that trial counsel called its own DNA expert to testify as well. Thus, we conclude the district court did not err in denying this claim.

(Dkt. no. 170-6 at 16-17.)

If petitioner asserts that the admission of evidence by the state court violated his due process rights, he may be entitled to habeas relief only if the evidence rendered the trial "fundamentally unfair." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). The admission of inculpatory evidence violates due process only if there were no permissible inferences the jury could have drawn from the evidence, which was so inflammatory that it necessarily prevented a fair trial. *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998). The Supreme Court has made "very few rulings regarding the admission of evidence as a violation of due process," and it has never "made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant the issuance of the writ." *Holley*, 568 F.3d at 1101; *see Estelle*, 502 U.S. at 70 (holding that admission of relevant evidence generally does not amount to due process violation warranting habeas relief).

1       The Nevada Supreme Court was not objectively unreasonable in denying Bolin's

2   claims that the trial court's refusal to exclude the hair comparison evidence, the DNA

3   evidence, or the statistical probability evidence deprived him of due process.[5] As a

4   general matter, challenges to the particular methodology employed by an expert witness

5   go to the weight of the evidence, not its admissibility. *See, e.g., Hicks*, 103 F.3d at 846*;*

6   *United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994); *see also*, *United States*

7   *v. Jakobetz*, 955 F.2d 786, 800 (2nd Cir. 1992); *United States v. Bonds*, 12 F.3d 540,

8   563 (6th Cir.1993); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir.2008);

9   *Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1344-46 (11th

10   Cir.2003); *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193-94 (11th Cir. 2011).

11   Moreover, Bolin's allegations as to the unreliability of the evidence are, for the most

12   part, overstated.

13       With respect to the hair comparison analysis, respondents correctly point out that

14   the purpose of Cook's testimony was merely to establish that Bolin could not be

15   excluded as the source of the hair found in the pubic combing of Ricks and to provide a

16   foundation for why the hair was sent to Cellmark for DNA testing. The prosecution did

17   not argue or even suggest at trial that the presence of the hair, in and of itself,

18   established Bolin as the perpetrator. Cook and Thornton, the defense expert, provided

19   very similar testimony as to hair comparison being a poor method of identification, but a

20   viable method for excluding individuals as a possible source. (Dkt. no. 156-1 at 86-88,

21   dkt. no. 160-5 at 41-42, dkt. no. 161-2 at 23.) And, though he did not share Cook's

22   opinion as to the hair's similarity to the samples obtained from Bolin, Thornton agreed

23   that Bolin could not be excluded as the source of the hair.[6] (Dkt. no. 161-2 at 35.)

24   Finally, Bolin also suggests that the security videotape footage of him at B & R Video

---

25       [5]Here again, this Court rejects Bolin's argument that the Nevada Supreme Court

26   did not adjudicate these claims on the merits for the purposes of § 2254(d). *See Richter*, 131 S.Ct. at 784-85.

27       [6]In her report, Rudin disparages the findings of Cook and Thornton, but also

28   concedes that she is "not specifically an expert in hair comparison." (Dkt. no. 168-1 at 16.)

and the witness sighting of an African-American at the crime scene influenced Cook's conclusion about the hair's "Negro characteristics," but Thornton admitted on cross examination that one can "make some judgments concerning the racial background" of the source of the hair and that the hair in question had characteristics of a Black person. (*Id.* at 53.)

Bolin's allegations regarding the unreliability of the DNA evidence are similarly not supported by the record. He claims that the DNA testing conducted by the State was inconclusive and that the State failed to demonstrate that the DNA evidence had any relationship to the crime. He relies heavily on the fact that DNA was found on the shaft of the hair as well as the root, which indicated that a substance had been deposited on the hair. He points to a report generated by Cellmark wherein it states that "[s]ince the types obtained from the hair shaft were the same as those obtained from the hair root, no conclusion can be made regarding the donor of the hair." (Dkt. no. 24-3 at 23.)

The testimony of both the State's and the defense's DNA experts explained that the PCR testing employed by the State could not identify the source of a given DNA sample, but could only be used to eliminate possible contributors and to make frequency findings with respect to those who could not be eliminated. (Dkt. no.156-1 at 160-61, 212-13; dkt. no. 160-4 at 30-36.) In addition, the experts testified that PCR testing would not reveal the age, race, or gender of the source of a given sample. (Dkt. no. 157-1 at 22, dkt. no. 160-4 at 30-31.) Accordingly, the jury was well-informed as to the limitations of PCR testing. *See Hicks*, 103 F.3d at 846-47 (condoning the admission of PCR DNA testing). Likewise, the State's expert testified extensively about the presence of DNA on the shaft of the hair and the possibility that that DNA came from a source other than the donor of the hair. (Dkt. no. 156-1 at 180-82; dkt. no. 157-1 at 101-02, 109, 117-18.) The undisputed fact remains, however, that the DNA type found on

///

///

///

the hair root and the hair shaft was the same and that type was consistent with Bolin's DNA type and the DNA type of a very small ratio of African-Americans.[7]

With respect to the statistical probability evidence, Bolin argues that it was based on faulty population statistics, the incorrect database to determine frequency, and preconceived assumptions about the race, age, and gender of the source of the DNA. The admissibility of DNA-related probability estimates has been approved by the Ninth Circuit. *See Chischilly*, 30 F.3d at 1158. Bolin presented his own evidence as to population and the frequency of the DNA type found on the hair. Thus, he cannot claim that the presentation of this type of evidence rendered his trial fundamentally unfair. With regard to the "assumptions" about the race, age, and gender of the source of the DNA, the State presented evidence, independent of the DNA evidence, that the perpetrator was an African-American male between the age of 20 and 44. As such, the State laid a proper foundation for applying these parameters to the population data and DNA test results. In addition, because of the greater frequency of the given DNA type among African-Americans, the use of that racial category was, in one respect, favorable to Bolin. In his reply/traverse, Bolin misinterprets the frequency numbers provided by the various experts in this case to argue that the DNA type found on the hair was *more common* in Caucasians and Hispanics, than in African-Americans. (Dkt. no. 200 at 59, 99, 109, 117-18.)  Even Rudin confirmed that "the most common occurrence of the profile is found in the African-American population." (Dkt. no. 168-1 at 32.) And, while the total number Caucasians and Hispanics in Clark County presumably exceeded the total number of African-Americans at the relevant time, that does not appear to be the point Bolin is arguing.[8]

---

[7]As noted above, the various estimates provided by the DNA experts in the record before the Court are one in 1,100 (Rudin), one in 2,400 (Calandro), and one in 2,600 (Yates).

