EXHIBIT A

**Julie D. Cantor MD | JD**
California Bar No. 231672*
GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
100 Wilshire Boulevard, Suite 1760
Santa Monica, CA 90401
(424) 291-2194 (phone)
(312) 380-7002 (fax)
jcantor@goldmanismail.com
*Admitted pro hac vice

**Jonathan P. Schneller**
California Bar No. 291288**
**Kelly Kambourelis**
California Bar No. 336324**
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
(213) 430-6000 (phone)
(213) 430-6407 (fax)
jschneller@omm.com
kkambourelis@omm.com
**Pro hac vice application submitted;
attorney has complied with LR IA 11-2

[Additional counsel listed on next page]

*Attorneys for Petitioner Gregory Bolin*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| GREGORY BOLIN,<br><br>          Petitioner,<br><br>    v.<br><br>WILLIAM GITTERE, *et al.*,<br><br>          Respondents. | Case No. 3:07-cv-00481-ART-CLB<br><br>**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**EVIDENTIARY HEARING REQUESTED**<br><br>**<u>DEATH PENALTY CASE</u>** |

1  [Additional counsel continued from caption page]

2  **Paola Armeni**
Nevada Bar No. 8357
3  CLARK HILL PLC
1700 South Pavilion Center Drive, Suite 500
4  Las Vegas, NV 89135
(702) 697-7509 (phone)
5  (702) 778-9709 (fax)
parmeni@clarkhill.com

6
*Attorneys for Petitioner Gregory Bolin*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................11

II.   JURISDICTION AND VENUE .............................................................16

III.  PROCEDURAL HISTORY....................................................................16

     A.    State Trial Court Proceedings .....................................................16

     B.    Direct Appeal ..............................................................................16

     C.    State Post-Conviction Proceedings .............................................17

     D.    Federal Habeas Corpus Proceedings ..........................................17

          1.    Proceedings Before This Court....................................17

          2.    Appeal to the Ninth Circuit .........................................18

          3.    *Rhines* Stay ................................................................18

IV.  Statement of Facts .................................................................................19

     A.    The Eyewitness ...........................................................................21

          1.    The Voluntary Interview..............................................24

          2.    The One-on-One Showup .............................................25

     B.    The Forensics..............................................................................31

          1.    The Footwear Impressions ...........................................32

          2.    The "Foreign" Hair ......................................................32

          3.    The Sexual Assault Evidence.......................................39

     C.    The Prior Offense........................................................................42

     D.    The Jailhouse Informant .............................................................45

     E.    Newly Presented Evidence ..........................................................46

          1.    Additional Evidence that the DNA Result Was Invalid Because the "Foreign" Hair Was Contaminated and the Use of Derivative Population Statistics Was Improper .............................................46

          2.    Evidence that P-30 Is Not "Proof Positive" of Semen.............................49

          3.    Evidence of the Unreliability of Microscopic Hair Analysis..................53

          4.    Evidence of LVMPD's Improper Methods to Measure the Footwear Impressions and Incorrect Conclusion as to Shoe Size .........................54

          5.    Evidence that Siebert Overheard Details About Bolin's Case................55

V.   Claims For Relief ..................................................................................56

     CLAIM 1  (Violation of Due Process as to Admission of Unreliable Eyewitness Identification Secured through Unnecessarily Suggestive One-on-One Showup Procedure) ..................................................................60

     A.    The Showup Was Unnecessarily Suggestive ........................................61

     B.    The Identification Was Not Independently Reliable ............................65

     CLAIM 2  (Ineffective Assistance of Trial Counsel as to Admission of  Invalid DNA Evidence and Flawed Statistical Analysis)........................................................68

1

**TABLE OF CONTENTS**
**(Continued)**

2

**Page**

3    CLAIM 3  (Additional Due Process Violations) ...............................................72

4    A.    Prosecutorial Misconduct—*Napue* Violations ...............................72

5        1.    Failure to Correct False DNA Evidence. ....................................73

6        2.    Failure to Correct False P-30 Evidence ....................................76

        3.    Failure to Correct False Footwear-Impression Evidence.....................79

7    B.    Prosecutorial Misconduct—Vouching for Witnesses ...........................83

8    C.    Prosecutorial Misconduct—Appeals to Racial Prejudice ......................85

    D.    Ineffective Assistance of Counsel.............................................87

9        1.    Failure to Investigate P-30 Evidence .........................................87

10        2.    Failure to Investigate Footwear Evidence.................................89

        3.    Failure to Investigate Jailhouse Informant's Story ...................92

11    E.    Changes in Scientific Knowledge .............................................93

12        1.    Flawed Expert Testimony That P-30 Was "Proof Positive" of Semen ...94

        2.    Use of Discredited Microscopic Hair Comparison .................95

13    CLAIM 4 (Cumulative Error).............................................................96

14 VI.    PRAYER FOR RELIEF .......................................................................99

   VII.    DECLARATION UNDER PENALTY OF PERJURY.............................................100

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcala v. Woodford,*
334 F.3d 862 (9th Cir. 2003) .................................................................. 96, 97, 99

*Bennett v. Stirling,*
842 F.3d 319 (4th Cir. 2016) .............................................................................. 85

*Berger v. United States,*
295 U.S. 78 (1935) ............................................................................................. 83

*Bolin v. Baker,*
994 F.3d 1154 (9th Cir. 2021) ............................................................................ 18

*Bolin v. Baker,*
Case No. 15-99004 (9th Cir.) .............................................................................. 16

*Bolin v. Nevada,*
525 U.S. 1179 (1999) .......................................................................................... 16

*Bolin v. Nevada,*
552 U.S. 1231 (2008) .......................................................................................... 17

*Bolin v. Reubart,*
538 P.3d 444 (Nev. Nov. 22, 2023) .............................................................. 19, 57

*Bolin v. State,*
114 Nev. 503, 960 P.2d 784 (1998) .................................................................... 16

*Buck v. Davis,*
580 U.S. 100 (2017) ................................................................................. 68, 85, 88

*Coddington v. Martel,*
2023 WL 3229948 (E.D. Cal. May 3, 2023) ...................................................... 85

*Cossel v. Miller,*
229 F.3d 649 (7th Cir. 2000) .............................................................................. 66

*Dickens v. Ryan,*
740 F.3d 1302 (9th Cir. 2014) ...................................................................... 57, 94

*Dow v. Virga,*
729 F.3d 1041 (9th Cir. 2013) ............................................................................ 73

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Foster v. California*,
    394 U.S. 440 (1969) ............................................................................. 61

*Gable v. Williams*,
    49 F.4th 1315 (9th Cir. 2022) ............................................................. 58

*Gersten v. Senkowski*,
    426 F.3d 588 (2d Cir. 2005) ................................................................ 89

*Gimenez v. Ochoa*,
    821 F.3d 1136 (9th Cir. 2016) .............................................. 93, 94, 95, 96

*Green v. Loggins*,
    614 F.2d 219 (9th Cir. 1980) ............................................ 60, 61, 63, 65

*Griffin v. Harrington*,
    727 F.3d 940 (9th Cir. 2013) .......................................................... 68, 88

*Heath v. Hill*,
    397 Fed. App'x 308 (9th Cir. 2010) ................................................ 61, 63

*Hooks v. Workman*,
    689 F.3d 1148 (10th Cir. 2012) ...................................................... 68, 88

*House v. Bell*,
    547 U.S. 518 (2006) ...................................................................... passim

*Howard v. Bouchard*,
    405 F.3d 459 (6th Cir. 2005) .............................................................. 61

*Jackson v. Brown*,
    513 F.3d 1057 (9th Cir. 2008) .......................................... 72, 73, 75, 78

*Jackson v. Fogg*,
    589 F.2d 108 (2d Cir. 1978) ............................................................ 61, 63

*Johnson v. Bagley*,
    544 F.3d 592 (6th Cir. 2008) .......................................................... 68, 88

*Kelly v. Stone*,
    514 F.2d 18 (9th Cir. 1975) ................................................................ 85

*Killian v. Poole*,
    282 F.3d 1204 (9th Cir. 2002) ........................................................ 72, 93

- 6 -

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Kimmelman v. Morrison,*
   477 U.S. 365 (1986) ........................................................................................... 68

*Leeds v. Russell,*
   75 F.4th 1009 (9th Cir. 2023) ....................................................................... 57, 58

*Lindstadt v. Keane,*
   239 F.3d 191 (2d Cir. 2001) ............................................................................. 89

*Majoy v. Roe,*
   296 F.3d 770 (9th Cir. 2002) ............................................................................ 58

*Manson v. Brathwaite,*
   432 U.S. 98 (1977) ....................................................................................... 61, 63

*Martinez v. Ryan,*
   566 U.S. 1 (2012) .............................................................................................. 57

*Matter of Richmond,*
   16 Wash. App. 2d 751 (2021) ........................................................................... 86

*Maxwell v. Roe,*
   628 F.3d 486 (9th Cir. 2010) ............................................................... 72, 75, 93

*McCleskey v. Kemp,*
   481 U.S. 279 (1987) ......................................................................................... 85

*Napue v. Illinois,*
   360 U.S. 264 (1959) ......................................................................................... 72

*Neil v. Biggers,*
   409 U.S. 188 (1972) ................................................................................... 60, 65

*Parle v. Runnels,*
   505 F.3d 922 (9th Cir. 2007) ...................................................................... 96, 99

*Perry v. New Hampshire,*
   565 U.S. 228 (2012) ......................................................................................... 65

*Rhines v. Weber,*
   544 U.S. 269 (2005) ................................................................................... 17, 18

*Schlup v. Delo,*
   513 U.S. 298 (1995) ......................................................................................... 58

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Simmons v. United States*,
  390 U.S. 377 (1968)...........................................................................................60, 61

*Solomon v. Smith*,
  645 F.2d 1179 (2d Cir. 1981)...........................................................................66

*State v. Blanks*,
  479 N.W.2d 601 (Iowa Ct. App. 1991)...........................................................85

*Stovall v. Denno*,
  388 U.S. 293 (1967).........................................................................................61

*Strickland v. Washington*,
  466 U.S. 668 (1984)...................................................................................passim

*United States v. Agurs*,
  427 U.S. 97 (1976)...........................................................................................73

*United States v. Alahmedalabdaloklah*,
  76 F.4th 1183 (9th Cir. 2023) .........................................................................72

*United States v. Cabrera*,
  222 F.3d 590 (9th Cir. 2000) ..........................................................................85

*United States v. Doe*,
  903 F.2d 16 (D.C. Cir. 1990)..........................................................................86

*United States v. Edwards*,
  154 F.3d 915 (9th Cir. 1998) ..........................................................................84

*United States v. Givens*,
  767 F.2d 574 (9th Cir. 1985) ..........................................................................61

*United States v. Jernigan*,
  492 F.3d 1050 (9th Cir. 2007) ........................................................................67

*United States v. Jones*,
  689 F.3d 12 (1st Cir. 2012).............................................................................66

*United States v. Montgomery*,
  150 F.3d 983 (9th Cir. 1998) ..........................................................................61

*United States v. Ruiz*,
  710 F.3d 1077 (9th Cir. 2013) ........................................................................83

- 8 -

1

2

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

3

*United States v. Young,*
  470 U.S. 1 (1985)...................................................................................83

4

5

*Walker v. Martel,*
  709 F.3d 925 (9th Cir. 2013) ...............................................................68

6

*Williams v. Baca,*
  2018 WL 3447172 (D. Nev. July 17, 2018) .....................................57, 94

7

8

*Young v. Conway,*
  698 F.3d 69 (2d Cir. 2012)....................................................................67

9

**Statutes**

10

28 U.S.C. § 2241 .........................................................................................16

11

NRS 200.364(2) (1995) .........................................................................39, 41

12

NRS 200.366(1) (1995) .........................................................................39, 41

13

NRS 34.726(1) .......................................................................................19, 57

14

NRS 34.810(1)(b) ..................................................................................19, 57

15

NRS 34.810(1)(b)(2) ...................................................................................19

16

NRS 34.810(2) ............................................................................................19

17

**Other Authorities**

18

Associated Press, *Vegas Police Sorry After Wrong Man Goes to Prison*, Deseret
  News (July 7, 2011, 4:20 PM),
  https://www.deseret.com/2011/7/7/20202517/vegas-police-sorry-after-
  wrong-man-goes-to-prison..........................................................................33

19

20

21

Coramae Richey Mann & Lance E. Selva, *The Sexualization of Racism: The
  Black as Rapist and White Justice*, 3 W. J. Black Studies 168 (1979) ..................86

22

23

Executive Office of the President, President's Council of Advisors on Science &
  Technology, *Report to the President, Forensic Science in Criminal Courts:
  Ensuring Scientific Validity of Feature-Comparison Methods* (Sept. 2016),
  https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCA
  ST/pcast_forensic_science_report_final.pdf.................................................54

24

25

26

27

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1

**TABLE OF AUTHORITIES**
**(Continued)**

2

Page(s)

3

Joyce W. Lacy & Craig E. L. Stark, *The Neuroscience of Memory: Implications*

4

*for the Courtroom*, 14 Nature Rev. Neurosci. 649 (2013) ....................................67

5

*Las Vegas Weather in 1995*, Extreme Weather Watch,
https://www.extremeweatherwatch.com/cities/las-vegas/year-1995 ....................................20

6

7

Lawrence Mower, *Police Technician Whose DNA Error Sent Wrong Man to*
*Prison Resigns*, Las Vegas Rev.-J. (July 26, 2011, 5:56 PM),
https://www.reviewjournal.com/crime/courts/police-technician-whose-dna-

8

error-sent-wrong-man-to-prison-resigns/..............................................................33

9

Letter from James B. Comey, Director of the FBI, to Governors (June 10, 2016),

10

https://www.fbi.gov/file-repository/second-governor-letter-061016.pdf/view ....................54

11

Press Release, FBI, *FBI Testimony on Microscopic Hair Analysis Contained*
*Errors in at Least 90 Percent of Cases in Ongoing Review* (Apr. 20, 2015),

12

https://www.fbi.gov/news/press-releases/fbi-testimony-on-microscopic-hair-
analysis-contained-errors-in-at-least-90-percent-of-cases-in-ongoing-review...................53

13

14

Spencer S. Hsu, *FBI Admits Flaws in Hair Analysis Over Decades*, Wash. Post
(Apr. 18, 2015, 5:44 PM), https://www.washingtonpost.com/local/crime/fbi-

15

overstated-forensic-hair-matches-in-nearly-allcriminal-trials-for-
decades/2015/04/18/39c8d8c6-e515-11e4-b510-962fcfabc310_story.html.........................53

16

17

*What Is the Average Shoe Size for Men?*, Healthline (Aug. 7, 2019),
https://www.healthline.com/health/average-shoe-size-for-men ............................................32

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1    GREGORY BOLIN, by and through his counsel, respectfully petitions this Court for

2  the issuance of a Writ of Habeas Corpus and by this Fifth Amended Petition alleges as

3  follows:

**I.    INTRODUCTION**

4

5    On July 15, 1995, a 21-year-old Las Vegas woman, Brooklyn Ricks, was found

6  murdered, her mouth gagged, her hands bound, and her chest punctured multiple times,

7  apparently with a screwdriver that was later found in her abandoned truck. Detectives with

8  the Las Vegas Metropolitan Police Department (LVMPD) quickly focused their attention on a

9  single suspect, 38-year-old Gregory Bolin, even though not one shred of physical or forensic

10  evidence connected him to the crime.

11    There was blood at the crime scene. None of it was Bolin's. There was blood on the

12  screwdriver. It was not Bolin's either. There were fingerprints at the crime scene and in

13  Ricks's truck. None belonged to Bolin. And a search of Bolin's parents' home where he was

14  temporarily staying, including an examination of his clothes and shoes, turned up no trace of

15  Ricks—no blood, no DNA, no personal effects. Bolin's conviction was based entirely upon

16  deeply flawed evidence—most notably, a glaringly unreliable eyewitness identification and a

17  DNA test of a contaminated hair recovered from Ricks's body. This is exactly the kind of

18  evidence that produces wrongful convictions. Without a doubt, Bolin was wrongfully

19  convicted.

20    To pin Ricks's murder on Bolin, the LVMPD orchestrated a highly suggestive and

21  indisputably unreliable one-on-one showup that violated clearly established protections

22  against false or biased witness identification. The day after the murder, detectives brought

23  Keith Sirevaag, the construction worker who had found Ricks's body and said he had

24  glimpsed a Black man walking away from the crime scene, to the Clark County Detention

25  Center. Sergeant Ken Hefner ushered Sirevaag into an interview room and told him that he

26  was the "only person" who could identify the suspect and thus bore an "awesome

27

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1    responsibility" for solving the case.  As Hefner later admitted, he underscored Sirevaag's

2    importance for an undeniably improper purpose: "to put pressure on him."

3           Rather than present Sirevaag with a photographic array of mugshots or assemble a

4    lineup of potential suspects for him to compare, Hefner invited Sirevaag to wander the jail and

5    roam the holding cells—"looking for a black suspect."  But Hefner did not place Bolin in a

6    holding cell among other candidates.  Instead, he staged a one-on-one showup for Sirevaag,

7    singling Bolin out for him as the man police hoped to arrest.  As Sirevaag stood in the

8    station's booking area, a uniformed officer entered with Bolin, who was brought to the

9    detention center pursuant to a search warrant to submit to fingerprints, a photographic mug

10   shot, and a blood draw.  Sirevaag studied Bolin for five or ten minutes without making an

11   identification—despite Hefner's prompting, "Is this the guy, or what?" and "Does this appear

12   to be the suspect or not?"

13          Losing patience, Hefner brought in new escorts for Bolin, investigating detectives

14   Dwayne Morgan and Donald Tremel, who had been waiting outside to avoid skewing the

15   showup.  Sirevaag knew Morgan and Tremel—they had spoken at length at the crime scene—

16   and knew they were investigating Ricks's murder.  Sirevaag now watched as the very same

17   detectives began processing Bolin: drawing his blood, fingerprinting him, and photographing

18   him from all angles.  At Sirevaag's request, Bolin was made to remove his shirt to display his

19   tattoo and physique, which he did.  The detectives' parading of Bolin—clearly

20   communicating that Bolin was the suspect they hoped Sirevaag would identify—was both an

21   error-riddled stunt and an egregious violation of Bolin's due process rights.

22          Despite Hefner's clear signals, Sirevaag left the jail without identifying Bolin, but the

23   damage had been done.  An hour after Hefner drove him home, Sirevaag contacted him—at

24   Hefner's invitation—and was reassured that "few things we do as human beings are absolute"

25   and urged to make a choice that "would allow him to sleep at night."  With that nudge,

26   Sirevaag went from too unsure to identify Bolin to 70 to 90 percent sure that Bolin was the

27   man he saw at the scene.  This was despite the fact Bolin differed markedly in terms of age,

28

- 12 -

height, weight, and complexion from the man that Sirevaag had initially described at the scene—a man whom Sirevaag had seen for just 20 to 30 seconds, in dim morning light, from a side angle, at a 20- to 40-foot distance.  Sirevaag went on to identify Bolin at trial.

Bolin's subsequent conviction was constitutionally infirm for another reason: Police obtained and the prosecution introduced a DNA result from a contaminated hair that had no place in the trial and that Bolin's unprepared and overwhelmed defense counsel failed to investigate or challenge.  The prosecution built the bulk of its scientific case against Bolin around a single "foreign" hair recovered from Ricks's pubic area.  In an effort to impute guilt, an LVMPD criminalist referred to it as a "Negroid" hair, despite admitting he could not determine the race of a hair's donor by visual examination.  And relying on now-debunked hair comparison techniques, the criminalist reached the "subjective" conclusion that the hair was "microscopically similar" to and "indistinguishable" from one of Bolin's pubic hair samples.  Worse, Cellmark Diagnostics, the laboratory that tested the hair for DNA, had determined that the sample was contaminated: It contained the same DNA profile on both the root of the hair (where DNA should be found) *and* on the shaft of the hair (where DNA should *not* be found).  As a result, the Cellmark Report explained, "no conclusion can be made regarding the donor of the hair."

Ignoring the hair's uselessness in identifying Ricks's killer, the prosecution engaged in an extraordinary act of mathematical extrapolation, positing that the DNA profile found on the contaminated hair is present in approximately 1 in 2,600 African Americans and eliciting testimony that some 22,000 Black men between the ages of 20 and 44 lived in Las Vegas at the time of the crime.  Based on the population frequency and statistics, the prosecution then made the preposterous assertion that Bolin was one of just nine Black men in Las Vegas who could have committed the crime.  Rather than attack the scientific invalidity of the hair sample and move to exclude the contaminated DNA evidence, Bolin's counsel quibbled about the prosecution's population estimates, endorsing the damaging theory that a pool of potential donors could be calculated from a contaminated hair sample.  As his counsel admitted,

- 13 -

1   "[W]hen it comes to D.N.A. and the scientific stuff, I'm going to tell you, I'm like out in left

2   field.  I can't follow it."  Trial counsel's inexplicable abdication of the duty to investigate the

3   defective DNA evidence deprived Bolin of his constitutional right to effective assistance of

4   counsel.

5           Although these two central pillars of the prosecution's case prejudicially violated

6   Bolin's due process rights, the errors continued.  The prosecution speculated that Bolin had

7   sexually assaulted Ricks, and it used that purported sexual assault as its theory of motive.  But

8   the state forensic pathologist who performed the autopsy testified that there was no bruising or

9   trauma to Ricks's vaginal or anal regions or thighs.  No sperm was found in or around Ricks or

10  on her pantyliner.  All that the prosecution could point to was a trace amount of P-30, also

11  called "prostate specific antigen," a protein that the state's criminalist testified was "proof

12  positive" of semen.  As it turns out, that testimony was patently false: Extensive scientific

13  literature published before and after Bolin's trial made clear that P-30 is *not* "proof positive" of

14  semen, and it is *not* unique to men.  It is also found in female bodily fluids, including urine and

15  vaginal fluid.

16          Proceeding from the false premise that the trace amount of P-30 was conclusive

17  evidence of semen, the prosecution then leapt to three damning and incorrect conclusions: (1)

18  that the P-30 had proven "sexual penetration," which was a statutory requirement of the

19  sexual assault charge;  (2) that sexual assault was the motive for Ricks's murder; and (3) that

20  victims of Bolin's prior conviction—for a rape he committed and pled guilty to at age 18—

21  should testify at this trial about their experience 21 years earlier.  Portraying both crimes as

22  the product of similarly "aberrant sexual behaviors," the prosecution was permitted to call as

23  witnesses the 1975 rape victim, her husband, and two investigating officers, who, over the

24  course of two days, provided graphic and emotionally wrenching accounts of a crime for

25  which Bolin had already paid his debt.  The P-30 was the foundation for all of it.  Without it,

26  the sexual assault charge would have disappeared, the prosecution's theory of motive for the

27

28

- 14 -

murder would have dissolved, and the prior bad-act testimony would have been entirely irrelevant.

The jury also did not have the benefit of considering the trove of additional evidence that Bolin recently presented to the state courts and now submits to the Court: (1) an affidavit from the Cellmark Diagnostics population geneticist who oversaw the DNA testing and certified the results, explaining that due to the contamination, the hair sample "cannot, in any way, be attributed to Mr. Bolin," and that the "manipulated" derivative statistics about population frequencies of the DNA profile found on the contaminated hair were "mind boggling" and "irrelevant"; (2) articles from the 1980s and 1990s, as well as an expert report recognizing that P-30 is found not just in semen, but also in *female* bodily fluids, including *vaginal fluid*, and thus cannot provide conclusive evidence of sexual assault; (3) an expert report showing that footwear impressions found near the crime scene were not, as prosecutors argued, the "same size" Bolin wears and that the process for measuring the impressions was rife with error; (4) evidence that microscopic hair comparison has been discredited on both a national and local level; and (5) a witness declaration that discredits the testimony of the prosecution's jailhouse informant, who told the jury that Bolin was paranoid about fingerprints on a screwdriver and truck.

Gregory Bolin was wrongfully convicted, and his wrongful conviction is the result of repeated instances of prosecutorial misconduct, ineffective assistance of his trial counsel, an unreliable eyewitness identification procured through an unnecessarily suggestive eyewitness identification, the persistent use of discredited expert testimony, and other violations of due process. Respondents have illegally and unconstitutionally imprisoned Bolin on Death Row at Nevada's Ely State Prison for the last 27 years and counting. Now 67 years old, Bolin seeks a writ of habeas corpus so he can live his remaining years as a free man.

//

//

//

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

## II.    JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. § 2254.  Venue is proper in this district because Bolin is unlawfully incarcerated as a result of convictions and a death sentence imposed on him by the Clark County, Nevada District Court.  28 U.S.C. § 2241.

## III.    PROCEDURAL HISTORY

### A.    State Trial Court Proceedings

On September 26, 1995, the District Attorney for Clark County, Nevada, filed an Information charging Bolin with first-degree kidnapping, sexual assault, and murder.  ECF No. 23-6 at 2.[1]  That day, the prosecution also filed its notice of intent to seek the death penalty.  ECF No. 23-6 at 10.  The prosecution filed an Amended Information on May 30, 1996.  ECF No. 23-3 at 2-3.

On July 15, 1996, after a trial that lasted for more than a month, a Clark County, Nevada jury found Bolin guilty on all counts.  ECF No. 23-6 at 14-16.  On July 31, 1996, the court sentenced Bolin to death on the murder count and imposed consecutive life terms on the kidnapping and sexual assault counts.  ECF No. 23-6 at 34-35.  On October 2, 1996, the court entered the judgment of conviction.  *Id.* at 34-35.

### B.    Direct Appeal

On May 19, 1998, the Nevada Supreme Court affirmed Bolin's conviction.  *Bolin v. State*, 114 Nev. 503, 960 P.2d 784 (1998); ECF No. 23-6 at 65-81.  That court denied Bolin's petition for rehearing on August 27, 1998.  ECF No. 24-3 at 2.

