# Attachment

ERIC W. SWANIS, ESQ.
Nevada Bar No. 06840
**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada  89135
Telephone:  (702) 792-3773
Facsimile:   (702) 792-9002
Email:   swanise@gtlaw.com

CAROLINE HELLER, ESQ.*
JENNIFER BARTLETT, ESQ.*
**GREENBERG TRAURIG, LLP**
One Vanderbilt Avenue
New York, New York  10017
Telephone:  (212) 801-2165
*Pro Hac Vice Forthcoming*
Email:   Caroline.Heller@gtlaw.com
            Jennifer.Bartlett@gtlaw.com

***Counsel for Amici Curiae, The Innocence Project, Inc.
and the Wilson Center for Science and Justice***

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

| GREGORY BOLIN, | CASE NO. 3:07-cv-00481-ART-CLB |
|---|---|
| Petitioner, | **BRIEF FOR AMICI CURIAE, THE INNOCENCE PROJECT, AND THE WILSON CENTER FOR SCIENCE AND JUSTICE** |
| v. | |
| WILLIAM GITTERE, et al., | |
| Defendants. | |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada  89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

# **TABLE OF CONTENTS**

PAGE

INTEREST OF *AMICUS CURIAE* ............................................................. 1

INTRODUCTION AND PRELIMINARY STATEMENT ........................................... 2

ARGUMENT ...................................................................................... 5

I.   MISTAKEN EYEWITNESS IDENTIFICATIONS ARE ONE OF THE
     LEADING CAUSES OF WRONGFUL CONVICTIONS. ................................ 5

II.  DECADES OF SCIENTIFIC RESEARCH SHOW THAT SINGLE-WITNESS
     SHOWUPS LIKE THE ONE IN THIS CASE ARE UNDULY SUGGESTIVE. ............... 8

     A.   Showups are inherently suggestive—and produce unreliable
          identifications. ...................................................................... 8
     B.   The showup in this case was both unwarranted and particularly suggestive. ....... 10
     C.   Police pressure and influence further contributed to an impermissibly
          suggestive procedure and resulted in an unreliable identification ................. 12

III. THE ADMISSION OF THE EYEWITNESS IDENTIFICATION EVIDENCE
     VIOLATED DUE PROCESS BECAUSE IT BORE NO INDICIA OF
     RELIABILITY NEEDED TO OVERCOME THE SUGGESTIVENESS OF THE
     IDENTIFICATION PROCEDURE. .................................................... 15

     A.   *Biggers* Factors Nos. 1 & 2: Sirevaag's opportunity to observe the culprit
          at the crime scene and the degree of attention he paid were insufficient to
          support a reliable identification. .............................................. 15
     B.   *Biggers* Factor No. 3 weighs against reliability because of discrepancies
          between Sirevaag's description of the culprit and Gregory Bolin. .............. 18
     C.   *Biggers* Factor No. 4: Scientific research confirms that Sirevaag's initial
          uncertainty strongly suggests that the identification was unreliable. ............ 21
     D.   *Biggers* Factor No. 5 weighs in favor of unreliability or is neutral. ............. 23

IV.  IN-COURT IDENTIFICATIONS BASED ON UNRELIABLE SHOWUP
     IDENTIFICATIONS ARE AT LEAST AS UNRELIABLE AS THE SHOWUP. ............ 24

CONCLUSION .................................................................................. 28

**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Browning v. Baker,*
 875 F.3d 444 (9th Cir. 2017) ............................................................................ 8, 11, 16

*Green v. Loggins,*
 614 F.2d 219 (9th Cir. 1980) ........................................................................................ 17

*Manson v. Brathwaite,*
 432 U.S. 98 (1977) ....................................................................................................... 15

*Morales v. United States,*
 248 A.3d 161 (D.C. 2021) ............................................................................................ 23

*Mysholowsky v. New York,*
 535 F.2d 194 (2d Cir. 1976) ........................................................................................... 8

*Neil v. Biggers,*
 409 U.S. 188 (1972) ............................................................................................... 15, 21

*People v. Sammons,*
 949 N.W.2d 36 (Mich. 2020) ................................................... 8, 10, 12, 13, 20, 24

*State v. Dickson,*
 141 A.3d 810 (Conn. 2016) .......................................................................................... 25

*State v. Henderson,*
 208 N.J. 208 (N.J. 2011) ........................................................................................... 4, 9

*State v. Lawson,*
 291 P.3d 673 (Or. 2012) ................................................................................................. 4

*Stovall v. Denno,*
 388 U.S. 293 (1967) ........................................................................................................ 8

*U.S. v. Milhollan,*
 599 F.2d 518 (3d Cir. 1979) ........................................................................................... 8

*U.S. v. Murdock,*
 928 F.2d 293 (8th Cir. 1991) .......................................................................................... 8

*U.S. v. Sanchez,*
 988 F.2d 1384 (5th Cir. 1993) ........................................................................................ 8

*United States v. Domina,*
 784 F.2d 1361 (9th Cir. 1986) ...................................................................................... 25

*United States v. Greene,*
 704 F.3d 298 (4th Cir. 2013) ........................................................................................ 24

*United States v. Jones,*
 689 F.3d 12 (1st Cir. 2012) ........................................................................................... 23

**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

*United States v. Wade*,
    388 U.S. 218 (1967) ................................................................................ 8

*United States v. Wofford*,
    2017 WL 5514176 (N.D. Okla. Nov. 17, 2017) .................................... 24

*Young v. Conway*,
    698 F.3d 69 (2d Cir. 2012) ............................................................. 3, 19

**Other Authorities**

A. Daniel Yarmey et al., *Accuracy of Eyewitness Identifications in Showups and
    Lineups*, 20 LAW & HUM. BEHAV. 459 (1996) ...................................... 9

Adele Quigley-McBride & Gary L. Wells, *Eyewitness Confidence and Decision
    Time Reflect Identification Accuracy in Actual Police Lineups*, 47 L. & HUM.
    BEHAV. 333 (2023) ................................................................................ 21

Brandon Garrett, CONVICTING THE INNOCENT: WHERE CRIMINAL PROSECUTIONS
    GO WRONG 48 (2011) ..................................................... 2, 3, 9, 19, 27

Brandon L. Garrett et al., *Factoring the Role of Eyewitness Evidence in the
    Courtroom*, 17 J. EMPIRICAL LEGAL STUD. 556 (2020) ........................ 8

Christian A. Meissner & John C. Brigham, *Thirty Years of Investigating the Own-
    Race Bias in Memory for Faces: A Meta-Analytic Review*, 7 PSYCH. PUB.
    POL'Y & L. 3 (2001) ............................................................................. 19

Christian A. Meissner et al., *A Theoretical Review and Meta-Analysis of the
    Description-Identification Relationship in Memory for Faces*, 20 EUR. J.
    COGNITIVE PSYCH. 414 (2008) ........................................................... 19

Deborah Davis & Elizabeth F. Loftus, *Eyewitness Science in the 21st Century:
    What Do We Know and Where Do We Go from Here?*, *in* THE STEVENS'
    HANDBOOK OF EXPERIMENTAL PSYCHOLOGY AND COGNITIVE NEUROSCIENCE
    529 (John T. Wixted, Elizabeth A. Phelps & Lila Davachi eds., 4th ed. 2018) ................ 6

Edwin Grimsley, The Innocence Project, *What Wrongful Convictions Teach Us
    About Racial Inequality* (Sept. 26, 2012)*,*
    https://www.innocenceproject.org/what-wrongful-convictions-teach-us-about-
    racial-inequality ................................................................................... 20

Fiona N. Newell et al., *Recognizing Unfamiliar Faces: The Effects of
    Distinctiveness and View*, 52 Q.J. EXPERIMENTAL PSYCH. 509 (1999) ................ 16

Gary L. Wells & Amy L. Bradfield, *"Good, You Identified the Suspect":
    Feedback to Eyewitnesses Distorts Their Reports of the Witnessing
    Experience*, 83 J. OF APPLIED PSYCH. 360 (1998) .............................. 22

Gary L. Wells & Elizabeth A. Olson, *Eyewitness Testimony*, 54 ANN. REV. PSYCH.
    277 (2003) ............................................................................................ 18

Gary L. Wells & Laura Smalarz, *Lives Destroyed by Distorted Recollections of
    Fluency, Attention, View, and Confidence: A Sin of Bias in Eyewitness
    Identification*, 11 J. APPLIED RSCH. MEMORY AND COGNITION 461 (2022) .......... 18, 27

**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

iii

Gary L. Wells et al., *Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence*, 44 LAW & HUM. BEHAV. 3 (2020) ...................................................... 8, 13, 21, 23, 24, 25

Gary L. Wells, *Psychological Science on Eyewitness Identification and Its Impact on Police Practices and Policies*, 75 AM. PSYCH. 9, 1316 (2020) ............................ 13, 20, 26

Harold Hill et al., *Information and Viewpoint Dependence in Face Recognition*, 62 COGNITION 201 (1997) ................................................................................. 16

Henry F. Fradella, *A Synthesis of the Science and Law Relating to Eyewitness Misidentifications and Recommendations for How Police and Courts Can Reduce Wrongful Convictions Based on Them,* 47 SEATTLE U. L. REV. 1 (2023) ........................................................................ 5, 6, 10, 17, 18, 23

Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony*, 2 FED. CTS. L. REV. 1 (2007) .................................... 19

IACP Law Enforcement Policy Center, *Eyewitness Identification Model Policy* (Sept. 2016), https://www.theiacp.org/sites/default/files/2018-08/EyewitnessIDPolicy2016.pdf ........................................................ 8, 10

Innocence Project, *DNA Exonerations in the United States (1989-2020)*, https://innocenceproject.org/dna-exonerations-in-the-united-states/ (last visited June 27, 2024) .................................................................................... 1

Jee Park, *Eyewitness Identification and Innocence*, 64 LOY. L. REV. 669 (2018) ...................... 3