[8]In his reply/traverse, Bolin misinterprets the frequency numbers provided by the various experts in this case to argue that the DNA type found on the hair was *more common* in Caucasians and Hispanics, than in African-Americans. (Dkt. no. 200 at 59, 99, 109, 117-18.)  Even Rudin confirmed that "the most common occurrence of the *(fn. cont…)*

1   Absent clearly established federal law recognizing that admission of irrelevant or

2   prejudicial evidence violates due process, the Nevada Supreme Court's denial of Bolin's

3   due process claims could not have been unreasonable under AEDPA. *See Wright v.*

4   *Van Patten*, 552 U.S. 120, 125-26 (2008) (holding that state court could not have

5   unreasonably applied federal law if no clear Supreme Court precedent existed); *Holley*,

6   568 F.3d at 1101. On that basis, this Court is not permitted to grant relief. However,

7   even if this Court were to consider Bolin's due process claims *de novo*, it would deny

8   them because, for the reasons set forth above, he has not shown that the evidence at

9   issue was so irrelevant or unreliable that it rendered his trial fundamentally unfair.

10   Bolin's allegations of ineffective assistance of counsel are also not grounds for

11   habeas relief in this case. Counsel challenged the admissibility of Cook's testimony

12   regarding the hair comparison analysis by filing a pretrial motion in limine and vigorously

13   litigating the issue at a hearing held on the motion. As recounted above, they enlisted

14   experts to confront the various aspects of the State's scientific and statistical evidence.

15   A review of the trial court record indicates that counsel had a firm grasp of the relevant

16   issues and effectively cross-examined the State's experts. Counsel also objected to

17   Hardcastle's statistical probability testimony and, to some extent, was successful in

18   limiting the scope of that testimony.

19   The Nevada Supreme Court correctly identified *Strickland* as the controlling

20   federal authority and its decision to deny relief was not objectively unreasonable. The

21   additional allegations Bolin raises in this proceeding fall well short of demonstrating that

22   his counsel were ineffective. As respondents point out, defense counsel conducted

23   extensive pretrial discovery in relation to the forensic evidence. Bolin has not shown that

24   earlier preparation would have appreciably enhanced counsel's performance. For

26   *(…fn. cont.)*
profile is found in the African-American population." (Dkt. no. 168-1 at 32.) And, while

27   the total number Caucasians and Hispanics in Clark County presumably exceeded the
total number of African-Americans at the relevant time, that does not appear to be the

28   point Bolin is arguing.

1   example, Bolin alleges that Erickson's delay in coordinating with Thornton regarding the

2   hair evidence rendered her unprepared to challenge the admissibility of Cook's

3   testimony. Yet, he does not specify how additional preparation with Thornton would

4   have produced grounds (i.e., beyond those argued by Erickson) for the trial court to rule

5   Cook's testimony inadmissible.

6         Likewise, the State's DNA expert, Yates, conceded on both direct and cross

7   examination the possibility that the DNA found on the hair came from an external

8   source. As noted above, that possibility did not render the DNA evidence inconclusive

9   or irrelevant. Bolin faults counsel for not identifying "potential sources of error in

10  evidence collection and handling" that might have resulted in a contaminated sample,

11  but does not provide any further details or make a showing that any such error actually

12  occurred in this case.[9] (Dkt. no. 200 at 124.) Beyond that, Bolin does not specify what

13  additional evidence or argument counsel failed to present on this issue.

14        And, as noted, Bolin's counsel did object to the admissibility of Hardcastle's

15  statistical probability testimony. The court held hearings outside the presence of the

16  jury, during which counsel challenged the relevance and reliability of Hardcastle's

17  conclusions. (Dkt. no. 157-2 at 6-16, 27-48.)

18        In his reply/traverse, Bolin argues that counsel exacerbated the harm of the

19  statistical probability evidence by presenting testimony similar to that presented by the

20  State. On this issue, he points to a proffered exhibit consisting of correspondence

21  between Erickson and Thornton, wherein Thornton questioned Hardcastle's proposed

22  testimony. (Dkt. no. 202-1.)  In that correspondence, Thornton indicated that, based in

23  part on his consultation with Dr. Calandro, the proposed testimony was suspect

24  because it assumed that the hair from which the DNA was taken was that of a Black

25  person and because it arrived at a firm number of people in the Las Vegas area who

26  _____

27        [9]Rudin's report only makes a general assertion that "collection procedures at that
      time were not optimized to minimize human contamination" and that the possibility that
28    "the DNA profile represents a foreign contaminant . . . cannot formally be dismissed."
      (Dkt. no. 168-1 at 29.)

could have been the source of the DNA type. (*Id.* at 7.) As to the first point, an eyewitness, Keith Sirevaag, testified at trial that, upon arriving at an otherwise vacant construction site at 5:30 a.m., he observed an African-American male walking away from the partially-constructed home where Ricks' body was found.[10] (Dkt. no. 153-2 at 24, 33-34.) Additional evidence established the presence of semen in Ricks' vagina and excluded Ricks' husband as the source of the DNA found on the hair.[11] (Dkt. no. 156-1 at 74-75, 207-08.) And as noted above, Thornton, himself, testified that the hair had characteristics consistent with a Black person.

As to calculating the number of people in a given geographic area who possess a certain DNA type, Thornton's communication with Erickson included the following summarization of his viewpoint: "Neither Lisa Calandro nor I have a quarrel with the introduction of population statistics to show how common or how rare a certain complexion of DNA types might be, but reputable forensic scientists oppose the use of numbers to show guilt." (Dkt. no. 202-1 at 7.) Here, however, contrary to Thornton's concern, no witness testified that the number of individuals in the Las Vegas area possessing the relevant DNA type could be accurately determined based on the data available in this case.[12] Likewise, none of the experts testified that the frequency rate of the given DNA type among African-Americans reflected the odds that the DNA did not come from Bolin. *See Chischilly*, 30 F.3d at 1157 (discussing the prosecutor's fallacy with respect to DNA matching statistics).

///

---

[10]While Bolin challenges Sirevaag's testimony that Bolin was the man he observed, this aspect of Sirevaag's testimony is beyond dispute.

[11]Ricks' husband testified that, because Ricks had been menstruating, they had not had sexual intercourse for eight days prior to her death. The State also presented testimony from several witnesses indicating that it was highly unlikely that Ricks was involved in an extra-marital affair.

[12]According to Thornton's letter to Erickson (dated April 26, 1996), Thornton had apparently been informed that Hardcastle's proposed testimony included an estimate that 45 people in Las Vegas could have possessed the DNA type found on the hair. (Dkt. no. 202-1 at 7.) However, Hardcastle's testimony at trial did not include any such estimate.