On October 19, 1998, Bolin filed a Petition for a Writ of Certiorari in the United States Supreme Court, which was denied on March 1, 1999.  *Bolin v. Nevada*, 525 U.S. 1179 (1999) (mem.).

---

[1] Within this petition, "ECF No." refers to this Court's docket.  "ER" refers to the excerpts of record in *Bolin v. Baker*, Case No. 15-99004 (9th Cir.).  For "ECF" citations, to the extent there is a difference between the ECF-stamped page number and the document page number, citations are to the former.

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1

### C.    State Post-Conviction Proceedings

2      On April 22, 1999, Bolin filed a pro se habeas petition before the Clark County, Nevada

3   District Court in Case No. C130899.  ECF No. 23-7.  On May 30, 2000, after counsel was

4   appointed, Bolin filed an amended petition.  ECF No. 23-7 at 33-65.

5      On March 26, 2003, represented by new counsel, Bolin filed a Corrected Supplemental

6   Petition raising fourteen record-based, guilt-phase claims.  ECF Nos. 24-1, 24-2.  He filed a

7   motion for an evidentiary hearing on August 6, 2004.  ECF No. 168-1 at 6-34.

8      On July 28, 2005, the court denied Bolin's petition, refusing to hold an evidentiary

9   hearing.  ECF No. 24-3 at 4-8.

10     Bolin appealed, and the Nevada Supreme Court affirmed the trial court's decision in a

11  written opinion issued June 22, 2007.  *Id.* at 10-18.

12     Bolin then filed a petition for a writ of certiorari in the United States Supreme Court,

13  which was denied on February 25, 2008.  *Bolin v. Nevada*, 552 U.S. 1231 (2008) (mem.).

14

### D.    Federal Habeas Corpus Proceedings

15

#### 1.    Proceedings Before This Court

16     Before this Court, Bolin filed a pro se habeas petition, a First Amended Petition, and, on

17  July 30, 2009, a Second Amended Petition.  ECF Nos. 2, 18, 49.

18     On November 8, 2010, Respondents moved to dismiss the Second Amended Petition,

19  arguing (among other things) that a number of claims had not been exhausted in state court.

20  ECF No. 59.  On March 9, 2011, conceding that some claims were unexhausted and that the

21  petition was therefore "mixed," Bolin filed a motion for a stay-and-abeyance pursuant to *Rhines*

22  *v. Weber*, 544 U.S. 269 (2005), to return to state court to exhaust his claims.  ECF No. 71.

23     On May 6, 2011, the Court denied the motion, finding that Bolin had not established

24  good cause for failing to exhaust all of his claims.  ECF No. 77.  On September 27, 2011, the

25  Court then granted in part and denied in part Respondents' motion to dismiss.  ECF No. 90.

26  The Court ordered that "if [Bolin] does not abandon his unexhausted claims within the time

27  allowed, the . . .  Second amended petition shall be dismissed" in its entirety.  *Id.* (docket text);

28

- 17 -

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1    *see also* ECF No. 119 (similar docket text).  As a result, Bolin formally abandoned the

2    unexhausted claims, and he subsequently filed Third and Fourth Amended Petitions without

3    those claims.  ECF Nos. 131, 133, 136, 138, 139.

4          On February 13, 2015, the Court denied Bolin's Fourth Amended Petition and rejected

5    his request for an evidentiary hearing.  ECF No. 227.  The Court issued a certificate of

6    appealability as to whether it "erred in concluding that Bolin was not entitled to stay and

7    abeyance under *Rhines v. Weber*, 544 U.S. 269 (2005), because he failed to show good cause

8    for failing to exhaust his claims in state court[.]"  *Id.* at 49 (italics added).  On March 2, 2015,

9    Bolin filed his notice of appeal.  ECF Nos. 229, 231.

10                    **2.       Appeal to the Ninth Circuit**

11          On appeal before the United States Court of Appeals for the Ninth Circuit, Bolin raised

12   the certified *Rhines*-stay issue and two uncertified issues related to: (1) the unreliable

13   eyewitness identification that followed an unnecessarily suggestive one-on-one showup

14   procedure; and (2) the ineffective assistance of his trial counsel in failing to challenge the

15   prosecution's invalid DNA evidence.  *See Bolin v. Baker*, 994 F.3d 1154, 1156 (9th Cir. 2021).

16   On April 26, 2021, the Ninth Circuit held that this Court applied an incorrect standard when it

17   denied Bolin's motion for a *Rhines* stay, and it "reverse[d] and remand[ed] for reconsideration

18   of Bolin's *Rhines* motion under the proper standard."  *Id.* at 1155.  The Ninth Circuit did not

19   reach the uncertified issues.  *Id.* at 1156.

20                    **3.       *Rhines* Stay**

21          On remand to this Court, Bolin filed a renewed motion for a *Rhines* stay, and the parties

22   stipulated to stay the action pending presentation of then-unexhausted claims in state court.

23   ECF Nos. 265, 268.  On September 10, 2021, the Court granted Bolin's *Rhines* motion and

24   stayed these federal habeas proceedings.  ECF No. 269.

25          On June 21, 2022, and July 24, 2022, Bolin filed a habeas petition and an amended

26   habeas petition with exhibits, respectively, before the Clark County, Nevada District Court in

27   Case No. A-22-854391-W.  Exs. 147, 148.  That court denied Bolin's petition on December 23,

28

- 18 -

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1    2022, holding that the petition was procedurally barred.  Ex. 151 (citing Nevada Revised

2    Statutes ("NRS") 34.726(1) (claims time-barred under Nevada's one-year deadline to file state

3    habeas petition), NRS 34.810(1)(b)(2) (claims waived because they could have been raised on

4    direct appeal or prior state habeas petition), NRS 34.810(2) (petition second or successive and

5    abuse of the writ)).

6        Bolin appealed, and the Nevada Supreme Court affirmed the trial court's decision on

7    November 22, 2023 in Case No. 85894, also holding that Bolin's petition was procedurally

8    barred by Nevada law.  ECF Nos. 316, 320; *Bolin v. Reubart*, 538 P.3d 444 (Nev. Nov. 22,

9    2023) (mem.) (citing NRS 34.726(1) and 34.810(1)(b), (2), and holding that, because

10   "[a]pplication of the statutory procedural default rules to post-conviction habeas petitions is

11   mandatory[,] . . .  the district court did not err in denying Bolin's petition [as] procedurally

12   barred"); Exs. 152-156.  On December 18, 2023, the Nevada Supreme Court issued the

13   remittitur.  ECF No. 320 at 12.

14       Back before this Court, on December 21, 2023, the parties filed a joint stipulation to lift

15   the *Rhines* stay.  ECF No. 315.  On January 31, 2024, the Court lifted the stay.  ECF No. 321.

16   **IV.    <u>STATEMENT OF FACTS</u>**

17       1.    On the evening of July 14, 1995, Gregory Bolin visited the B&R Video store on

18   North Jones Boulevard in Clark County, Nevada.  ECF No. 152-3 at 67.  New to town after his

19   recent release from a Colorado prison,[2] Bolin was temporarily staying at his parents' house and

20   looking forward to moving into his own place, spending time with his six-year-old son, starting

21   at the University of Nevada, Las Vegas in the fall, taking his driver's test in a few days, and

22   making new friends.  ECF No. 159-4 at 56, 93; ECF No. 159-1 at 29, 39-40; ECF No. 160-1 at

23   43-44; ECF No. 152-4 at 30.  In the meantime, he spent time with his niece, Aisha, who was

24   also staying at his parents' house.  ECF No. 159-1 at 15-18.  Given the record-breaking heat that

25   _____

26   [2] Bolin had been paroled from his prior offense in May 1988.  In the 15 months before he was
     returned to prison on a parole violation in August 1989, Bolin met and began a relationship with
27   a woman, and they had a son in April 1989.  After the parole violation, Bolin became focused
     on furthering his education in order to improve himself and support his family.  ECF 152-4 at
28   30.

summer,[3] and the fact that neither had access to a car, they would go on walks at night when the temperatures cooled, sometimes stopping at the video store to rent movies to watch the next day when it was too hot to go outside.  ECF No. 159-1 at 18, 21, 23, 29, 36-39; ECF No. 159-4 at 92-93; ECF No. 152-4 at 85.  Their rentals that summer included the animated fantasy film "The Secret of Nimh," Arnold Schwarzenegger's spy comedy "True Lies," and the sports drama "Above the Rim."  ECF No. 159-1 at 30; Ex. 170.

2.    On July 14, Bolin stopped by B&R Video around 10 p.m., just a few minutes before an employee named Brooklyn Ricks arrived at B&R to cover the end of her sister's shift—and left without talking to or interacting with Ricks at all.  ECF No. 152-3 at 63-69; ECF No. 152-4 at 6-11.  Two hours later, Ricks and her coworker, Tabitha Wharton, closed and locked up the store.  ECF No. 153-1 at 81.  Wharton watched Ricks drive away without issue ten minutes after midnight; she did not see anyone else in the parking lot or around Ricks's truck, and nothing seemed amiss.  *Id.* at 82-85.  However, Ricks did not make it home after her shift, even though she lived just a mile away.  ECF No. 152-4 at 103; ECF No. 152-3 at 14-17, 72-73.

3.    Early the next morning, a construction worker found Ricks, who was identified by her B&R shirt, at a construction site roughly a 15-minute drive from the video store.  ECF No. 154-2 at 45, 107-08; ECF No. 153-4 at 6-7; ECF No. 158-1 at 13.  The construction worker reported seeing a muscular Black man leave the framed house in which Ricks was found.  ECF No. 153-2 at 33-35, 43.  Ricks's sisters, who also worked at the video store, told police about Bolin, who had been to the store and had asked them to hang out or get coffee.  ECF No. 152-3 at 55-62; ECF No. 155-3 at 13-17; ECF No. 153-1 at 5-6.  Although the sisters declined his invitations, they acknowledged that Bolin had not bothered them and was "[j]ust friendly."  ECF No. 153-1 at 5-6, 35; ECF No. 152-3 at 59-60.  There was no evidence Bolin had ever met Ricks or knew of her family relation to the sisters he had spoken to.  ECF No. 152-3 at 60; ECF

---

[3] *Las Vegas Weather in 1995*, Extreme Weather Watch, https://www.extremeweatherwatch.com/cities/las-vegas/year-1995 (last visited Feb. 12, 2024).

No. 153-1 at 28-30.  The two had not crossed paths—Bolin visited the store at night, and apart from the night in question when she was covering the end of her sister's shift, Ricks worked the dayshift.  Exs. 157, 158 (Bolin's rental receipts); Exs. 159, 160 (B&R employee schedule); ECF No. 159-1 at 39.

4.      The construction worker described a suspect younger, taller, heavier, and lighter-complexioned than Bolin.  *See infra* ¶¶ 10-14.  But after police learned that Bolin had visited B&R Video the night before Ricks died and that he had recently been incarcerated in Colorado, Bolin quickly became the only suspect.  The detectives did not investigate other Black men who visited B&R Video—and were spotted on the store's surveillance camera—the same night. ECF No. 154-3 at 43-44, 97; ECF No. 152-4 at 49.

5.      The investigation that followed uncovered no valid forensic evidence tying Bolin to the crime scene, the purported murder weapon, Ricks's primer gray pickup truck, or Ricks's body.  But police conducted a flawed eyewitness showup in violation of Bolin's due process rights and obtained purported DNA evidence from a contaminated hair sample that Bolin's lawyers failed to challenge—violations compounded at trial by other flawed forensic testimony and the prosecution's racially inflammatory argument that Bolin had "treated that crime scene like his personal jungle and Brooklyn Ricks [as] his chosen prey."  ECF No. 161-2 at 133.

### A.      The Eyewitness

6.      According to trial testimony, on July 15, 1995, construction worker Keith Sirevaag arrived at his Las Vegas work site between 5:30 and 6:00 a.m.  ECF No. 153-2 at 24, 27.  The sun was not up, but it was light enough to see.  *Id.* at 27, 37.  He noticed a pickup truck at the site.  *Id.* at 29.  Apparently expecting to be the first to arrive, Sirevaag thought it was "kind of odd" to see another truck parked at the site.  *Id.* at 29, 33.  He pulled up between two framed, unfinished houses.  *Id.* at 31-32, 34.  Movement inside one of the houses caught his eye. *Id.* at 33.

7.      Sirevaag watched as a Black man walked out of one of the framed houses and "calmly" crossed in front of him, left to right and at an angle, toward the parked truck.  *Id.* at

33-35, 42. Sirevaag watched the man for approximately 20 to 30 seconds. *Id.* at 42. Unconcerned, he figured that "maybe the guy partied last night and slept there over night." ECF No. 145-6 at 136.

8.    Sirevaag observed the man from a range of 20 to 40 feet, and only from a right angle—never straight on. ECF No. 153-2 at 35-36; ECF No. 153-3 at 31-32. When the man passed by Sirevaag's vehicle, Sirevaag looked away. ECF No. 153-2 at 35. Sirevaag had already turned back toward the same framed house when he heard the truck's door slam and engine start. *Id.* at 38-39. Sirevaag then watched the truck "take off" through his rearview mirror. *Id.* at 39.

9.    Sirevaag turned his attention to his job. As he was unlocking his toolbox, he heard a strange noise coming from the framed house. ECF No. 153-2 at 46-47. Inside, Sirevaag discovered the beaten and bloodied body of Brooklyn Ricks. She was gagged, with her hands tied behind her. *Id.* at 49-50. Ricks appeared to be unconscious but still breathing. *Id.* at 50. Sirevaag ran to a neighboring house and summoned the police. *Id.* at 52-53. When he returned, Ricks was no longer breathing. *Id.* at 53-54.

10.    Soon after, officers from the Las Vegas Metropolitan Police Department arrived. *Id.* at 54-55. Sirevaag provided a handwritten statement describing the suspect as a "Black guy" who "was 6ft, 230lbs" with a "Black tattoo [on his] right arm." Ex. 171; ECF No. 24-5 at 8. According to Sirevaag, the suspect wore "shorts tan in color [and a] tank top darker in color." *Id.* He had "black" "clean cut hair" and was "clean shaved." *Id.* Sirevaag also described the man as a light-complected Black man. ECF No. 158-3 at 9, 58; ECF No. 161-3 at 12-13.

11.    Investigating detectives Dwayne Morgan and Donald Tremel arrived next, and Morgan recorded a second, more detailed statement from Sirevaag. ECF No. 154-2 at 20-21. Sirevaag told Morgan that the suspect was between 20 and 30 years old, but estimated he was in his "mid-20s." ECF No. 154-1 at 63-64. According to Sirevaag, the suspect "had more of a youthful look" and "didn't look pretty mature." *Id.* at 64. Sirevaag explained, "I don't think he looked as old as I do and I'm 33." *Id.*

12.     When asked if he got a good look at the suspect, Sirevaag said, "Straight on front, no.  At a[n] angle . . . , the right side pretty good."  *Id.* at 56; ECF No. 153-3 at 32 ("It wasn't a straight on front view.  It was . . . from the right half of his body more so.").  Sirevaag "had not seen his full face."  ECF No. 153-4 at 50.

13.     Sirevaag described the suspect as muscular, "like a body builder."  ECF No. 154-2 at 33.  He told Morgan that although the suspect's tattoo was hard to see, it was an inch or two across and "came to a point on top of it."  ECF No. 154-1 at 60, 63.

14.     Bolin had little in common with Sirevaag's description.  He was five feet, nine inches tall, weighed about 195 pounds, was nearly 39 years old, and was medium- to dark-complected.  ECF No. 145-5 at 6; ECF No. 145-6 at 236; ECF No. 161-3 at 79; ECF No. 160-1 at 19-21; ECF No. 152-2 at 7-8; Ex. 164.  His tattoo was not an inch or two across, was located on his shoulder (not his arm), and did not come to a point at the top.  Exs. 165, 167.

15.     The detectives obtained a surveillance tape from B&R Video and viewed it with Ricks's two sisters, Liberty Wilson and Brittney Lewis, both of whom also worked at the video store.  ECF No. 154-2 at 49-50, 52; ECF No. 152-3 at 48-49; ECF No. 158-1 at 21-22.  The tape showed Bolin entering the store for a few minutes around 10:00 p.m., just before Ricks arrived, and briefly speaking to Wilson.  ECF No. 158-1 at 21-24; ECF No. 152-4 at 6-11.  He appeared to be wearing a dark tank top and lighter colored shorts—a typical outfit given that temperatures exceeded 100 degrees every day that week.  ECF No. 152-4 at 9; *supra* ¶ 1 n.3.  Wilson left when Ricks arrived to relieve her, and Bolin left at the same time.  ECF No. 153-1 at 81-82; ECF No. 152-4 at 6-11.  Even though other Black men appeared on the surveillance tape and the image quality was poor, Morgan thought that Bolin looked like Sirevaag's description of the perpetrator.  ECF No. 154-3 at 42-49; Ex. 162.  The other Black men seen on the surveillance tape were not investigated.  ECF No. 154-3 at 43-44, 97; ECF No. 152-4 at 49.

16.     Ricks's sisters knew Bolin because he had rented videos at B&R Video several times in the two weeks before the crime.  ECF No. 152-4 at 22-26, 69-70; Exs. 157, 158, 170.  He usually came in with his teenaged niece.  ECF No. 152-4 at 85-87.  On a few occasions, he

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

invited Wilson to have coffee or go out with him, and he once called the store to speak with her. ECF No. 152-3 at 55-62. He also asked Lewis to coffee twice. ECF No. 153-1 at 6-7. She testified that he was "[j]ust friendly. He was friendly." *Id.* at 6, 35. Lewis also acknowledged that when she declined his invitations, Bolin did not respond negatively; he "[j]ust said okay." *Id.* at 6. She also agreed that he was "always a gentleman" and described him as "normal for a video customer. Nothing unusual." *Id.* at 38, 49. Wilson came to a similar conclusion, noting, "I just figured he was new in town and didn't know anybody, didn't know what there was to do or anything." ECF No. 152-3 at 59-60. There was no evidence that Bolin ever met Ricks. ECF No. 152-3 at 60; ECF No. 153-1 at 28-31.

### 1. The Voluntary Interview

17. Detectives Morgan and Tremel arrived at Bolin's residence around 12:30 p.m. on July 15, 1995. ECF No. 154-2 at 55. Bolin's father invited them in. *Id.* at 56. Bolin came downstairs and agreed to answer the detectives' questions in a recorded statement. *Id.* at 57-58, 61.

18. Bolin told the detectives that he had been headed to an Albertsons grocery store around 10:00 p.m. the previous night. As he passed by B&R Video, he saw Wilson, who he had met a few times at the store, and stopped to talk to her. Ex. 172 at 2. She was just getting off work, so he said he would see her later and left. *Id.* at 3. He continued to Albertsons, where he bought beer and donuts to enjoy in the park. *Id.* at 5.

19. At this point, Bolin had been in Las Vegas for less than two weeks. ECF No. 159-1 at 20. On his way home from the park, Bolin met two men named Ronnie and Robert in front of the Albertsons, and they invited him to a house party. *Id.* at 5-7. They drove him there in an older model white two-door car. *Id.* at 7. Bolin was tired of spending time with his niece and was looking for friends his own age. ECF No. 159-1 at 29. Since he did not know his way around Las Vegas, Bolin could not say where the party had been, except that it took about 20 minutes to get there. Ex. 172 at 6-7. He came home around dawn. *Id.* at 6, 8.

20.    At trial, Bolin's father testified that he had been downstairs ironing when Bolin returned home between 4:45 and 5:00 a.m.—at least 30 minutes before Sirevaag arrived at the construction site.  ECF No. 159-4 at 61-62; ECF No. 153-2 at 24.  Bolin's father woke up at 3:00 a.m. daily; on weekdays, he started work at 5:00 a.m., and on weekends, he woke up at the same time out of habit and did chores.  ECF No. 159-4 at 53-55, 61-62; ECF No. 160-1 at 5.

21.    Bolin told the detectives that he had been wearing brown shorts, a white t-shirt, and brown sandals the night before.  Ex. 172 at 3, 7-8.  He falsely said that he had never been arrested.  *Id.* at 9-10.  When the detectives explained that it would help "eliminate [him] from suspicion," he agreed to come to the jail two days later to be photographed for inclusion in a photo lineup.  *Id.* at 9-11; ECF No. 154-3 at 120-21.

22.    Later that day, the detectives obtained a search warrant that authorized them to search Bolin's parents' house for a black tank top, beige shorts, white sneakers, and Ms. Ricks's personal effects, and to obtain a serology kit, fingerprints, and photographic "mug shot" of Bolin.  ECF No. 23-2 at 2-3; ECF No. 154-2 at 72-73.  The detectives executed the search warrant the next morning.  ECF No. 154-2 at 76.  None of Ricks's personal effects were found at Bolin's parents' house or in his possession.  *Id.* at 90-91; ECF No. 158-1 at 48-49.  Nor did the detectives find any physical evidence linking Bolin to the crime scene.  *Id.*

23.    The detectives seized a pair of tan athletic shorts that fastened with a drawstring—not dress shorts, as Sirevaag had described.  ECF No. 154-2 at 80-81; Ex. 214; ECF No. 153-3 at 33.  They impounded a blue tank top from Bolin's room, as well as a black tank top from the laundry room.  ECF No. 154-2 at 84, 88.  They took a pair of sandals and a pair of deck shoes.  *Id.* at 77-78.  And while searching, Tremel came across a Colorado Department of Corrections ID card bearing Bolin's name and photograph.  *Id.* at 91.

### 2.    The One-on-One Showup

24.    Sirevaag had a keen interest in police work, expressing his "amaze[ment]" with the profession.  ECF No. 153-3 at 7; ECF No. 145-6 at 184-85.  He had spent three or four hours at the crime scene the day he discovered Ricks's body, talking formally and informally to

- 25 -

police—primarily Morgan and Tremel. ECF No. 153-2 at 58; ECF No. 154-2 at 19-21; ECF No. 158-3 at 86. The following morning, he received a call from Morgan and Tremel's supervisor, Sgt. Ken Hefner. ECF No. 153-2 at 59-60. Hefner told Sirevaag that he might have to come to the station to "view a bunch of people and see if he could ID somebody." *Id.* at 60. Sirevaag made clear that he wanted to see more than a photograph; he needed to see the suspect's "build and stature and mannerisms," and he "wanted to see the location of the tattoo." ECF No. 158-3 at 9; ECF No. 226 at 108. Shortly after, Hefner called again to confirm that Sirevaag was needed at the station. ECF No. 153-2 at 60.

25.    When Sirevaag arrived, Hefner brought him into a small interview room and told him that they had "made some progress in the case and you're an important witness." ECF No. 24-5 at 4. Hefner emphasized that Sirevaag was the "only person" who saw the suspect and was "the person that will ultimately have to make an identification or not make an identification." *Id.* at 4-5. In case it was not already clear, he spelled it out: "[T]hat's a[n] awesome responsibility." *Id.* at 5. He thanked Sirevaag in advance for his "effort" in helping to solve "this terrible crime," and reiterated, "[Y]ou're the only one that can do this." *Id.* At trial, Hefner candidly stated, "I did that to put pressure on him." ECF No. 158-3 at 79.

26.    Although LVMPD maintained drawers of mugshots for use in photographic arrays (ECF No. 160-4 at 6-12; Ex. 163), the detectives did not arrange for either an in-person or photographic lineup. Instead, Hefner explained to Sirevaag that they were going to walk around the jail looking at "lots of people, different shapes, sizes, colors, ages, and stuff like that." ECF No. 24-5 at 5. But "obviously," he said, "in this situation we're looking for a black suspect." *Id.* Hefner said that the procedure could be a dry run to test Sirevaag's recollection and told him that he was not required to make an identification. *Id.* If he did recognize anyone, they would "go from there." *Id.* At this point, Sirevaag was unsure that he would be able to identify the man he had seen. ECF No. 154-1 at 17, 39-40.

27.    At Hefner's request, Sirevaag tried to draw the tattoo he had seen on the suspect. ECF No. 158-3 at 81. At trial, he admitted that his drawing did not look similar to Bolin's

- 26 -

tattoo.  ECF No. 153-3 at 47; *see also* Ex. 161 (Sirevaag's drawing); Exs. 166, 167 (Bolin's actual tattoo).

28.    Sirevaag and Hefner left the interview room and wandered around the jail for about ten minutes, looking into holding cells and at officers going about their business.  ECF No. 153-2 at 62-64.  Sirevaag saw somewhere between 60 and 150 individuals of various races.[4] Hefner conceded that none of these individuals fit Sirevaag's description of the perpetrator.  ECF No. 158-3 at 56-57; ECF No. 226 at 115.  Unsurprisingly, no one caught Sirevaag's eye.

29.    But the detectives had devised a way to encourage an identification from Sirevaag: present Bolin directly to him, capitalizing on Bolin's presence in the detention center as part of the execution of the search warrant.  After they had finished searching Bolin's parents' home, the detectives still needed to take Bolin's photograph and fingerprints, and to obtain a serology kit from him.  Thus, detectives Morgan and Tremel transported Bolin to the jail and then waited outside while a third officer—Officer Milton, who was in uniform—"walk[ed] [Bolin] into the Detention Center."  ECF No. 154-2 at 95; ECF No. 158-1 at 60; ECF No. 158-2 at 14-15.  Tremel testified that he and Morgan waited outside because they knew they "were going to conduct a one-on-one with the witness," who had "already seen [them] at the scene."  ECF No. 158-1 at 60.  Hefner called it an "informal one on one line-up."  ECF No. 226 at 106.

30.    Meanwhile, Sirevaag finished his tour of the holding cells and came into the booking area, where he saw the uniformed officer leading Bolin into the station.  ECF No. 153-2 at 64-65; ECF No. 154-2 at 95.  Sirevaag told Hefner there was a "spark or a resemblance" there.  ECF No. 153-2 at 67.  He felt Bolin had "the right build and the clothing [was] the same type"—"classy clothing."  ECF No. 158-3 at 20-21.

31.    Sirevaag watched Bolin in the booking area for five or ten minutes but did not identify Bolin as the man he had seen.  ECF No. 154-3 at 139; ECF No. 158-1 at 60; ECF No.