Jennifer N. Sigler & James V. Couch, *Eyewitness Testimony and the Jury Verdict*, 4 N. AM. J. PSYCHOL. 143 (2002) ................................................................. 6

John T. Wixted & Gary L. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy:  A New Synthesis*, 18 PSYCH. SCI. PUB. INT. 10 (2017) ......................................................................... 21, 22, 26

John T. Wixted et al, *Test a Witness's Memory of a Suspect Only Once*, 22 PSYCH. SCI. IN THE PUB. INTEREST 1s, 2s (2021) ........................................................ 25, 26

Jules Epstein, *The Great Engine that Couldn't: Science, Mistaken Identifications, and the Limits of Cross-Examination*, 36 STETSON L. REV. 727 (2007) ................................... 7

Kenneth A.  Deffenbacher et al., *Forgetting the Once-Seen Face:  Estimating the Strength of an Eyewitness's Memory Representation*, 14 J. EXPERIMENTAL PSYCH. APPLIED  139 (2008)........................................................................ 19, 23

Laura Smalarz and Gary L. Wells, *Do Multiple Doses of Feedback Have Cumulative Effects on Eyewitness Confidence?*, 9 J. APPLIED RSCH. IN MEMORY AND COGNITION 508 (2020)....................................................... 26, 27

Margaret Bull Kovera & Andrew J. Evelo, *The Case for Double-Blind Lineup Administration*, 23 PSYCHOL. PUB. POL'Y & L. 421 (2017) ................................... 13

Margaret Bull Kovera et al., *Science-Based Recommendations for the Collection of Eyewitness Identification Evidence*, 58 CT. REV.: J. AM. JUDGES ASS'N 130 (2022)............................................................................................ 27

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773     Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773     Facsimile: (702) 792-9002

Marloes de Jong et al., *Familiar Face Recognition as a Function of Distance and Illumination: A Practical Tool for Use in the Courtroom*, 11 PSYCH., CRIME & L. 87 (2005) ................................................................................................ 17

Melanie Sauerland et al., *Decision Time and Confidence Predict Choosers' Identification Performance in Photographic Showups*, 13 PLoS One 1 (2018) .................... 21

Melissa Boyce et al., *Belief of Eyewitness Identification Evidence*, *in* 2 Handbook of Eyewitness Psych.: Memory for People 501 (2007) ............................................ 6

Mem. from Sally Q. Yates, Deputy Att'y Gen. re Eyewitness Identification: Procedures for Conducting Photo Arrays 4 (Jan. 6, 2017), https://www.justice.gov/archives/opa/press-release/file/923201/dl?inline ........................... 10

Michael D. Cicchini & Joseph G. Easton, *Reforming the Law on Show-up Identifications*, 100 J. CRIM. L. & CRIMINOLOGY, 381 (2010) ................................. 9

Michael P. Toglia & Garrett L. Berman, *Convicted by Memory, Exonerated by Science*, ASSOCIATION FOR PSYCHOLOGICAL SCIENCE (Aug. 30, 2021) at 3, https://www.psychologicalscience.org/observer/convicted-memory ...................................... 6

Michael R. Leippe, *The Case for Expert Testimony About Eyewitness Memory*, 1 PSYCH. PUB. POL'Y & L. 909 (1995) ........................................................... 7

Michael R. Leippe et al., *Crime Seriousness as a Determinant of Accuracy in Eyewitness Identification*, 63 J. APPLIED PSYCH. 345 (1978) ............................... 18

Mitchell L. Eisen et al., *An Examination of Showups Conducted by Law Enforcement Using a Field-Simulation Paradigm*, 23 PSYCHOL. PUB. POL'Y & L. 1 (2017) ........................................................................................... 9

Nancy K. Steblay & Jennifer E. Dysart, *Repeated Eyewitness Identification Procedures with the Same Suspect*, 5 J. APPLIED RSCH. MEMORY & COGNITION 284 (2016) .................................................................... 24, 26

Nancy K. Steblay et al., *The Eyewitness Post Identification Feedback Effect 15 Years Later: Theoretical and Policy Implications*, 20 PSYCH., PUB. POL'Y & L. 1 (2014) ................................................................................................ 23

Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* 56 (2014) ................................................................ 16, 19, 20, 23

National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (last visited July 16, 2024) ..................................................................... 3

Neil Brewer & Gary L. Wells, *The Confidence-Accuracy Relationship in Eyewitness Identification: Effects of Lineup Instructions, Foil Similarity, and Target-Absent Base Rates*, 12 J. EXPERIMENTAL PSYCH.: APPLIED 11 (2006) ....................... 7

Patrick M. Wall, *Eye-Witness Identification in Criminal Cases* (3rd ed. 1965) ............................. 8

Richard S. Schmechel et al., *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence*, 46 JURIMETRICS J. 177 (2006) ............................. 7

Ryan J. Fitzgerald et al., *Change Detection Inflates Confidence on a Subsequent Recognition Task*, 19 MEMORY 879 (2011) ................................................. 15

Sara Frueh, *Strengthening Science to Support Justice,* National Academies (Oct. 23, 2023), https://www.nationalacademies.org/en/news/2023/10/strengthening-science-to-support-justice ................................................................................................................ 5

Steven E. Clark, *Blackstone and the Balance of Eyewitness Identification Evidence*, 74 ALB. L. REV. 1105 (2011) ......................................................... 5, 7

Tanja Rapus Benton et al., *Has Eyewitness Testimony Research Penetrated the American Legal System?: A Synthesis of Case History, Juror Knowledge, and Expert Testimony*, 2 Handbook of Eyewitness Psych.: Memory for People 453 (2007) ............................................................................................................... 7

Third Circuit Task Force, *2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*, 92 TEMP. L. REV. 1 (2019) ......................................................................................................... 9, 12

Thomas D. Albright & Brandon L. Garrett, *The Law and Science of Eyewitness Evidence*, 102 B.U. L. REV. 511 (2022) ......................................... 3, 13, 16, 19, 27

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773     Facsimile: (702) 792-9002

## INTEREST OF *AMICUS CURIAE*

*Amici Curiae* the Innocence Project, Inc. and the Wilson Center for Science and Justice at Duke Law, by and through their attorneys, Greenberg Traurig, LLP, submit this brief in support of Petitioner Gregory Bolin.[1]

The Innocence Project is a nonprofit organization that works to free the innocent, prevent wrongful convictions, and create fair, compassionate, and equitable systems of justice for everyone.  Since its founding in 1992, the Innocence Project has used DNA and other scientific advances to prove innocence.  Beginning with Glen Woodall, it has helped free or exonerate 251 people.  Collectively, Innocence Project clients have spent more than 3900 years behind bars.

The advent of DNA testing has provided scientific proof that wrongful convictions are not isolated or rare events.  The Innocence Project has long studied the causes of these injustices and pursued legislative and administrative reforms designed to enhance the truth-seeking function of the criminal justice system.  It has found that honest but mistaken eyewitness identifications are a leading cause of wrongful convictions, contributing to nearly 70% of DNA exonerations.  *See* Innocence Project, *DNA Exonerations in the United States (1989-2020)*, https://innocenceproject.org/dna-exonerations-in-the-united-states/ (last visited June 27, 2024). The Innocence Project's extensive experience with mistaken identification cases has led it to advocate for a variety of systemic reforms, including improving police procedures by requiring officers to adhere to scientifically supported "best practices," proposing model legislation, and revisiting convictions resting on what science shows to be unreliable eyewitness identifications.

The Wilson Center, led by Faculty Director Brandon L. Garrett,[2] L. Neil Williams, Jr. Distinguished Professor of Law and author of "Convicting the Innocent: Where Criminal Prosecutions Go Wrong," works to advance criminal justice and equity through law and science.

---

[1] This brief has not been authored, in whole or in part, by counsel to any party in this habeas action. No party or counsel to any party contributed money intended to fund preparation or submission of this brief.  No persons, other than the *amici curiae*, its members, or their counsel, contributed money that was intended to fund preparation or submission of this brief.

[2] Professor Garrett has been involved with a number of law and science reform initiatives, including the American Law Institute's project on policing, for which he serves as Associate Reporter, and serves on a National Academy of Sciences Committee concerning eyewitness.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

To further its mission, students and faculty pursue research, policy, and education to improve criminal justice outcomes.  One of the Wilson Center's primary focuses is on the accuracy of evidence to prevent wrongful convictions by improving and fundamentally reforming how scientists, the public, judges, lawyers, and jurors understand evidence presented in court and on preventing eyewitness misidentification, a leading cause of wrongful convictions.  The Wilson Center works to identify reliable ways to inform lawyers, judges, and jurors about the scientific limitations of this type of evidence.  The Wilson Center, in conjunction with Duke University School of Law, maintains a "DNA Exonerations Database." *See* https://convictingtheinnocent.com/.

Amici have a strong interest in this case due to their commitment to rectifying wrongful convictions, preventing misidentifications, and encouraging courts to adopt reliable scientific principles.  Petitioner Gregory Bolin was sentenced to death based largely upon an identification by Keith Sirevaag that followed an egregiously suggestive stationhouse showup.  Police officers processed Mr. Bolin like an arrestee, fingerprinting him and taking his photograph, and then made him take off his shirt to exhibit his tattoo, as Mr. Sirevaag stared at him for at least five to ten minutes.  Meanwhile, the investigating officer was putting pressure on Mr. Sirevaag to make an identification, telling him that he was the only person who could identify the culprit and that he was helping solve a terrible crime, and then explicitly asked him: "Is this the guy?"  Even still, Mr. Sirevaag only made an equivocal identification, saying he was "not sure" and rating his confidence level as 5 out of 10.  Several decades of scientific research demonstrates that a stationhouse showup this suggestive results in an identification so unreliable as to create a very substantial likelihood of misidentification.  Mr. Bolin should not be on death row based on an eyewitness identification this untrustworthy.