1    The prosecutor suggested in closing argument that, based on the population and

2   probability statistics provided by the experts at trial, 10 or 11 individuals in the local area

3   would fit the relevant DNA type. This argument was borderline improper in that it was

4   based on the illogical leap that the number of matching profiles could be neatly

5   calculated by dividing the chance of a random match among African-Americans into the

6   estimated number of people in a given population group (in this case, African-American

7   males in Las Vegas in July of 1995 between the ages of 20 and 44). Even so, the

8   prosecutor's statements were argument, not evidence, and the jury was instructed to

9   distinguish between the two. In addition, "[b]ecause many lawyers refrain from objecting

10   during opening statement and closing argument, absent egregious misstatements, the

11   failure to object during closing argument and opening statement is within the 'wide

12   range' of permissible professional legal conduct." *U.S. v. Necoechea*, 986 F.2d 1273,

13   1281 (9th Cir.1993) (citing *Strickland*, 466 U.S. at 689).

14    In summary, the scientific and statistical evidence admitted at trial did not result

15   in a violation of Bolin's constitutional rights and his counsel did not perform below

16   constitutional standards in challenging that evidence. Bolin is not entitled to habeas

17   relief in relation to Claim Nine.

18    **D.    Claim Ten**

19    In Claim Ten, Bolin alleges that his constitutional rights were violated due to the

20   trial court's admission of an unreliable eyewitness identification of him as the person

21   seen leaving the crime scene. As noted above, Keith Sirevaag testified at trial about his

22   observations upon arriving at the construction site where Ricks' body was found.

23   Sirevaag's testimony included an affirmative identification of Bolin as the person he saw

24   walking away from the partially-constructed home where he found Ricks, bound and

25   gagged, a short time later. (Dkt. no. 153-2 at 37-38.) In addition to alleging a violation of

26   his right to due process, Bolin claims that his counsel were ineffective in failing to

27   challenge Sirevaag's testimony.

28   ///

1    In the hours following Sirevaag's discovery of Ricks' body, Detective Morgan

2    conducted a taped interview with Sirveaag in which Sirevaag reported seeing a Black

3    male walking by him at an angle as he (Sirevaag) was seated in his truck. (Dkt. no. 200

4    at 129-30.) In that interview, Sirevaag described the man as very clean cut ("short hair"

5    and "clean shaven") and very muscular ("built like a body builder"). (Dkt. no. 154-2 at

6    33.) He also noted that the man was wearing tan shorts and a dark tank top and that he

7    had a tattoo on his right arm. (*Id.* at 34.) He estimated the man's age as 20 to 30 years

8    old, his height as six feet, and his weight as 230 pounds. (Dkt. no. 200 at 130-31.) The

9    next day, the Las Vegas police conducted the identification procedure that lies at the

10   heart of Claim Ten.

11   The Nevada Supreme Court recounted that procedure as follows:

12        At the conclusion of their search, Dets. Morgan and Tremel
          escorted Bolin to the Clark County Detention Center (detention center) to
13        take his photographs and fingerprints and administer a serology kit. . . .
          Additionally, Det. Morgan arranged to have Sirvaag[13] conduct a walk-
14        through identification session at the detention center during the time that
          Bolin would be present.

15        While Dets. Morgan and Tremel were executing the search warrant
16        at Bolin's residence, Sirvaag arrived at the detention center to prepare for
          his walk-through identification session. Sgt. Hefner conducted an interview
17        with Sirvaag and informed him that some of the inmates had been dressed
          in police uniforms and some undercover police officers had been placed in
18        the holding cells in order to test Sirvaag's memory. Additionally, Sirvaag
          drew two pictures of the tattoo he saw on the right arm of the man at the
19        construction site.

20        After conducting the interview, Sgt. Hefner escorted Sirvaag
          through the detention center. During the identification procedure, Sirvaag
21        observed six holding cells containing approximately seventy inmates of
          various races in each cell. Additionally, Sirvaag observed numerous
22        people in the detention center's booking area. After approximately fifteen
          minutes, Sirvaag proceeded to the detention center's main entrance area
23        where Bolin, who was dressed in casual attire, had just entered. Because
          Sirvaag knew that Dets. Morgan and Tremel were conducting the
24        investigation into Ricks' death, they entered the detention center
          separately from Bolin to ensure that Sirvaag would not be improperly
25        influenced in his attempts to identify a suspect.

26   ───────────────

27        [13]Inasmuch as it conflicts with spelling the court reporter recorded when Sirevaag
     was sworn as a witness at trial (as well as the spelling indicated throughout the state
28   court record), the spelling of Sirevaag's name in the Nevada Supreme Court's opinion
     on direct appeal appears to be incorrect.

> After observing Bolin for several minutes, Sirvaag informed Sgt. Hefner that due to Bolin's clean-shaven facial appearance, his neatly trimmed hairstyle, and his rather large muscular build, Bolin resembled the man that he saw at the construction site. Dets. Morgan and Tremel then took Bolin approximately twenty feet down an adjacent hallway for photographing and fingerprinting. As Bolin was being photographed, Sirvaag observed him with his shirt off, at a distance of approximately twenty feet, for about five to ten minutes. Because of the presence of a tattoo on Bolin's upper right arm near his bicep, Sirvaag became more convinced that Bolin was the man that he had seen at the construction site.

> Although he identified many similarities between Bolin and the man he saw at the construction site, Sirvaag told Sgt. Hefner that he was not completely certain that Bolin was the same man. After completing the walk-through identification session, Sirvaag departed the detention center at approximately 12:30 p.m. However, approximately one hour after his departure, Sirvaag telephoned Sgt. Hefner and stated that he was ninety percent sure that the man he saw at the detention center was the same person he saw leaving the crime scene.

*Bolin*, 960 P.2d at 789-90 (footnote added).

At Bolin's preliminary hearing on September 13, 1995, Sirevaag testified that he was about twenty feet away from the person he observed at the construction site, who he described as a Black male, "around six foot, very clean cut, short hair, clean shaven" and weighing approximately 220-230 pounds. (Dkt. no. 145-6 at 151.) He further testified that the person was very muscular, was wearing a pair of tan shorts and a tank top that was darker, and had a tattoo on his upper right arm. (*Id.* at 151-53.) In addition, he identified Bolin, who was sitting at the defense table in a blue jumpsuit, as the person he saw at the construction site. (*Id.* at 152.)

Pursuant to a defense motion seeking to have Sirevaag's testimony suppressed, the court conducted a hearing on May 29, 1996. In his testimony at that hearing, Sirevaag's description of the person he saw did not differ appreciably from the description he provided at the preliminary hearing. (Dkt. no. 226 at 26-27.) However, Sirevaag also admitted that he had read the preliminary hearing transcript prior to testifying at the suppression hearing. (*Id.* at 63-64.)