---

[4] Sirevaag estimated that he viewed 60 or 70 individuals in the holding cells.  ECF No. 153-2 at 62-64.  Hefner estimated that Sirevaag viewed "between a hundred and 150" individuals.  ECF No. 158-3 at 20.

158-4 at 12-13.  Hefner testified that he was "trying to be patient," but eventually felt Sirevaag had "had enough time to view Mr. Bolin," and he was "no longer interested in accommodating" him.  ECF No. 158-4 at 23-24; ECF No. 226 at 118; ECF No. 158-3 at 24.  He then called in Tremel and Morgan, with whom Sirevaag had spoken at length the day before at the crime scene, to replace Officer Milton as Bolin's handlers, and they "proceed[ed] doing what they needed to do."  ECF No. 226 at 118; ECF No. 158-1 at 61-62.

32.    With Sirevaag still watching, the detectives processed Bolin as if he had been arrested, including "the blood draw, photographing, [and] fingerprints."  ECF No. 158-3 at 61-62; ECF No. 158-1 at 61-62; ECF No. 158-2 at 16-18.  Afterward, Hefner informed Tremel—as Sirevaag stood by—that Sirevaag needed to see Bolin shirtless; he wanted to see Bolin's tattoos.  ECF No. 158-2 at 12-13; ECF No. 154-1 at 18-19.

33.    Sirevaag watched as Bolin was made to take off his shirt in the middle of the hallway (ECF No. 158-2 at 12), and as the same photographer that Sirevaag had seen documenting the crime scene took pictures of Bolin without his shirt.  ECF No. 153-4 at 38; ECF No. 158-2 at 12-13.

34.    Bolin was made to display his body from all angles: front, back, left, and right. ECF No. 158-2 at 12-13; Exs. 164, 165, 168, 169.[5]  He was also prompted to hold up a ruler while the photographer took closeup shots of Bolin's tattoo.  Ex. 167.  And Sirevaag watched the entire spectacle—performed by two detectives and a photographer who Sirevaag knew were investigating the murder.  ECF No. 153-2 at 68; ECF No. 158-1 at 61, 68; ECF No. 154-2 at 97. Nobody else was subjected to this treatment while Sirevaag watched.  ECF No. 154-1 at 61.

35.    After a while, Hefner asked Sirevaag what he thought of what he was "s[eeing] with the black male" (*id.*), and then asked him outright: "Is this the guy, or what?"  ECF No. 158-3 at 71; *id.* ("I asked him, I said, if he could give me a decision.")  ECF No. 226 at 101

---

[5] The shirtless photography from all angles was outside the scope of the search warrant, which authorized the officers to take a simple "photographic mug shot" of Bolin.  ECF No. 23-2 at 2.

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

("After a while it kind of became apparent to me that perhaps he wasn't going to say anything, so I asked him, 'Does this appear to be the suspect or not?'").

36.    Even after witnessing a one-man procession staged for his benefit, Sirevaag responded, "I'm not sure."[6]  ECF No. 154-1 at 17; *see also* ECF No. 226 at 101.  Hefner then "thanked him for his time and . . . took him home."  ECF No. 158-3 at 24.  During the drive, Sirevaag asked Hefner, "[H]ow did you get him, find this individual so fast."  ECF No. 145-6 at 184.  Hefner declined to answer but encouraged Sirevaag to call if anything did "come back" to him.  ECF No. 153-2 at 71.  Bolin was taken home too—he had not been identified, and he was not under arrest.  ECF No. 158-1 at 69; ECF No. 158-2 at 10.

37.    After Hefner dropped him off, Sirevaag kept thinking about what had occurred, and he contacted Hefner an hour later.  ECF No. 153-2 at 72-73.  In that short time, Sirevaag had begun "feeling more strongly about the man" he had viewed at the detention center, and he asked Hefner "a few times over the whole ordeal" whether law enforcement had other evidence. *Id.* at 72; ECF No. 153-4 at 46, 50-51; ECF No. 158-3 at 27, 72-73.  Hefner declined to answer; he told Sirevaag he did not want to "influence or taint" the process because "what you know is what you know," as opposed to "what other witnesses provide."  ECF No. 158-3 at 73.

38.    But that did not stop Hefner from prompting Sirevaag again: "You'll have to tell us if that was him or not."  *Id.* at 27.  Sirevaag said, "Oh, I'm not telling you it's not the guy." *Id.* at 28.  Hefner "could tell [that Sirevaag] was mulling [it] over in his mind" and so assured him that "few things we do as human beings are absolute."  *Id.* at 28, 30-31.

39.    Hefner told Sirevaag that "[h]e'd have to pick or . . . express himself in a way that a judge or jury could understand him; and, most of all, he had to pick a way of expressing himself that he was comfortable with that would allow him to sleep at night."  *Id.* at 31.  Then he invited Sirevaag to use a "scale of 1 to 10 or one to a hundred percent."  *Id.*  Although

---

[6] Morgan testified that Sirevaag put himself at a five, on a scale of one to ten.  ECF No. 154-3 at 30.  Sirevaag remembered giving a numerical estimate but did not remember the answer.  ECF No. 153-4 at 33-34.  Hefner did not remember a numerical estimate at the showup.  ECF No. 158-3 at 69.

recollections varied, Sirevaag was now somewhere between 70 and 90 percent certain.  *Id.*; ECF No. 153-4 at 47; ECF No. 154-3 at 30.  As Sirevaag recalled when asked what he told Hefner about his level of certainty, "I think it was 70, 80.  Maybe 75, 80 percent."  ECF No. 153-4 at 47.[7]

40.    Throughout this process, Sirevaag was "looking for a certain body build[] and . . . a tattoo," and he was more sure of "the body than the face."  ECF No. 226 at 82-83.

41.    Sirevaag had two more opportunities to view Bolin before trial.  The first was Bolin's September 1995 preliminary hearing.  When asked to identify the perpetrator, Sirevaag admitted that he not only considered what he had witnessed at the scene, but he also thought about seeing Bolin at the jail showup.  ECF No. 145-6 at 194-95.  Observing Bolin in the courtroom, sitting in an inmate jumpsuit between his lawyers, Sirevaag now declared that he was "sure" Bolin was the man he had seen.  *Id.*

42.    Sirevaag saw Bolin again at an evidentiary hearing shortly before trial.  Just before Sirevaag testified, one of the prosecutors, Gary Guymon, spoke to him in the hallway about other evidence in the case.  According to Sirevaag, Guymon "mentioned something about a pubic hair and something about panties."  ECF No. 153-4 at 50.  Although Sirevaag had asked about other evidence on multiple prior occasions, Sirevaag claimed that he told Guymon that he did not "want to hear any evidence because [he'd] have to come up here and say that [he] heard something."  *Id.* at 51; ECF No. 145-6 at 184; ECF No. 158-3 at 73; ECF 153-4 at 46 ("Isn't it true that you asked [Hefner] if they had any other evidence? A. I had asked that a few times over the whole ordeal.").  He also said that the information Guymon had mentioned had not impacted him.  ECF No. 154-1 at 46.  On the stand, Sirevaag paused for some time before identifying Bolin, later explaining that he was getting a "good look at him."  ECF No. 226 at 80.  Sirevaag added, "Even with a shirt on I can see he's a big man, and I recognize his face now."

---

[7] Sgt. Hefner wrote in his report that Sirevaag "was 90 percent sure that Bolin was the person he saw fleeing the murder scene in the victim's truck."  ECF No. 158-4 at 17.  Bolin's arrest warrant, which came two days later, was based in part on Hefner's statement that Sirevaag was "90 percent sure" Bolin was the man he had seen at the crime scene.  ECF No. 24-5 at 12-13.

*Id.* at 38.  According to Sirevaag, the identification was based on "[m]ostly seeing him that Saturday morning [at the crime scene], and then I saw him again at the preliminary [hearing]." *Id.*

43.     By the time of trial, Sirevaag had seen Bolin enough times that he identified him in court without hesitation.  ECF No. 153-2 at 37-38.  Despite having described merely a "resemblance" based on build and clothing style at the showup (*id.* at 67; ECF No. 158-3 at 20-21), Sirevaag now claimed that what had looked familiar to him was "partially the face I was recognizing" and also "the big build of a guy, trim hair."  ECF No. 153-2 at 65.  He conceded that if he had been asked at the showup to identify Bolin's face without seeing his "muscle build or body style," he could not have made an identification "a hundred percent at that time."  ECF No. 153-4 at 45.

**B.     The Forensics**

44.     An autopsy revealed that Brooklyn Ricks had suffered multiple blunt traumas to the head, neck, and extremities, as well as a dozen puncture-type wounds that the forensic pathologist opined could have been made by a screwdriver.  ECF No. 157-3 at 51-60.  The causes of death were internal hemorrhaging from a puncture wound to the chest and blunt trauma to the head.  *Id.* at 63.  A bloody screwdriver was found in Ricks's primer-gray truck, which Sirevaag had identified as the truck he saw at the crime scene.  ECF No. 156-3 at 28; ECF No. 153-2 at 77-79.

45.     Although there were blood and fingerprints at the crime scene, fingerprints in the truck, and blood on the screwdriver, the police could not tie any of it to Bolin.  ECF No. 154-3 at 92, 107-08; ECF No. 158-2 at 38, 53, 64-66; ECF No. 155-1 at 52; ECF No. 156-2 at 35-38, 56-57.  Nor was any trace of Ricks or her personal effects found on Bolin or in his possession.

46.     To connect Bolin to the crime, the prosecution was thus forced to rely on a single dark "foreign" hair found on Ricks's body and a set of featureless footwear impressions that appeared to lead to and away from where Ricks was found.  The prosecution also attempted to

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

tie Bolin to the crime by combining evidence about Bolin's 1975 rape conviction with the state

criminalist's testimony that semen was purportedly found in Ricks's vagina.

### 1.    The Footwear Impressions

47.    A set of "smooth" footwear impressions were discovered leading to and from the

crime scene.  ECF No. 156-3 at 18, 101-02.  These impressions were "featureless"—they had

"no heel marks, no sole identification marks[;] it was a smooth pattern from heel to toe."  *Id.* at

101; ECF No. 157-4 at 13 ("featureless," "very little character to the sole").

48.    Crime scene analysts estimated that these smooth impressions were left by a

shoe that was in the "range" of size 10 or 11, and "generally in the same order of size" as Bolin,

who wore a size 10.5.  ECF No. 157-4 at 12, 16, 20; ECF No. 156-3 at 18.  This estimate was

based on a visual inspection of photographs that crime scene analyst Dan Ford had taken of the

impressions next to a ruler placed on the ground.  ECF No. 156-3 at 101.

49.    Although the crime scene analysts referred to a "range" of sizes, the prosecution

argued at trial that the footwear impressions were the "same size" that Bolin wore—a men's

10.5.  Ex. 174 (prosecution's closing demonstrative stating "SAME SIZE"); ECF No. 161-2 at

165 ("we do know . . . that the footwear impressions are consistent with a 10-1/2"); *id.* at 168

("How many of those people are going to have a size 10-1/2, do we know?  We know of one.");

*id.* at 174 ("[H]ow many of them have a 10-1/2 shoe?").

50.    Even if the crime scene analysts' rudimentary process of measuring the outsoles

of featureless footwear impressions had been reliable, and even if the footwear impressions at

the scene had actually been from a size 10.5 shoe (*but see infra*, Claim 3(A)(3) and 3(D)(2)),

there is no dispute that size 10.5 is "pretty normal" for men.[8]  ECF No. 158-1 at 100.

### 2.    The "Foreign" Hair

51.    The prosecution's forensic case centered on a single hair recovered from Ricks's

body.  Terry Cook, an LVMPD criminalist who would later resign after it was discovered that

---

[8] In fact "[i]n the United States, the average shoe size in men is thought to be around 10.5."
*What Is the Average Shoe Size for Men?*, Healthline (Aug. 7, 2019),
https://www.healthline.com/health/average-shoe-size-for-men.

his forensic work sent an innocent man to prison,[9] analyzed two hairs that had been combed from Ricks's pubic area. ECF No. 156-1 at 82, 108. He felt that one of the two hairs resembled Ricks's hair and appeared to be "Caucasian." *Id.* at 97, 89. The other was "much darker, [a] little bit longer, and much wider." *Id.* at 89.

52. Cook could not determine the race of a hair's donor by visual examination. It is impossible to determine the race of a hair from microscopic hair comparison because there are no unique hair characteristics among races. ECF No. 158-4 at 34-35, 63. Nevertheless, Cook told the detectives it was a "Negroid hair," had "Negro characteristics," and was "consistent with that of a Negro suspect." ECF No. 155-1 at 22, 49-50; ECF No. 156-1 at 96-97; ECF No. 152-2 at 24 (prosecutor repeating "Negroid hair" and "Negroid race" multiple times).

53. Cook, who had one week of training in hair analysis through an FBI course (ECF No. 156-2 at 31; ECF No. 158-4 at 52), used microscopic hair analysis to conclude that the hair was "microscopically similar" to *one* of the 30-or-so hair samples provided by Bolin—meaning that Cook could not exclude him as the source of the foreign hair based on a side-by-side visual inspection under a microscope. ECF No. 158-4 at 53 ("When I say microscopically similar, it means that in the hairs provided that are represented to me as standards, I have found one that is indistinguishable. Q. So . . . of the 30 hairs that you looked at, you found one that you felt was indistinguishable from the foreign hair [found on] Brooklyn Ricks? A. That's correct."); ECF No. 156-1 at 107-08 (testifying that microscopic similarity occurs when "the hair in question is compared to the standards and you find one that is essentially identical"; testifying that the foreign hair found on Ricks "had a counterpart in the hair standards of . . . Mr. Bolin").

---

[9] *See* Lawrence Mower, *Police Technician Whose DNA Error Sent Wrong Man to Prison Resigns*, Las Vegas Rev.-J. (July 26, 2011, 5:56 PM), https://www.reviewjournal.com/crime/courts/police-technician-whose-dna-error-sent-wrong-man-to-prison-resigns/ (noting that Cook's error "sent the wrong man to prison" after he "swapped vials of DNA evidence"); Associated Press, *Vegas Police Sorry After Wrong Man Goes to Prison*, Deseret News (July 7, 2011, 4:20 PM), https://www.deseret.com/2011/7/7/20202517/vegas-police-sorry-after-wrong-man-goes-to-prison.

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

54.    Cook conceded that microscopic hair comparison is "subjective" and that there are no "objective criteria" for the comparisons, and Cook did not take notes about the hair characteristics that led to his conclusion. ECF No. 156-1 at 88, 111-14; ECF No. 161-2 at 18; ECF No. 158-4 at 39. Cook also qualified his conclusion by explaining that there was no way to know how many other people might likewise have hair "microscopically similar" to the "foreign" hair. ECF No. 156-1 at 107-08; ECF No. 158-4 at 37-39.

55.    Despite the impossibility of calculating microscopic similarities across populations, Cook emphasized that microscopically similar hairs "could have originated from" the suspect, and that, although there was a "possibility of excluding" Bolin as the source of the hair using microscopic hair comparison, Bolin "was not able to be eliminated." ECF No. 156-1 at 87; 156-2 at 49-50. Cook testified that among Bolin's hair samples was at least one hair that was "identical" and "indistinguishable from the hair that [was] found . . . on Brooklyn Ricks." ECF No. 158-4 at 97.

56.    During closing argument, the prosecution capitalized on this point, failing to acknowledge the limited value of microscopic hair analysis: "Hair evidence is best for exclusionary value. Absolute for exclusionary value. And neither expert, defense or prosecution, can exclude that man." ECF No. 161-2 at 167. In rebuttal, the prosecution pointed out that Cook did a microscopic "[s]ide-by-side analysis" comparing the "suspect hair with the known hair standards of [Bolin] and he found one which was indistinguishable," meaning "they were microscopically similar." ECF No. 161-3 at 156-57.

57.    The "foreign" hair was also sent—along with a sample of Bolin's and Ricks's blood—for DNA testing at Cellmark Diagnostics, an independent laboratory. ECF No. 156-1 at 125; Ex. 173. There, Paula Yates, a molecular biologist, analyzed the hair using Polymerase Chain Reaction ("PCR"). PCR allows scientists to "look at a different panel of genes in the DNA" and "make many copies of these regions and type them." *Id.* at 160. Yates testified that PCR testing could substantially narrow the number of possible contributors of a DNA sample, but it could not make an absolute identification. ECF No. 156-1 at 160-61.

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

58.     As Yates explained, the only forensically relevant portion of the hair was the root—because DNA is "only contained in the root of the hair" and can thus show "from whom did this hair originate." *Id.* at 179-80.  By contrast, "DNA suitable for PCR . . . is not contained in the shaft of the hair." *Id.*

59.     The PCR test's inability to detect DNA in the shaft of a hair permitted Yates to use the shaft of the "foreign" hair as a control for contamination. *Id.* at 180-82.  Yates testified that when conducting the control test, if DNA was found in connection with the shaft of a hair, "that would mean that there was something *on* the hair such as skin, tissue, or blood, or something of that nature"—such that any DNA result from the root portion could not be reliably determined to have originated from the root. *Id.* at 180 (emphasis added).  If DNA is found in connection with the root section of a hair but not the shaft, one "can be reasonably sure that the DNA . . . from the root portion was from the root itself and not from what was on the shaft." *Id.* at 181-82.  Controlling for contamination—by testing one piece of the hair that contains the root and an "adjacent" piece that contains just the shaft—ensures that "biological tissue *on* the hair" is not "responsible for those [DNA] results." *Id.* at 180-81 (emphasis added).

60.     Yates further emphasized that if results from the shaft and root portion were "the same," she would "have no way of knowing whether or not the [genetic] typing results that [she] got from the root part of the hair was actually from the root itself or was from the shaft or what was on the shaft." *Id.*; *see also* ECF No. 157-1 at 109 ("Q. So if you are getting a result from the shaft and it might be the result of. . . either blood or tissue, how do we know that the results that we're getting are from the root rather than from the hair shaft? A. We don't know.").

61.     That is precisely what happened with the "foreign" hair.  Yates "cut a portion of the hair that contained the root and . . . as a control measure, [she] cut a portion of the shaft of the hair *right next to* that piece," and tested them for DNA.  ECF No. 156-1 at 180 (emphasis added).  "The [DNA] types that [Yates] got from the hair root portion were the same as those that [she] got from the shaft portion of the hair." *Id.* at 190.  According to Yates:

> Because I got the same types from the shaft as I got from the root portion . . . I was not able then to distinguish between what was actually obtained from the root, *if anything*, and what was on the shaft itself. In other words, the DNA that I got from the root portion, because it was the same as the DNA profile that I got from the shaft portion, I could not then tell whether or not that DNA that I typed was actually from the root itself or from what was on the hair.

*Id.* (emphasis added). The hair was contaminated. There was no way to know whether the DNA came from the hair itself or "what was on the hair." *Id.*

62. Still, the prosecution elicited testimony that Yates "could not exclude" Bolin as being "associated with the DNA from that hair [root] or that hair shaft"—without clarifying that the results indicated contamination. *Id.* at 206-07; ECF No. 161-2 at 167-68 (arguing misleadingly in closing that the "State's experts for DNA and the defendant's experts for DNA agree, and that is that the [defendant] cannot be excluded, that DNA compliments [*sic*] the subjective hair comparison and that DNA cannot exclude" him). That conclusion was a nullity, which the Cellmark Report made clear: "Since the types obtained from the hair shaft were the same as those obtained from the hair root, *no conclusion can be made* regarding the donor of the hair." ECF No. 24-3 at 23 (emphasis added).

63. The Cellmark Report was not introduced into evidence.

64. Worse still, the prosecution used the population frequency statistics of the DNA found on the contaminated hair, which were noted in the Cellmark Report, to extrapolate that Bolin was one of only a few individuals who could have committed the crime. The Cellmark Report included "approximate frequencies" for Caucasian, African-American, and Hispanic populations for the DNA result found on the contaminated hair. ECF No. 24-3 at 23. According to Cellmark's databases, the DNA profile found on the contaminated hair could be found in approximately 1 in 5,800 Caucasians, 1 in 2,600 African Americans, and 1 in 15,000 Hispanics. *Id.*; ECF No. 156-1 at 209-13; ECF No. 157-1 at 76.

65. The population frequencies were, of course, completely irrelevant. They were the population frequencies for a DNA result from a *contaminated* hair—not a hair that had any forensic value to a murder investigation or trial.

66.     The prosecution buried the contamination issue by eliciting extensive testimony about the number of Black men in Las Vegas in July 1995. *See* ECF No. 157-2 at 49 (prosecution's expert estimating the Black male population between ages 20 and 44 in July 1995 was 21,111).

67.     Then, in closing, the prosecution multiplied those Las Vegas population statistics by the frequency that the contaminated hair's DNA profile is found in African American men, to solidify the idea that Bolin was one of only a few men who could have committed the crime:

> He is the only one that can't be excluded in this investigation. He is 1 in 2400. And you can do the math however you want to do the math. You can listen to whoever's experts you listen to. . . . There [were] approximately 22,000 black male adults in the range of 20 to [44]. . . . When you begin to do that math, all you look for is an estimate. I don't submit that it's an exact number. But you find that 1 in 2400 or 1 in 2600 goes into 22,000 about 9 times. Now, you can put a fudge factor in there, and you can say that it goes in 10 or 11 [times].

ECF No. 161-2 at 173[10]; *see also* ECF No. 152-1 at 48, 52, 53 (arguing in opening statements that Bolin had "one in 2600 D.N.A."). The prosecution then extrapolated a step further, asking the jury "how many of those [10 or 11] individuals" were known to have various circumstantial similarities—like a 10.5 shoe size, to have visited the video store, to have been identified by Sirevaag, and to have been suspected by Ricks's sisters. ECF No. 161-2 at 173-74.

68.     Bolin's trial counsel not only failed to object to testimony from the prosecution's witness about the DNA result, but they also did not correct the defense expert's glaring failure to acknowledge that the hair was contaminated. Defense expert Lisa Calandro incorrectly agreed that the DNA profile at issue originated "in the root" and "from the root" of the foreign hair. ECF No. 160-4 at 81, 88-89 (answering multiple questions about whether Bolin could be excluded based on DNA "from the root" or "in the root"). She also explicitly agreed that Bolin could not be "excluded as the donor of the hair," ignoring the contamination of the hair and Cellmark's own conclusion that nothing could be said about the hair's donor. *Id.* at 88.

---

[10] The defense expert's estimated population frequency (1/2400), multiplied by the estimated population of Black men, aged 22 to 44, in Las Vegas in July 1995 (22,000), equals approximately 9.2.

69.    Bolin's trial counsel also failed to object to or challenge the testimony about the population statistics as irrelevant, even though those statistics were premised on the false assumption that the hair was not contaminated.  Instead, the defense *endorsed* the prosecution's theory, using its *own* experts to quibble about exactly how many Black men were in Las Vegas on July 15, 1995, and whether a different laboratory's population statistics of "1 in 2,400" for African Americans should be used instead of Cellmark's "1 in 2,600."  ECF No. 160-3 at 75 (estimating that there were 21,682, instead of 21,111 Black men in the 20-to-44 age range in Las Vegas in July 1995); ECF No. 160-4 at 35-36 (estimating that DNA profile occurred in "1 in 2,400" African Americans).  Defense counsel missed the issue entirely.

70.    Bolin's trial counsel was equally ineffective in combatting these issues during closing arguments.  In fact, Bolin's lead trial attorney confessed, "[W]hen it comes to D.N.A. and the scientific stuff, I'm going to tell you, I'm like out in left field.  I can't follow it."  ECF No. 161-3 at 35.  Instead of arguing that the hair was contaminated and the population statistics were thus irrelevant, defense counsel: (1) argued that the population of Las Vegas is "just too volatile" in the "fastest growing city in America," where "people come and go"; (2) criticized the prosecution's Las Vegas population statistics that were based on July 1, 1995 information and thus were outdated by two weeks by the date of the murder; and (3) conceded that the population frequency at issue was "either 1 in 2,400 or 1 in 2,600."  *Id.* at 36, 98.  Apparently conceding that the only question up for debate was the statistical impact of the DNA, defense counsel concluded by asking the jury, "[I]s it fair to try to convict someone on an estimate?"  *Id.* at 99.

71.    Paula Yates's brief testimony that she had obtained the same DNA profile from both the root and the shaft of the "foreign" hair was long forgotten by the jurors, who were led to believe, by both the prosecution and Bolin's own counsel, that the issue was about population frequencies and the number of Black men in Las Vegas—not that the hair was plainly contaminated and any statistics related to that hair were entirely irrelevant.

### 3.    <u>The Sexual Assault Evidence</u>

72.    Under Nevada law, both at the time of Bolin's trial and today, the crime of sexual assault requires "sexual penetration."  Specifically, the version of the criminal statute that was operative in 1996 states, "A person who subjects another person to sexual penetration, or who forces another person to make a sexual penetration on himself or another, or on a beast, against the victim's will or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault."  Ex. 176 (NRS 200.366(1) (1995)).  In turn, "'Sexual penetration' means cunnilingus, fallatio, or any intrusion, however slight, of any part of a person's body or any object manipulated or inserted by a person into the genital or anal openings of the body of another, including sexual intercourse in its ordinary meaning."  Ex. 175 (NRS 200.364(2) (1995)).

73.    Although the prosecution charged Bolin with sexual assault, there was virtually no evidence supporting such a crime.  The *only* purported evidence of sexual assault included the presence of the "foreign" hair (*supra*), the fact that Ricks's underwear was inside-out (ECF No. 155-3 at 62), a pantyliner that the prosecution conceded may not have been connected to the case (ECF No. 152-1 at 45),[11] and a trace amount of P-30, a protein that can be found in semen, on Ricks's vaginal swab (ECF No. 156-1 at 74-75).