## INTRODUCTION AND PRELIMINARY STATEMENT

The leading factors that contribute to wrongful convictions were all present in Mr. Bolin's case: unreliable eyewitness testimony based on a highly suggestive and unnecessary showup procedure; an untrustworthy jailhouse informant with a motive to lie; contaminated forensic evidence; racially charged, faulty expert testimony regarding the contaminated evidence;

prosecutorial misconduct; and ineffective assistance of counsel. Amici here focus on only one of the many glaringly prejudicial factors that contributed to Mr. Bolin's conviction—the unreliable identification of a lone eyewitness obtained through a highly suggestive stationhouse showup procedure. This resulted in a miscarriage of justice: Mr. Bolin has been on death row for almost 28 years based in large part upon an eyewitness identification that science reveals to be unreliable.

The importance of ensuring reliability in eyewitness testimony cannot be overstated. As of the date of filing, the National Registry of Exonerations lists 3,557 exonerations nationwide; 957 of these cases involved at least one witness who mistakenly identified the exoneree as the person the witness saw commit the crime. The National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx (last visited July 16, 2024). The DNA Exonerations Database includes 375 exonerations that have occurred from 1989 to 2020—258 of these individuals were originally convicted based, at least in part, on a witness (or witnesses) who mistakenly identified the exoneree as the person the witness saw commit the crime. *See* Convicting the Innocent, https://convictingtheinnocent.com/ (last visited July 16, 2024).

Wrongful convictions based on mistaken eyewitness identifications "undermine and erode trust in the criminal justice system." Thomas D. Albright & Brandon L. Garrett, *The Law and Science of Eyewitness Evidence*, 102 B.U. L. REV. 511, 516 (2022). Such wrongful convictions have ruined an untold number of lives. Moreover, they mean that the true perpetrators of the crimes often remain at large—and free to commit further crimes. *See id.* (citing Jee Park, *Eyewitness Identification and Innocence*, 64 LOY. L. REV. 669, 670 (2018)).

Psychologists have long studied the risk factors for mistaken eyewitness identifications. The body of social science research concerning eyewitness memory and identifications is robust and reliable; it has been reviewed, replicated, and is generally accepted in the research community. Courts thus regularly and routinely rely on this research in cases involving eyewitness identifications. *See, e.g.*, *Young v. Conway*, 698 F.3d 69, 78–79 (2d Cir. 2012) (relying on "an extensive body of scientific literature" on eyewitness identification in granting habeas petition);
/ / /

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

*State v. Henderson*, 208 N.J. 208, 247–79 (N.J. 2011) (applying scientific findings to its analysis of whether eyewitness identification procedure was impermissibly suggestive and unreliable).

Scientific studies generally divide the factors that affect the reliability of eyewitness identifications into two categories: estimator variables and system variables. *See State v. Lawson*, 291 P.3d 673, 685 (Or. 2012). *Estimator variables* "generally refer to characteristics of the witness, the alleged perpetrator, and the environmental conditions of the event that cannot be manipulated or adjusted by state actors." *Id.* A non-exclusive list of estimator variables include high levels of stress or fear during the event; a witness's degree of attention; the duration a witness was exposed to the culprit; environmental viewing conditions such as the angle of view, lighting, or other obstructions; a witness's physical and mental condition; a witness's ability to describe the perpetrator; the culprit's characteristics, including a distinctive appearance and the influence of the witness's own-race bias; and memory decay (or "retention interval"). *See id.* at 685–88. *System variables* refer to the circumstances surrounding the identification procedure that are under the control of law enforcement. *Id.* at 685. System variables include, but are not limited to, factors such as whether a single-person showup or a lineup was employed; whether the identification procedure is double blind (or blinded); lineup construction; the use of repeated viewings; suggestive questioning; and post-identification feedback. *Id.* at 686–87.

Scientific research in the field of eyewitness memory and identification demonstrates that the eyewitness identification evidence presented at Mr. Bolin's trial is subject to multiple flaws and should not have been admitted. Indeed, the identification evidence here bears the hallmarks of the kind of mistaken identification that results in wrongful convictions. Both estimator and system variables played a part. First, estimator variables: This was a cross-racial identification, where the eyewitness had only a partial view of the perpetrator for a short period, viewing him from the side and in dim light, and had little reason to pay attention to the culprit's face (as he did not yet know a crime had occurred). Next, system variables: The identification resulted from an extraordinarily suggestive stationhouse showup, in which Mr. Bolin was made to take his shirt off and display his torso (shirtless from the waist up) to the eyewitness while it appeared, erroneously, that Mr. Bolin was being booked for this crime by officers that the eyewitness knew were

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

investigating the crime; the police made suggestive comments; and there was intense pressure to make an identification. Even after law enforcement had all but told the eyewitness that Mr. Bolin was the culprit, the witness still only initially made an uncertain identification of Mr. Bolin after lengthy deliberation—saying he was "not sure" and rating his confidence as only 5 out of 10. If untainted procedures had been used, such a slow, equivocal identification would be indicative of potential unreliability; under the actual circumstances of this overwhelmingly suggestive identification procedure, it signals a likelihood of misidentification.

Decades of scientific research—and innumerable wrongful convictions—attest to the danger of basing a criminal case on an identification so untrustworthy. Amici urge this Court to rectify the damage done by the unconstitutional admission of such unreliable evidence.

## ARGUMENT

### I. MISTAKEN EYEWITNESS IDENTIFICATIONS ARE ONE OF THE LEADING CAUSES OF WRONGFUL CONVICTIONS.

Scholars have analyzed false convictions and come to a consensus that "mistaken eyewitness identification is one of the primary causes of wrongful convictions in the United States." Steven E. Clark, *Blackstone and the Balance of Eyewitness Identification Evidence*, 74 ALB. L. REV. 1105, 1106 (2011). "In the last 20 to 30 years, there have been several thousand cases in the United States in which judges have determined that previously convicted defendants were, in fact, factually innocent . . ." Sara Frueh, *Strengthening Science to Support Justice,* National Academies (Oct. 23, 2023), https://www.nationalacademies.org/en/news/2023/10/strengthening-science-to-support-justice (quoting Judge Rakoff of the U.S. District Court for the Southern District of New York). "[S]tatistically by far the biggest element" contributing to wrongful convictions "has been inaccurate eyewitness identifications." *Id.*

Many laypeople do not understand how frequently eyewitness identifications are wrong. Henry F. Fradella, *A Synthesis of the Science and Law Relating to Eyewitness Misidentifications and Recommendations for How Police and Courts Can Reduce Wrongful Convictions Based on Them,* 47 SEATTLE U. L. REV. 1, 20 (2023). "Laboratory research conducted under 'ideal' viewing

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

conditions for simple face-matching tasks reveals that '[c]orrect identifications of the target when present in lineups ranged between 60% and 80% in almost all studies . . . .  Error rates increase to between 30% and 57% when the task is harder due to less-than-ideal viewing conditions . . . .'"  *Id.*  (quoting Deborah Davis & Elizabeth F. Loftus, *Eyewitness Science in the 21st Century: What Do We Know and Where Do We Go from Here?*, *in* THE STEVENS' HANDBOOK OF EXPERIMENTAL PSYCHOLOGY AND COGNITIVE NEUROSCIENCE 529, 534 (John T. Wixted, Elizabeth A. Phelps & Lila Davachi eds., 4th ed. 2018)).  And, of course, real-world viewing conditions are seldom ideal.

One reason for the fallibility of eyewitness identification is that identification procedures "at their core produce memory evidence which, as with any recollection, is subject to error and contamination" and "is subject to the same frailties and biases" that infiltrate individuals' recall in daily life.  Michael P. Toglia & Garrett L. Berman, *Convicted by Memory, Exonerated by Science*, ASSOCIATION FOR PSYCHOLOGICAL SCIENCE (Aug. 30, 2021) at 3, https://www.psychologicalscience.org/observer/convicted-memory.  "A person's expectations and stereotypes can also affect both perception and memory: what we perceive and encode is, to a large extent, determined by cultural biases, personal prejudices, effects of training, prior information, and expectations induced by motivational states, among others."  Fradella, *supra*, 47 SEATTLE U. L. REV. at 35–36 (citation and marks omitted).

Despite the frequent inaccuracy of eyewitness identifications, jurors place inordinate weight on eyewitness identification testimony.  A representative study found that conviction rates by mock juries increased from 49% to 68% when a single eyewitness account was added.  Jennifer N. Sigler & James V. Couch, *Eyewitness Testimony and the Jury Verdict*, 4 N. AM. J. PSYCHOL. 143, 146 (2002).  In fact, eyewitness identification evidence "has been shown to be comparable to or more impactive than physical evidence, character evidence, polygraph evidence, and even sometimes confession evidence."  Melissa Boyce et al., *Belief of Eyewitness Identification Evidence*, *in* 2 Handbook of Eyewitness Psych.:  Memory for People 501, 505 (2007) (citations omitted).  Moreover, eyewitness testimony can have a perverse, compounding effect:  "The existence of eyewitness identification evidence increases the perceived strength of the other evidence presented," irrespective of that evidence's independent probative value.  *Id.*

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773     Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

In addition to placing great stock in eyewitness testimony, jurors tend not to be able to accurately discriminate between correct and honest but mistaken eyewitnesses.   Michael R. Leippe, *The Case for Expert Testimony About Eyewitness Memory*, 1 PSYCH. PUB. POL'Y & L. 909, 925 (1995).  One study found that "mock jurors were unable to distinguish between correct and incorrect witnesses, believing them 80% of the time when they were correct and 80% of the time when they were incorrect."  Clark, *supra*, 74 ALB. L. REV. at 1148.  This apparent inability to assess accuracy derives from jurors' tendency to "rely heavily on eyewitness factors that are *not* good indicators of accuracy." Tanja Rapus Benton et al., *Has Eyewitness Testimony Research Penetrated the American Legal System?:  A Synthesis of Case History, Juror Knowledge, and Expert Testimony*, 2 Handbook of Eyewitness Psych.: Memory for People 453, 484 (2007).  Psychologists theorize that jurors rely heavily on factors that have little relation to accuracy because the scientific principles explaining the unreliability of eyewitness testimony are often counterintuitive.  *See* Leippe, *supra*, 1 PSYCH., PUB. POL'Y & L. at 921.  Many jurors have "basic misunderstandings about the way memory works in general and about specific factors that can affect the reliability of eyewitness identifications."  Richard S. Schmechel et al., *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence*, 46 JURIMETRICS J. 177, 204 (2006).  Furthermore, cross-examination, which is best at ferreting out lies and inconsistencies, is far less effective with honest but mistaken eyewitnesses.  *See generally* Jules Epstein, *The Great Engine that Couldn't: Science, Mistaken Identifications, and the Limits of Cross-Examination*, 36 STETSON L. REV. 727 (2007).