At trial, Sirevaag, Detective Morgan, Detective Tremel, and Sergeant Hefner testified about various aspects of Sirevaag's description of the person he saw at the

construction site and Sirevaag's walk-through at the detention center that resulted in his identification of Bolin. In his testimony, Sirevaag expressed certainty that Bolin was the person he saw walking away from the partially-constructed home where Ricks was found. The defense presented the testimony of Dr. Robert Schomer, a forensic psychologist specializing in eyewitness identification. Schomer testified at length about factors that may influence the accuracy of an eyewitness's recollection of what he or she observed.

Bolin argued on direct appeal that the trial court's admission of testimony regarding Sirevaag's "one-on-one" identification of Bolin at the detention center violated his constitutional rights to due process and a fair trial. The Nevada Supreme Court ruled upon the claims as follows:

> *The district court did not err in allowing the admission of the one-on-one identification made by Sirvaag.*
>
> Bolin argues that the one-on-one identification made by Sirvaag at the detention center was unnecessarily suggestive and unreliable. Specifically, Bolin argues that Sirvaag's identification was unnecessarily suggestive because Bolin was the only muscular African-American male asked to remove his shirt during the identification procedure and because Sirvaag saw Bolin communicating with Dets. Morgan and Tremel, whom Sirvaag knew were conducting the Rick's [sic] murder investigation. Additionally, Bolin argues that the State had an obligation to employ a less suggestive identification procedure, such as a photo or a physical line-up. Bolin further asserts that Sirvaag was an unreliable witness, as evidenced by Sirvaag's inability during trial to provide the jury with descriptions of Dets. Morgan and Tremel even though he had met with both detectives on numerous occasions.
>
> The applicable test is whether, in light of the totality of the circumstances, the identification was so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendant was denied due process of law. *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). In *Bias v. State*, 105 Nev. 869, 871, 784 P.2d 963, 964 (1989), we explained that the test enunciated by the Court in *Stovall* involved a two-fold inquiry: "(1) whether the procedure is unnecessarily suggestive and (2) if so, whether, under all the circumstances, the identification is reliable despite an unnecessarily suggestive identification procedure."
>
> We conclude that the identification procedure employed by the LVMPD at the detention center was not unnecessarily suggestive. On the day of the identification procedure at the detention center, Bolin was escorted into the facility wearing normal, casual attire, accompanied by a uniformed officer whom Sirvaag had never met. While Sirvaag had

1   observed well over one hundred individuals of various races in the
2   detention center up to that point, Sirvaag indicated to Sgt. Hefner that
    Bolin bore a resemblance to the man he saw at the crime scene. Further,
3   Sirvaag made his identification of Bolin without any prompting.

4          Although Sirvaag observed Dets. Morgan and Tremel question and
    photograph Bolin, this activity took place only after Sirvaag identified Bolin
5   to Sgt. Hefner. Furthermore, Sirvaag provided a clear description of the
    man that he saw exit the framed house at the crime scene and that
6   description was nearly identical to Bolin's appearance as depicted on the
    B & R Video surveillance tape. Sirvaag's inability to provide the jury with
7   descriptions of Dets. Morgan and Tremel, in light of the fact that Sirvaag
    was confronted by numerous detectives in a short amount of time after he
8   became a witness to this crime, is not dispositive. Based on the foregoing,
    we conclude that the district court did not err in admitting evidence
9   pertaining to Sirvaag's detention center identification of Bolin.

10  *Bolin*, 960 P.2d at 796-97.

11         In his state post-conviction proceeding, Bolin again challenged the trial court's

12  admission of testimony relating to the State's identification procedure and Sirevaag's

13  identification of Bolin. Bolin also raised a claim that his counsel were ineffective in

14  challenging that testimony. The Nevada Supreme Court addressed Bolin's claims as

15  follows:

16         Bolin contends that the district court erred in denying his claim that
    a witness identified him after an unduly suggestive show-up procedure
17  and that the show-up tainted the witness's subsequent in-court
    identification of Bolin; thus, Bolin argues, both identifications should have
18  been excluded at trial. In Bolin's direct appeal, we concluded that the
    show-up procedure was not improper. This ruling is now law of the case
19  and will not be revisited. [fn.16:  *See Pellegrini*, 117 Nev. at 879, 34 P.3d
    at 532.]  Bolin also argues that the district court erred in denying his claim
20  that this court misapprehended the facts relating to this claim in his direct
    appeal. This claim was not properly brought in a postconviction petition for
21  writ of habeas corpus. We note that after this court decided his direct
    appeal, Bolin unsuccessfully sought rehearing. [fn.17:  *Bolin v. State*,
22  Docket No. 29497 (Order Denying Rehearing, August 27, 1998).]  Bolin
    also argues his counsel were ineffective for failing to challenge the
23  identifications. As we have already ruled that the show-up procedure was
    not improper, Bolin failed to demonstrate that counsel's performance
24  prejudiced him. Bolin further argues that trial counsel were ineffective for
    failing to object to testimony by the witness at the crime scene that he
25  recognized his face, even though the witness had also testified that he did
    not see Bolin's face. We conclude counsel was not ineffective. Our review
26  of the record indicates that the witness testified that at the crime scene he
    saw Bolin's face in profile but not straight-on. The State questioned the
27  witness about these facts, and the jury was capable of assessing the
    witness's credibility and weighing his identification of Bolin. Thus, the
28  district court did not err in denying these claims.

35

1   (Dkt. no. 170-6 at 18-19.)

2           Bolin argues that the Nevada Supreme Court's adjudication of his claims is not

3   entitled to deference because it is based on an unreasonable determination of the facts.

4   Specifically, he contends that the Nevada Supreme Court erroneously determined that

5   Sirevaag identified Bolin prior to seeing Detectives Morgan and Tremel question and

6   photograph him, when, in actuality, Sirevaag was uncertain of the identification at that

7   point, and only made his positive identification after leaving the detention center. In

8   addition, he challenges the Nevada Supreme Court's determination that Sirevaag's

9   description of the man that he saw at the construction site was "nearly identical" to

10  Bolin's appearance on the B & R Video surveillance tape. In this regard, Bolin alleges

11  that the video did not support Sirevaag's estimate of Bolin's age and height (which were

12  inaccurate), Sirevaag's description of the tattoo (also inaccurate), or Sirevaag's

13  description of Bolin's skin complexion.