74.    The doctor who performed the autopsy agreed that he did not observe "any evidence of a sexual assault."  ECF No. 157-3 at 85.  There was no bruising or trauma to Ricks's vaginal or anal regions or thighs.  *Id.* at 79, 85.  There was no sperm found in or around Ricks or on her pantyliner.  ECF No. 156-1 at 73-74, 102-03; ECF No. 156-2 at 28-29.

75.    As LVMPD criminalist Terry Cook put it, the test for P-30 was the "final chance . . . to identify semen."  ECF No. 156-1 at 74.

---

[11] There were two pantyliners.  Ricks was wearing one inside her underwear.  The second was found a distance from the body—on the dirt road leading up to the construction site, scattered with other random items (a cup, a paper towel, a cigarette butt, and a cardboard jewelry box), none of which was ever connected to the case.  ECF No. 152-1 at 44-46.

76.     Cook testified that, based on the P-30 test, "a trace amount of semen was, in fact, present"—by which he meant "a very small quantity of semen." *Id.* at 74-75.  Cook repeatedly testified that P-30, in no uncertain terms, was proof of semen:

> a.  the P-30 test is "a test that we use to identify semen because there is a protein in semen that's specific to semen . . . called P30," *id.* at 74;
>
> b.  the weakly positive P-30 test told Cook "that a trace amount of semen was, in fact, present," meaning "a very small quantity of semen was, in fact, present," *id.* at 75;
>
> c.  P-30 is a "seminal protein," *id.* at 78-80;
>
> d.  the P-30 result showed that "a small amount of semen was present" and as "seminal protein, obviously it came from a man," *id.* at 80;
>
> e.  the P-30 was "proof positive of semen," *id.* at 99;
>
> f.  "just p30 alone, which [he] did identify, would identify semen conclusively," ECF No. 156-2 at 47; and
>
> g.  "P30 is tantamount to semen, yes," *id.* at 54.

77.     Cook testified that such "trace amounts of semen" can remain in the vagina for "a few hours to a few days" (ECF No. 156-1 at 81, 99)—which suggested that it did not come from Ricks's husband, who testified that he and his wife had not had sex for about eight days. ECF No. 152-2 at 68.[12]

78.     The P-30 was detected in such small "concentrations that [Cook] couldn't forensically do anything with" it—i.e., test it for blood type or DNA.  ECF No. 156-1 at 80; ECF No. 156-2 at 57-58.

79.     Apart from the "trace" amounts of P-30, the evidence of sexual assault—the pantyliner on the road, the inside-out underwear, and the "foreign" hair—was weak, speculative, and irrelevant to penetration.  In fact, during oral argument on direct appeal, as discussed *infra*, Nevada Supreme Court Justice Robert E. Rose remarked that the "sexual assault is questionable."  ECF No. 24-3 at 65.  The prosecution agreed with that conclusion on

---

[12] The husband, however, suffered from credibility problems—for example, he testified at length about his relationship with his wife but did not mention that he had previously filed for divorce until confronted with the divorce petition itself.  ECF No. 152-2 at 82-86.

multiple occasions.  ECF No. 145-6 at 238 (prosecutor conceding sexual assault count was "weakest"); ECF No. 147-1 at 43 (same).  As did the Nevada trial court judge.  ECF No. 147-1 at 51 ("The evidence [of sexual assault] is thin.").

80.    Against this backdrop and for several reasons, the P-30 was critical.  Most obviously, the prosecution's sexual assault charge required the prosecution to prove that "sexual penetration" occurred—and the prosecution had no other evidence to show penetration.  ECF No. 161-2 at 86-87 (jury instruction defining sexual assault as requiring "sexual penetration"); Exs. 175, 176 (NRS 200.364(2), 200.366(1) (1995)).

81.    The other circumstantial evidence—the inside-out underwear, the random pantyliner, the "foreign" hair—could not prove penetration.  The sexual assault charge was thus based entirely on the P-30 finding.  In opening and closing arguments, the prosecution stated that the P-30 "identifies semen, and it identifies it as proof positive," meaning that "there had to be ejaculate in this woman within the last two hours to three days."  ECF No. 161-2 at 131; *see also id.* ("Certainly there was penetration.  Certainly it speaks to intercourse."); ECF No. 152-1 at 52 ("The samples obtained from her vagina established that there [was] evidence of semen."). The prosecution then stated that "we know . . . through evidence, beyond a reasonable doubt, that there was penetration because [of] the presence of P-30."  ECF No. 161-2 at 132.  Without the P-30, the prosecution could not sustain the sexual assault charge.

82.    Beyond the sexual assault charge itself, the P-30 evidence was equally important to the prosecution's murder charge against Bolin because sexual assault was the prosecution's theory of motive.  The prosecution elicited testimony and argued that "sexual assault is the second most common motive in homicides involving females."  ECF No. 161-2 at 131; *see also id.* at 170-72 (arguing sexual assault as motive); *id.* at 144 (arguing the "defendant had an interest in attractive girls or women"); ECF No. 158-3 at 41, 100 (eliciting testimony from Hefner about sexual assault as motive for homicide).  Without the P-30 "proof" of sexual assault, the prosecution's motive for murder would have fallen away.

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

83.     Bolin's trial counsel did not dispute that P-30 was proof of semen.  Defense expert Lisa Calandro testified that P-30 is a "semen specific protein" (ECF No. 160-4 at 54), and in closing, defense counsel conceded that P-30 "would be indicative of . . . sexual intercourse."  ECF No. 161-3 at 68.  As discussed *infra*, the testimony about P-30 was false.

### C.     The Prior Offense

84.     The P-30 evidence was significant in securing Bolin's murder conviction for a another important reason: The purported evidence of semen paved the way for the egregious admission of extensive testimony about Bolin's decades-old rape conviction—an offense to which Bolin pleaded guilty and served his time.  ECF No. 155-2 at 36-38; ECF No. 155-1 at 47.

85.     The Ricks case had almost nothing in common with the 1975 offense, committed when Bolin was 18 years old, except for the most superficial similarities—the race of the women (both white), the fact that the crimes occurred late at night, and the purported involvement of a vehicle.  ECF No. 202-2 at 48 (arguing that there was a common plan or scheme based on similarities "in age of the victims," "in the race of the victims," the "time frame" being late at night, and "that the victim's vehicle was used in the perpetration of these crimes").

86.     The two crimes were different in important, obvious ways.  The prior offense featured two perpetrators, a gun, and multiple attempts at robbery, including a ransacking of the victims' apartment and multiple attempts to obtain cash from the victims at a local convenience store.  ECF No. 155-1 at 59-63, 84-87, 102-03.  By contrast, the Ricks murder was apparently committed by a lone culprit, featured no gun, and, by the state's own admission, involved only marginal proof of either robbery or sexual assault.[13]  ECF No. 145-6 at 239; ECF No. 202-2 at 51-54.  During oral argument on direct appeal to the Nevada Supreme Court, Justice Rose acknowledged the lack of similarities in the crimes.  Noting that "identity," was the "primary basis for admission here," Justice Rose stated:

---

[13] Ricks's backpack, two rings, and bracelet were missing and never recovered.  ECF No. 152-2 at 57, 70-71.

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1

2
I see there was no murder, it was done with another, this is the Colorado
matter.  There was, robbery was clearly one of the major ingredients there
and it appears to be marginal here.  It was done with a gun in Colorado
and a knife here.  There were two victims in Colorado and not here.  And
the sexual assault is questionable.  So I don't see an awful lot of those
identifying marks you're talking about and if I don't see a lot, I really
wonder whether or not the District Judge was right.

3

4

5     ECF 24-3 at 64-65.

6          87.     Despite these stark differences and the lack of meaningful similarities, the

7     purported evidence of sexual assault in the Ricks case—namely, the P-30 evidence—was what

8     allowed the prosecution to argue for admission of the prior-acts evidence.  During a pretrial

9     motion hearing on March 29, 1996, the prosecution argued that the P-30 finding was evidence

10    "that within a 48 hour time frame of the murder of this young woman[,] . . . there had been

11    semen deposited in the vaginal area."  ECF No. 147-1 at 43; *see also id.* at 44 ("There was

12    recent evidence of intercourse.  The semen is there within a 48 hour time frame to prove it.").

13    Then, two months later, while arguing for admission of the prior acts evidence, the prosecution

14    stated that the "fact that there was some semen found in her speaks to the fact that there was a

15    sexual assault."  ECF No. 202-2 at 47.  The prosecution told the court that the two main issues

16    in this case were "the identity of the perpetrator" and "was there in fact a sexual assault; was

17    this woman sexually penetrated."  *Id.* at 46.  According to the prosecution, "the crime of 1975

18    addresse[d] both of those issues."  *Id.*

19         88.     The trial court held that the "behavior in the 1975 incident and the instant case

20    are both terribly aberrant sexual behaviors or involve terribly sexual aberrant behaviors that are,

21    in [the court's] opinion, similar enough to demonstrate consistent underlying themes."  *Id.* at 61.

22    The court then admitted the evidence on the issue of the perpetrator's "identity," as well as to

23    show a "common plan, intent, similar modus operandi and similar sexual aberration" under

24    Nevada law.  *Id.* at 60-62; ECF No. 149-3 at 57 (reiterating that prior offense evidence could

25    come in on "issue of identity to show a sexual assault occurred, to show a similar plan, to show

26    intent interrelated to that kind of plan, a similar modus operandi and also to demonstrate . . . that

27

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1   there is a similar sexual aberration involved").  The court reasoned, in part, that "both" cases

2   "involved brutal and forcible rapes."  ECF No. 149-3 at 56.

3        89.    And, thus, the highly prejudicial evidence against Bolin came in.  The rape

4   victim testified.  Her husband testified.  And so did two investigating officers from Colorado,

5   where the crime occurred.  *See generally* ECF No. 155-1 at 55-109; ECF No. 154-3 at 70-87;

6   ECF No. 155-2 at 6-50.

7        90.    The rape victim, Royce Renee Morriss, gave detailed, emotional, and graphic

8   testimony about the crime that Bolin committed in 1975 when he was 18 years old.  ECF No.

9   155-1 at 70-87.  The husband provided a consistent account from his own perspective,

10  describing in graphic detail how he heard the rape occurring in the back seat of the vehicle as he

11  remained locked in the trunk.  ECF No. 154-3 at 79-82.

12       91.    The prosecution relied heavily on this prior offense to obtain Bolin's conviction.

13  The prior offense was a critical component of the prosecution's trial narratives—that Bolin was

14  interested in attractive white women, that Bolin could be identified in this case based on his past

15  "aberrant behavior," and that his past "aberrant behavior" demonstrated his motivations for the

16  crime.  The prosecution argued in closing:

17          Can the motive of the Royce Rene Morris [*sic*] case tell us something in
18          this case?  Can the intent in the Royce Rene Morris [*sic*] case tell us
        something in this case?  Can the knowledge of the Royce Rene Morris
19          [*sic*] case tell us something about the individual who is identified in this
        case?  Or can the Royce Rene Morris [*sic*] case tell us something about
20          the identity of the perpetrator in this case?

21          Can the perpetrator in the Royce Rene Morris [*sic*] case, can that person's
        sexual aberrant behavior tell us something about the sexual aberrant
22          behavior seen in this case?

23          And I submit that it is aberrant behavior, whether it was 21 years ago or
        whether it was yesterday, to hold a woman at gunpoint and to place her
24          husband in the trunk of the car and to sexually assault her against her will
        throughout the course of an evening.

25  ECF No. 161-2 at 169-71; *see also id.* at 143-44 (arguing about Bolin's interest in "attractive

26  girls or women" and "attractive females").

27

28

- 44 -

92.     The prosecution went further still, arguing that the *absence* of a murder in 1975 could be viewed as *evidence* of a murder in 1995:

> It speaks of the knowledge, because, after all, some 21 years ago, we learned something.  If a victim is left to tell the story, and certainly, Royce Rene Morris [*sic*] escaped, and she was able to make identification, that identification is going to identify the perpetrator.  Brooklyn Ricks was not able to do that.   Brooklyn Ricks was silenced.  And there is something significant about that.

ECF No. 161-2 at 172.  But it all turned on the P-30 test result   Without the P-30 evidence, there would have been no evidence of sexual penetration, and neither the highly prejudicial prior-acts testimony nor the prosecution's motive arguments would have had any basis.

**D.     The Jailhouse Informant**

93.     To shore up weaknesses with its forensic and eyewitness evidence, the prosecution also called a jailhouse informant, a man who shared a cell with Bolin for approximately one week in August 1995, to describe Bolin's purported paranoia about evidence that related to certain elements of the case.  ECF No. 157-2 at 77-82.

94.     Michael Siebert, a heavy drug user, testified that after he told Bolin that he had studied criminal investigation, Bolin asked him whether fingerprints could be identified on various surfaces in a car or truck, or from a screwdriver.  *Id.* at 85-88.  Siebert testified that he had no independent information about the relevance of a truck or screwdriver to Bolin's case.  *Id.* at 92-93.

95.     Siebert had serious credibility issues.  Siebert was once arrested when, while under the influence of four substances, he called police to report that someone had stolen steaks from him.  *Id.* at 103-05.  He was arrested again for grabbing t-shirts from an unauthorized vendor in a restaurant and then flashing a badge as he ran off, intending to sell them to support his drug habit.  *Id.* at 107-08.  Siebert also admitted that he had falsely claimed that he was HIV positive in order to obtain more favorable housing in the jail.  *Id.* at 112-13.

96.     Siebert was a daily user of methamphetamine and other substances.  *Id.* at 105-06.  A defense expert testified about the significant negative effects of regular

- 45 -

methamphetamine use on cognition and perception. ECF No. 159-2 at 66-72. The expert testified that its use "leads to a sense of suspiciousness, vigilance, watchfulness" and is associated with "fear reactions" and "paranoia." *Id.* at 65.

97.     Siebert also admitted that, ten days after giving his statement to the detectives, he was allowed to plead guilty to a reduced charge for his impersonation offense, receiving a time-served sentence of just five days. ECF No. 157-3 at 29. In connection with his controlled substances charge, which was a felony carrying a prison term of one to five years, he was permitted to plead to misdemeanor possession and sentenced to a suspended 30-day term. *Id.* at 29-30.

### E.     Newly Presented Evidence

98.     In addition to the constitutional violations that are already reflected in the record, new evidence sheds even more light on the injustice of Bolin's conviction and imprisonment. Had the information and evidence that follows been presented at trial, no reasonable juror would have found Bolin guilty beyond a reasonable doubt.

#### 1.     Additional Evidence that the DNA Result Was Invalid Because the "Foreign" Hair Was Contaminated and the Use of Derivative Population Statistics Was Improper

99.     Dr. Lisa Forman Neall, the population geneticist at Cellmark Diagnostics who signed the Cellmark Report in this case and supervised Paula Yates (ECF No. 157-1 at 85), signed an affidavit that makes clear that the DNA evidence was from a contaminated hair and had precisely no forensic value. *See* Ex. 177. As Dr. Forman Neall stated, "DNA from an individual's hair should only be found in the testing of a hair root. A DNA result should not be obtained from a hair shaft. If DNA is found on a hair shaft, then it can only be there because of a 'transfer,' a term that means contamination from another biological source. The contamination could have come at any time—even during PCR analysis at the laboratory." *Id.* ¶ 4.

100.     Dr. Forman Neall then made clear that, in this case, "the hair shaft yielded a DNA result," which "means that the hair shaft was contaminated, and the Cellmark testing

1    detected biological material that was *on* the hair shaft." *Id.* ¶ 5 (emphasis in original). "Thus,

2    we could not determine whether the DNA results from the hair root testing reflected the profile

3    of the hair root itself or, rather, the profile of *something that was on the hair root*—like the

4    same biological material that contaminated the adjacent hair shaft." *Id.* (emphasis in original).

5    Importantly, she noted: "Since we could not rule out contamination of the hair root, the DNA

6    results from the hair root were *inconclusive*." *Id.* (emphasis in original).

7        101.    The affidavit from Dr. Forman Neall was obtained in May 2022, which was

8    when she first learned about Bolin's case.  Dr. Forman Neall wrote in her affidavit that it

9    "trouble[d] [her] greatly to think that this Cellmark Report—a report that [she] signed regarding

10   work that [she] personally oversaw—played a role in the trial and conviction of Mr. Bolin." *Id.*

11   ¶ 8.  The inconclusive nature of the results "means that there is no DNA evidence from this case

12   that can be used in any probative way." *Id.*  "There is no reliable scientific evidence from the

13   Cellmark Report that can be used to identify or infer the source of that hair.  None." *Id.*  "The

14   hair discussed in the Cellmark Report cannot, in any way, be attributed to Mr. Bolin." *Id.*

15       102.    Because the hair was contaminated, the population frequencies included in the

16   Cellmark Report had no connection to the hair itself.  The frequencies were included only

17   because the 1995 laboratory guidelines required them.  As Dr. Forman Neall explained, the

18   lab's accreditation "guidelines required population statistics to be included in any report that

19   contained information about DNA genotypes." *Id.* ¶ 6.  She then definitively stated that "it

20   would have been complete error to use the population statistics noted in the Cellmark Report to

21   draw inferences or conclusions about the hair and/or its origin," given that the results

22   demonstrated contamination and were inconclusive. *Id.* ¶ 7.  "Because the DNA results were

23   inconclusive, any use of the population statistics noted in the Cellmark Report to suggest that

24   Mr. Bolin was one of a vanishingly small number of Black men who could have committed the

25   crime is beyond courtroom hyperbole.  It is pure sophistry." *Id.*

26       103.    Moreover, Dr. Forman Neall also discredited the significance of the population

27   frequencies (even if they had been valid in this case), noting that the statistics were "meant to

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

give context to the match and move its meaning away from the winning-the-lottery realm by grounding it in the likelihood of a match just by chance within human populations." *Id.* ¶ 6. She elaborated:

> [T]he statistics associated with the genotypes revealed on the hair shaft and hair root are extremely common. The spurious assertion that using the number of Black people living in or traveling through Las Vegas and dividing it by the proffered statistic to arrive at fewer than a dozen people who could have committed the crime (even *IF* the hair results had been conclusive, which they weren't—they were simply invalid) would not have withstood any statistical scrutiny. There are so many fallacious premises in that "analysis" that it is mind boggling.

*Id.* ¶ 8. "That these statistics were manipulated to represent something that, forensically and scientifically, they could not represent, and that a jury was permitted to consider them in its decision, leads me to conclude that the conviction of Mr. Bolin represents a miscarriage of justice." *Id.*

104.    In sum, Dr. Forman Neall explained that the use of the Cellmark Report against Bolin was "illegitimate," "tragic," and "grossly unfair." *Id.* ¶ 9.

105.    The LVMPD's own current "Biology/DNA Detail Procedures Manual" makes clear that no conclusions can be drawn from contaminated DNA results—using almost identical language to that contained in the Cellmark Report. For example, the LVMPD manual states when controls for contamination fail, "no conclusions will be made." Ex. 178 at 261-62 (§ 12.23.4). Similarly, "[i]f a contaminated sample cannot be resolved through re-analysis (whether due to internal sample-to-sample contamination, sample switch, etc.), the following report statement will be used: 'Due to a sample contamination issue, no conclusions will be made in regard to <XX>.'" *Id.* at 260 (§ 12.23.1). In Bolin's case, the Cellmark Report said the *same thing*—"no conclusion can be made regarding the donor of the hair" (ECF No. 24-3 at 23)—yet the prosecution used the DNA results to implicate Bolin in this crime, and rather than challenging that effort, Bolin's counsel effectively endorsed it.

## 2. Evidence that P-30 Is Not "Proof Positive" of Semen

106. Contrary to the repeated testimony and argument that P-30 is "proof positive" of semen (*see supra* ¶¶ 76-83), *there was no proof of semen in this case* and therefore: (1) no proof of sexual penetration, as required for the sexual assault charge; (2) no forensic evidence of sexual assault, which the prosecution argued was the motive for Ricks's murder; and (3) no basis for the admission of the highly prejudicial testimony about Bolin's 1975 offense. It was clear in 1996 and remains indisputable that P-30—the "prostate-specific antigen" also known as PSA—is found not only in semen, but also in *female* bodily fluids, including *vaginal* fluid.

107. The affidavit of Dr. Rhonda C. Williams explains that P-30 is "*not* specific to semen and that it is found in (among other body fluids) amniotic fluid, breast milk, breast tumors, female serum, female urine, and female vaginal fluid." Ex. 179 ¶ 4 (emphasis in original). This was understood well before Bolin's trial. *Id.* ¶ 3. Dr. Williams also explained that it is "forensically invalid" to state that a "positive p30 finding is conclusive for male semen." *Id.* ¶ 8. In fact, a "trace" amount of P-30, in the absence of sperm cells, is "the same finding [she] would expect to see from a female decedent's vaginal swabs detecting the female's own bodily fluid." *Id.*

108. Dr. Williams stated that "in the case against Gregory Bolin, there is no conclusive serological evidence for the existence of semen," a conclusion "based on the lack of sperm cells and a barely positive p30 test." *Id.* ¶ 9.

109. That P-30 is found in vaginal and other female bodily fluids—and is not unique to semen—was well known in the scientific community at the time of Bolin's trial. At least 18 scientific research articles, letters to journal editors, and similar materials published prior to Bolin's 1996 trial demonstrate that P-30 is not, in any way, "proof positive" of semen:

> a. Ex. 180: John W. Huffman, *The Detailed Anatomy of the Paraurethral Ducts in the Adult Human Female*, 55 Am. J. Obstetrics & Gynecology 86, 86, 97-98 (1948) (discussing paraurethral ducts and glands in females—i.e., the female analogue of the male prostate, which produces P-30—and stating that "[t]he evidence that the paraurethral ducts and their glands are homologues of the prostate has come to be generally accepted").

b. Ex. 181: Vincent J. Longo, *Letter to the Editor: The Female Prostate*, 20 Urology 108, 108 (1982) (sounding the alarm against any forensic conclusion that a positive prostatic acid phosphatase was conclusive for semen—and thus evidence of rape—because vaginal fluid originating in the embryologic homologue of the human male prostate, dubbed "the female prostate," could also produce this enzyme and yield false positive test results).

c. Ex. 182: Richard J. Ablin, *Letter to the Editor: Prostate-Specific Antigen and the Female Prostate*, 35 Clinical Chemistry 507, 507-08 (1989) (explaining that recent studies detecting PSA (i.e., P-30) in female subjects is a reflection of "the biological fact that women have a prostate gland [also known as a paraurethral and (or) Skene's glands]" and warning that a forensic finding of PSA was not indicative of rape because the proteins are not unique to men) (brackets in original).

d. Ex. 183: Jeffrey J. Pollen & Anna Dreilinger, *Immunohistochemical Identification of Prostatic Acid Phosphatase and Prostate Specific Antigen in Female Periurethral Glands*, 23 Urology 303, 303-04 (1984) (identifying PSA (i.e., P-30) in female cadavers).

e. Ex. 184: Shelley L. Tepper, et al., *Homology Between the Female Paraurethral (Skene's) Glands and the Prostate*, 108 Archives Pathology & Lab. Med. 423, 424-25 (1984) (identifying paraurethral glands in females that tested positive for PSA and noting that the research "clearly demonstrated, using immunologic methods, that the cells of female paraurethral glands and adjacent urethral mucosa contain antigenic substances identical to those found in the [male] prostate").

f. Ex. 185: Hans Svanholm, Ole Peter Anderson & Hardy Røhl, *Tumour of Female Paraurethral Duct*, 411 Virchows Archiv A 395, 395-97 (1987) (cancerous tumor originating from a female paraurethral duct contained PSA).

g. Ex. 186: P.H.J. Riegman, et al., *The Prostate-Specific Antigen Gene and the Human Glandular Kallikrein-1 Gene Are Tandemly Located on Chromosome 19*, 247 FEBS Letters 123, 125 (1989) (isolating genes encoding PSA to chromosome 19, which is found in human males and females).

h. Ex. 187: Reinhard Golz & Guenther Erich Schubert, *Prostate Specific Antigen: Immunoreactivity in Urachal Remnants*, 141 J. Urology 1480, 1480 (1989) (detecting PSA in urachal remnants of cadaveric males and females and concluding that "PSA-staining is evidently not confined exclusively to tissue originating in the [male] prostate").

i. Ex. 188: Nicholas Wernert, et al., *The 'Female Prostate': Location, Morphology, Immunohistochemical Characteristics and Significance*, 22 Eur. Urology 64, 64 (1992) (using immunostaining for PSA to demonstrate prostate-analogous periurethral glands—"the 'female prostate'"—in 66.7% of 33 cases analyzed and noting that the glands "resemble strongly the male prostate glands before puberty").

j. Ex. 189: Milan Zaviačič, Jozef Šidlo & Miroslav Borovský, *Prostate Specific Antigen and Prostate Specific Acid Phosphatase in Adenocarcinoma of Skene's Paraurethral Glands and Ducts*, 423 Virchows Archiv A 503, 503

- 50 -

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

(1993) (noting that a cancer originating in a female subject's paraurethral gland showed "distinct" PSA that, among other things, "point[ed] to the equivalence between the male prostate and [female] Skene's paraurethral glands and ducts").

k. Ex. 190: Jürgen Breul, Ulrich Pickl & Rudolf Hartung, *Prostate-Specific Antigen in Urine*, 26 Eur. Urology 18, 19 (1994) (detecting PSA in urine of 38% of female subjects).

l. Ex. 191: He Yu & Eleftherios P. Diamandis, *Prostate-Specific Antigen in Milk of Lactating Women*, 41 Clinical Chemistry 54, 55 (1995) (detecting PSA in female breast milk).

m. Ex. 192: He Yu & Eleftherios P. Diamandis, *Prostate-Specific Antigen Immunoreactivity in Amniotic Fluid*, 41 Clinical Chemistry 204, 206-07 (1995) (detecting PSA in female uterine amniotic fluid).

n. Ex. 193: Howard C.B. Graves, *Nonprostatic Sources of Prostate-Specific Antigen: A Steroid Hormone-Dependent Phenomenon?*, 41 Clinical Chemistry 7, 8 (1995) (remarking that the existence of PSA in females had been clearly established and stating, "PSA can no longer be considered an absolutely tissue-specific marker. In time, this finding may require a name change for this interesting protease").

o. Ex. 194: Shoichi Ebisuno, Masahiro Miyai & Tomofumi Nagareda, *Clear Cell Adenocarcinoma of the Female Urethra Showing Positive Staining with Antibodies to Prostate-Specific Antigen and Prostatic Acid Phosphatase*, 45 Urology 682, 683-85 (1995) (describing a case of clear cell adenocarcinoma arising from the female urethra and noting positive staining for PSA).

p. Ex. 195: K. A. Alanen, et al., *Immunohistochemical Labelling for Prostate Specific Antigen in Non-prostatic Tissues*, 192 Pathology, Rsch. & Prac. 233, 234 (1996) (identifying PSA immunoreactivity in breast cancer).

q. Ex. 196: Ferdinando Mannello, Giuseppe Bianchi & Giancarlo Gazzanelli, *Immunoreactivity of Prostate-Specific Antigen in Plasma and Saliva of Healthy Women*, 42 Clinical Chemistry 1110, 1111 (1996) ("PSA is a widespread biochemical marker produced by many tumors, by normal tissues, and during pregnancy.").

r. Ex. 197: Xavier Filella, et al., *Detection of Nonprostatic PSA in Serum and Nonserum Samples from Women*, 68 Int'l J. Cancer 424, 426 (1996) (identifying PSA in milk secretions, breast cysts, amniotic fluids, women's serum, and broncho-alveolar washings and concluding that "PSA can no longer be considered as a specific prostate tissue marker, since it is present in many other tissues").