Jurors are unduly compelled by an eyewitness's certainty in their identification at trial.  "[M]ock-juror studies have found that confidence has a major influence on mock-jurors' assessments of witness credibility and verdicts."  Neil Brewer & Gary L. Wells, *The Confidence-Accuracy Relationship in Eyewitness Identification: Effects of Lineup Instructions, Foil Similarity, and Target-Absent Base Rates*, 12 J. EXPERIMENTAL PSYCH.: APPLIED 11, 11 (2006).  A telling study found that the confidence a witness expressed in her identification in a mock trial erased any otherwise tempering effect the observation circumstances—such as lighting, distance, or angle—might have had on the jurors' verdict.  Clark, *supra*, 74 ALB. L. REV. at 1149.  Empirical

research has also "shown that eyewitness confidence can distort jurors' perceptions of other aspects of the testimony." Brandon L. Garrett et al*., Factoring the Role of Eyewitness Evidence in the Courtroom*, 17 J. EMPIRICAL LEGAL STUD. 556, 558 (2020).

Such a reliance on confidence at trial is particularly troublesome where, as here, the witness's confidence levels were low *at the time of the initial identification*—a factor that scientific research has revealed points to the likelihood of a misidentification. Considering the sway that even mistaken eyewitness testimony has over jurors, and the role that mistaken identifications play in wrongful convictions, it is crucial that courts critically assess the admission of demonstrably unreliable identification testimony—like the identification evidence here.

## II. DECADES OF SCIENTIFIC RESEARCH SHOW THAT SINGLE-WITNESS SHOWUPS LIKE THE ONE IN THIS CASE ARE UNDULY SUGGESTIVE.

### A. Showups are inherently suggestive—and produce unreliable identifications.

Courts and commentators have "widely condemned" the "practice of showing suspects singly to persons for purposes of identification, and not as part of a lineup." *Stovall v. Denno*, 388 U.S. 293, 302 (1967). Indeed, "[i]t is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed to be guilty by the police." *United States v. Wade*, 388 U.S. 218, 234 (1967). "The inherently suggestive nature of showups has long been beyond debate. Showups have been called 'the most grossly suggestive identification procedure now or ever used by the police.'" *People v. Sammons*, 949 N.W.2d 36, 41–42 (Mich. 2020) (citing Patrick M. Wall, *Eye-Witness Identification in Criminal Cases,* p. 28 (3rd ed. 1965)); *see also, e.g.*, *Browning v. Baker*, 875 F.3d 444, 467 (9th Cir. 2017); *U.S. v. Sanchez*, 988 F.2d 1384, 1389 (5th Cir. 1993); *U.S. v. Murdock*, 928 F.2d 293, 297 (8th Cir. 1991); *U.S. v. Milhollan*, 599 F.2d 518, 523 (3d Cir. 1979); *Mysholowsky v. New York*, 535 F.2d 194, 197 (2d Cir. 1976). In growing numbers, law enforcement agencies also disfavor single-suspect presentations. *See, e.g.*, IACP Law Enforcement Policy Center, *Eyewitness Identification Model Policy* (Sept. 2016), https://www.theiacp.org/sites/default/files/2018-08/EyewitnessIDPolicy2016.pdf ("The use of showups should be avoided whenever possible . . . ."). Researchers, too, recommend that showups "should be avoided whenever it is possible to use a lineup." Gary L. Wells et al*., Policy and*

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

*Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence*, 44 LAW & HUM. BEHAV. 3, 8, 26 (2020).

Decades of research has consistently found that showups "result in higher rates of false identifications of innocent suspects than lineups." Third Circuit Task Force, *2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*, 92 TEMP. L. REV. 1, 14 (2019) (collecting articles). Indeed, while laboratory studies have long found that "showups can result in high rates of innocent suspect identifications," recent field-simulation studies have found that "the risk of false identification . . . may be even greater than previously thought." Mitchell L. Eisen et al., *An Examination of Showups Conducted by Law Enforcement Using a Field-Simulation Paradigm*, 23 PSYCHOL. PUB. POL'Y & L. 1, 17 (2017) (finding that the rate of false identifications went up about three-fold from showup studies conducted in the laboratory to a field simulation of a showup). Simply put, showups are "the least reliable of all the identification procedures." Michael D. Cicchini & Joseph G. Easton, *Reforming the Law on Show-up Identifications*, 100 J. CRIM. L. & CRIMINOLOGY, 381, 381 (2010).

A study of the first 250 DNA exonerations in the United States confirmed that many eyewitnesses misidentify innocent people based on suggestive identification procedures. *See* Brandon Garrett, CONVICTING THE INNOCENT: WHERE CRIMINAL PROSECUTIONS GO WRONG 48 (2011). In 78 percent of the cases that involved misidentifications where the trial transcript was available, there was evidence at trial that the identification procedures used were suggestive (125 of 161). *Id.* at 55. And 33 percent of these wrongful convictions involved misidentifications that were obtained by showups (53 of 161). *Id.*

"Studies that have evaluated showup identifications illustrate that the timeframe for their reliability appears relatively small." *Henderson*, 27 A.3d at 903. One study found that although "photo showups performed within minutes of an encounter were just as accurate as lineups," a mere two hours later "58% of witnesses failed to reject an 'innocent suspect' in a photo showup, as compared to 14% in target-absent photo lineups." *Id.* (citing A. Daniel Yarmey et al., *Accuracy of Eyewitness Identifications in Showups and Lineups*, 20 LAW & HUM. BEHAV. 459, 464 (1996)).

/ / /

Accordingly, showups are typically authorized only in the immediate temporal and geographical proximity of a crime—or if there is some other reason why it is impossible to assemble a lineup. *See* Fradella, *supra*, 47 SEATTLE U. L. REV. at 72–77 (explaining showups may be necessary, for example, when witness is dying). No such reason was present here.

**B.    The showup in this case was both unwarranted and particularly suggestive.**

This was not a situation where the showup was conducted within minutes or even hours of the crime or where the police were deciding whether to detain or release a suspect. The stationhouse showup here, instead, occurred a day after the crime and when Mr. Bolin was not under arrest, reducing both its reliability and the justification for its use.

Further, law enforcement's excuse for not assembling a photographic or corporeal lineup was dubious. The police eschewed a lineup for a showup because they were supposedly "dealing with a rather unique suspect description in this case." ECF No. 158-3 at 9, 53; ECF 24-5 at 5; ECF No. 226 at 92, 108. But the eyewitness's description of the culprit as a muscular Black man who was six-feet tall, weighing about 230 pounds, ECF No. 324 at 145; ECF No. 24-5 at 8; 226 at 26-27, with a tattoo on his right arm, ECF No. 154-1 at 60, 63, is not a description that seems "unique." Moreover, even where a suspect has "unique" features, law enforcement agencies have methods to deal with this unique characteristic and still —perhaps especially—disfavor single-suspect confrontation procedures. *See* Mem. from Sally Q. Yates, Deputy Att'y Gen. re Eyewitness Identification: Procedures for Conducting Photo Arrays 4 (Jan. 6, 2017), https://www.justice.gov/archives/opa/press-release/file/923201/dl?inline ("Where the suspect has a unique feature, such as a scar, tattoo, or mole, or distinctive clothing that would make him or her stand out in a photo array, filler photographs should include that unique feature either by selecting fillers who have such a feature themselves or by altering the photographs of fillers to the extent necessary to achieve a consistent appearance."); IACP Law Enforcement Policy Center, *Eyewitness Identification Model Policy*, *supra*, at IV(b)(5) (similar).

Moreover, the showup here was even more suggestive than a typical showup. Not only is the suggestiveness of a showup "aggravated when it is conducted in a police stationhouse," *People v. Sammons*, 949 N.W.2d 36, 44 (Mich. 2020) (citations omitted), but the procedures in this case

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

maximized suggestiveness. Mr. Bolin was brought into the booking area and displayed, by himself, for Mr. Sirevaag to view. ECF No. 158-1 at 60. No other suspect was subjected to the same treatment. ECF No. 154-1 at 61. After Mr. Bolin was initially escorted in by a uniformed officer, Sergeant Hefner grew impatient after Mr. Sirevaag had viewed Mr. Bolin in the booking area for five to ten minutes without making an identification and decided Mr. Sirevaag "had enough time to view Mr. Bolin." ECF No. 158-4 at 23–24; ECF No. 226 at 118. Sergeant Hefner then called into the stationhouse two detectives whom Mr. Sirevaag *knew* to be involved in investigating the case, as he recognized them from the crime scene. ECF No. 154-2 at 95; ECF No. 158-1 at 60-61; ECF No. 158-3 at 61; ECF No. 154-2 at 97; ECF No. 226 at 118. Compounding the damage already done by these suggestive cues, with Mr. Sirevaag still watching, these detectives processed Mr. Bolin as if he had been arrested, including "the blood draw, photographing, [and] fingerprints." ECF No. 158-3 at 61-62; ECF No. 158-1 at 61-62; ECF No. 158-2 at 16-18. Afterward, Sergeant Hefner informed one of the detectives—as Mr. Sirevaag stood by—that Mr. Sirevaag needed to see Mr. Bolin shirtless because he wanted to see Mr. Bolin's tattoo. ECF No. 158-2 at 12-13; ECF No. 154-1 at 17-19. Mr. Sirevaag observed as Mr. Bolin took off his shirt and the photographer from the crime scene took photos of his torso from various angles. ECF No. 158-2 at 12-13. All of this goes far beyond a garden-variety showup. *Cf. Browning v. Baker*, 875 F.3d 444, 451, 467–68 (9th Cir. 2017) (displaying a shirtless and handcuffed suspect and asking "Is this him?" made showup "highly suggestive and any resulting identification of little evidentiary value").