14          Bolin further argues that, in reviewing the issue *de novo*, this Court must

15  conclude the identification procedure was so suggestive and unreliable that it

16  constitutes a due process violation under *Stovall* and its progeny, most notably *Neil v.*

17  *Biggers*, 409 U.S. 188 (1972). To support this argument, he relies heavily on a report

18  prepared for the purposes of this federal proceeding by Roy S. Malpass, Ph.D. (Dkt. no.

19  24-4.)  Dr. Malpass is a purported expert on cognition science, with an emphasis on

20  eyewitness testimony. The report identifies the following problems with Sirevaag's

21  identification in this case: (1) the limited viewing conditions under which Sirevaag

22  observed the person at the construction site; (2) the fact that it was a cross-racial

23  identification; (3) Sergeant Hefner's pre-identification instructions to Sirevaag, which put

24  pressure on him to identify the offender; (4) aspects of the procedure that called special

25  attention to the suspect (such as allowing Sirevaag to observe the suspect's "unique

26  features" and failing to include "lineup fillers" with features similar to the suspect); and

27  (5) repeated exposure to the suspect at court hearings prior to the identification at trial.

28  *(Id.)*

1    This Court does not agree that the Nevada Supreme Court made findings of facts

2    that were "objectively unreasonable" in denying Bolin's claim. Bolin is correct that

3    Sirevaag's more definitive identification of Bolin came only after he had left the

4    detention center, however, prior to seeing Bolin with Detectives Morgan and Tremel,

5    Sirevaag had picked Bolin out as the person who resembled the man he saw at the

6    construction site.

7    Likewise, evidence presented in the state proceeding supports the Nevada

8    Supreme Court's finding that Sirevaag's description of the man that he saw at the

9    construction site was "nearly identical" to Bolin's appearance on the video store

10   surveillance tape. Bolin, as seen on the surveillance tape, had the same clothing,

11   muscular build, and hair style that Sirevaag described in his initial statements to the

12   police. (Dkt. no. 217-1.) Also, photographs of Bolin taken by the police a couple of days

13   after the murder show that he had a very youthful appearance relative to his actual age,

14   so Sirevaag's inaccurate estimate of Bolin's age does weigh significantly against the

15   state court's finding. (*Id.*) Similarly, the poor quality and abstract design of Bolin's tattoo

16   likely contributed to Sirevaag's inability to accurately describe it. (*Id.*) Accordingly, the

17   state court decision was not based on an unreasonable determination of the facts for

18   the purposes of § 2254(d)(2).

19   Even if this Court were to consider the claim *de novo*, it would not grant relief. A

20   suggestive identification procedure does not, in itself, establish constitutional error.

21   Instead, the court must determine whether there was a "'very substantial likelihood of

22   irreparable misidentification.'" *Biggers*, 409 U.S. at 198 (quoting *Simmons v. United

23   States*, 390 U.S. 377, 384 (1968)). Where a witness identification is tainted by

24   suggestive procedures, the court must consider the reliability of the identification in light

25   of the totality of the circumstances. *Biggers*, 409 U.S. at 199. The factors to be

26   considered in evaluating the likelihood of misidentification are: (1) the opportunity of the

27   witness to view the criminal at the time of the crime, (2) the witness's degree of

28   attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level

1    of certainty demonstrated by the witness at the confrontation, and (5) the length of time

2    between the crime and the confrontation. *Id.* at 199-200.

3        The *Biggers* factors are designed to determine whether a suggestive

4    identification may nonetheless be admissible under constitutional standards. *Id.*,

5    *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977).  Thus, the factors are to be weighed

6    against the corrupting effect of the suggestive identification. *Brathwaite*, 432 U.S. at

7    114.

8        Here, the *Biggers* factors weigh in favor of finding the identification

9    constitutionally admissible. Sirevaag observed the person at the construction site from a

10   distance of approximately twenty feet. He testified that, at the time, the sun had yet to

11   rise, but that "it was light outside" and he had no difficulty seeing the man. (Dkt. no. 153-

12   22 at 27.)  Given his testimony that "it was odd . . . to have someone walking through

13   the job site that early in the morning" and that the man's clothing made him "look out of

14   place on the job site" (*id.* at 34, 36), Sirevaag presumably paid more than passing

15   attention to the man. And, as noted above, Sirevaag's pre-identification description of

16   Bolin was accurate in several respects.

17       In light of the fact that the identification took place the day following Sirevaag's

18   observation of the suspect at the crime scene, the only *Biggers* factor that weighs in

19   Bolin's favor is the uncertainty that Sirevaag initially expressed to the police at the

20   detention center. However, later that same day and well before seeing Bolin as a

21   defendant in court, Sirevaag notified Sergeant Hefner that he was significantly more

22   confident about his identification.

23       This Court accepts that Malpass identified factors that may have added

24   suggestiveness to Sirevaag's identification of Bolin. In addition, the court agrees that

25   allowing Sirevaag to see Detectives Morgan and Tremel question and photograph Bolin

26   tainted, to some extent, his subsequent (more definitive) identification.  Even so, the

27   totality of the circumstances does not support a conclusion that the identification

28   violated Bolin's right to due process. *See Brathwaite*, 432 U.S. at 116 ("Surely, we

cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.'"").

In addition, whether a defendant's due process rights were violated by the admission of identification testimony based upon a suggestive pretrial identification procedure is subject to harmless error analysis. *United States v. Jarrad*, 754 F.2d 1451, 1458 (9th Cir. 1984). In this context, the harmless error analysis asks whether the error "had a substantial and injurious effect or influence on the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Overwhelming evidence aside from Sirevaag's identification supported the jury's finding of Bolin's guilt. That evidence established the following facts. Bolin lived a short walk from B & R Video and had frequented the store often in the two weeks prior to the murder, asking out or expressing interest in Ricks and her two sisters, who also worked in the store. (Dkt. no. 152-3 at 51-62, dkt. no. 155-3 at 14-15, dkt. no. 159-1 at 21.)  The testimony of one of the sisters, together with the surveillance video, establishes that Bolin came into the store at 9:50 p.m. on the night of July 15, 1995, wearing light colored shorts and a dark tank top, and that he left the store approximately ten minutes later heading toward an adjacent Albertson's grocery store. (Dkt. no. 152-3 at 67-71, dkt. no. 152-4 at 10-11.) A co-worker at the video store who closed the store with Ricks that night watched Ricks leave in her pickup truck and drive past the Albertson's shortly after midnight. (Dkt. no. 153-1 at 80-85.)

Sirevaag's initial statement to Detective Morgan was that, between 5:30 and 6:00 a.m. in an otherwise vacant construction site, he saw a very muscular, clean cut, African-American male in tan shorts and a dark tank top, with a tattoo on his right arm, walking away from the partially-constructed home where, minutes later, Sirevaag found Ricks.[14] Sirevaag noticed a pickup truck at the scene that matched the description of the truck Ricks was driving the night before. (Dkt. no. 152-4 at 42, dkt. no. 153-2 at 28-29.)