110. Additional articles that post-date Bolin's trial confirm the point:

s. Ex. 198: Eleftherios P. Diamandis & He Yu, *Nonprostatic Sources of Prostate-Specific Antigen*, 24 Urologic Clinics N. Am. 275, 276-80 (1997) (reviewing the literature on the presence of PSA in breast cancer tissue, breast fluids, amniotic fluid, female blood serum, ovarian tissue, endometrial

tissue, kidney tissue, pituitary tissue, sweat glands, and other cancers, and concluding that PSA is not specific to the male prostate gland).

t. Ex. 199: Milan Zaviačič & Richard J. Ablin, *Letter to the Editor: The Female Prostate*, 90 J. Nat'l Cancer Inst. 713, 713 (1998) (dating knowledge of the female prostate to 1672 and concluding that, due the expression of PSA by the female, "the presence of PSA . . . for the confirmation of spermatic secretion in the absence of spermatozoa has no forensic value").

u. Ex. 200: M. Zaviačič & R.J. Albin, *The Female Prostate and Prostate-Specific Antigen. Immunohistochemical Localization, Implications of This Prostate Marker in Women and Reasons for Using the Term "Prostate" in the Human Female*, 15 Histology & Histopathology 131, 138-39 (2000) (discussing the Skene's paraurethral glands and ducts in females—which the authors endorse as the female prostate—as a source of PSA).

v. Ex. 201: Pilar Martínez et al., *Semen Searching When Sperm Is Absent*, 55 Sci. & Just. 118, 118 (2015) (noting that PSA test is not "confirmatory" for semen because "PSA is an antigen present in both male and female biological fluids").

111.    In short, the female Skene's glands, also known as paraurethral glands and dubbed "the female prostate," is the embryologic equivalent of the male prostate and creates the same protein, but in lesser amounts.  That is why a weakly positive P-30 test without the detection of sperm cells is *not* "proof positive" of semen.  To the contrary, a weakly positive P-30 test may simply detect the vaginal fluid belonging to the female herself, which means that Terry Cook's P-30 result may simply have detected Ricks's *own vaginal fluid*.

112.    Today, the LVMPD's own "Biology/DNA Detail Procedures Manual" makes clear that a weakly positive P-30 result in the absence of sperm—the very same circumstances Terry Cook discovered in this case—would not be "proof positive" of semen:

a. "Other body fluids such as blood or urine can also contain PSA.  In addition, PSA can be found in very low concentrations in female vaginal fluid."  Ex. 178 at 32 (§ 2.14.3).

b. "Results can also be considered inconclusive when there is a combination of no sperm observed and weak positive results are obtained." *Id.* at 33 (§ 2.14.3(4)(c)).

c. "In certain instances, additional body fluids (saliva and vaginal) have been demonstrated to yield weak P30 results which may be false positives.  Based on the totality of a case (e.g., case scenario, no evidence of sperm, etc.), the analyst may choose to report the P30 result as 'semen inconclusive' instead of 'semen indicated.'" *Id.* at 225 (§ 12.5.1).

- 52 -

1

2

        d.   "A positive P30 result in the absence of spermatozoa and foreign DNA cannot be conclusively attributed to the presence of semen.  P30 can be detected in other body fluids."  *Id.* (§ 12.5.2).

3

      **3.**     **Evidence of the Unreliability of Microscopic Hair Analysis**

4

     113.    Over the past three decades, microscopic hair comparison has been discredited as

5

an unreliable forensic technique that should have no role in criminal prosecutions.

6

     114.    In April 2015, *The Washington Post* reported that nearly all of the FBI

7

Laboratory's microscopic hair comparison analysts had "overstated forensic matches in ways

8

that favored prosecutors in more than 95 percent of the 268 trials reviewed," including 32

9

capital defendants, 14 of whom had already been executed or died in prison.  Ex. 202 at 1.[14]

10

The FBI and Justice Department formally acknowledged these issues, and according to legal

11

analysts, the "admissions mark[ed] a watershed in one of the country's largest forensic scandals,

12

highlighting the failure of the nation's courts for decades to keep bogus scientific information

13

from juries."  *Id.* at 1-2.

14

     115.    The same month, an FBI press release acknowledged these findings.  Ex. 203.[15]

15

The press release quoted Peter Neufeld, Co-Director of the Innocence Project, who said: "These

16

findings confirm that FBI microscopic hair analysts committed widespread, systematic error,

17

grossly exaggerating the significance of their data under oath with the consequence of unfairly

18

bolstering the prosecutions' case."  *Id.*

19

     116.    In June 2016, FBI Director James B. Comey sent a letter to state governors

20

acknowledging that "for cases from the 1990s and earlier, [the FBI has] discovered problems

21

with the way [its] examiners talked about the nature of hair comparisons," including by making

22

"statements that went beyond the limits of science in ways that put more weight on a hair

23

24

25

26

27

28

[14] Spencer S. Hsu, *FBI Admits Flaws in Hair Analysis Over Decades*, Wash. Post (Apr. 18, 2015, 5:44 PM), https://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-matches-in-nearly-allcriminal-trials-for-decades/2015/04/18/39c8d8c6-e515-11e4-b510-962fcfabc310_story.html.

[15] Press Release, FBI, *FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review* (Apr. 20, 2015), https://www.fbi.gov/news/press-releases/fbi-testimony-on-microscopic-hair-analysis-contained-errors-in-at-least-90-percent-of-cases-in-ongoing-review.

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

comparison than scientifically appropriate" and that "could have misled a jury or judge." Ex. 204.[16]

117.    Comey's letter then expressed concern that the FBI's "approach in the 1990s and before" may have "introduce[d] error into . . . state and local lab work," based on "introductory training on hair comparison" that the FBI offered to state and local labs.  *Id.*

118.    Terry Cook, who used microscopic hair comparison techniques to conclude that Bolin could not be excluded as the "foreign" hair's donor, and who testified that one of Bolin's hair samples was "indistinguishable" from the "foreign" hair was trained in one such FBI course.  *See supra* ¶¶ 53-56; ECF No. 158-4 at 49, 53, 58, 97; ECF No. 156-2 at 31.

119.    In September 2016, the Executive Office of the President's Council of Advisors on Science and Technology concluded that the Department of Justice had not "provide[d] a scientific basis for concluding that microscopic hair examination is a valid and reliable process." Ex. 205[17] at 120-21.

120.    Tellingly, the LVMPD "Biology/DNA Detail Procedures Manual" now reflects that microscopic hair comparison is unreliable.  According to the manual, the "LVMPD Biology/DNA Detail does not perform microscopic hair comparisons." Ex. 178 at 45.

### 4.    Evidence of LVMPD's Improper Methods to Measure the Footwear Impressions and Incorrect Conclusion as to Shoe Size

121.    The prosecution argued that the footwear impressions found at the scene were the "same" size as Bolin, who wears a size 10.5 shoe.  Ex. 174 (prosecution's closing demonstrative); ECF No. 157-4 at 12; ECF No. 161-2 at 166-68, 174.

122.    Dr. Alicia Wilcox, a forensic footwear expert, has since reviewed the footwear evidence in this case and identified multiple failings with both the methodologies used in

[16] Letter from James B. Comey, Director of the FBI, to Governors (June 10, 2016), https://www.fbi.gov/file-repository/second-governor-letter-061016.pdf/view.
[17] Executive Office of the President, President's Council of Advisors on Science & Technology, *Report to the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*, at 3-7, 120-21 (Sept. 2016), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf.

connection with the footwear impressions and the conclusions that the detectives and the

prosecution drew.  Most notably, her report explains:

a.  The methodology the detectives used to photograph the footwear impressions
was unsound and not well-documented, and the detectives should have taken
three-dimensional casts of the impressions.  Ex. 206 at 2-3;

b.  Different brands of shoes leave impressions of different sizes, and because
the brand cannot be identified from a featureless footwear impression, there
is "no scientific basis for measuring the length of featureless crime scene
impressions and attributing it to the size of a shoe."  *Id.* at 2-3, 6-8.

c.  Even assuming the measurements were correct, a "measurement of 11
inches" falls within the range of men's sizes 6.5 to 8, not 10, 10.5, or 11.  *Id.*
at 3, 7.

### 5.     Evidence that Siebert Overheard Details About Bolin's Case

123.     Jailhouse informant Michael Siebert testified that Bolin was paranoid about

fingerprints on elements of the crime scene—specifically, a screwdriver and truck.  *Supra*

¶¶ 93-97.  Another inmate from Bolin's unit in August 1995 has signed an affidavit that

explains how Siebert could have known about those elements of the crime.

124.     Specifically, the inmate—who requested that his name and other identifying

information be redacted on the public docket—stated that he spoke with Bolin about the

prosecution's "case against him."  Ex. 207 ¶ 4.  Bolin told the inmate that his "lawyer had said

that if there was no evidence of [Bolin] being in that truck, like his fingerprints on the radio

knob or dashboard or steering wheel or other places inside the vehicle, then the state had no

case."  *Id.*  By contrast, the inmate told Bolin that "investigators had found [his] fingerprints on

the rearview mirror in [his own] case."  *Id.*  The inmate described Bolin as someone "who kept

to himself" and "not the type to talk or share his case with anyone"—Bolin only spoke to *him*

because the inmate knew Bolin's brother. *Id.* ¶ 8.

125.     The inmate's affidavit stated that Siebert was "behind" Bolin in the cell and

"overheard the conversation" about Bolin's case. *Id.* ¶¶ 5, 7. Further, the inmate saw Siebert

"looking down from his top bunk at [Bolin's] legal paperwork," which was "spread out on the

1    desk." *Id.* ¶ 6.  The inmate stated that no prior lawyer for Bolin had ever contacted him before

2    Bolin's current federal habeas counsel.  *Id.* ¶ 7.

3    **V.    CLAIMS FOR RELIEF**

4        126.    Bolin asserts four claims for relief in this Fifth Amended Petition.  First, the

5    admission of Keith Sirevaag's eyewitness identification, which came after an unnecessarily

6    suggestive one-on-one showup procedure and had no indicia of reliability, violated Bolin's due

7    process rights.  Second, Bolin received constitutionally deficient assistance of counsel in

8    connection with his trial counsel's failure to investigate, object to, or otherwise correct the

9    admission of invalid DNA evidence, which the prosecution paired with misleading population

10    statistics to prejudicially argue that Bolin was one of only a few individuals who could have

11    killed Ricks.  These claims were presented in Bolin's Fourth Amended Petition.  ECF No. 138.

12    Without the evidence related to the first two claims—the faulty eyewitness identification and

13    invalid DNA evidence—the prosecution had no case against Bolin.

14        127.    But Bolin also suffered additional violations of his due-process rights,

15    represented in newly exhausted Claim 3.  Bolin's trial was fundamentally unfair due to

16    prosecutorial misconduct.  The prosecutors committed *Napue* violations by eliciting and failing

17    to correct false testimony about the validity and significance of the DNA evidence (when the

18    hair was contaminated), the presence of P-30 as proof of sexual assault (when P-30 is found in

19    vaginal fluid, not just semen), and the shoe size corresponding to the footwear impressions

20    found at the crime scene (which were measured inaccurately and corresponded to a shoe size

21    much smaller than Bolin's).  The prosecution also vouched for its witnesses and appealed to

22    racial prejudice.  Additionally, Bolin received ineffective assistance from his trial counsel for

23    their blatant failures to investigate or challenge the P-30 and footwear-impression evidence, as

24    well as the failure to investigate an alternate explanation for jailhouse informant Siebert's

25    knowledge of the case, even though Bolin identified two witnesses for his attorneys to contact.

26    Finally, Bolin's conviction was obtained through the use of discredited expert testimony—in

27

28

connection with the P-30 evidence and use of widely denounced microscopic hair analysis—in violation of Bolin's due process rights.

128.    Also newly exhausted is Claim 4, in which Bolin establishes that the cumulative impact of these constitutional errors rendered his trial fundamentally unfair.

129.    Bolin finished exhausting his *Napue* and *Strickland* theories in Claim 3 and his cumulative-error theory in Claim 4 in the Nevada state courts on November 22, 2023.  He did not exhaust the *Gimenez* theory, but that subclaim should be considered exhausted under the anticipatory procedural default doctrine because the Nevada state courts would have held that it was procedurally barred for the same reasons as his other claims and theories.  *See, e.g.*, *Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) (en banc) ("An unexhausted claim will be procedurally defaulted, if state procedural rules would now bar the petitioner from bringing the claim in state court."); *Williams v. Baca*, 2018 WL 3447172, at *3 (D. Nev. July 17, 2018) (when it is "plain" that a habeas petitioner's unexhausted claims would be ruled procedurally barred in state court if the petitioner were to return to state court to exhaust those claims, the anticipatory default doctrine applies, and the Court considers the petitioner's unexhausted claims "to be technically exhausted, but subject to the procedural default doctrine"); *Bolin v. Reubart*, 538 P.3d 444 (Nev. Nov. 22, 2023) (mem.) (citing NRS 34.726(1) and 34.810(1)(b), (2), and holding that "the district court did not err in denying Bolin's petition [as] procedurally barred" and stating bars are "mandatory").

130.    Bolin is able to overcome any procedural bars that Respondents may assert as to Claims 3 and 4 in two ways.  First, as to theories of Claim 3 related to ineffective assistance of trial counsel, Bolin can establish the cause and prejudice exception under *Martinez v. Ryan*, 566 U.S. 1 (2012).  Bolin's postconviction counsel's performance was deficient in failing to raise claims regarding trial counsel's ineffective assistance of counsel—which, in turn, were related to failure to investigate and object to the P-30 evidence, footwear-impression evidence, and Siebert's story; this deficient performance by post-conviction counsel obviously prejudiced Bolin.  *Leeds v. Russell*, 75 F.4th 1009, 1016-18 (9th Cir. 2023).  These underlying ineffective-

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1    assistance-of-trial-counsel claims are "substantial"; Bolin must only show that the claims have

2    "some merit," and for the reasons described in Claim 3 below, these claims are clearly

3    meritorious. *Id.* at 1017.

4        131.    Second, as to all claims and theories in Claims 3 and 4, the *Schlup v. Delo*

5    "fundamental miscarriage of justice" gateway permits review of an otherwise procedurally

6    barred claim if the petitioner shows it is "more likely than not that no reasonable juror would

7    have convicted him" in light of "newly presented" evidence—evidence "that was not presented

8    at trial." *Gable v. Williams*, 49 F.4th 1315, 1322 (9th Cir. 2022) (citing *Schlup v. Delo*, 513

9    U.S. 298 (1995)); *House v. Bell*, 547 U.S. 518, 538 (2006) ("A petitioner's burden at the

10   gateway stage is to demonstrate . . . in light of the new evidence . . . that more likely than not

11   any reasonable juror would have reasonable doubt."); *Majoy v. Roe*, 296 F.3d 770, 775 (9th Cir.

12   2002). Bolin satisfies the *Schlup* gateway with the following newly presented evidence, all of

13   which was presented to the state courts during Bolin's *Rhines* stay:

14          a.   an affidavit from the supervisor of the Cellmark Report explaining that the
15               "foreign" hair was contaminated, the DNA results were thus a nullity, and the
                 population frequencies could not and should not have been used in this case;

16          b.   an expert report and 22 articles demonstrating that P-30 is not "proof
17               positive" of semen, which negates the prosecution's (1) proof of
                 "penetration" for the sexual assault charge, (2) theory of sexual assault as the
18               motive for the murder, and (3) basis for obtaining admission of prejudicial
                 testimony about Bolin's 1975 rape conviction;

19          c.   the LVMPD's "Biology/DNA Detail Procedures Manual," published on May
20               26, 2022, which discredits the prosecution's use of P-30 evidence,
                 microscopic hair comparison evidence, and contaminated DNA evidence;

21          d.   an expert report explaining that the crime scene analysts used flawed
22               methodology to measure the footwear impressions and improperly converted
23               that measurement to a shoe size, which led the prosecution to falsely state
                 that Bolin's shoe size was the "same size" as the impressions; and

24          e.   an affidavit from an inmate that provides an alternative explanation for how
                 Siebert knew details about Bolin's case.

25   *Supra* ¶¶ 98-125; Exs. 177-207.

26

27

28

132.    When considering this new evidence, the Court "must consider 'all the evidence' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial'"—and "assess the likely impact of the evidence on reasonable jurors." *House*, 547 at 537-38 (citations omitted).  Here, the newly presented evidence would have had a powerful impact on the jurors, who would understand that the "foreign" hair could not link Bolin to the crime, that the use of microscopic hair analysis has been debunked, and that the footwear impressions were not Bolin's size.  The jurors would have understood that there was no proof of penetration or sexual assault—which cuts against the sexual assault charge, the prosecution's theory of motive, and the purported similarities between this crime and Bolin's 1975 offense—and they would have been confronted with an alternative explanation for the testimony provided by jailhouse informant and known liar, Michael Siebert.

133.    Especially given the inadmissibility of Sirevaag's eyewitness testimony, there would have been no basis to convict Bolin.  But even if Sirevaag's testimony were admissible, the jury would have been left with just a shoddy eyewitness identification.  Even setting aside the unnecessary suggestiveness of the one-on-one showup that violated Bolin's due process rights, Sirevaag initially said he was "not sure" that Bolin was the man he had seen.  And unlike the actual progression of the trial, the prosecution would not have been able to reinforce the deficiencies in the eyewitness's testimony by relying on DNA evidence.  Whereas the prosecution told the jury that "when science supports citizen Sirevaag and when citizen Sirevaag supports science, you begin to see how close the connection is in this case and how true the identification is" (ECF No. 161-2 at 169-70), there would have been no science whatsoever to back up the prosecution's claims.  The prosecution would have been forced to rely only on the highly circumstantial, non-incriminating evidence like the facts that Bolin visited a video store on the night in question, was acquainted with Ricks's sisters, and was a muscular Black man who had a tattoo on his right shoulder and wore a tank top during a very hot July.

134.    Certainly, in light of the newly presented evidence, it is "more likely than not any reasonable juror would have reasonable doubt" about whether Bolin committed the murder, kidnapping, and sexual assault of which he was convicted. *House*, 547 U.S. at 538, 540-41 (in rape-murder case, new evidence that proved semen—the "only forensic evidence at the scene that would link House to the murder"—did not belong to House was impactful in FMOJ analysis because "[w]hen the only direct evidence of sexual assault drops out of the case, so, too, does a central theme in the State's narrative linking House to the crime").

135.    As a result, any procedural bars that Respondents may assert should be excused, and Claims 3 and 4 should be considered on the merits.

## CLAIM 1
### (Violation of Due Process as to Admission of Unreliable Eyewitness Identification Secured through Unnecessarily Suggestive One-on-One Showup Procedure)

136.    Bolin hereby incorporates by reference and realleges here all preceding paragraphs, and in particular, paragraphs 6-43.

137.    Due process forbids the admission of an eyewitness identification where the identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).

138.    The Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972), established a two-step test to evaluate whether an identification procedure violates due process. "First, a court must determine whether the challenged pre-trial encounter was unnecessarily or impermissibly suggestive. Second, the court must examine the totality of the circumstances in order to decide whether the witness' in-court identification is nonetheless reliable." *Green v. Loggins*, 614 F.2d 219, 223 (9th Cir. 1980); *see also Biggers*, 409 U.S. at 199-200.

139.    Under this test, Sirevaag's identification of Bolin—which was produced by an unnecessarily suggestive showup procedure and was wholly unreliable—violated Bolin's due process rights.

1

### A.    <u>The Showup Was Unnecessarily Suggestive</u>

2      140.    An "identification procedure is suggestive when it 'emphasize[s] the focus upon

3   a single individual' thereby increasing the likelihood of misidentification." *United States v.*

4   *Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998).  "The practice of showing suspects singly to

5   persons for the purpose of identification, and not as part of a lineup, has been widely

6   condemned." *Stovall v. Denno*, 388 U.S. 293, 302 (1967); *see also Simmons*, 390 U.S. at 383

7   (explaining that danger of misidentification is "increased if the police display to the witness

8   only the picture of a single individual who generally resembles the person he saw"); *United*

9   *States v. Givens*, 767 F.2d 574, 581 (9th Cir. 1985) ("Showing a witness a single photograph

10  which potentially suggests an identification desired by law enforcement officials is improper

11  conduct which we do not condone."); *Foster v. California*, 394 U.S. 440, 442-43 (1969)

12  (holding that lineup in which petitioner's height and clothing made him stand out from other

13  suspects was a "compelling example of unfair lineup procedures").

14      141.    Other suggestive circumstances include: providing the witness with information

15  about the investigation's progress, *Simmons*, 390 U.S. at 385; allowing a witness to learn that

16  the suspect has been arrested, *Green*, 614 F.2d at 223; *Jackson v. Fogg*, 589 F.2d 108, 111 (2d

17  Cir. 1978); and prompting or pressuring the witness to make an identification, *Heath v. Hill*,

18  397 Fed. App'x 308, 311 (9th Cir. 2010) (finding procedure suggestive in part because witness

19  "believed that the detective wanted him to pick 'the guy'"); *see also Manson v. Brathwaite*, 432

20  U.S. 98, 116 (1977) (relying on absence of "coercive pressure" in finding procedure not

21  suggestive).  As a general matter, "[u]nnecessary suggestiveness . . . depends 'upon whether the

22  witness's attention was directed to a suspect because of police conduct.'" *Howard v. Bouchard*,

23  405 F.3d 459, 469-70 (6th Cir. 2005).

24      142.    Each of these factors is present here.  Most importantly, the LVMPD detectives

25  arranged for a suggestive showup procedure that singled out Bolin in front of the eyewitness,

26  Keith Sirevaag.  Bolin was not placed in the holding cells with the 60 to 150 other men of

27  various races that Sirevaag walked past in the detention center.  Rather, Bolin was led into the

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

detention center by a uniformed officer, after Sirevaag had finished walking through the facility, which drew immediate attention to Bolin as the potential suspect. ECF No. 153-2 at 62-64; ECF No. 158-3 at 19-20; ECF No. 154-2 at 95; ECF No. 158-1 at 60; ECF No. 158-2 at 15. The detectives even conceded that it was a "one on one" show up. Hefner called the procedure an "informal one on one line-up" and Tremel called it a "one-on-one identification." ECF No. 226 at 106; ECF No. 158-2 at 10; ECF No. 158-1 at 60. No matter the phrasing, one thing was clear: Bolin was singled out from all the other men in the detention center.

143.    But the singling out did not end there. After Sirevaag watched Bolin for approximately ten minutes, Sgt. Hefner eventually lost "patience" with Sirevaag's inability to identify Bolin and directed his detectives to "start doing what they were going to do"—i.e., process Bolin as a criminal suspect. ECF No. 158-3 at 69. Thus, Sirevaag watched as Detectives Tremel and Morgan—both of whom Sirevaag had spoken with at length at the crime scene the day before—entered the building and led Bolin through the fingerprinting process, blood draw, and a series of photographs from all angles. *Id.* at 61-62, 69; ECF No. 226 at 118; ECF No. 158-1 at 60-61; ECF No. 154-3 at 139; ECF No. 158-2 at 16-18.

144.    The man who photographed Bolin was the same photographer Sirevaag had seen taking pictures at the crime scene the day before. ECF No. 153-4 at 38; ECF No. 158-2 at 11-12. At Sirevaag's request, Bolin was made to remove his shirt, and he was then photographed shirtless. ECF No. 158-2 at 12-13; ECF No. 154-1 at 17; Ex. 164, 165, 168, 169. Sirevaag was also shown Bolin's tattoo, of which photographs were also taken. Exs. 166, 167.

145.    No one else at the detention center was emphasized through this intrusive examination, led by the very detectives and crime-scene photographer that Sirevaag knew were investigating the same murder he was called in to help solve. ECF No. 154-1 at 61. Only Bolin was singled out in this manner. The detectives may as well have placed a neon sign next to Bolin identifying him as their suspect.

146.    Sirevaag quickly grasped that Bolin was the man that the detectives had brought him in to identify. This is clear from Sirevaag's question to Hefner, "[H]ow did you get him,

find this individual so fast and whatever." ECF No. 145-6 at 184. Allowing a witness to learn that the suspect has been arrested is undeniably suggestive, *Green*, 614 F.2d at 223; *Jackson*, 589 F.2d at 111, and although Bolin was not actually arrested until two days later, Sirevaag was led to believe, and indeed believed, that Bolin was under arrest at the detention center (even though he was only there pursuant to a search warrant). After the showup Sirevaag had witnessed, he had every reason to believe that Bolin was under arrest, and that the "detective wanted him to pick" Bolin. *Heath*, 397 Fed. App'x at 311.