While at the police station, Mr. Sirevaag was presented with no other individual who remotely matched his description of the person he saw the day before (particularly in a showup), and he was presented with no other individual who was treated as a suspect by the officers he knew to be investigating the crime. Nevertheless, Mr. Sirevaag was still far from certain that Mr. Bolin was the person he had seen. ECF No. 153-2 at 71; ECF No. 158-3 at 71; ECF No. 154- 1 at 17; *see also* ECF No. 226 at 100-101. When Sergeant Hefner asked him point blank, "Is this the guy or what?" and asked him to make a decision, Mr. Sirevaag replied, "I'm not sure." ECF No. 158-3 at 71; ECF No. 154-1 at 17. On a ten-point scale—even after the highly

11

suggestive one-on-one procedure—Mr. Sirevaag rated his certainty at only a *five*. ECF No. 154- 3 at 30.

After Mr. Sirevaag failed to make an unequivocal identification, Sergeant Hefner drove him home and told him to call if he remembered anything. ECF No. 153-2 at 71. About an hour later, Mr. Sirevaag called, curious what evidence the police had against Mr. Bolin. ECF No. 153- 2 at 72-73; ECF No. 153-4 at 45-46, 50-51; ECF No. 158-3 at 27, 72-73. Sergeant Hefner declined to answer, telling Mr. Sirevaag he did not want to "influence or taint" the process because "what you know is what you know," as opposed to "what other witnesses provide," ECF No. 158-3 at 73, suggesting that there was additional evidence.

This was not the only suggestive conversation Mr. Sirevaag had with the police. When Sergeant Hefner drove Mr. Sirevaag home after the showup, Mr. Sirevaag asked him, "[H]ow did you get him, find this individual so fast[?]" ECF No. 145-6 at 184. In other words, the stationhouse showup, where Mr. Bolin was booked by detectives in front of him, led Mr. Sirevaag to believe that the police had arrested Mr. Bolin for the crime. It was only *after* the suggestive procedure *and* these suggestive post-viewing conversations that Mr. Sirevaag expressed any certainty as to an identification of Mr. Bolin—and even then he still was only 70 to 80% certain. ECF No. 153-4 at 47. Thus, not only was the showup unwarranted—given that there were no exigent circumstances—and exceedingly suggestive, but as set forth more fully in Section IV, *infra*, Mr. Sirevaag's identification was also influenced by law enforcement's post-identification feedback, rendering his identification at trial more confident yet even more unreliable.

**C.    Police pressure and influence further contributed to an impermissibly suggestive procedure and resulted in an unreliable identification.**

Influence and cues by law enforcement also infected the eyewitness identification here, rendering it unreliable. Contrary to best practices, the police officer administering the showup here (Sergeant Hefner) was the investigating officer and knew that Mr. Bolin was the suspect—placing the officer in a prime position to pressure Mr. Sirevaag to identify Mr. Bolin.

It is well established that the involvement of a non-blind administrator tends to influence the eyewitness and undermine the accuracy of the identification. *See Sammons*, 949 N.W.2d at 46

n.9 (explaining that identification procedures should be conducted by officers who do not know the identity of the suspect so as not to "contaminate" the identification). Even if the officer tries to remain neutral, a non-blind administrator can skew an eyewitness's identification and render it unreliable, as the eyewitness will pick up the administrator's "tone of voice, pauses, demeanor, facial expressions, and body language," which may be "difficult to detect and prevent." *Id.* "Social influence can be insidious with suggestive behaviors occurring outside the awareness of the actor or the target of the behavior . . . . [L]ineup administrators might covertly communicate information to the witness about which person in the lineup is the suspect." Margaret Bull Kovera & Andrew J. Evelo, *The Case for Double-Blind Lineup Administration*, 23 PSYCHOL. PUB. POL'Y & L. 421, 422 (2017). Decades of research shows that a witness is likely to make an identification consistent with the expectations of the administrator of the identification procedure. Wells et al.*, supra,* 44 LAW & HUM. BEHAV. at 14– 17. In short, "single-blind administration of lineups increases the likelihood that the witness will identify the suspect . . . *irrespective of whether the suspect is the culprit*." *Id.* at 14 (emphasis added). For this reason, researchers have long recommended that identification procedures be double-blind—meaning that the administrator does not know the identity of the suspect. *See id.* at 8. Accordingly, many jurisdictions now use double-blind lineups. *See* Albright & Garrett, supra, 102 B.U. L. REV. at 534.

The importance of double-blind administration is amply demonstrated by law enforcement's course of conduct here. Sergeant Hefner called Mr. Sirevaag the morning following the event and asked him to come to the station to "view a bunch of people and see if [he] could ID somebody," ECF No. 153-2 at 60, without telling him that the true perpetrator may or may not be there. Shortly thereafter, Sergeant Hefner called again to confirm that Mr. Sirevaag was needed at the police station. *See id.* When he arrived, Sergeant Hefner told Mr. Sirevaag that his role in identifying the culprit was an "awesome responsibility," that he was the only person who could identify the culprit, that he was helping solve a terrible crime, and that he was an important witness."[3] ECF No. 24-5 at 4-5. Although Sergeant Hefner told Mr. Sirevaag that they

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

---

[3]    *See* Gary L. Wells, *Psychological Science on Eyewitness Identification and Its Impact on Police Practices and Policies*, 75 AM. PSYCH. 9, 1316, 1322 (2020) (discussing how the pressure on witnesses to

might be taking a "dry run" to test Mr. Sirevaag's validity, *id.* at 5, and that it was "alright also if [he] [do not] see anybody," *id.*, Sergeant Hefner did not inform Mr. Sirevaag that the culprit might not be present. Sergeant Hefner also told Mr. Sirevaag that he was the only person who saw the perpetrator and was "the person that will ultimately have to make an identification or not make an identification." ECF No. 24-5 at 4-5. Indeed, Sergeant Hefner conceded, "I did that to put pressure on him." ECF No. 158-3 at 79. Eventually, Sergeant Hefner asked Mr. Sirevaag "[i]s this the guy, or what?" ECF No. 158-3 at 71; ECF No. 226 at 101.

Law enforcement also cued Mr. Sirevaag and strongly implied that Mr. Bolin was the suspect. Sergeant Hefner told him that "obviously" in this situation "we're looking for a black suspect" and suggested that they had already made an arrest by stating that they had already "made some progress" in the case. ECF No. 24-5 at 4-5. The police signaled that Mr. Bolin was suspected of this crime by having the two detectives Mr. Sirevaag met at the crime book Mr. Bolin like an arrestee, fingerprinting him and drawing his blood, then making him remove his shirt and photographing him and his tattoo. ECF No. 158-3 at 61-62; ECF No. 158-2 at 12-13; 158-3 at 61- 62. After Mr. Sirevaag was still unable to make an unequivocal identification despite these cues, Sergeant Hefner told Mr. Sirevaag to call if anything "c[a]me back" to him. ECF No. 153- 2 at 71. This suggested that Mr. Sirevaag's failure to unequivocally identify Mr. Bolin was *incorrect*, and that an identification of Mr. Bolin would be *correct*. Taken together, these actions underscored the need for an identification, suggested the identity of the suspect, and reinforced a tentative identification by suggesting it was correct.

In sum, Sergeant Hefner pressured Mr. Sirevaag to make an identification, cued him that Mr. Bolin was the suspect, and then later signaled to him that his equivocal identification of Mr. Bolin was of the suspect. ECF No. 24-5 at 4; ECF No. 153-2 at 60, 71; ECF No. 158-3 at 72- 73; ECF No. 226 at 101. Law enforcement's pressure and cues to Mr. Sirevaag were overwhelmingly suggestive, resulting in an untrustworthy identification.

/ / /

help solve a case can contribute to a witness "mentally rewrit[ing]" their memory based on social influences after their initial identification decision).

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

**III.    THE ADMISSION OF THE EYEWITNESS IDENTIFICATION EVIDENCE VIOLATED DUE PROCESS BECAUSE IT BORE NO INDICIA OF RELIABILITY NEEDED TO OVERCOME THE SUGGESTIVENESS OF THE IDENTIFICATION PROCEDURE.**

Because Mr. Sirevaag's identification of Mr. Bolin stemmed from an unduly suggestive identification procedure, evidence of that identification should have been admitted at trial only if "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977) (quoting *Biggers*, 409 U.S. at 199). To determine if an identification is reliable despite a suggestive procedure, the Supreme Court identified five non-exclusive factors for courts to consider: (1) the witness's opportunity "to view the criminal at the time of the crime"; (2) "the witness's degree of attention"; (3) the accuracy of the witness's description of the criminal prior to the confrontation; (4) the witness's "level of certainty" about the identification "at the confrontation"; and (5) "the time between the crime and the confrontation." *Id.* at 114 (citing *Biggers*, 409 U.S. at 199-200).

Overwhelming scientific research indicates that at least four of the five *Biggers* factors weigh in favor of Mr. Bolin and demonstrate the unreliability of the identification.