---

[14]The aforementioned photographs of Bolin corroborate that, at the time, he was clean cut, had a tattoo on his right arm, and possessed a very muscular build. (Dkt. no. 217-1 at 16-23.)

He observed the truck speeding away moments after seeing the man matching Bolin's description walk past him toward where the truck had been parked. (Dkt. no. 153-2 at 38.)

The following day, Ricks' truck, containing a screwdriver smeared with blood matching her type, was found parked 4 to 5 blocks from where Bolin was living, but approximately five miles from the crime scene. (Dkt. no. 154-2 at 101; dkt. no. 155-1 at 33; dkt. no. 156-1 at 118-19; dkt. no. 156-3 at 114-17, 120-21.) Bolin's father, with whom Bolin was living at the time, testified that Bolin came home near daybreak on June 16, 1995.[15] (Dkt. no. 159-4 at 61.) When questioned by the police, Bolin provided a vague and unsubstantiated account of his whereabouts on the night of the murder, told them that he was wearing a white t-shirt that night, and denied owning a dark tank top prior to the police finding one in his dryer. (Dkt. no. 154-2 at 65-66, 88-89; dkt. no. 154-3 at 18-19; dkt. no. 156-3 at 70; dkt. no. 158-1 at 38-40, 51-52.) In addition to the DNA evidence discussed above, shoe prints closely matching Bolin's shoe size were found leading into the unfinished house where Ricks' body was found. (Dkt. no. 156-3 at 101-07, dkt. no. 157-4 at 12-20.) An inmate who shared a cell with Bolin testified that Bolin had questioned him at length about fingerprints, with a particular focus on obtaining prints from the surfaces typically found in the interior of a truck and the handle of a screwdriver. (Dkt. no. 157-2 at 87-95.) In light of the foregoing, any error in admitting evidence of Sirevaag's identification of Bolin was clearly harmless.

For the same reason, Bolin cannot meet the *Strickland* prejudice prong in relation to his ineffective assistance of counsel claim. *See Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995) (noting that the *Strickland* prejudice standard is more difficult for a defendant to meet than the "substantial and injurious effect or influence" prejudice standard for ///

---

[15]Bolin's father testified that Bolin arrived between 4:45 and 5:00 a.m., which placed Bolin at home before the time Sirevaag arrived at the construction site. Even so, the testimony corroborated that Bolin had been out all night. In addition, Bolin admitted to the police that he had come home at dawn. (Dkt. no. 158-1, p. 40.)

1    harmless error review).  Moreover, counsel filed, prior to trial, two motions and a petition

2    for writ of habeas corpus in which they sought to exclude Sirevaag's identification.

3          Claim Ten is denied.

4          **E.    Claim Eleven**

5          In Claim Eleven, Bolin alleges that his conviction and sentence violate his

6    constitutional rights because the State failed to document evidence it had gathered,

7    failed to protect crucial evidence from being destroyed, and failed to properly impound

8    and store evidence which caused loss of evidentiary value. The evidence at issue is the

9    hairs obtained from the pubic combing of Ricks' body. Bolin contends that Cook failed to

10   adequately document the characteristics of the darker hair prior to sending it in for DNA

11   testing, which subsequently altered the hair in a way that prevented the defense from

12   conducting a meaningful independent analysis of the hair's characteristics. He further

13   alleges that the lighter hair that Cook concluded to have come from the victim was

14   never provided to the defense for analysis. In addition, he claims that two additional

15   hairs from the combing were withheld by the State. He also asserts that his counsel

16   were ineffective for failing to investigate these claims and properly raise them in the trial

17   court.

18         Under *California v. Trombetta*, 467 U.S. 479 (1984), the State has a

19   constitutional duty to preserve evidence, but the duty is limited to evidence whose

20   exculpatory value was apparent before its destruction, and is of such nature that the

21   defendant cannot obtain comparable evidence from other reasonably available means.

22   *Trombetta*, 467 U.S. at 489. "The mere failure to preserve evidence which could have

23   been subjected to tests which might have exonerated the defendant does not constitute

24   a due process violation." *U.S. v. Hernandez*, 109 F.3d 1450, 1455 (9th Cir. 1997) (citing

25   *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).  Destruction of potentially exculpatory

26   evidence does not violate the Constitution unless the evidence was destroyed in bad

27   faith. *Youngblood*. 488 U.S. at 58.

28   ///

Here, the record establishes that the darker hair was only partially consumed by the DNA testing and that the defense expert, Thornton, was able analyze it, albeit not as comprehensively as the defense may have preferred. As to the lighter hair, the Nevada Supreme Court, in its decision on Bolin's state post-conviction petition, noted that "the State disclosed the existence of the lighter hair though it did not preserve it." (Dkt. no. 170-6 at 18.)   Notwithstanding this finding, this Court is unable to discern from the record what actually occurred to the lighter hair beyond the fact that Cook had mounted both the darker hair and the lighter hair on slides.[16] In any case, any claim that the hair evidence had any exculpatory value is based on speculation, a fact Bolin appears to concede by referring to the evidence throughout Claim Eleven as "possibly exculpatory" or "potentially exculpatory."[17] Thus, in the absence of any specific allegation or evidence that the State acted in bad faith in allegedly failing to preserve the hair evidence, Bolin fails to establish a constitutional violation. *See Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (rejecting *Trombetta* claim where value of evidence and showing of bad faith were speculative).

With regard to whether counsel was ineffective by not challenging the State's alleged failure to preserve evidence, Bolin raised the claim in his state post-conviction proceeding. The Nevada Supreme Court concluded as follows:

> Bolin does not allege that the State acted in bad faith, and he merely speculates that either hair *might* have exculpated him. Such speculation is not sufficient to support a *Brady* claim or a claim of improper loss of evidence or to demonstrate counsel's deficiency or prejudice, and we conclude the district court did not err denying this claim.

(Dkt. no. 170-6 at 18.) Because the Nevada Supreme Court correctly applied federal law and arrived at a reasonable conclusion, § 2254(d) precludes federal habeas relief.

---

[16]Respondents' assertion, which Bolin does not rebut, is that the lighter hair "was certainly available if trial counsel wanted to submit the hair to any testing," but that there "is no evidence of any effort by trial counsel to request the 'lighter' or 'Caucasian' hair for analysis." (Dkt. 171 at 53.)

[17]Bolin suggests that the mere fact that the lighter hair did not come from him endowed the hair with exculpatory value. Given Cook's testimony that the hair appeared to have come from Ricks (dkt. no. 156-1 at 82, 89, 97) and the absence of any evidence to the contrary, this Court does not agree.