147.    The procedure's extreme suggestiveness was only exacerbated by the pressure the detectives placed on Sirevaag to make an identification—another factor in the suggestiveness analysis. *Brathwaite*, 432 U.S. at 116. Before the showup, Hefner told Sirevaag that they had "made some progress in the case and you're an important witness." ECF No. 24-5 at 4. He emphasized that Sirevaag was the "only person" who saw the suspect and was "the person that will ultimately have to make an identification or not make an identification." *Id.* at 4-5. He told Sirevaag that it was an "awesome responsibility." *Id.* at 5. He thanked Sirevaag in advance for his "effort" in helping to solve "this terrible crime," and reiterated, "[Y]ou're the only one that can do this." *Id.* At trial, Hefner conceded, "I did that to put pressure on him." ECF No. 158-3 at 79.

148.    Then, during the showup, Hefner asked Sirevaag what he thought of what he was "s[eeing] with the black male" (ECF No. 154-1 at 61), and then asked, "[i]s this the guy, or what?" ECF No. 158-3 at 70; *id.* at 24 ("I asked him, I said, if he could give me a decision."); *see also* ECF No. 226 at 101 ("After a while it kind of became apparent to me that perhaps he wasn't going to say anything, so I asked him, 'Does this appear to be the suspect or not?'").

149.    Later, after Sirevaag was unable to make an identification, Hefner encouraged Sirevaag to call if anything did "come back" to him (ECF No. 153-2 at 71)—essentially asking Sirevaag to change his mind. And when Sirevaag contacted Hefner an hour later wanting to know what other evidence Hefner had on Bolin, Hefner told him he did not want to "influence or taint" Sirevaag's impressions—suggesting that there *was* evidence capable of tainting

Sirevaag's memory.  ECF No. 158-3 at 73.  Hefner then provided the reassurance Sirevaag

needed.  ECF No. 153- at 72-73.  Hefner told him that "few things we do as human beings are

absolute" and advised that Sirevaag would have to "express himself in a way that a judge or

jury could understand him; and, most of all, he had to pick a way of expressing himself that he

was comfortable with that would allow him to sleep at night."  ECF No. 158-3 at 31.  Hefner

then suggested Sirevaag use a numerical scale to express his level of certainty, at which point,

Sirevaag reported being somewhere between 70 to 90 percent sure that Bolin was the man he

had seen.  *Id.*; ECF No. 153-4 at 47 (Sirevaag recalls being "70, 80," "[m]aybe 75, 80 percent"

sure); ECF No. 158-4 at 17 (Hefner's report stated Sirevaag was "90 percent" sure).

150.     There can be little dispute that this highly suggestive procedure was unnecessary.

The detectives had access to drawers of photographs, including men of all races (ECF No. 160-

4 at 6-12; Ex. 163), but chose to emphasize Bolin in front of the witness.  Although the

prosecution argued that Sirevaag needed to see the suspect's physique and mannerisms (ECF

No. 158-3 at 9; ECF No. 226 at 108), the detectives could have arranged for an in-person

procedure in which Sirevaag could view Bolin's body and mannerisms without singling him out

and treating him like he had been arrested.  The detectives claimed that Bolin's physique was

somehow too unique to find other similar candidates for a lineup (ECF No. 158-3 at 9; ECF No.

226 at 108), but they did not even bother to put Bolin in the holding cells so that he could be

viewed among other inmates.  Nor was there any reason to have the same detectives and

photographer Sirevaag had met at the crime scene process Bolin simply because Hefner had

"lost patience" with Sirevaag's inability to make an identification.  ECF No. 158-3 at 24.  There

was no urgency; in connection with serving the search warrant, the detectives had conceded that

they "didn't feel [Bolin] was going to leave."  ECF No. 154-2 at 74.  The detectives could have

taken the time to put together an appropriate lineup from the readily available photographs or

otherwise.

//

//

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1

**B.    The Identification Was Not Independently Reliable**

2      151.    At the second step of the *Biggers* analysis, courts look to five factors to

3   determine whether an eyewitness identification following an unnecessarily suggestive

4   procedure is nonetheless reliable: (1) "the opportunity of the witness to view the criminal at the

5   time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of the witness' prior

6   description of the criminal"; (4) "the level of certainty demonstrated by the witness at the

7   confrontation"; and (5) "the length of time between the crime and the confrontation." *Biggers*,

8   409 U.S. at 199-200.  "Where the 'indicators of [a witness'] ability to make an accurate

9   identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the

10  identification should be suppressed." *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012).

11     152.    As to the first factor, "the opportunity of the witness to view the criminal at the

12  time of the crime," Sirevaag, by his own admission, did *not* get a good look at the man he saw

13  leaving the crime scene on the morning of July 15, 1995.  Between 5:30 and 6:00 a.m., having

14  just arrived at the construction site to begin his work day, Sirevaag saw a Black man walking

15  for 20 to 30 seconds from 20 to 40 feet away.  ECF No. 153-2 at 24, 27, 35-36, 42.  The light

16  was dim; the sun had not yet risen.  *Id.* at 27, 37.  From Sirevaag's perspective, the man was

17  walking at an angle, so Sirevaag saw only his right side; he did not see the man straight on.

18  ECF No. 145-6 at 35-36; ECF No. 153-3 at 31-32.  Sirevaag was also focused on the man's

19  muscular physique, not his face.  ECF No. 153-4 at 50; ECF No. 226 at 82-83.

20     153.    As to the second factor, "the witness' degree of attention," Sirevaag had no

21  reason to pay close attention to the man, who was walking "calmly" past Sirevaag's truck.  ECF

22  No. 153-2 at 42.  Although Sirevaag thought it was "kind of odd" that someone was at the

23  construction site so early, it was not that unusual.  *Id.* at 29.  Sirevaag figured that "maybe the

24  guy partied last night and slept there over night."  ECF No. 145-6 at 136.  Sirevaag was not yet

25  aware a crime had occurred, and was "merely a casual observer," *Green*, 614 F.2d at 224,

26  arriving to work that morning.

27

28

154.    As to the third factor, "the accuracy of the witness' prior description of the criminal," Sirevaag's initial description bore little resemblance to Bolin.  Sirevaag estimated that the man he saw was in his mid-20s—in the range of 20 to 30 years old—and thought the man looked younger than Sirevaag, who was then 33.  ECF No. 154-1 at 63-64.  Sirevaag estimated that the man was six feet tall and weighed 230 pounds.  Ex. 171; ECF No. 24-5 at 8.  He noticed the man had a tattoo on his right arm, which he said was an inch or two across and came to a "point" at the top.  ECF No. 154-1 at 60, 63.  Sirevaag also described the man as light-complected.  ECF No. 158-3 at 9, 58; ECF No. 161-3 at 12-13.

155.    Bolin, by contrast, was then nearly 39 years old—almost a decade older than the top of Sirevaag's estimated range.  Bolin stood five feet, nine inches tall and weighed approximately 195 pounds.  ECF No. 145-5 at 6; ECF No. 145-6 at 236; ECF No. 161-3 at 79; ECF No. 160-1 at 18-21.  Bolin had a tattoo, but it did not resemble what Sirevaag described or drew for the detectives.  ECF No. 158-3 at 47; *see also* Ex. 161 (Sirevaag's drawing); Exs. 166, 167 (Bolin's actual tattoo).  He was medium- to dark-complected.  ECF No. 152-2 at 8; Ex. 164.

156.    The fourth factor, "the level of certainty demonstrated by the witness at the confrontation," weighs decisively in Bolin's favor.  Even after the unnecessarily suggestive one-on-one showup and police pressure, Sirevaag was unable to identify Bolin at the detention center.  He was simply "not sure."  ECF No. 158-3 at 70; *see also* ECF No. 226 at 100.  In fact, according to Morgan, Sirevaag rated himself at a five on a ten-point scale in terms of certainty.  ECF No. 154-3 at 29.  Sirevaag's "lack of confidence" at the detention center "is certainly a reliable warning sign" of *unreliability*.  *United States v. Jones*, 689 F.3d 12, 18 (1st Cir. 2012).

157.    The fact that Sirevaag identified Bolin at a 70 to 90 percent level of certainty an hour later and was "sure" by the time of trial—both after additional police pressure, police reassurance, and time to think about the suggestive spectacle he had seen—is not relevant given his initial uncertainty.  *See, e.g.*, *Cossel v. Miller*, 229 F.3d 649, 655-56 n.4 (7th Cir. 2000) (emphasizing the minimal relevance of a witness's certainty about her identification at *trial* because "that fact must be considered in light of the suggestive identifications she participated

- 66 -

in prior to trial, as well as the level of uncertainty she expressed at those identifications" and noting the trial identification was "just as likely to be a product of a prior unduly suggestive identification as it is to be a product of an independent recollection of the crime"); *Solomon v. Smith*, 645 F.2d 1179, 1187 (2d Cir. 1981) ("Without in any way impugning [the eyewitness's] veracity, we discount her recollection . . . of this initial identification as 'positively sure,' since it had been contemporaneously recorded by the police as negative/possible, and in the interim she had been subjected to at least six suggestive police procedures, some of which she did not even recall."). When it mattered most, Sirevaag was entirely unsure and unable to identify Bolin.

158.    The fifth factor, "the length of time between the crime and the confrontation," does not weigh against Bolin. Although only a day had passed between the time when Sirevaag witnessed the Black man at the crime scene and his identification of Bolin over the phone to Hefner, the identification occurred *after* Sirevaag had told Hefner he was "not sure" if Bolin was the man he had seen. ECF No. 158-3 at 31, 71; *see also* ECF No. 226 at 101. Memories simply do not improve over time, especially when new conflicting information—like a suggestive one-on-one showup—is introduced. *See* Joyce W. Lacy & Craig E. L. Stark, *The Neuroscience of Memory: Implications for the Courtroom*, 14 Nature Rev. Neurosci. 649, 650-51 (2013) (describing distortion of memories when witnesses are introduced to new misinformation—"for example, an impairment in the memory of the face of a perpetrator after being exposed to a photo of a police suspect who was not the true perpetrator"—and explaining that "[m]emory distortions can also occur simply with the passage of time and with repeated recounting of events").

159.    Further, cross-racial identifications like this one pose a significant risk of misidentification—even without a suggestive lineup or the passage of time. *Young v. Conway*, 698 F.3d 69, 81 (2d Cir. 2012) ("[S]ocial science research indicates that people are significantly more prone to identification errors when trying to identify someone of a different race."); *cf.*

1  *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007) ("Cross-racial identifications,

2  such as the eyewitness accounts offered against Jernigan, are particularly suspect.").

3      160.  In sum, admission of the eyewitness identification, which lacked any semblance

4  of reliability and which followed an unnecessarily suggestive one-on-one showup procedure,

5  violated Bolin's due process rights.

6  **CLAIM 2**
**(Ineffective Assistance of Trial Counsel as to Admission of**

7  **Invalid DNA Evidence and Flawed Statistical Analysis)**

8      161.  Bolin hereby incorporates by reference and realleges here all preceding

9  paragraphs, and in particular, paragraphs 51-71.

10      162.  "To establish ineffective assistance of counsel 'a defendant must show both

11  deficient performance [by counsel] and prejudice.'"  *Walker v. Martel*, 709 F.3d 925, 940 (9th

12  Cir. 2013).  Under the first prong, trial counsel's performance is constitutionally deficient if the

13  petitioner shows that it "fell below an objective standard of reasonableness," as measured by

14  "prevailing professional norms."  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  This

15  standard is satisfied when trial counsel fails to conduct adequate pretrial preparation,

16  *Kimmelman v. Morrison*, 477 U.S. 365, 383-87 (1986); fails to advance meritorious motions to

17  exclude or otherwise timely object to important evidence, *Griffin v. Harrington*, 727 F.3d 940,

18  945-46 (9th Cir. 2013); or presents experts that endorse a prosecution's theory, *Buck v. Davis*,

19  580 U.S. 100, 118-19 (2017); *Hooks v. Workman*, 689 F.3d 1148, 1204-05 (10th Cir. 2012);

20  *Johnson v. Bagley*, 544 F.3d 592, 605 (6th Cir. 2008).

21      163.  Under the second *Strickland* prong, the petitioner "must show that there is a

22  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

23  would have been different."  466 U.S. at 692.  "A reasonable probability is a probability

24  sufficient to undermine confidence in the outcome."  *Id.* at 694.

25      164.  Bolin's trial counsel's failure to challenge the prosecution's use of invalid DNA

26  evidence to argue that Bolin was one of only a few individuals who could have murdered Ricks

27  was both constitutionally deficient and prejudicial.  The Cellmark Report that detailed the DNA

28

results clearly indicated that "no conclusion can be made regarding the donor of the hair" (ECF No. 24-3 at 23)—i.e., the hair was contaminated—yet Bolin's trial counsel sat back and allowed the prosecution to argue that the hair found on Ricks's body was almost certainly Bolin's. Instead of moving to exclude this invalid evidence or challenging it in any way, Bolin's trial counsel offered their own witnesses, who bolstered the prosecution's egregious use of the DNA evidence. As defense counsel conceded to the jury, these errors were not strategic: counsel simply did not understand the science of this case.

165.    The prosecution's forensic case against Bolin centered on the DNA profile from a "foreign" hair found on Ricks's pubic region. The DNA results from the foreign hair were invalid. The PCR test that Cellmark administered is only useful if it detects DNA in a hair's root, not its shaft. ECF No. 156-1 at 179-82. Thus, a DNA result from the shaft portion of the hair indicates that extraneous biological material has been transferred to the hair—i.e., contamination. *Id.* Here, because the shaft portion of the "foreign" hair yielded DNA results identical to the root portion, the hair failed the control test for contamination, and "no conclusion" could be drawn "regarding the donor of the hair." *Id.* at 190; ECF No. 24-3 at 23. There was no way to determine whether the DNA result came from the root itself or from the same biological material that was contaminating the shaft. The DNA result was therefore inconclusive and irrelevant.

166.    The prosecution ignored this defect and instead falsely linked Bolin to the hair on Ricks's body. The prosecution elicited testimony from Paula Yates, the Cellmark analyst who performed the PCR test, that Bolin could not be excluded as the donor of the DNA found on the hair. ECF No. 156-1 at 206-07. Then, starting with the premise that the DNA result was valid, the prosecution used the evidence to argue that Bolin was just one of roughly nine people in Las Vegas who could have been the source of the hair—based on population statistics for Black men aged 20 to 44 in Las Vegas (21,111) and the frequency that the DNA profile found on the hair in Black individuals (1 in 2,600). ECF No. 161-2 at 167-68; ECF No. 24-3 at 23; ECF No. 156-1 at 209-13; ECF No. 157-1 at 76; ECF No. 157-2 at 49. As a result, the DNA

evidence was used to show the jury that Bolin was realistically the only person who could have killed Ricks—even though *the argument's entire premise was false*.  ECF No. 161-2 at 173-74.

167.    The DNA was critical to the prosecution's case.  No other forensic evidence tied Bolin to the crime.  In opening statement, the prosecution emphasized that Bolin had "one in 2600 D.N.A." based on the "D.N.A. extracted from the hair."  ECF No. 152-1 at 47-48, 53.  Then, in closing, the prosecution argued that Bolin "cannot be excluded" based on the DNA, and the DNA "can identify in a range [of] 1 in 2600 to 1 in 2400."  ECF No. 161-2 at 168.  The prosecution then used the DNA results to arrive at an artificially low number of potential donors: "There [were] approximately 22,000 black male adults in the range of 20 to 24 [in Las Vegas in July 1995]. . . .  I don't submit that it's an exact number.  But you find that 1 in 2400 or 1 in 2600 goes into 22,000 about 9 times.  Now, you can put a fudge factor in there, and you can say that it goes in 10 or 11."  *Id.* at 173-74.  The prosecution then asked, "how many of those [10 or 11] individuals" were known to have a 10.5 shoe size, to have visited the video store, to have been identified by Sirevaag, and to have been suspected by Ricks's sisters.  *Id.*  To tie up the case, the prosecution claimed that "when science supports citizen Sirevaag and when citizen Sirevaag supports science, you begin to see how close the connection is in this case and how true the identification is."  *Id.* at 169-70.  But what the prosecution presented was not supported by science at all.

168.    Bolin's trial counsel failed to prevent or correct these flawed conclusions at every turn.  They failed to move for exclusion of the DNA evidence, despite the clear statement on the Cellmark Report indicating that "no conclusion" could be drawn about the hair's donor.  They failed to object when the prosecution elicited the misleading testimony from Paula Yates that Bolin could not be excluded as the donor of the DNA.  They also failed to adequately cross-examine Paula Yates on this point.  Bolin's trial counsel briefly touched on the issue—eliciting Yates's agreement that "if you get a result from the shaft, which you did in this case, . . . there must be some other . . . substance on the shaft, [because] shafts do not have DNA," and that "we don't know" if DNA found on a hair shaft is "from the root rather than from the hair shaft."

1    ECF No. 157-1 at 109.  But trial counsel did not then ask Yates if, in such a case, any

2    conclusion could be drawn about the DNA from the hair's root.  The answer is no—but Bolin's

3    counsel failed to elicit testimony that the hair's contamination deprived it of forensic value.

4         169.    Instead of objecting to the DNA evidence—or the irrelevant population

5    frequencies and statistics that were based on the DNA evidence—Bolin's trial counsel called

6    their own witnesses, who bolstered the prosecution's theory.  One defense expert, Lisa

7    Calandro, erroneously and repeatedly attributed the DNA results to the "root" of the foreign

8    hair, failing to acknowledge the contamination at all.  ECF No. 160-4 at 81, 88-89.  Defense

9    counsel did not correct the error.  Calandro also testified that the DNA profile appeared in 1 in

10   2,400 Black individuals (instead of the prosecution's 1 in 2,600), and another defense expert,

11   Dr. Michael Carroll, testified that there were 21,682 Black men aged 20 to 44 in Las Vegas in

12   July 1995 (instead of the prosecution's 21,111).  ECF No. 160-4 at 35; ECF No. 160-3 at 75.

13   Bolin's trial counsel did not call out the false premise of these debates.

14        170.    In closing argument, Bolin's trial counsel failed to mention the contamination.

15   His only passing references to DNA issues in closing were in reference to the number of Black

16   men in Las Vegas on July 15, 1995 and other equally irrelevant population frequency issues.

17   ECF No. 161-3 at 36, 98.  Bolin's trial counsel's performance thus allowed the jury to believe

18   that the only questions for it to resolve were the number of Black men in Las Vegas in July

19   1995, and whether the DNA frequency was 1 in 2,400 versus 1 in 2,600.  Quibbling over minor

20   differences in population statistics and frequencies erroneously confirmed for the jury that the

21   DNA results were valid and relevant.

22        171.    These were not strategic choices—the defense simply failed to adequately

23   prepare for the DNA issues in this trial.  As Bolin's lead trial attorney confessed to the jury in

24   closing: "[W]hen it comes to D.N.A. and the scientific stuff, I'm going to tell you, I'm like out

25   in left field.  I can't follow it."  *Id.* at 36.

26        172.    Had Bolin's trial counsel educated themselves on or investigated the DNA

27   contamination issue, they could have and would have moved to exclude or objected to the DNA

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

evidence, properly cross-examined the prosecution's witnesses about the irrelevance of a contaminated hair, and made clear to the jury that the prosecution's statistical backflips were invalid. The failure to do so fell well below any "objective standard of reasonableness," and, given the importance of this forensic evidence to the prosecution's argument that Bolin was one in only a few people who could have statistically committed the crime, "there is a reasonable probability that . . . the result of [Bolin's trial] would have been different" but for these errors. *Strickland*, 466 U.S. at 688, 694. There is no question that Bolin's trial counsel's performance on these DNA issues "undermine[s] confidence" in Bolin's conviction. *Id.*

### CLAIM 3
#### (Additional Due Process Violations)

173. Beyond the errors presented by Claims 1 and 2, Bolin suffered additional due process violations throughout his trial. Bolin hereby incorporates by reference and realleges here all preceding paragraphs.

### A.    Prosecutorial Misconduct—*Napue* Violations

174. Due process forbids the prosecution from obtaining a conviction through the presentation of false testimony—and requires prosecutors to correct false testimony or evidence that they present. *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959). If false evidence "is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth," even if the falsity does not occur as a "result of guile or a desire to prejudice." *Id.* at 269-70 (citation omitted). Constitutional error occurs even "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* at 269. A *Napue* violation occurs if "testimony or evidence presented at trial was 'actually false' or misleading," *United States v. Alahmedalabdaloklah*, 76 F.4th 1183, 1231 (9th Cir. 2023), and "the prosecution knew or should have known that the testimony was actually false," yet failed to correct it, *Jackson v. Brown*, 513 F.3d 1057, 1071, 1075 (9th Cir. 2008). In fact, when "false evidence [brings] about a defendant's conviction," the Ninth Circuit has granted habeas relief based on the violation of due process rights—regardless of the prosecution's

knowledge. *Cf. Maxwell v. Roe*, 628 F.3d 486, 499 (9th Cir. 2010); *Killian v. Poole*, 282 F.3d 1204, 1209 (9th Cir. 2002) ("A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness.").

175.    *Napue* violations demand a new trial so long as the false testimony was material—i.e., whether there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Jackson*, 513 F.3d at 1076 (citation omitted) (emphasis in original); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976); *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013).

176.    In this case, the prosecution knew or should have known that multiple key strands of evidence were false, but it corrected none of them.  First, the prosecution failed to correct its witness's prominent testimony that the results of its DNA test were probative of the identity of the "foreign" hair's donor, which was plainly and obviously false in light of the Cellmark Report's conclusion that the DNA test failed its control for contamination and that "no conclusion" could be drawn about the DNA's source.  Second, the prosecution failed to correct criminalist Terry Cook's testimony that the P-30 detected in Ricks's vaginal swab was "proof positive" of semen, despite extensive scientific literature underscoring that low levels of P-30, such as those detected in Ricks, can be present in vaginal fluids in the absence of semen. Finally, the prosecution failed to correct—and then misstated—testimony that Bolin's shoe size was consistent with footwear impressions found at the crime scene, after LVMPD crime scene analysts conducted unreliable collection practices, unreliable measurements, and incorrect size-conversion methodologies to reach their conclusions.

### 1.    Failure to Correct False DNA Evidence.

177.    Bolin hereby incorporates by reference and realleges here all preceding paragraphs, and in particular, paragraphs 51-71, 99-105, and 161-172.

178.    The prosecution's forensic case against Bolin centered on testimony that a DNA test could not exclude Bolin as the donor of a "foreign" hair found on Ricks's pubic region.  But those DNA results were obviously invalid.  As earlier explained, the PCR test performed by

- 73 -

Cellmark could detect DNA only from the root of a hair, not the shaft.  Because the root and shaft yielded the same DNA results, the hair failed the control test for contamination, and no conclusion could be drawn as to the hair's donor.  This defect was indisputably apparent to the prosecution from the Cellmark Report itself, which stated: "Since the types obtained from the hair shaft were the same as those obtained from the hair root, *no conclusion can be made* regarding the donor of the hair."  ECF No. 24-3 at 23 (emphasis added).[18]  But the prosecution made no attempt to correct its witnesses' misleading testimony that the DNA result was probative of the hair's donor.  The Cellmark Report was not admitted into evidence.

179.    The prosecution also should have known that the DNA evidence was inconclusive because its witness, Paula Yates, briefly testified that she obtained the same DNA results from both the shaft and root portions of the hair, meaning that she could not "tell whether or not [the] DNA that [she] typed was actually from the root itself or from what was on the hair."  ECF No. 156-1 at 190.  But despite Yates's passing reference to contamination, the prosecution elicited extensive testimony about: (1) the frequency that the particular DNA profile that was found on the contaminated hair is found in the Black population, and (2) the number of Black men between ages 20 and 44 living in Las Vegas, and then argued that Bolin was one of only nine, ten, or eleven individuals (depending on "fudge factor") that could have killed Ricks.  *Supra* ¶¶ 64-67; ECF No. 161-2 at 173-74.  The prosecution then argued that Bolin was the only individual of those few who was known to have various characteristics—e.g., he was acquainted with Ricks's sisters and had a tattoo on his right shoulder—to establish that Bolin was realistically the only person who could have committed the crime.  *Id.*  Accepting the central premise of this argument, defense experts disputed the exact DNA frequencies and Las Vegas demographics, but they did not contest the DNA evidence's validity.

---

[18] Dr. Lisa Forman Neall, the population geneticist who supervised the DNA testing and signed the Cellmark Report, has recently stated what was obvious from the Cellmark Report itself: the hair failed the control test, meaning it was contaminated and had no forensic value to the case, and the use of the population statistics was "beyond courtroom hyperbole."  Ex. 177 at 1-5; *supra* ¶¶ 99-104.  The prosecution did not call Dr. Forman Neall to testify.

180.     Both sides' extrapolation of DNA frequencies and demographics assumed that the DNA result was valid.  It was not.  Yet, the prosecution never noted for the jury that the DNA frequency and demographic statistics that were central to its case rested on a false premise.  Although the prosecution knew or should have known from the Cellmark Report that the DNA results were inconclusive, the prosecution allowed prosecution and defense experts to squabble over trivial statistical disagreements about DNA population frequencies in Las Vegas, without once disclosing that those statistics were entirely irrelevant and because the hair was contaminated.

181.     The prosecution's introduction of this DNA evidence, as well as the statistical contortions it performed to show that the DNA almost certainly came from Bolin, was a central pillar of its case, easily satisfying the *Napue* standard for materiality.  Without the DNA, the prosecution had no forensic evidence against Bolin—and no argument that Bolin was one of only a few individuals who could have committed the crime.  Using the population frequencies and statistics, the prosecution emphasized the (false) impact of the DNA in its closing argument, repeatedly asking "how many of those 10 or 11 people" had various circumstantial similarities to the case—like having a right upper-arm tattoo, wearing a dark-colored tank top, having a prior rape conviction that was said to involve "aberrant sexual conduct," living nearby the location where Ricks's truck was found, wearing a size 10.5 shoe (*but see infra*, Claim 3(A)(3)), and being identified by Sirevaag (*but see supra*, Claim 1)—immediately before asking the jury to "identify the defendant in this case."  ECF No. 161-2 at 173-74.  Though independently weak, the circumstantial evidence combined with the prosecution's potent-but-irrelevant DNA-based statistics gave the jury little choice but to answer the prosecution's call.