**A.    *Biggers* Factors Nos. 1 & 2: Sirevaag's opportunity to observe the culprit at the crime scene and the degree of attention he paid were insufficient to support a reliable identification.**

The first two *Biggers* factors address the conditions under which the eyewitness initially observed the culprit: "the opportunity of the witness to view the criminal at the time of the crime" and "the witness' degree of attention." *Biggers*, 409 U.S. at 199. Both factors affect the ability to accurately observe and remember visual details about a person. *See, e.g.*, Ryan J. Fitzgerald et al., *Change Detection Inflates Confidence on a Subsequent Recognition Task*, 19 MEMORY 879, 879-81 (2011). And both factors cut against a finding that the identification here was reliable.

Indeed, Mr. Sirevaag's opportunity to observe the culprit at the crime scene and the degree of attention he paid were insufficient to support a reliable identification—as reflected by the lack of certainty in his initial identification. Scientific studies demonstrate that Mr. Sirevaag's ability to observe, process, and remember the culprit's appearance was diminished by the viewing angle,

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

15

the light level, the distance, his lack of attention, and the fact that the culprit and Mr. Sirevaag were members of different racial groups. *See* Albright & Garrett, *supra*, 102 B.U. L. Rev. at 526.

*First*, the distance and viewing angle hindered Mr. Sirevaag's ability to fully observe the culprit. Mr. Sirevaag viewed the culprit from a distance of about 20 to 40 feet and only at a side angle, observing his right side but never his full face. ECF No. 153-2 at 35-36; ECF No. 153-3 at 31-32; ECF No. 153-4 at 50. In fact, Mr. Sirevaag looked away when the perpetrator passed by his vehicle. ECF No. 153-2 at 35. Because Mr. Sirevaag was able to view only one side of the culprit's face from a distance, his ability to make a reliable identification was reduced. *See Browning v. Baker*, 875 F.3d 444, 467 (9th Cir. 2017) (noting a witness "saw only the side of the assailant's head" and concluding that her identification "deserve[d], at most, minimal weight.").

An eyewitness's perception of a face "viewed directly from the front differs considerably—with changes in aspect ratio and relative placement of facial features—from . . . a face viewed from an oblique side angle." Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* 56 (2014). For instance, one study found that when eyewitnesses were shown faces from a side angle instead of head-on, misidentifications increased by twenty-nine percent (29%). Fiona N. Newell et al., *Recognizing Unfamiliar Faces: The Effects of Distinctiveness and View*, 52 Q.J. EXPERIMENTAL PSYCH. 509, 523, 528 (1999); *see also id.* at 530 (finding a "clear disadvantage for recognition of profile views"). Another research study characterized "the profile view" as "bad for many tasks, including face identification . . . because important information such as the configuration of internal features is not visible." Harold Hill et al., *Information and Viewpoint Dependence in Face Recognition*, 62 COGNITION 201, 204–05 (1997).

*Second*, the light level and viewing distance likely hindered Mr. Sirevaag's ability to reliably identify the culprit. Mr. Sirevaag arrived at the construction site between 5:30 and 6:00 a.m. ECF No. 153-2 at 24. Although it was light enough to see, the sun was not up. ECF No. 153- 2 at 27, 37. Mr. Sirevaag's observation of the perpetrator in the dim pre-dawn light and from a distance at which recognition of *familiar* faces has been found to steeply drop off
/ / /

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

indicates that the viewing conditions rendered his later identification of Mr. Bolin less than reliable.

There is "a systematic decrease of [facial] recognition performance with . . . decreasing illumination" and the "quality" of an eyewitness identification "critically depends on the conditions in which the criminal was observed."  Marloes de Jong et al., *Familiar Face Recognition as a Function of Distance and Illumination: A Practical Tool for Use in the Courtroom*, 11 PSYCH., CRIME & L. 87, 87 (2005).  Researchers designed one study against the background principle that "the probability of correctly recognizing faces of unknown persons . . . [is] a function of distance and illumination during original viewing." *Id.*  In that study, researchers observed a "steep drop" in facial recognition of *familiar* faces beginning at a distance of 12 meters—or about 40 feet.  The researchers also concluded that they could characterize as "reliable" only recognitions of familiar faces based on observations of no more than 12 meters and *only if* the light level was "at least 30 lux"—equivalent to a room with bad illumination.  *Id.* at 91, 95.

*Third*, the relative lack of attention Mr. Sirevaag paid to the culprit at the time of the crime likely diminished his ability to accurately identify the culprit later.  Mr. Sirevaag arrived on the site for work and did not know a crime had occurred until after his opportunity to view the perpetrator had passed.  ECF No. 145-6 at 135-36.  Mr. Sirevaag also only observed the culprit for about 20 or 30 seconds in total.  ECF No. 153-2 at 42.  He further acknowledged that he "had no reason to" look around the job site when he arrived to see if anyone was there.  ECF No. 145- 6 at 166.  That Mr. Sirevaag did not know a crime had occurred when he observed the culprit, and admittedly did not pay close attention to the perpetrator during his brief observation of him, diminished the likelihood that his later identification was correct.  *See Green v. Loggins*, 614 F.2d 219, 224 (9th Cir. 1980) (noting the witness "had been merely a casual observer of the activity").

Event significance plays an important role in the accuracy of memory.  When "people fail to perceive that a significant event is occurring, their attention is not focused on what is transpiring," which "leads to poorer perception and memory of the event."  Fradella, 47 SEATTLE U. L. REV. at 32– 33.  In the context of eyewitness accuracy, this translates into "high levels of

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

inaccuracy in identifications" of the perpetrator when a witness does not perceive the event to be significant. *Id.* at 33. Even witnesses with a "*significant* opportunity to view the culprit [might have] little reason to attend closely" because they "often do not realize that they have witnessed a crime until after the culprit has fled." Gary L. Wells & Elizabeth A. Olson, *Eyewitness Testimony*, 54 ANN. REV. PSYCH. 277, 282 (2003) (emphasis added). Researchers have found that not knowing a crime has occurred substantially decreases the probability that a witness will correctly identify the culprit. In one study, eyewitnesses to a serious crime correctly identified the culprit 56.3% of the time when informed beforehand that they would be witnessing a crime, but only 12.5% of the time when informed after the fact. Michael R. Leippe et al., *Crime Seriousness as a Determinant of Accuracy in Eyewitness Identification*, 63 J. APPLIED PSYCH. 345, 348 (1978).

Finally, as set forth more fully in Section IV below, post-identification feedback likely contaminated Mr. Sirevaag's trial testimony about these factors. "Postidentification feedback refers to information given to eyewitnesses about their identification after they have made an identification decision." Gary L. Wells & Laura Smalarz, *Lives Destroyed by Distorted Recollections of Fluency, Attention, View, and Confidence: A Sin of Bias in Eyewitness Identification*, 11 J. APPLIED RSCH. MEMORY AND COGNITION 461, 461 (2022). Witnesses who receive post-identification feedback "show[] a shocking degree of distortion in their recall of the ease with which they were able to pick the person out of the lineup, how good their view was, how much attention they paid during witnessing, and the confidence they had at the time of identification." *Id.* As a result of such post-identification feedback, as further discussed below, Mr. Sirevaag's recounting at trial of the circumstances of his viewing of the culprit was unreliable. His trial testimony likely greatly exaggerated both his opportunity to view and degree of attention.

**B.**     ***Biggers* Factor No. 3 weighs against reliability because of discrepancies between Sirevaag's description of the culprit and Gregory Bolin.**

The third *Biggers* factor addresses the eyewitness's initial description of the perpetrator. It concerns the description of the culprit *first* given to police because that description is more likely to be accurate than any subsequent description—as memory only declines with time.

/ / /

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

Kenneth A. Deffenbacher et al., *Forgetting the Once-Seen Face: Estimating the Strength of an Eyewitness's Memory Representation*, 14 J. EXPERIMENTAL PSYCH. APPLIED 139, 148 (2008).

Unsurprisingly, studies have found that the greater the description mismatch, the greater the likelihood that the identification is inaccurate. *See* Christian A. Meissner et al., *A Theoretical Review and Meta-Analysis of the Description-Identification Relationship in Memory for Faces*, 20 EUR. J. COGNITIVE PSYCH. 414, 431, 435 (2008). This has also been found to be a common problem among exoneration cases: A study of the first 250 DNA-based exonerations revealed that, in those misidentification cases where the trial transcript was available, there was a substantial mismatch between the eyewitness descriptions and the actual appearances of the innocent defendants in sixty-two percent (62%) of the cases (100 out of 161). Garrett, CONVICTING THE INNOCENT at 68–69.

One reason for this is that "even under optimal viewing conditions, eyewitnesses can have great difficulty identifying strangers (and even nonstrangers)." Albright & Garrett, 102 B.U. L. REV. at 517 (citing Nat'l Rsch. Council, *Identifying the Culprit*, at 1–2). Difficulties in facial recognition are only exacerbated in cases involving cross-racial identifications like this one.

"[S]ocial science research indicates that people are significantly more prone to identification errors when trying to identify someone of a different race." *Conway*, 698 F.3d at 81. This cross-race effect—or "own-race bias"—is one of the most well-established findings in the field of eyewitness identification and memory. A "meta-analysis" aggregating data from 39 different studies concluded that eyewitnesses were 56% more likely to falsely believe they had seen a face before if that face was not of their race. Christian A. Meissner & John C. Brigham, *Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review*, 7 PSYCH. PUB. POL'Y & L. 3, 15 (2001). Studies have found that own-race bias is even more pronounced where "a Caucasian eyewitness identifies an African-American suspect." Henry F. Fradella, *Why Judges Should Admit Expert Testimony on the Unreliability of Eyewitness Testimony*, 2 FED. CTS. L. REV. 1, 14 (2007). And it is "significantly" magnified by reduced viewing time, which "increase[d] . . . the proportion of false alarm responses to other-race faces." Nat'l Rsch. Council, *Identifying the Culprit*, at 96 (citing Meissner & Brigham, *supra*, at 19–20).