1    Claim Eleven is denied.

2        **F.    Claim Fifteen**

3        In Claim Fifteen, Bolin alleges that his conviction and sentence are

4    unconstitutional because the jury instructions failed to require his jury to find all of the

5    mens rea elements of first-degree murder. The claim focuses on the jury instructions on

6    premeditation and implied malice. According to Bolin, the premeditation instruction

7    blurred the distinction between first and second degree murder, while the implied malice

8    instruction was vague and ambiguous and created a mandatory presumption as to an

9    essential element of the charged crime. Bolin argues that the instructions relieved the

10   State of its burden of proof on essential elements of first degree murder and, but for the

11   improper instructions, there is a reasonable probability the jury would have returned a

12   different verdict.

13       The instruction on "premeditation and deliberation" that Bolin claims was

14   defective read as follows:

15           Premeditation is a design, a determination to kill, distinctly formed
             in the mind at any moment before or at the time of the killing.
16
                 Premeditation need not be for a day, an hour or even a minute. It
17           may be as instantaneous as successive thoughts of the mind. For if the
             jury believes from the evidence that the act constituting the killing has
18           been preceded by and has been the result of premeditation, no matter
             how rapidly the premeditation is followed by the act constituting the killing,
19           it is willful, deliberate and premeditated murder.

20   (Dkt. no. 161-4 at 15 (Instruction No. 13).)

21       The Nevada statutes define first degree murder, in relevant part, as a "willful,

22   deliberate and premeditated killing." NRS § 200.030(1)(a). The use of the challenged

23   instruction was condoned by the Nevada Supreme Court in *Kazalyn v. State*, 825 P.2d

24   578 (Nev. 1992), and is commonly referred to as the *Kazalyn* instruction. Eight years

25   after *Kazalyn*, the Nevada Supreme Court ruled, in *Byford v. State*, 994 P.2d 700 (Nev.

26   2000), that the instruction was deficient because it defined only premeditation and failed

27   to provide an independent definition for deliberation. *See Byford*, 994 P.2d at 713.

28   ///

43

1    In his petition, Bolin cites to *Polk v. Sandoval*, 503 F. 3d 903 (9th Cir. 2007), to

2    support his claim that the trial court's use of the *Kazalyn* instruction violated his right to

3    due process. In *Polk*, the court held that the instruction violates due process because it

4    relieves the State "of its burden of proving every element of first-degree murder beyond

5    a reasonable doubt." *Polk*, 503 F. 3d at 909. Subsequent to the filing of Bolin's petition,

6    however, the Ninth Circuit decided *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013).

7    In *Babb*, the Ninth Circuit determined that its holding in *Polk* regarding the

8    constitutionality of the *Kazalyn* instruction is no longer good law in light of the

9    intervening the Nevada Supreme Court decision in *Nika v. State*, 198 P.3d 839 (Nev.

10   2008), which explained "that *Byford* represented a change in, rather than a clarification

11   of, [Nevada] law." *Babb*, 719 F.3d at 1029. Thus, in cases (like Bolin's) in which the

12   conviction was final prior to the *Byford* decision, due process did not require

13   independent definitions for premeditation and deliberation because, prior to *Byford*, they

14   were not separate elements of the mens rea necessary for first degree murder. *See id.*[18]

15   Even so, Bolin advances reasons why *Babb* should not apply to him. First, he

16   contends that the *Babb* court's holding was colored by the deferential standards

17   imposed by AEDPA, while this Court is required to address the claim *de novo* because

18   the Nevada Supreme Court did not address the claim in its decision on direct appeal.

19   This contention is undermined by the following excerpt from *Babb*:

20            *Polk* did not hold, *and could not have held*, that where a statute
         includes both premeditation and deliberation in its definition of the mens
21       rea for first degree murder, it is a violation of due process if the jury
         instruction fails to provide independent definitions for each of those terms.
22       After *Nika*, *Babb's claim that the Kazalyn instruction violated her due
         process rights because it did not provide a distinct definition for
23       deliberation must fail.*

24   ///

---

25   [18]*Babb* held that it is a violation of due process to not use the new instructions
     announced in *Byford* in cases in which the conviction was not final at the time of the
26   *Byford* decision. *Babb*, 719 F.3d at 1032. That holding has since been limited by *Moore
     v. Helling*, 763 F.3d 1011 (9th Cir. 2014), which held that, due to the Supreme Court's
27   intervening decision in *White v. Woodall*, 134 S.Ct. 1697 (2014), *Babb* is no longer good
     law with respect to defendants whose convictions became final prior to *Bunkley v.
28   Florida*, 538 U.S. 835 (2003).

1    *Babb*, 719 F.3d at 1030 (emphasis added). Thus, the *Babb* court's conclusion was that

2    no constitutional violation occurred as a result of the instruction, separate and apart

3    from whether the federal court was required to defer to the state court's federal law

4    ruling on the issue. And, as noted above, the Nevada Supreme Court's failure to

5    discuss this claim does not relieve this Court of its obligation to apply § 2254(d). *See*

6    *Williams*, 133 S. Ct. at 1095 ("[T]here are instances in which a state court may simply

7    regard a claim as too insubstantial to merit discussion.").[19]

8          Next, Bolin argues that *Babb* was wrongly decided and that, "[w]hen the state

9    courts use state law subterfuge to avoid ruling on the federal law claim, federal courts

10   are free to disregard state law reliance and address the federal law claim on its own

11   merits." (Dkt. no. 200 at 153.)  According to Bolin, the *Babb* court failed to recognize

12   that, independent of the *Kazalyn* instruction's failure to separately define premeditation

13   and deliberation, the instruction erased the distinction between first and second degree

14   murder by allowing premeditation to consist of intent to kill formed "at the time of the

15   killing." He further claims that, with the *Nika* decision, the Nevada Supreme Court

16   manipulated state law to avoid the consequences of the *Polk* decision, thereby

17   impermissibly limiting the availability of a federal remedy for defendants in murder cases

18   tainted by the *Kazalyn* instruction.

19         States are free to define the elements of state crimes. *Apprendi v. New Jersey*,

20   530 U.S. 466, 484-87 (2000); *McMillan v. Pennsylvania*, 477 U.S. 79, 84-86 (1986). The

21   "new instruction" on premeditation recommended by the Nevada Supreme Court when it

22   abandoned the *Kazalyn* instruction also provides that premeditation "may be as

23   instantaneous as successive thoughts of the mind." *Byford v. State*, 994 P.2d 700, 714-

24   15 (Nev. 2000). Despite Bolin's disagreement with the decision, this Court is bound by

25   the holding in *Babb* with respect to pre-*Byford* cases involving the *Kazalyn* instruction.