182.     Bolin has thus established that there is "*any* reasonable likelihood" that the introduction of invalid DNA evidence and population statistics that were based on a false premise "*could* have affected"—and almost surely did affect—the jury's verdict.  *Jackson*, 513 F.3d at 1076; *Maxwell*, 628 F.3d at 508 (false evidence was material when it was "centerpiece

of the prosecution's case" and "[n]early all of the other evidence against [petitioner] was circumstantial").

183.    Under *Napue*, the prosecution's failure to correct a central—and demonstrably false—premise of its case requires overturning Bolin's conviction.

### 2.    Failure to Correct False P-30 Evidence

184.    Bolin hereby incorporates by reference and realleges here all preceding paragraphs, and in particular, paragraphs 72-92 and 106-112.

185.    The prosecution likewise failed to correct testimony it elicited from LVMPD criminalist Terry Cook that, even in the absence of sperm, a positive P-30 result from a vaginal swab is "proof positive" evidence of semen.  ECF No. 156-1 at 99.  Cook testified that semen "was, in fact, present" in Ricks's vagina, that P-30 is a "seminal protein" that "obviously came from a man," and that P-30 was "proof positive of semen" that "identif[ied] semen conclusively."  *Id.* at 75, 78, 80, 99; ECF No. 156-2 at 47.

186.    All of these statements were false.  Scientific literature readily available to the prosecution and its criminalist demonstrated that P-30 is not, in fact, "proof positive" of semen or sexual penetration.  That literature explained that P-30 is found not just in semen, but also multiple types of bodily fluids in a *woman's* body.

187.    A spate of scientific articles published before Bolin's 1996 trial debunked the false assumption that the P-30 protein was found only in semen.  Beginning in 1982, those studies detailed the presence of P-30 in other bodily fluids, including female vaginal fluid, female urine, female serum, breast tumors, breast milk, and amniotic fluids.  *See supra* ¶¶ 107-109; Exs. 180-197.  Consistent with those studies, the LVMPD's own "Biology/DNA Detail Procedures Manual" now warns: "Other body fluids such as blood or urine can also contain PSA.  In addition, PSA can be found in very low concentrations in female vaginal fluid."  Ex. 178 at 32 (§ 2.14.3); *see also id.* at 225 ("A positive P30 result in the absence of spermatozoa and foreign DNA cannot be conclusively attributed to the presence of semen.  P30 can be detected in other body fluids." (§ 12.5.2)).  This conclusion was well-established in readily

available scientific literature at the time of Bolin's 1996 trial, yet the prosecution both elicited false testimony to the contrary and failed to correct it.

188.    This uncorrected false testimony, too, meets the test for materiality under *Napue*. Cook's testimony that P-30 was "proof positive" of semen was the necessary predicate to three essential components of the prosecution's case.  First, the prosecution was required to show "sexual penetration" for the sexual assault charge, and it had no such evidence without the P-30. ECF No. 161-2 at 88-89 (jury instructions); *see also* Exs. 175, 176 (NRS 200.364(2), 200.366(1)).  Second, the prosecution argued that the sexual assault—based on the P-30 evidence—was the motive for Ricks's murder.  ECF No. 147-1 at 51 (trial court noting during a pretrial hearing that the "preliminary hearing transcript seems to suggest that the most likely motive for this homicide was a sexual assault"); ECF No. 161-2 at 133, 170-73 (prosecution arguing in closing that sexual assault motivated the murder); ECF No. 161-2 at 142 (arguing the "defendant had an interest in attractive girls or women," and in particular, Ricks's sisters). Indeed, the prosecution elicited testimony and argued that "sexual assault is the second most common motive in homicides involving females."  ECF No. 161-2 at 133; ECF No. 158-3 at 41, 100 (eliciting Hefner's testimony about sexual assault as motive for homicide).

189.    Third, the false P-30 conclusion led the trial court to admit Bolin's 1975 rape conviction.  The Ricks case and the 1975 offense were highly distinguishable, aside from superficial similarities like the age and race of the victims, the late-night timing of the crimes, and the fact that there were purportedly sexual assaults in both cases.  *Supra* ¶¶ 85-88.  After extensive arguments about whether the prior-offense evidence should be allowed, the trial court determined that both cases "involved brutal and forcible rapes" and "terribly sexual aberrant behaviors that are . . . similar enough to demonstrate consistent underlying themes," and admitted the evidence on issues of the perpetrator's "identity," "common plan, intent, similar modus operandi and similar sexual aberration."  ECF No. 202-2 at 61-62; ECF No. 149-3 at 56. Not only did the prosecution then elicit extensive prejudicial testimony about the prior offense and argue that it demonstrated Bolin's motive, but it also told the jury that Bolin "learned

- 77 -

something" from the prior offense: "If a victim is left to tell the story, . . . she [is] able to . . . identify the perpetrator.  Brooklyn Ricks was not able to do that.  Brooklyn Ricks was silenced.  And there is something significant about that."  ECF No. 161-2 at 171-72.

190.    Of course, without the P-30 evidence, there was no proof of sexual penetration in this case—the speculative and circumstantial evidence, like a pantyliner found on the road and never connected to the crime, inside-out underwear, and the presence of a "foreign" hair, does not speak to penetration.  In fact, even *with* the false P-30 evidence, the trial court judge himself thought the sexual assault evidence was "thin," the prosecution agreed that the sexual assault evidence was "weak[]," and a Nevada Supreme Court justice commented that the "sexual assault is questionable."  ECF No. 147-1 at 51 (trial court noting at a pretrial hearing that evidence of sexual assault is "thin" but "circumstantially it is enough to suggest a prima facie case can be made out"); ECF No. 145-6 at 238 (prosecutor conceding sexual assault count was "weakest"); ECF No. 147-1 at 43 (same); ECF No. 24-3 at 65 (Justice Rose of Nevada Supreme Court remarking during oral argument that the "sexual assault is questionable").  Therefore, without the false P-30 evidence, there would have been no rationale for the sexual assault charge, the theory of sexual assault as the motive for the murder, or the admission of prejudicial testimony about Bolin's prior offense.  *See* ECF No. 161-2 at 131-33, 171-73.

191.    Certainly, there is "*any* reasonable likelihood" that the false P-30 evidence, the highly prejudicial testimony on the prior offense, and the prosecution's theory of sexual assault as the motive for the murder "*could* have affected" the jury's decision to convict Bolin of all counts.  *Jackson*, 513 F.3d at 1076; *cf. House*, 547 U.S. at 540-41 (in rape-murder case in which the key issue was "who committed the crime," recognizing that "[w]hen identity is in question, motive is key," and emphasizing importance of sexual assault motive as a "central theme in the State's narrative linking [petitioner] to the crime").

//

//

//

### 3.     Failure to Correct False Footwear-Impression Evidence

192.     Bolin hereby incorporates by reference and realleges here all preceding paragraphs, and in particular, paragraphs 47-50 and 121-122.

193.     The prosecution called multiple experts and witnesses to establish that the smooth, featureless footwear impressions found leading to and from the crime scene fell within a range that included Bolin's shoe size of 10.5.  To reach that conclusion, however, the prosecution and its witnesses relied on flawed collection practices, unreliable measurements, and incorrect size-conversion methodologies.  Despite the flaws in this testimony—flaws that should have been apparent at the time—the prosecution then relied on this testimony in closing arguments in its attempt to link Bolin to the crime scene.  Moreover, the prosecution overstated the evidence in closing, creating the illusion that the footwear impressions at the scene were a precise match for Bolin's shoe size, when the existing evidence supported only a *range* of shoe sizes.

194.     At Bolin's trial, the prosecution elicited testimony from two LVMPD investigators—crime scene analyst Michael Bechler and senior crime scene analyst Daniel Ford—who were responsible for gathering evidence from the crime scene, including by photographing the footwear impressions.  ECF No. 156-3 at 18, 101-02.  Bechler testified first, explaining that he found footwear impressions leading to the crime scene.  *Id.* at 16-18.  He then described those footwear impressions as "smooth, large, somewhat large, maybe ten or eleven size." *Id.* at 18.  He did not offer any foundation whatsoever for how he reached that conclusion about the shoe size, nor did he establish himself as an expert in footwear impressions.  *Id.*

195.     Ford testified next, stating that, when he took pictures of the footwear impressions, he "put a ruler down . . . for size identification." *Id.* at 101.  Based on the pictures, Ford testified that the impressions "measured out approximately eleven inches." *Id.* at 102.

196.     The prosecution then elicited testimony from Torrey Johnson, an LVMPD criminalist who examined the photographs Ford took of the footwear impressions as well as several pairs of shoes that had been recovered from Bolin's parents' house. ECF No. 157-4 at

- 79 -

6-7.  Johnson testified that the shoes recovered from Bolin's parents' house were a size 10.5. *Id.* at 12.  He also testified—based only on his review of Ford's photographs—that the impressions at the crime scene were "about eleven and a half inches long."  *Id.*  Johnson's methodology was to "just physically look" at the pictures and "compare them with" the shoes recovered from Bolin's parents' house.  *Id.* at 14-15.  He stated that the shoes recovered from Bolin's parents' house (a pair of sandals and a pair of dress shoes) were "eleven and three-quarters inches" and "eleven and seven-eighths of an inch" long, respectively.  *Id.* at 17-18, 32.  He then concluded that those shoes were "in the same range" and "generally in the same order of size" as the shoes that left the impressions at the crime scene.  *Id.* at 16, 20.  He did not explain what he meant by the "same order of size"—except to state that the "exterior dimensions" of a shoe are not necessarily "reflective of what size foot goes inside it"—nor did he provide any basis for his conclusion beyond mere visual comparison.  *Id.* at 16.

197.    The prosecution relied on these witnesses' testimony to assert in closing arguments that the footwear impressions they found at the crime scene were "consistent with a 10-1/2"—Bolin's shoe size.  ECF No. 161-2 at 165.  The prosecution then repeatedly referenced that precise shoe size—"10-1/2"—even though the testimony was only that the footwear impressions were "generally in the same order of size" or in the "same range" as Bolin's shoe size.  For example, during closing argument, the prosecution asked the jury how many of the nine, ten, or eleven individuals with the DNA profile at issue "are going to have a size 10-1/2 shoe[?]"  *Id.* at 166; *see also id.* at 174 ("[H]ow many of them have a 10-1/2 shoe[?]").

198.    During closing arguments, the prosecution also published a demonstrative poster to the jury that boldly stated: "FOOTWEAR IMPRESSIONS SAME SIZE AS DEFENDANT." Ex. 174 (depicted *infra* at 98).

199.    The conclusions that the featureless footwear impressions found at the crime scene were a size 10.5 or that it was the same size that Bolin wears are entirely false.  The witnesses' methodology in measuring the footwear impressions was forensically invalid.  And even if they had properly measured the impressions, the conclusions they and the prosecution

1    drew from those measurements were also forensically invalid.  These errors are in addition to

2    the prosecution's decision to overstate the testimony, even aside from its forensics flaws.

3        200.    According to the newly submitted report of certified footwear examiner Dr.

4    Alicia Wilcox, the "industry standard at the time that this crime occurred (and long before and

5    today)" for collecting and measuring footwear impressions "was to place a camera on a tripod

6    and ensure that the lens is parallel to the impression."  Ex. 206 at 4.  Failure to do so "can

7    significantly limit the conclusions of a footwear examiner because . . . it leads to distortion in

8    the image and makes subsequent measurements unreliable."  *Id.*  The photographs Ford took at

9    the crime scene failed to comply with this standard and thus would not "allow an examiner to

10   determine a shoe size in a reliable way."  *Id.*  In short, "because the photographs were not taken

11   properly, conclusions from the comparisons are unreliable."  *Id.* at 11.

12       201.    Johnson's conclusion that the footwear impressions were in the "same order of

13   size" as Bolin's shoes was likewise flawed.  As Dr. Wilcox explains, a mere visual comparison

14   of shoes to footwear impressions is not—and was not at the time of the investigation or trial—

15   an accepted form of analysis in the forensic footwear community.  *Id.* at 6-8.  It is especially

16   improper to compare shoes to impressions; the "proper procedure" would be to "compare like

17   with like, to compare an impression to an impression."  *Id.* at 8.

18       202.    Furthermore, due to the variations in shoe sizes and "outsole" lengths across

19   brands, the length of an impression cannot pinpoint a specific size.  *Id.* at 6.  Rather, it can

20   reflect a range of possible shoe sizes, depending on the brand.  *Id.* at 6-7.  Here, the footwear

21   impressions were "featureless" (ECF No. 157-4 at 13), so the brand could not be determined.

22       203.    Most troubling is the fact that, even if the witnesses had properly collected and

23   measured the footwear impressions, their conclusions about the footwear impressions' size were

24   entirely wrong.  Shoe sizes are very fine measurements, with each half-size reflecting "a 2 to 5

25   [millimeter] difference in length."  Ex. 206 at 6.  The "leading textbook on footwear impression

26   evidence in 1995"—William Bodziak's 1990 *Footwear Impression Evidence*—includes

27

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

research findings on the conversion of footwear impression length to shoe size for five major

brands of sneakers:

| Size | ADIDAS mm | CONVERSE ALL STAR mm | CONVERSE STD. PATTERN mm | NIKE mm | PUMA mm |
|---|---|---|---|---|---|
| 6 | *** | 273.5 | 267 | *** | 271.5 |
| 6.5 | 272 | 277.5 | 271 | 267.6 | 274.8 |
| 7 | 277.8 | 282.2 | 275 | 271.9 | 278.9 |
| 7.7 | 281.4 | 286 | 279 | 275.2 | 283.2 |
| 8 | 284.9 | 280.1 | 283 | 283.3 | 289.5 |
| 8.5 | 289.6 | 295.7 | 287 | 285.4 | 293.2 |
| 9 | 293.9 | 298.6 | 291 | 288.3 | 297.3 |
| 9.5 | 297.9 | 301.8 | 295 | 290.2 | 302.1 |
| 10 | 303.3 | 306.1 | 300 | 294.8 | 305.5 |
| 10.5 | 308 | 301.6 | 304 | 300.9 | 310.2 |
| 11 | 310 | 315 | 308 | 302.5 | 313.8 |
| 11.5 | *** | 318.6 | 313 | *** | 320.5 |
| 12 | 320.8 | 322.8 | 317 | 311.7 | 322.4 |

**Table 1 [Adapted from Bodziak 1990, page 172][5]: Average Length Measurements of Five Major Brands of Sneakers**

*Id.* at 6-7 (highlights added by Dr. Wilcox).

204.    As this chart makes clear, Ford's estimation that the featureless footwear

impressions were approximately 11 inches in length (about 279 millimeters) would have been

consistent with a shoe size between 6.5 and 8, depending on the brand—not a shoe size between

10 and 11, as Bechler testified. *Id.* at 6-7; ECF No. 156-3 at 102. Had Bechler or the

prosecution consulted the Bodziak textbook, the error would have been clear. Even Bechler's

11.5-inch estimate (ECF No. 157-4 at 12), which equates to roughly 292 millimeters, would

correspond to sizes 8.5 to 9.5—*not* Bolin's 10.5 shoe size. A size 10.5 shoe would leave an

impression ranging in size from 301.6 to 310.2 millimeters, or 11.8 to 12.2 inches. In short, and

as Dr. Wilcox noted, there "is no scientifically valid way" to conclude that the footwear

impressions at the crime scene were made by a size 10.5 shoe, and the evidence that did exist at

the time of the trial was completely inconsistent with that result. Ex. 206 at 6-8.

205.    The prosecution knew or should have known that the testimony it elicited was

both false and premised on invalid methodologies. As noted above, Dr. Wilcox's testimony

about proper footwear collection practices (like using a tripod) and accurate measurement

methodologies (like using a conversion table from the "leading textbook" in 1995, rather than a visual comparison) was based on the forensic community's standard, which had been established "long before" Bolin's trial. *Id.* at 4, 6.

206. Rather than correct its witnesses or disclose the deficiencies in their analysis, the prosecution relied on this flawed measurement and conversion process to submit to the jury its unsupported conclusion, which was wrong *and* overstated the witnesses' testimony: "FOOTWEAR IMPRESSIONS SAME SIZE AS DEFENDANT." Ex. 174 (depicted *infra* at 98). Given the lack of forensic evidence tying Bolin to the crime scene, there is "*any* reasonable likelihood" that the false testimony and the prosecution's use of the false footwear-impression testimony and the prosecution's false and misleading spin on it "*could* have affected" the jury's verdict. *Jackson*, 513 F.3d at 1076.

## B. Prosecutorial Misconduct—Vouching for Witnesses

207. Bolin hereby incorporates by reference and realleges here all preceding paragraphs.

208. Throughout closing arguments and rebuttal, the prosecutors committed misconduct by repeatedly and improperly vouching for their key witness, Keith Sirevaag. The prosecution may not vouch for a witness by "placing the prestige of the government behind a witness through personal assurances of the witness's veracity" or "suggesting that information not presented to the jury supports the witness's testimony." *United States v. Ruiz*, 710 F.3d 1077, 1085 (9th Cir. 2013); *see also United States v. Young*, 470 U.S. 1, 18-19 (1985); *Berger v. United States*, 295 U.S. 78, 88-89 (1935). In Bolin's trial, the prosecutors did both.

209. Prosecutor Mel Harmon repeatedly bolstered Sirevaag's credibility through personal assurances. He referred to Sirevaag as "the hero" of the case and "a conscientious, responsible individual," and he argued that Sirevaag's eyewitness identification "boil[ed] down to [his] good conscience." ECF No. 161-3 at 142-43. Indeed, both prosecutors repeatedly called him "citizen Keith Sirevaag"—an identifier with no purpose other than to improperly vouch for his credibility. ECF No. 161-2 at 107 ("citizen Keith Sirevaag"), 111 (same), 146

1    (same), 169 ("citizen Sirevaag"); ECF No. 161-3 at 126 ("citizen Sirevaag"), 143 ("responsible

2    citizen"), 147 ("duty as a citizen").  The prosecution also told the jury that the "police" *and*

3    "this community" were "*lucky* it was a guy like Sirevaag, a responsible person," who was a

4    witness in this case.  ECF No. 161-3 at 134 (emphasis added).

5        210.    The prosecutors further suggested that extra-record evidence supported

6    Sirevaag's testimony.  They introduced contextual evidence not in the record to argue that

7    Sirevaag was a credible eyewitness, stating that "he's not a professional witness," that "he

8    hasn't had any legal training," and that "he doesn't know the rules of evidence."  *Id.* at 126.

9    None of this was stated in or plausibly inferred from the record.  The prosecutors further

10   contended that Sirevaag had "really done everything that a responsible person could do" (*id.* at

11   138), and "cooperated to the best of his ability with law enforcement" (ECF No. 152-1 at 26).

12   Such statements improperly rely on the prosecutors' own experiences—which are not in the

13   record—to vouch for Sirevaag's veracity and reliability.

14       211.    The vouching in this case "is particularly likely to jeopardize the fundamental

15   fairness of the trial" because "the credibility of [the] witness[] [was] crucial."  *United States v.*

16   *Edwards*, 154 F.3d 915, 921 (9th Cir. 1998).  Sirevaag's testimony was both critically important

17   and fiercely contested.  The defense moved to suppress Sirevaag's testimony as a result of the

18   suggestive eyewitness procedure (*see supra*, Claim 1), which was denied after a lengthy pretrial

19   hearing.  ECF No. 226 at 21-122.  At trial, Sirevaag's testimony spanned three days, and he was

20   subject to multiple rounds of extensive cross-examination.  ECF Nos. 153-2, 153-3, 153-4, 154-

21   1.  The credibility of Sirevaag—who waffled from "not sure," to 70 or 90 percent sure, to

22   absolutely sure about his identification of Bolin—was central to the case, and so the

23   prosecutors' repeated vouching for his veracity and character bore a significant chance of

24   swaying the outcome and was a violation of Bolin's due process rights.

25       //

26       //

27       //

28

- 84 -

1

### C.    Prosecutorial Misconduct—Appeals to Racial Prejudice

2      212.    Bolin hereby incorporates by reference and realleges here all preceding

3  paragraphs.

4      213.    The prosecutors committed misconduct by appealing to racial fear and prejudice

5  throughout Bolin's trial.  "Appeals to racial . . . prejudice during the course of a trial violate a

6  defendant's Fifth Amendment right to a fair trial."  *United States v. Cabrera*, 222 F.3d 590, 594

7  (9th Cir. 2000); *see also Buck*, 580 U.S. at 119; *Kelly v. Stone*, 514 F.2d 18, 19 (9th Cir. 1975).

8  As the Supreme Court has made clear, the "Constitution prohibits racially biased prosecutorial

9  arguments."  *McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987).

10      214.    In closing argument, the prosecution told the jury that Bolin "treated the crime

11  scene like his *personal jungle* and Brooklyn Ricks [as] his *chosen prey*."  ECF No. 161-2 at 133

12  (emphases added).  This description "mine[s] a vein of historical prejudice against African-

13  Americans, who have been appallingly disparaged as primates or members of a subhuman

14  species in some lesser state of evolution."  *Bennett v. Stirling*, 842 F.3d 319, 324-25 (4th Cir.

15  2016).  As the Fourth Circuit stated in response to the *Bennett* prosecutor's comparison of a

16  criminal defendant to King Kong and various members of the animal kingdom: "The comments

17  plugged into potent symbols of racial prejudice, encouraging the jury to fear [the defendant] or

18  regard him as less human on account of his race."  *Id.* at 325-26.

19      215.    Indeed, courts nationwide recognize that comparing a defendant to an animal—

20  as the prosecution did here by painting the imagery of Bolin hunting in his "personal jungle"—

21  is improper and invokes racial prejudice.  *See, e.g.*, *State v. Blanks*, 479 N.W.2d 601, 603 (Iowa

22  Ct. App. 1991) (reversing conviction where prosecutor cited to the movie "Gorillas in the Mist"

23  because comparisons to apes and gorillas "can be interpreted by the jury as having racial

24  overtones"); *Coddington v. Martel*, 2023 WL 3229948, at *164 (E.D. Cal. May 3, 2023)

25  (comparison of petitioner to "a litany of animals . . . [including] a snake, a jackal, and a vulture

26  . . . telegraphed clearly that Petitioner was subhuman and that he belonged in a cohort of beasts"

27

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

1  in violation of Eighth Amendment); *Matter of Richmond*, 16 Wash. App. 2d 751, 755 (2021)

2  ("The most obvious problem with animal analogies is they can convey racist sentiments.").

3      216.    The prosecution's description also drew upon this nation's history of racial

4  oppression and prejudice—much of it closely connected with the "myth of the black rapist"

5  used to inflict fear of Black men hunting white women. *See generally* Coramae Richey Mann

6  & Lance E. Selva, *The Sexualization of Racism: The Black as Rapist and White Justice*, 3 W. J.

7  Black Studies 168 (1979) (arguing that "no two myths have been more pervasive, or divisive, in

8  American society" than the myths of the Black man as rapist and of the white woman's sexual

9  purity). In doing so, the prosecution's racially inflammatory comment crossed the line by

10  "shift[ing] its emphasis from evidence to emotion." *United States v. Doe*, 903 F.2d 16, 25 (D.C.

11  Cir. 1990).

12      217.    In addition to the explicit comparison to Bolin as a jungle predator, throughout

13  the proceedings, the prosecution invoked these racist themes and narratives. For example, in

14  arguing for publication of a photograph of Ricks while she was alive, the prosecution stated

15  during a pretrial hearing that the "photograph shows that Brooklyn Ricks was a blond and

16  actually a very fair[-]haired blond" and that it was "very probative to the companionship that the

17  defendant sought." ECF No. 153-1 at 52-53. The prosecution elicited testimony about Ricks's

18  blond hair color compared to her sisters (*see id.* at 56-58), and contrasted that with the allegedly

19  "Negro" hair found on her body (*see* ECF No. 156-1 at 96-97 (Cook's repetitive testimony

20  about the "Negro characteristics" of the hair and the "Negro suspect")). And at trial, the

21  prosecutors openly tied these racial comparisons to Bolin's alleged sexual interest in Ricks's

22  sisters. *See* ECF No. 152-1 at 31 (in opening, arguing that Bolin had "interest in female

23  companionship" and "made passes" at Ricks's sisters); *id.* at 32 (arguing Bolin "likes to talk

24  with pretty members of the opposite sex"); ECF No. 161-2 at 143 (in closing, pointing out that

25  Bolin's niece said that Lewis, one of the sisters, was "attractive" but she "turned him down");

26  *id.* at 144 ("Certainly, it's established that the defendant had an interest in attractive girls or

27  women. These three girls were sisters. And I submit to you that siblings look alike."); *id.*

28

- 86 -

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

("These siblings, all three, were attractive females.  And we learned that Gregory Bolin is interested in attractive females, that he wanted to date those girls in particular.").

218.    The prosecutors' emphasis on race is further highlighted by their attempt to establish that Bolin had a pattern of "sexual aberrant behavior."  *See* ECF No. 161-2 at 170.  In connection with the 1975 prior offense, the prosecutor specifically elicited testimony from the female victim's husband that the assailants were Black men.  ECF No. 154-3 at 75.  Then, when questioning the female victim, the prosecutor asked about her "physical appearance" at the time of the assault, disturbingly asking if she was "a shapely woman" with a "nice figure"—clearly attempting to emphasize the prosecution's theory that Bolin was interested in attractive white women.  ECF No. 155-1 at 67-68; *see also* ECF No. 202-2 at 48 (arguing for admission of prior bad acts evidence based in part on similarities "in age of the victims" and "in the race of the victims").