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773     Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

The cross-race effect is an important factor in wrongful convictions. Own-race bias has been found to explain as much as 42% of erroneous eyewitness identifications in exoneration cases studied. *Id.* (citing Edwin Grimsley, The Innocence Project, *What Wrongful Convictions Teach Us About Racial Inequality* (Sept. 26, 2012)*,* https://www.innocenceproject.org/what-wrongful-convictions-teach-us-about-racial-inequality. Two thirds of the DNA exonerations where there was a proven misidentification are cases in which the misidentified person was African American, like Mr. Bolin. Wells, *supra*, 75 AM. PSYCH. at 1316 (66.4%).

The discrepancies between Mr. Sirevaag's initial description of the culprit and Mr. Bolin's appearance weigh against reliability. Mr. Sirevaag told the police that the perpetrator was twenty to thirty years old, six feet tall, and 230 pounds, ECF No. 154-1 at 63-64; ECF No. 324 at 145; ECF No. 24-5 at 8, when Mr. Bolin was quite a bit older and smaller in stature—38 years old, five feet nine inches, and 195 pounds. ECF No. 145-5 at 6; ECF No. 145-6 at 236; ECF No. 161-3 at 79; ECF No. 160-1 at 18-21. Mr. Sirevaag described the culprit as light-complected, when Mr. Bolin in fact is medium to dark-complected. ECF No. 158-3 at 9, 58; ECF No. 161-3 at 12- 13; ECF No. 152-2 at 8; ECF No. 324 at 165. Further, Mr. Sirevaag reported that the culprit he observed had a tattoo on his right arm (when the tattoo is actually on Mr. Bolin's shoulder), and he drew a picture of it for police officers. ECF No. 154-1 at 60, 63; ECF No. 324 at 128, 134. Although Mr. Bolin has a tattoo on his right shoulder, Mr. Sirevaag acknowledged that Mr. Bolin's tattoo "[d]oesn't look similar" to the tattoo he drew the day of the crime scene. ECF No. 153-3 at 47; *compare* ECF No. 324 at 117 (Sirevaag's drawing), *with* ECF Nos. 131, 134 (Mr. Bolin's actual tattoo).

In short, the only thing that Mr. Bolin has in common with the man that Mr. Sirevaag first described is that they are both Black men with a tattoo located somewhere on their right side. Because Mr. Sirevaag's original description of the culprit and drawing of his tattoo were made when his memory was fresh, this mismatch suggests that the later identification is unreliable. *See People v. Sammons*, 949 N.W.2d 36, 50 (Mich. 2020) ("Jones's description was wrong about the most specific details of the suspects, and therefore this factor does not provide strong indicia of reliability.").

**C.** ***Biggers* Factor No. 4: Scientific research confirms that Sirevaag's initial uncertainty strongly suggests that the identification was unreliable.**

The fourth *Biggers* factor addresses an eyewitness's level of certainty "at the confrontation"—*i.e.*, at the time of the *initial* identification. *Biggers*, 409 U.S. at 199. Research shows that "when eyewitnesses are tested using *appropriate identification procedures*, the confidence they express [at the initial identification procedure] can be, and usually is, a highly reliable indicator of accuracy." John T. Wixted & Gary L. Wells, *The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis*, 18 PSYCH. SCI. PUB. INT. 10, 11 (2017) (emphasis added). But while high-confidence initial identifications signal accuracy *if* proper procedures were used, "low-confidence initial IDs [like Mr. Sirevaag's initial identification] *always* signal low accuracy—whether the identification procedure was pristine or not." *Id.* at 14 (emphasis added). Moreover, when suggestive police procedures are used, like they were here, low-confidence identifications "are even more error-prone." *Id.* at 49.

Suggestive police procedures "rais[e] the overall level of mistaken identifications" and "can increase the confidence with which eyewitnesses make a mistaken identification." *Id.* at 48. When identification procedures are suggestive, "the confidence of the witness is not based purely on the strength of the memory signal. If the confidence statement is based on considerations other than [memory of the crime], . . . [the] confidence-accuracy relation no longer holds." *Id.* at 47.

Accuracy is further predicted by decision speed (or the lack thereof). Studies have consistently shown that eyewitnesses who make relatively quick decisions—decisions measured in seconds, not minutes—are more likely to make accurate identifications. *See, e.g.*, Wells et al., *supra*, 44 L. & HUM. BEHAV. at 23 ("Identifications made more quickly are more likely to be accurate."); Adele Quigley-McBride & Gary L. Wells, *Eyewitness Confidence and Decision Time Reflect Identification Accuracy in Actual Police Lineups*, 47 L. & HUM. BEHAV. 333, 345-46 (2023) (same). Decision time is cumulative with confidence: Identifications that are both quick and high-confidence are the most likely to be accurate. *See, e.g.*, Melanie Sauerland et al., *Decision time and confidence predict choosers' identification performance in photographic showups*, 13 PLoS One 1, 8 (2018) ("[F]ast and confident identification decisions were more

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

diagnostic than slow or less confident decisions, with the combination of both being most diagnostic[.]").

Mr. Sirevaag's initial lack of confidence in identifying Mr. Bolin, even after he had stared at him for five to ten minutes, strongly indicates that his identification was neither accurate nor reliable. Even after the police pressured him to make an identification while presenting Mr. Bolin in an unnecessarily suggestive, stationhouse showup, where detectives he recognized from the crime scene were apparently processing Mr. Bolin for arrest, and where the police displayed only Mr. Bolin to him with and without a shirt, he was *still* unable to quickly make an identification or identify Mr. Bolin with any certainty. He could say only "that on a scale of one to 10," "he was five." ECF No. 154-3 at 29-30. This uncertainty is evidence of a likely misidentification.

Mr. Sirevaag *later* expressed 70% to 80% certainty, ECF No. 153-4 at 47, only after asking officers several times what other evidence they had in the case, ECF No. 158-3 at 73, and only after officers cued him that they wanted him to identify Mr. Bolin by asking him to contact them if he thought of anything else. The detectives' behavior provided Mr. Sirevaag feedback that his slow, tentative identification was correct, undoubtedly inflating his confidence. Tellingly, even after this confirmatory feedback, Mr. Sirevaag's pre-trial confidence never reached one hundred percent (100%).

Regardless of whether a witness later identifies a suspect with certainty, "only an *initial* confidence statement—one that is made *before* there is much opportunity for confidence contamination to occur—provides reliable information." Wixted & Wells, *supra*, 18 Psych. Sci. Pub. Int. at 50–51 (emphasis added). The inflation in Mr. Sirevaag's confidence over time is accounted for by a well-established phenomenon known as the "post-identification feedback effect." *Id.* at 18. Even simple comments to a witness who has made a mistaken identification can lead to an immediate and significant boost in the witness's confidence. *Id.* A seminal study concluded that telling witnesses "Good, you identified the suspect" increased the number of people who were certain of their *mistaken* identifications from 15% to 50%. Gary L. Wells & Amy L. Bradfield, *"Good, you identified the suspect": Feedback to eyewitnesses distorts their reports of the witnessing experience*, 83 J. of Applied Psych. 360, 374 (1998). This finding has

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

repeatedly been replicated: Post-identification feedback distorts and amplifies statements of confidence. *See* Nancy K. Steblay et al., *The Eyewitness Post Identification Feedback Effect 15 Years Later: Theoretical and Policy Implications*, 20 PSYCH., PUB. POL'Y & L. 1 (2014). For this reason, researchers recommend that the police obtain an immediate confidence statement—as that is the most reliable indicator of confidence. *See* Wells et al., *supra*, 44 L. & HUM. BEHAV. at 21–22.

Accordingly, Mr. Sirevaag's later expressions of greater confidence—after receiving post-identification confirmation from law enforcement—do not tip the scale in favor of reliability, because only the initial level of confidence provides reliable information. *See Morales v. United States*, 248 A.3d 161, 178–79 (D.C. 2021) ("Evidence indicates that self-reported confidence at the time of trial is not a reliable predictor of eyewitness accuracy.") (citing Nat'l Research Council, *Identifying the Culprit,* at 108). Mr. Sirevaag was far from confident during the stationhouse showup, and he did not readily identify Mr. Bolin. Mr. Sirevaag's lack of confidence and slow decision time at this initial identification procedure, despite the police's use of a highly suggestive showup procedure, powerfully undermines the reliability of his ultimate identification of Mr. Bolin. *See United States v. Jones*, 689 F.3d 12, 18 (1st Cir. 2012).

**D.** ***Biggers* Factor No. 5 weighs in favor of unreliability or is neutral.**

The final *Biggers* factor concerns the length of time between the crime and the confrontation. The "[r]ate of memory loss for an unfamiliar face is greatest right after the encounter and then levels off over time." Kenneth A. Deffenbacher et al., *Forgetting the Once-Seen Face: Estimating the Strength of an Eyewitness's Memory Representation*, 14 J. EXPERIMENTAL PSYCH. APPLIED 139, 148 (2008). "[E]ven a short delay of five minutes can undermine the predictive value of a witness's confidence in an identification." Fradella, *supra*, 47 SEATTLE U. L. REV. at 43 (citing Wells et al., 44 L. & HUM. BEHAV. at 7). In a meta-analysis, researchers found that the "memory strength for [a] once-seen face loses 15% of its strength in the first 10 min[utes]" after the initial viewing. Deffenbacher, *supra*, 14 J. EXPERIMENTAL PSYCH. APPLIED at 146.