26   _____

27   [19]Given that *Byford* had yet to be issued and Bolin did not devote nearly as much
     attention to the issue on direct appeal as he did his numerous other claims, it is
     understandable that the Nevada Supreme Court did not specifically discuss the
28   premeditation instruction in its decision.

And, even if the *Nika* decision was influenced by *Polk*, the Nevada Supreme Court did not run afoul of clearly established U.S. Supreme Court precedent in not granting Bolin relief based on the premeditation instruction. Thus, this Court must defer to the decision in accordance with § 2254(d).

> The instruction on implied malice that Bolin challenges stated as follows:

>> Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.

>> Malice may be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned or malignant heart.

(Dkt. no. 161-4 at 13 (Instruction No. 11).)

Bolin's claim based on this instruction lacks merit because, regardless of whether the instruction is lacking in a general sense, there is no reasonable likelihood that the jury applied it in a way that violated Bolin's constitutional rights. *See Estelle*, 502 U.S. at 72 (noting that the suspect instructions must be considered in the context of the instructions as a whole and the trial record and that, in reviewing an ambiguous instruction, the court shall inquire whether there is a reasonable likelihood that the jury has applied the instruction in a way that violates the Constitution). The jury in Bolin's case found him guilty of first degree murder because it found that the murder was a willful, deliberate, and premeditated act. The finding of willfulness, premeditation, and deliberation conclusively established express malice, with no need to rely upon implied malice. *Scott v. State*, 554 P.2d 735, 738 (Nev. 1976).

Claim Fifteen is denied.

## G.    Claim Sixteen

In Claim Sixteen, Bolin contends that his conviction and death sentence are in violation of various constitutional rights because the trial judge issued an improper jury

///

///

///

1    instruction related to reasonable doubt, which he claims minimized the State's burden of

2    proof. The instruction at issue read as follows:

3            The defendant is presumed innocent until the contrary is proved.
         This presumption places upon the State the burden of proving beyond a
4        reasonable doubt every material element of the crime charged and that
         the defendant is the person who committed the offense.
5
             A reasonable doubt is one based on reason. It is not mere possible
6        doubt but is such a doubt as would govern or control a person in the more
         weighty affairs of life. If the minds of the jurors, after the entire comparison
7        and consideration of all the evidence, are in such a condition that they
         cansay they feel an abiding conviction of the truth of the charge, there is
8        not a reasonable doubt. Doubt to be reasonable must be actual and
         substantial, not mere possibility or speculation.
9
             If you have a reasonable doubt as to the guilt of the defendant, he
10       is entitled to a verdict of not guilty.

11   (Dkt. no. 161-4 at 20 (Instruction No. 18).)

12           The constitutionality of the reasonable doubt jury instruction depends on

13   "'whether there is a reasonable likelihood that the jury understood the instructions to

14   allow conviction based on proof insufficient to meet' the requirements of due process."

15   *Ramirez v. Hatcher*, 136 F.3d 1209, 1211 (9th Cir. 1998) (quoting *Victor v. Nebraska*,

16   511 U.S. 1, 6 (1994)). The jury instruction on reasonable doubt used at Bolin's trial was

17   the same instruction challenged in *Ramirez,* which the court of appeals criticized but

18   nonetheless upheld as constitutional. *Ramirez*, 136 F.3d at 1214-15; *see*, *also*, *Nevius*

19   *v. McDaniel*, 218 F.3d 940, 944-45 (9th Cir. 2000). As such, the law of this circuit

20   forecloses habeas relief based on that jury instruction.

21           Claim Sixteen is denied.

22           **H.    Claims Twenty-three and Fifty-three**

23           Bolin has voluntarily abandoned Claims Twenty-three and Fifty-three. (Dkt. no.

24   139.)

25   **IV.    EVIDENTIARY HEARING**

26           Bolin seeks an evidentiary hearing to develop facts in support of certain claims in

27   his petition. (Dkt. no. 201.)  In particular, Bolin asks for a hearing on his allegations that

28   his counsel was ineffective in litigating DNA issues and on his allegations that the

47

procedure that resulted in Sirevaag identifying him violated due process. The evidence he intends to "prove up" at a hearing is the aforementioned correspondence between Thornton and counsel Erickson (dkt. no. 202-1) and Malpass's declaration regarding the identification procedure employed by the State (dkt. no. 24-4 at 55-63). He also suggests that the hearing would allow for inquiry into whether certain decisions ///

made by Erickson were part of a rational trial strategy or the product of her undue delay in preparing for trial.

As to the Thornton correspondence and Malpass declaration, the Court has accepted the relevant evidence in those documents as true and has nonetheless concluded that Bolin is not entitled to relief. Similarly, Bolin's failure to show that he suffered *Strickland*-level prejudice as a result of counsel's performance renders academic any inquiry into the reason for decisions Erickson made in the course of her representation. Because Bolin does not stand to benefit from the Court conducting an evidentiary hearing in this case, his request for a hearing is denied. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

## V.    CONCLUSION

For the reasons set forth above, Bolin is not entitled to habeas relief. Thus, his application for habeas relief shall be denied.

*Certificate of Appealability*

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

///

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

Having reviewed its determinations and rulings in adjudicating Bolin's petition, the Court finds that reasonable jurists could debate the Court's resolution of Bolin's request for stay and abeyance under the guidelines established in *Rhines v. Weber*, 544 U.S. 269 (2005). (Dkt. nos. 77 and 80.)  Specifically, it is at least arguable, in light of more recent Ninth Circuit case law on the matter, that Bolin could demonstrate good cause for his failure to exhaust claims in state court. *See Blake v. Baker*, 745 F.3d 977, 984 (9th Cir. 2014) (holding that "good cause turns on whether the petitioner can set forth a reasonable excuse, supported by sufficient evidence, to justify [the failure to exhaust a claim in state court]"). The Court declines to issue a certificate of appealability for its resolution of any other procedural issues or any of Bolin's habeas claims.

**I**t is therefore ordered that petitioner's fourth amended petition for writ of habeas corpus (dkt. no. 138) is denied. The Clerk shall enter judgment accordingly.

It is further ordered that a Certificate of Appealability is granted with respect to the following issue:

> Whether this court erred in concluding that Bolin was not entitled to stay and abeyance under *Rhines v. Weber*, 544 U.S. 269 (2005), because he failed to show good cause for failing to exhaust his claims in state court.

///

///

///

49

1    It is further ordered that petitioner's motion for evidentiary hearing (dkt. no. 201)

2  is denied.

3    DATED THIS 13th day of February 2015.

4

5  MIRANDA M. DU
   UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28