219.    None of the prosecution's racially inflammatory language or narratives is acceptable, even in isolation.  Compiled together, they clearly violate Bolin's right to a fair trial.

**D.    Ineffective Assistance of Counsel**

**1.    Failure to Investigate P-30 Evidence**

220.    Bolin hereby incorporates by reference and realleges here all preceding paragraphs, and in particular, paragraphs 72-92, 106-112, and 184-191.

221.    Just as the prosecution failed to correct its witnesses' false testimony that the positive P-30 result from Ricks's vaginal swab was "proof positive" of the presence of semen (ECF No. 156-1 at 75, 78, 80, 99), Bolin's trial counsel also failed to identify or correct this error.  Even worse, Bolin's trial counsel presented the testimony of a defense expert who erroneously *endorsed* the prosecution witnesses' false testimony.  Had they researched the issue and engaged an expert familiar with the existing literature, they would have learned that P-30 is not "proof positive" of semen—as the scientific literature predating Bolin's 1996 trial made clear.  *See supra* ¶¶ 107-109; Exs. 180-197.

222.    Bolin's trial counsel provided ineffective assistance as to the P-30 issues on multiple occasions before and during trial—even though they were put on notice of the issue as early as the preliminary hearing, when the prosecution used Cook's P-30 testimony to argue that there was probable cause to believe that Bolin was guilty of sexual assault, a crime that required proof of penetration.  ECF No. 145-6 at 120-21 (Cook testifying at preliminary hearing to the presence of P-30, which was "proof positive" of semen); ECF No. 161-2 at 86, 88-89 (jury instruction defining "sexual penetration" as an element of "sexual assault"); Exs. 175, 176 (NRS 200.364(2), 200.366(1)).

a. Bolin's trial counsel failed to bring a motion to dismiss the sexual assault charge despite the lack of evidence of penetration, and subsequently, failed to bring a motion to exclude the P-30 evidence as evidence of sexual assault. *Griffin*, 727 F.3d at 945-46 (ineffective assistance of counsel based on failure to advance meritorious motions to exclude or timely object to important evidence).

b. During the hearing on the motion to exclude evidence of Bolin's prior offense, Bolin's trial counsel failed to object to the presentation of P-30 as evidence of sexual assault, leading the trial court to admit the prejudicial testimony on the prior rape conviction because the crimes purportedly both involved "brutal and forcible rapes" and "terribly sexual aberrant behaviors." ECF No. 202-2 at 61; ECF No. 149-3 at 56; *Griffin*, 727 F.3d at 945-46.

c. During trial, Bolin's counsel failed to object when Cook repeatedly told the jury that a weakly positive P-30 result is "proof positive" of semen.  ECF No. 156-1 at 78, 80, 99; *Griffin*, 727 F.3d at 945-46.

d. Bolin's counsel also called their *own* expert, who agreed that P-30 was "semen specific."  ECF No. 160-4 at 54; *see Buck*, 137 S. Ct. at 775-77 (ineffective assistance of counsel based on presentation of experts that endorse a prosecution's theory); *Hooks*, 689 F.3d at 1204-05 (similar); *Johnson*, 544 F.3d at 605 (similar).

e. During closing arguments, Bolin's counsel failed to object when the prosecution argued that the presence of semen proved "penetration" and that Ricks had been sexually assaulted—and instead *agreed* that the P-30 was "indicative of . . . sexual intercourse."  ECF No. 161-3 at 68; ECF No. 161-2 at 131.

223.    These repeated failures to challenge the prosecution's primary evidence of sexual assault and only proof of penetration—in a case where even the trial court judge opined that the sexual assault evidence was "thin" (ECF No. 147-1 at 51)—fell well below the "objective standard of reasonableness."  *Strickland*, 466 U.S. at 688; *see Lindstadt v. Keane*, 239 F.3d 191,

201 (2d Cir. 2001) (ineffective assistance in child-abuse case where defense counsel did not consider calling an expert that "could have brought to light a contemporaneous study, accepted for publication at the time of Lindstadt's trial, that found similar irregularities on the hymens of girls who were *not* abused"); *Gersten v. Senkowski*, 426 F.3d 588, 608 (2d Cir. 2005) (finding ineffective assistance of counsel where trial counsel "essentially conceded that the physical evidence was indicative of sexual penetration without conducting any investigation to determine whether this was the case" and where experts could have "testif[ied] that the prosecution's physical evidence was not indicative of sexual penetration and [thus] provided no corroboration whatsoever of the alleged victim's story").

224.    As a result of the failure to object to or challenge the P-30 evidence, the prosecution was able to bring and support the sexual assault charge, which required proof of penetration, and argue that sexual assault was the motive for the murder. ECF No. 161-2 at 88-89, 133, 170-72; Exs. 175, 176 (NRS 200.364, 200.366). Further, with the P-30 evidence unchecked, the prosecution was able to offer extensive testimony of Bolin's prior rape conviction and argue that the prior conviction taught Bolin to "silence[]" his alleged victims of sexual assault in order to avoid identification. ECF No. 161-2 at 172. Thus, there is a "reasonable probability" that had Bolin's trial counsel properly challenged the P-30 evidence, the "result of [Bolin's trial] would have been different." *Strickland*, 466 U.S. at 694. Bolin's trial counsel's performance on the P-30 issue "undermine[d] confidence" in Bolin's conviction. *Id.*; *cf. House*, 547 U.S. at 540-41 (recognizing in rape-murder case, "[w]hen identity is in question, motive is key," and emphasizing importance of sexual assault motive as a "central theme in the State's narrative linking [petitioner] to the crime").

## 2.    Failure to Investigate Footwear Evidence

225.    Bolin hereby incorporates by reference and realleges here all preceding paragraphs, and in particular, paragraphs 47-50, 121-122, and 192-206.

226.    As described above, the prosecution elicited and relied upon footwear-comparison testimony in an attempt to link Bolin to the crime scene. The testimony as to the

collection and measurement of footwear impressions at the crime scene was based upon flawed practices and unreliable methodologies that were known to be inadequate at the time. And even if the prosecution witnesses' flawed measurements are credited, the conclusion that an 11-inch or 11.5-inch footwear impression is consistent with a size 10.5 would still be wrong. The crime-scene impressions were smaller than—and outside the range of—Bolin's size 10.5. *See supra* ¶¶ 122, 203-204.

227.    Bolin's trial counsel did not investigate or research the proper methodology for collecting, measuring, or comparing footwear impressions, information that was readily available and known at the time of the investigation and trial, as described by certified footwear examiner Dr. Wilcox. Ex. 206; *supra* ¶¶ 122, 200-202, 205. Nor did trial counsel hire an expert specializing in footwear-impression methodologies. As a result, defense counsel failed to challenge (through objection, cross-examination, or rebuttal witnesses) the prosecution experts' testimony or the prosecution's arguments, both in connection with the methodologies used to measure the footwear impressions and the conclusions that those (flawed) measurements matched Bolin's 10.5 shoe size.

228.    On cross-examination of Bechler (who estimated the footwear impressions to be between a size 10 and 11) and Ford (who photographed and measured the footwear impressions at the crime scene), Bolin's trial counsel asked about the placement of the footwear impressions at the crime scene (ECF No. 156-3 at 47-50; ECF No. 157-1 at 23-27), and whether the impressions indicated a struggle (ECF No. 157-1 at 24), but not whether the photographs were taken in accordance with accepted forensic standards. And on cross-examination of Johnson (who testified that he "just physically look[ed]" at Bolin's shoes and the footwear impressions at the crime scene and concluded they were in the "same order of size"), defense counsel corrected a misstatement as to the length of one of the shoes found at Bolin's parents' house (ECF No. 157-4 at 14, 31-32), but did not otherwise challenge Johnson's analysis. Bolin's counsel did not cross-examine Bechler or Ford on how Ford's haphazard photography risked producing incorrect measurements of the footwear impressions' length—a risk understood at

the time and that would have been addressed by the accepted practice of using a tripod parallel to the impression, which Bechler failed to do. *See supra* ¶¶ 200, 205. Bolin's counsel likewise did not cross-examine the prosecution's witness about their methodology for converting an 11- or 11.5-inch footwear impression to a 10-11 shoe size—a conversion that the "leading textbook" available at the time would have revealed to be incorrect. *See supra* ¶¶ 203-205; Ex. 206 at 6-7.

229.    Further, Bolin's counsel did not object to the prosecution's overstatement of the evidence in closing; the witnesses testified that the impressions were "generally in the same order of size" or the "same range" as Bolin's shoe size, but the evidence did not support that the impressions were size 10.5 or the "same size" that Bolin wore—as the prosecution repeatedly stated in closing arguments. ECF No. 157-4 at 16, 20; ECF No. 161-2 at 165-66, 168, 174 (repeated references to size "10-1/2" shoes); Ex. 174 (demonstrative stating "SAME SIZE").

230.    Bolin's trial counsel called one witness, Dr. John Thornton, to discuss the footwear-impression evidence. But Thornton was an expert in "trace microanalysis," the use of "microscope[s] and microchemical techniques to identify and interpret items of physical evidence"—not footwear impressions. ECF No. 160-5 at 29-31. He testified primarily about other issues such as hair analysis. *Id.* at 28-29 (testifying he has written 175 articles, but none about footwear evidence); Ex. 206 at 9-10. Because he lacked footwear-impression expertise, he was unable to correct the false testimony presented by the prosecution's witnesses. Instead, he essentially reiterated their erroneous conclusions, testifying that the impressions found at the crime scene "could be a 10-1/2 [size shoe], but . . . could be something on either side as well." ECF No. 161-2 at 46.

231.    Bolin's lead trial attorney confirmed in June 2022 that it did not "occur to [him] to consult with an expert who specializes in forensic footwear impressions," and that this failure was not "strategic." Ex. 210 ¶¶ 5, 7.

232.    Trial counsel's failure to research, investigate, or understand how footwear impressions should be collected and measured, or to hire an expert who understood these issues,

1   fell well below the "objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  There

2   is a "reasonable probability" that had Bolin's trial counsel investigated these issues and been

3   able to explain to the jury that the footwear impressions at the crime scene were actually too

4   small to be Bolin's, the "result of [Bolin's trial] would have been different." *Id.* at 694.

5               **3.     Failure to Investigate Jailhouse Informant's Story**

6       233.    Bolin hereby incorporates by reference and realleges here all preceding

7   paragraphs, and in particular, paragraphs 93-97 and 123-125.

8       234.    The prosecution called Michael Siebert, a jailhouse informant and heavy drug

9   user, to testify that Bolin had expressed worry about certain elements of the prosecution's

10  theory of the crime—about which Siebert purportedly would not have had independent

11  knowledge.  Specifically, Siebert testified that during the week they shared a cell, Bolin grilled

12  Siebert about whether fingerprints could be removed from surfaces of a car or truck or from a

13  screwdriver.  *Supra* ¶¶ 93-94.  Seizing on Siebert's testimony, the prosecution argued that Bolin

14  was "worried about fingerprints" because "fingerprints are proof positive of a person's

15  presence."  ECF No. 161-2 at 162-64.  Although Siebert had numerous credibility issues,

16  including a track record of drug abuse and lying, the jury was led to believe that Siebert was

17  telling the truth about *this* because Siebert allegedly "doesn't know what the facts [of Bolin's

18  case] were."  *Id.* at 163.

19      235.    Bolin's trial counsel failed to investigate Siebert's story.  Specifically, they failed

20  to investigate how Siebert could have known that a truck or screwdriver were elements of the

21  prosecution's theory of the case.

22      236.    This failure is magnified by Bolin's statement to his trial counsel about "two

23  witnesses who could undermine [Siebert's] story," including one who "knew how [Siebert]

24  obtained information about Mr. Bolin's case."  Ex. 210 ¶ 4.  Bolin's lead trial attorney's 2022

25  affidavit confirms that he "should have investigated the jailhouse informant's story," that he did

26  not contact either individual his client told him about, and that the failure to do so was not

27  "strategic."  *Id.* ¶¶ 4, 7.

28

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

237.    Sure enough, one such witness, another inmate in Bolin's unit at the Clark County Detention Center, explained in an affidavit that Siebert overheard Bolin tell him that, according to Bolin's lawyer, "if there was no evidence of [Bolin] being in that truck, like his fingerprints on the radio knob or dashboard or steering wheel or other places inside the vehicle, then the state had no case." Ex. 207 ¶ 4. The inmate also witnessed Siebert "looking down from his top bunk at [Bolin's] legal paperwork," which was "spread out on the desk." *Id.* ¶ 6.

238.    Trial counsel's failure to research the jailhouse informant's story, even after Bolin's specific request, fell well below the "objective standard of reasonableness." *Strickland*, 466 U.S. at 688. If the jury had been forced to confront an alternate explanation for Siebert's knowledge of these aspects of Bolin's case, there is a "reasonable probability" that the "result of [Bolin's trial] would have been different." *Id.* at 694. Bolin's trial counsel's failure to investigate Siebert's story "undermines confidence" in Bolin's conviction. *Id.*

### E.    Changes in Scientific Knowledge

239.    Bolin hereby incorporates by reference and realleges here all preceding paragraphs, and in particular, paragraphs 51-56, 72-92, 106-112, 184-191, 220-224, and 113-120.

240.    A conviction that rests on "the introduction of flawed expert testimony at trial" violates due process if the evidence "undermined the fundamental fairness of the entire trial." *Gimenez v. Ochoa*, 821 F.3d 1136, 1144-45 (9th Cir. 2016) (citation omitted); *cf. Maxwell*, 628 F.3d at 499 ("We have . . . concluded that a defendant's due process rights were violated, and accordingly granted habeas relief, when it was revealed that false evidence brought about a defendant's conviction."); *Killian*, 282 F.3d at 1209 ("A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness.").

241.    That rule extends to expert testimony based on subsequently "discredited forensic principles" that are "debunked" after trial and "other junk science." *Gimenez*, 821 F.3d at 1143-44.

242.    Bolin's case was replete with false, flawed, and now-discredited expert testimony, including the false testimony that P-30 is proof of semen and the use of microscopic hair comparison, in violation of Bolin's due process rights.[19]

### 1.    Flawed Expert Testimony That P-30 Was "Proof Positive" of Semen

243.    As explained above, the expert testimony that the P-30 found on Ricks's vaginal swab was "proof positive" of semen was flatly wrong: It has been widely recognized that P-30 can be found in vaginal and other female bodily fluids.  Although this was clear at the time of Bolin's 1996 trial, such that the prosecution's failure to correct the error violates *Napue* and defense counsel's failure to correct it violates *Strickland* (*see supra*, Claim 3(A)(2) and 3(D)(1)), should the Court disagree, subsequent literature further confirms that Bolin was convicted based on "faulty science," in violation of his due process rights.  *Gimenez*, 821 F.3d at 1144.

244.    In addition to the 18 articles predating Bolin's trial that established that P-30 can be found in female vaginal fluid, female urine, female serum, breast tumors, breast milk, and amniotic fluids, multiple additional articles published after his trial further cement this point. *Supra* ¶¶ 107-111; Exs. 180-197 (articles predating trial); Exs. 198-201 (articles postdating trial).

245.    The falsity of the P-30 testimony remains equally apparent today—with the LVMPD's own 2022 Biology/DNA Detail Procedures Manual making clear that P-30—i.e., PSA—"can be found in very low concentrations in female vaginal fluid."  Ex. 178 at 32 (§ 2.14.3).  As Dr. Rhonda Williams stated in her newly presented affidavit, in Bolin's case, "[T]here is no conclusive serological evidence for the existence of semen . . . based on the lack of sperm cells and a barely positive p30 test."  Ex. 179 ¶ 9.  In other words, there is no "debate" that the testimony of prosecution expert Terry Cook and defense expert Lisa Calandro—that P-

---

[19] Bolin did not exhaust this theory in state court, but, based on the doctrine of anticipatory procedural default, the Court should treat it as exhausted.  *Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) (en banc); *Williams v. Baca*, 2018 WL 3447172, at *3 (D. Nev. July 17, 2018).

30 was "proof positive" of semen and a "semen specific protein"—rested on "discredited forensic principles." *Gimenez*, 821 F.3d at 1143; ECF No. 156-1 at 99; ECF No. 160-4 at 54.

246.    This debunked expert testimony "undermined the fundamental fairness of the entire trial." *Gimenez*, 821 F.3d at 1145.  The P-30 testimony was the prosecution's only forensic evidence of sexual assault and its only proof of "penetration"—as required for the sexual assault charge.  ECF No. 161-2 at 88-89.  Without this purported proof of semen, prosecutors would not have been able to admit highly prejudicial testimony about Bolin's decades-old prior conviction to argue that Bolin's motive for murdering Ricks was to cover up a sexual assault—i.e., that his prior offense taught him to "silence[]" sexual assault victims to avoid identification.  ECF No. 161-2 at 172.  The purported proof of sexual assault permeated all aspects of Bolin's trial, but the scientific literature about P-30 now makes clear that there was no proof of sexual assault at all.  This use of flawed expert testimony blatantly violated Bolin's due process rights.

### 2.    Use of Discredited Microscopic Hair Comparison

247.    The prosecution introduced expert testimony about the "foreign" hair found on Ricks's body that was based on microscopic hair comparison, which is now widely understood as unreliable.

248.    LVMPD criminalist Terry Cook testified that the foreign hair was "microscopically similar" to—and in fact, "identical" to and "indistinguishable" from—at least one of Bolin's 30-or-so sample hairs, and thus, Bolin could not be excluded as the hair's donor. ECF No. 158-4 at 53, 97; ECF No. 156-1 at 87; ECF No. 156-2 at 49-50.  Defense expert Dr. John Thornton similarly conceded that he could not "eliminate" Bolin as the donor of the hair based on microscopic hair analysis—despite having been able to "exclude suspects hundreds of times" in other cases.  ECF No. 161-2 at 35, 47.

249.    Notably, the entirety of Cook's microscopic hair training came from a one-week course taught by the FBI.  ECF No. 156-1 at 107, 110-11; ECF No. 156-2 at 31.  But the FBI has since publicly discredited the role of microscopic hair comparison in trials due to the

1  frequent "grossly exaggerat[ed]" testimony that goes "beyond the limits of science in ways that

2  put more weight on a hair comparison than scientifically appropriate" and that "could [mislead]

3  a jury or judge." Ex. 204; Exs. 202, 203; *supra* ¶¶ 114-120. The LVMPD's own 2022

4  Biology/DNA Detail Procedures Manual further reflects the procedure's unreliability, noting

5  that the "LVMPD Biology/DNA Detail does not perform microscopic hair comparisons."

6  Ex. 178 at 45.

7      250.    The hair was the only forensic evidence used to link Bolin to the crime. But the

8  hair only linked to Bolin through the use of now-discredited microscopic hair analysis and the

9  use of the same *contaminated* hair's DNA results. *See supra*, Claims 2 and 3(A)(1). This

10  seriously flawed line of expert testimony obviously "undermined the fundamental fairness of

11  the entire trial" and violated Bolin's due process rights. *Gimenez*, 821 F.3d at 1145.

13  ## CLAIM 4
   ### (Cumulative Error)

14      251.    Bolin hereby incorporates by reference and realleges here all preceding

15  paragraphs and every claim in this petition.

16      252.    Even if none of foregoing errors "would independently warrant reversal," the

17  errors together "so infected the trial with unfairness as to make the resulting conviction a denial

18  of due process." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citation omitted); *see also*

19  *Alcala v. Woodford*, 334 F.3d 862, 883 (9th Cir. 2003) ("[E]rrors that might not be so

20  prejudicial as to amount to a deprivation of due process when considered alone, may

21  cumulatively produce a trial setting that is fundamentally unfair.'"). Reversal is required when

22  the "combined effect of the errors had a 'substantial and injurious effect or influence on the

23  jury's verdict.'" *Parle*, 505 F.3d at 927 (citation omitted).

24      253.    Without the evidence discussed in Claims 1 and 2—Sirevaag's unreliable

25  eyewitness identification that followed an unnecessarily suggestive one-on-one showup

26  procedure and the invalid DNA evidence from a "foreign" hair found on Ricks's body, which

27  led the prosecution to argue misleadingly that Bolin was one of only a few men (and

28

realistically, the only man) who could have committed the crime—Bolin's trial would have been dramatically different.  The eyewitness identification and DNA evidence were the core foundations of the prosecution's case against Bolin—and the combined effect of the errors in Claims 1 and 2 warrant reversal under the cumulative-error doctrine.  *See Alcala*, 334 F.3d at 893 (affirming grant of petition where "cumulative impact of [the] errors goes to the heart of the prosecution's theory of the case and undermines every important element of proof offered by the prosecution").  In fact, two jurors in Bolin's case have since confirmed that the eyewitness identification and DNA evidence were critical to their decisions to convict. Ex. 211 (jury foreman Bradford T. Harris's declaration stating that the eyewitness and DNA evidence were compelling; recalling that prosecutors told "the jurors that the science and the statistics showed that the defendant committed the crime and that you can't argue with science," and the "defense attorneys made arguments about the probabilities, but it felt like they conceded the DNA and the statistics point"); Ex. 212 (juror Anna T. Schultz's declaration stating that the "eyewitness testimony was a major factor and weighed heavily on my decision to vote for guilt").

254.    Reversal is all the more warranted when considering the evidence that came in as a result of the errors described in Claim 3: the P-30 evidence that was supposedly "proof positive" of semen and sexual assault (allowing the prosecution to support its sexual assault charge, obtain admission of the highly prejudicial testimony about the 1975 rape conviction, and argue its theory that sexual assault was the motive for Ricks's murder), flawed evidence that footwear impressions near the crime scene matched Bolin's 10.5 shoe size, and evidence that Bolin was paranoid about fingerprints on the purported murder weapon and truck.  The prosecution's vouching for its key witness and appeals to racial fear and prejudice further solidify the inevitable conclusion that Bolin was deprived of a fundamentally fair trial, in precisely the same way as so many other wrongfully convicted defendants.

255.    The prosecution's demonstrative—which it used during its closing remarks and which is shown on the next page—depicted 14 circles of evidence that purportedly linked Bolin to the crime.  As the demonstrative makes clear, without the foregoing evidence, the

- 97 -

prosecution was left with scant circumstantial evidence, such as the fact that Bolin visited B&R

Video the night before the murder, the fact that a black tank top and beige shorts were found in

Bolin's parents' home, the fact that Bolin had asked Ricks's sisters to go to coffee, and the

proximity of Bolin's residence to Ricks's place of employment and the place where her truck

was found.[20]  None of those facts connects him to Ricks's murder.



Deputy District Attorney Gary Guymon uses a poster featuring a photograph of murder defendant Gregory Bolin to make a point during the trial's closing arguments, which lasted late into the evening Friday.

Clint Karlsen/Review-Journal

Ex. 174.[21]

---

[20] The fact that Ricks's truck was found "half a mile" from Bolin's parents' home (ECF No. 161-2 at 160-61) was not incriminating—the truck was also found in close proximity to B&R Video, Ricks's own home, and the home of Ricks's friend Misty Cordaro, whom Ricks's sister thought Ricks might have visited the night she disappeared.  *Id.* at 122 (truck was found "some one-and-a-half miles" from Ricks's home); ECF No. 159-1 at 23 (Bolin's parents' home was a "five to 10 minute[]" walk to B&R Video); ECF 153-1 at 18-20 (noting where Cordaro lived). Judicially noticeable maps of the area show the close proximity of these other locations to where the truck was found.  *See* concurrently filed Request for Judicial Notice & Ex. A.

[21] The circles read, clockwise from the top: "Defendant Frequents B&R," "Defendant Wanted to Date Brooklyn's Sisters," "Video Tape of Defendant in B&R," "Keith Sirevaag Sees Defendant at Murder Scene," "Brittany and Liberty Suspicious of Defendant," "Defendant's Admissions and Lies," "Proximity in Time and Place," "Black Tank Top / Beige Shorts," "Tattoo Location

256.    The myriad constitutional errors cut to the core of the prosecution's case and "so infected [Bolin's] trial with unfairness as to make the resulting conviction a denial of due process." *Parle*, 505 F.3d at 927 (citation omitted); *Alcala*, 334 F.3d at 893-94. The "combined effect of the errors had a 'substantial and injurious effect or influence on the jury's verdict,'" and requires reversal of Bolin's conviction. *Parle*, 505 F.3d at 927 (citation omitted).

## VI.    PRAYER FOR RELIEF

Petitioner Gregory Bolin respectfully requests that this Court:

1.    Issue a writ of habeas corpus to have Bolin brought before the Court so that he may be immediately discharged from his unconstitutional confinement and relieved of his unconstitutional sentence of death;

2.    Order an evidentiary hearing at which Bolin will offer this and further proof in support of the allegations in this Petition and in response to any defenses that may be raised by the State;

3.    Grant Bolin such further relief as, in the interests of justice, is appropriate.

Respectfully submitted,

**DATED**: February 16, 2024

/s/ Julie D. Cantor MD | JD
JULIE D. CANTOR MD | JD
GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP

/s/ Jonathan P. Schneller
JONATHAN P. SCHNELLER
KELLY KAMBOURELIS
O'MELVENY & MYERS LLP

/s/ Paola Armeni
PAOLA ARMENI
CLARK HILL PLC

*Attorneys for Petitioner Gregory Bolin*

---

and Description," "Truck Recovery within Blocks of Defendant's Residence," "Fingerprints Worry Defendant," "Footwear Impressions Same Size as Defendant, "Hair Evidence Microscopic and DNA," and "Aberrant Sexual Conduct."

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury under the laws of the United States of America and the State of Nevada that the facts alleged in this petition are true and correct to the best of counsel's knowledge, information, and belief.

Respectfully submitted,

**DATED**: February 16, 2024

/s/ Julie D. Cantor MD | JD
JULIE D. CANTOR MD | JD
GOLDMAN ISMAIL TOMASELLI BRENNAN &
BAUM LLP

**[PROPOSED] FIFTH AMENDED PETITION FOR WRIT OF HABEAS CORPUS**