/ / /

The facts in the record confirm that the fifth *Biggers* factor weighs against reliability or, at least, is neutral given that the biggest drop-off in memory occurs within hours and Mr. Sirevaag did not attempt an identification until more than 24 hours later.  ECF No. 153-2 at 59-60.  The longer the time between witnessing a crime and the showup, the less likely any identification is to be accurate.  Indeed, "[s]how-ups occurring only *two hours* after the encounter frequently led to misidentifications."  *United States v. Greene*, 704 F.3d 298, 307 (4th Cir. 2013) (citation omitted) (emphasis in original).  Showups occurring later than that—particularly showups occurring the next day—should therefore weigh in favor against a finding of reliability.  *See id.*; *United States v. Wofford*, 2017 WL 5514176 (N.D. Okla. Nov. 17, 2017) (suppressing identifications made at a showup where the witnesses waited two hours to view the defendant, and where the police informed them that they had "caught the guy."); *Sammons*, 949 N.W.2d at 46–47 (finding eyewitness identification obtained as a result of suggestive showup was unreliable—and thus inadmissible—when the witness did not arrive at the police station until four to five hours later).

## IV.    IN-COURT IDENTIFICATIONS BASED ON UNRELIABLE SHOWUP IDENTIFICATIONS ARE AT LEAST AS UNRELIABLE AS THE SHOWUP.

Memory of the culprit's appearance, unlike confidence, only declines with the passage of time.  And the process of testing a witness's memory for a stranger's face itself contaminates the memory.  An in-court identification at trial, then, can never be more reliable than an initial out-of-court identification.  In this case, however, there are several factors that made the in-court identification far less reliable.  It was likely an artifact of suggestive procedures, repeated viewings, and post-identification feedback rather than of the eyewitness's memory for the initial incident.

As an initial matter, "[a]n in-court identification is inherently suggestive, tantamount to a high-pressure showup."  Nancy K. Steblay & Jennifer E. Dysart*, Repeated Eyewitness Identification Procedures with the Same Suspect*, 5 J. APPLIED RSCH. MEMORY & COGNITION 284, 287 (2016).  It is "arguably even more suggestive . . . because it [is] clear to the witness that the defendant has already been indicted."  Wells et al., *supra*, 44 L. & HUM. BEHAV. at 27.  It is hard

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

"to imagine how there could be a more suggestive identification procedure than placing a witness on the stand in open court, confronting the witness with the person who the state has accused of committing the crime, and then asking the witness if he can identify the person who committed the crime." *State v. Dickson*, 141 A.3d 810, 822–23 (Conn. 2016).

Another "concern with in-court identification, where there has been suggestive pretrial identification, is that the witness later identifies the person in court, not from his or her recollection of observations at the time of the crime charged, but from the suggestive pretrial identification." *United States v. Domina*, 784 F.2d 1361, 1368 (9th Cir. 1986). This issue of memory contamination has led researchers to recommend that the police "avoid repeated identification procedures with the same suspect and witness." Wells et al., *supra*, 44 L. & HUM. BEHAV. at 25– 26.

Here, however, Mr. Sirevaag was asked to identify Mr. Bolin after the stationhouse showup in two separate hearings, as well as at trial—four times in total. *See* ECF No. 145-6 at 194-95; 153-4 at 50. Each of these viewings likely inflated his confidence in the identification, thereby making him a more convincing witness at trial. But the only identification procedure that provides any probative evidence of guilt or innocence is the first one—where he identified Mr. Bolin slowly and with low confidence despite the use of overwhelmingly suggestive police procedures.

Repeated viewings of a suspect—like happened here—produces confident witnesses but unreliable evidence. "Under the right conditions [unlike here], the first eyewitness identification test can provide reliable information." John T. Wixted et al, *Test a Witness's Memory of a Suspect Only Once*, 22 PSYCH. SCI. IN THE PUB. INTEREST 1s, 2s (2021). But later identifications are less reliable than the first because "memory is malleable" and, therefore, "can be contaminated." *Id.* The first identification procedure leaves the eyewitness with a "memory trace" of the suspect's face, and an association of that face with the crime; the memory signal generated by that face may be activated in a later viewing of the same suspect by the same witness, regardless of whether the suspect is the actual culprit. *Id.* at 2s–3s. Thus, repeated identifications typically result in that witness having inflated confidence in the identification by the time of trial due to memory

contamination.  *Id.*  Where, as here, an eyewitness is asked to identify a suspect "repeatedly," such as during an identification procedure, a pretrial hearing, and again at trial, the memory signal "is likely to feel stronger to the eyewitness each time he or she encounters the person."  Wixted & Wells, *supra*, 18 Psychol. Sci. Pub. Int. at 47.  That perceived signal strength, however, "is the result of repeated presentations of the suspect rather than the strength of the initial memory."  *Id.*

Researchers have studied the "multiple ways in which a witness's memory for a criminal can be redirected onto a new face during repeated identification procedures."  Steblay & Dysart, 5 J. Applied Rsch. Memory & Cognition at 285.  One explanation for how this can happen over the course of repeated viewings is known as "source confusion" or "(unconscious) transference."  *Id.*  Essentially, the witness remembers that they have seen the suspect's face before but misremembers where they saw it: "the recognition may stem from exposure at the first identification task rather than from the crime scene."  *Id.*  Another explanation for the tendency of witnesses to select previously seen suspects at second or subsequent identification procedures is called the "commitment effect": "consistent selections of the same suspect across repeated identification procedures may indicate reliable witness memory for the guilty culprit, but it may also result from *commitment* to a false recollection of an identified innocent suspect."  *Id.*

Taken together with repeated viewings, the post-identification feedback effect means that any in-court identification or statement of confidence has no independent probative value.  Research has revealed that confirmatory feedback not only "shockingly inflated reports of retrospective confidence, view, and attention, but also inflated a host of related variables such as witnesses' reports of how well they could make out details of the culprit's face."  *Wells, supra*, 75 Am. Psych. at 1322.  Critically, in tests of post-identification feedback, all the witnesses were mistaken, they all had the same (poor) view of the culprit, and so on.  *Id.*  "But a simple comment from the lineup administrator led to distorted recollections of their confidence, view, attention and other testimony-relevant reports of the entire witnessing and identification experience."  *Id.*  And, importantly, the memory distortions caused by post-identification feedback are cumulative, such that they get larger when witnesses received multiple "doses" of feedback—as witnesses might receive in interactions with the police and prosecution leading up to trial.  Laura Smalarz and Gary

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

1  L. Wells, *Do Multiple Doses of Feedback Have Cumulative Effects on Eyewitness Confidence?*,

2  9 J. APPLIED RSCH. IN MEMORY AND COGNITION 508 (2020) (answering "yes").

3      Moreover, court proceedings can themselves function as a form of post-identification

4  feedback. *See id.* at 517 (discussing "inference-based feedback"). Even if an administrator says

5  nothing about whether the witness correctly identified the suspect, witnesses will likely infer

6  whether they picked the "right" person based on how the case progresses. Margaret Bull Kovera

7  et al., *Science-Based Recommendations for the Collection of Eyewitness Identification Evidence*,

8  58 CT. REV.: J. AM. JUDGES ASS'N 130, 137 (2022). "Simply asking a witness to testify in court

9  can function as a form of confirming feedback, as it confirms that the witness correctly identified

10  the police's suspect." *Id.* Such feedback "may cause witnesses to forget the initial uncertainty

11  they felt . . . and express extreme confidence during their in-court testimony." *Id.*

12      Expressions of confidence at trial should therefore be viewed with skepticism, as repeated

13  viewings and post-identification feedback can cause an initially uncertain eyewitness (like

14  Mr. Sirevaag) to become completely certain by the time they testify at trial. *See* Albright &

15  Garrett, *supra*, 102 B.U. L. REV. at 534–35 (citation omitted). As the National Research Council

16  Report explained, "confidence levels expressed at later times [(in court, for example)] are subject

17  to recall bias, enhancements stemming from opinions voiced by law enforcement, counsel and the

18  press, and to a host of other factors that render confidence statements less reliable." *Id.* at 535.

19      Given the inordinate weight that jurors place on eyewitness confidence, such confidence

20  inflation can lead to wrongful convictions. Studies of DNA exoneration cases involving

21  misidentifications reveal that while witnesses invariably testified at trial to being certain in their

22  identifications, a majority had initially "not been certain at all." Garrett, *supra*, *Convicting the*

23  *Innocent* at 64. Indeed, some "eyewitnesses" who were confident at trial initially said they had

24  not even seen the culprit's face. *Id.* Researchers have concluded that post-identification feedback

25  is "responsible for the lions' share of wrongful convictions based on human memory errors." Gary

26  L. Wells and Laura Smalarz, *supra*, 11 J. APPLIED RSCH. MEMORY AND COGNITION at 463.

27  / / /

28  / / /

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

## CONCLUSION

In sum, scientific research reveals that the eyewitness identification evidence presented at trial bore none of the relevant indicia of reliability needed to overcome the inherent suggestiveness of the showup in this case. The admission of that evidence carried enormous prejudicial potential, as jurors place excessive weight on eyewitness testimony even when it is unreliable. Indeed, the confidence manufactured by suggestive procedures and post-identification feedback only makes such testimony more credible to jurors. The admission of such utterly unreliable yet highly persuasive evidence was a grave injustice and violated Mr. Bolin's right to due process.

DATED this 17th day of July 2024.

GREENBERG TRAURIG, LLP

By: /s/ Eric W. Swanis

ERIC W. SWANIS, ESQ.
Nevada Bar No. 6840
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada 89135
Email: swanise@gtlaw.com

CAROLINE HELLER, ESQ.*
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 801-2165
*Pro Hac Vice Forthcoming
Email: Caroline.Heller@gtlaw.com

JENNIFER BARTLETT, ESQ.*
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Telephone: (214) 665-3600
*Pro Hac Vice Forthcoming
Email: Jennifer.Bartlett@gtlaw.com

*Counsel for Amici Curiae, The Innocence Project, Inc. and the Wilson Center for Science and Justice*

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 792-3773    Facsimile: (702) 792-9002

## CERTIFICATE OF SERVICE

I hereby certify that on **July 17, 2024**, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive such service.

/s/  *Evelyn Escobar-Gaddi*

An employee of GREENBERG TRAURIG, LLP
