# Exhibit A

KRISHNA PRASAD
Nevada State Bar No. 15308
**PRASAD LAW**
275 Hill Street, Suite 248
Reno, NV 89501
Phone: 775.224.8014
Email: krishna@prasad-law.com

CARINE M. WILLIAMS
GEORGE H. KENDALL
NICOLA COHEN
ALEXANDRA DANIELS
*Pro Hac Vice Applications Forthcoming*
**SQUIRE PATTON BOGGS LLP**
1120 Avenue of the Americas, 13th Floor
New York, NY 10036
Phone: 212.407.9800
Email: carine.williams@squirepb.com

***Counsel for Amicus Curiae,***
***The Center for Integrity in Forensic Sciences***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| GREGORY BOLIN,<br><br>                    *Petitioner,*<br><br>        *v.*<br><br>JEREMY BEAN, et al.,<br><br>                    *Respondents.* | CASE NO. 3:07-cv-00481-ART-CLB<br><br>**BRIEF FOR AMICUS CURIAE, THE CENTER FOR INTEGRITY IN FORENSIC SCIENCES**<br><br>**DEATH PENALTY CASE** |

1

## <u>TABLE OF CONTENTS</u>

2                                                                        <u>Page</u>

3    TABLE OF AUTHORITIES ----------------------------------------------------ii

4    INTERESTS OF AMICUS CURIAE --------------------------------------------- 1

5    I.    Introduction ----------------------------------------------------------- 3

6    II.   Hair Microscopy Evidence -------------------------------------------- 5

7          A.    Microscopic Hair Comparison and Its Scientific Failures ------------------ 5

8
      1.    Hair Microscopy's Scientific Unreliability Heightens Risk of
9          Wrongful Convictions ------------------------------------------- 5

10               2.    Flawed Race Conclusions in "Expert" Hair Microscopy
11                     Testimony ---------------------------------------------------- 7

12         B.    Flawed Hair Microscopy in Mr. Bolin's Case ----------------------- 9

13   III.  DNA Testing of Hair Sample ------------------------------------------ 11

14         A.    Jurors Ascribe Great Weight to DNA Analysis --------------------- 11

15         B.    DNA Results in Mr. Bolin's Case Were Unreliable------------------ 13

16   IV.   Prostate-Specific Antigen (or "P-30") Testing ------------------------- 15

17         A.    P-30 Testing and Its Limitations for Indicating the Presence of
18               Semen ------------------------------------------------------- 15

19         B.    P-30 Evidence in Mr. Bolin's Case ------------------------------- 17

20   V.    Footwear Impression Analysis ---------------------------------------- 17

21         A.    The Unreliability of Footwear Impression Evidence---------------- 17

22         B.    The Footprint Analysis in this Case Was Flawed------------------- 18

23   VI.   Conclusion ------------------------------------------------------------ 22

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*McCrory v. Alabama*,
    144 S. Ct. 2483 (2024) ......................................................................... 3

*Redmond v. United States*,
    339 A.3d 1274 (D.C. 2025) .................................................................... 7

*United States v. Ausby*,
    916 F.3d 1089 (D.C. Cir. 2019) ............................................................. 7

*United States v. Butler*,
    955 F.3d 1052 (D.C. Cir. 2020) ............................................................. 7

*Williamson v. Reynolds*,
    904 F. Supp. 1529 (E.D. Okla. 1995) .................................................... 5

**Other Authorities**

*% Exonerations by Contributing Factor*, Nat'l Registry of Exonerations,
    https://exonerationregistry.org/exonerations-contributing-factor ......................... 3

ABS Group, *Root and Cultural Cause Analysis of Report and
    Testimony Errors by FBI MHCA Examiners* (Aug. 2018),
    https://vault.fbi.gov/root-cause-analysis-of-microscopic-hair-
    comparison-analysis/root-cause-analysis-of-microscopic-hair-
    comparison-analysis-part-01-of-01/view ................................................. 6

Anthony Walsh, *The Sexual Stratification Hypothesis and Sexual
    Assault in Light of the Changing Conceptions of Race*, 25
    Criminology 153 (1987) ........................................................................ 10

Associated Press, *Vegas Police Sorry After Wrong Man Goes to Prison*,
    Deseret News (July 7, 2011),
    https://www.deseret.com/2011/7/7/20202517/vegas-police-sorry-
    after-wrong-man-goes-to-prison/ .......................................................... 10

Ate Kloosterman et al., *Error Rates in Forensic DNA Analysis:
    Definition, Numbers, Impact, and Communication*, 12 Forensic Sci.
    Int'l Genetics 77 (2014) ........................................................................ 12

Catherine Lewis et al., *Race and Ethnic Categories: A Brief Review of Global Terms and Nomenclature*, 15(7) Cureus (July 1, 2023), https://www.cureus.com/articles/164928-race-and-ethnic-categories-a-brief-review-of-global-terms-and-nomenclature#!/ ............................................... 8

Devon E. LaBat et al., *Improving Juror Assessments of Forensic Testimony and Its Effects on Decision-Making and Evidence Evaluation*, 47 L. & Hum. Behav. 566 (2023) .......................................... 3

*Director Comey Letter to Additional Governors on State Reviews*, FBI: Documents (June 10, 2016), https://www.fbi.gov/file-repository/laboratory/second-governor-letter-061016.pdf/view .............................. 9

*DNA Exonerations in the United States* (1989-2020), Innocence Project, https://innocenceproject.org/dna-exonerations-in-the-united-states/ .................. 11

*DQ-Alpha*, Nat'l Inst. of Just. (June 16, 2023), https://nij.ojp.gov/nij-hosted-online-training-courses/crime-scene-and-dna-basics-forensic-analysts/history-and-types-forensic-dna-testing/polymerase-chain-reaction-pcr/dq-alpha ..................................................................... 13

*FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review*, FBI: Press Releases (Apr. 20, 2015), https://www.fbi.gov/news/press-releases/fbi-testimony-on-microscopic-hair-analysis-contained-errors-in-at-least-90-percent-of-cases-in-ongoing-review ................................................... 6

Fed. R. Evid. 702(a) ................................................................................... 19

Ferdinando Mannello et al., *Immunoreactivity of Prostate-Specific Antigen in Plasma and Saliva of Healthy Women*, 42 Clinical Chemistry 1110 (1996) ........................................................................ 16

Florian Wimpissinger et al., *The Female Prostate Revisited: Perineal Ultrasound and Biochemical Studies of Female Ejaculate*, 4 J. Sexual Med. 1388 (2007) ................................................................... 16

Flynn McRoberts, Maurice Possley & Steve Mills, *Scandal Touches Even Elite Labs*, Chi. Trib. (Oct. 21, 2004), https://www.chicagotribune.com/2004/10/21/scandal-touches-even-elite-labs/ ..................................................................................... 13

George Fisher, *Evidence* (4th ed. 2022) ...................................................... 4

Herbert Yu & Hans Berkel, *Prostate-Specific Antigen (PSA) in Women*, 151 J. La. State Med. Soc. 209 (1999) .......................................... 15, 16

Howard C.B. Graves et al., *Postcoital Detection of a Male-Specific Semen Protein: Application to the Investigation of Rape*, 312 N. Engl. J. Med. 338 (1985) ............................................................ 15

James Robertson & Elizabeth Brooks, *A Practical Guide to the Forensic Examination of Hair: From Crime Scene to Court* (1st ed. 2021) .......................... 8

Jefferson E. Holcomb, Marian R. Williams & Stephen Demuth, *White Female Victims and Death Penalty Disparity Research*, 21 Just. Q. 877 (2004) ..................................................................................... 10

Jeffrey J. Pollen & Anna Dreilinger, *Immunohistochemical Identification of Prostatic Acid Phosphatase and Prostate Specific Antigen in Female Periurethral Glands*, 23 Urology 303 (1984) .......................... 16

Joel D. Lieberman et al., *Gold Versus Platinum: Do Jurors Recognize the Superiority and Limitations of DNA Evidence Compared to Other Types of Forensic Evidence?*, 14 Psych. Pub. Pol'y & L. 27 (2008) ..................................................................................... 11

Jonathan J. Koehler, *Intuitive Error Rate Estimates for the Forensic Sciences*, 57 Jurimetrics J. 153 (2017) .......................................... 12

Kelly Sauerwein et al., *Bitemark Analysis: A NIST Scientific Foundation Review*, Nat'l Inst. of Standards & Tech., NIST IR 8352 (2023), https://nvlpubs.nist.gov/nistpubs/ir/2023/NIST.IR.8352.pdf .................... 3

Lawrence Mower, *Police Technician Whose DNA Error Sent Wrong Man to Prison Resigns*, Las Vegas Rev.-J. (July 26, 2011), https://www.reviewjournal.com/crime/courts/police-technician-whose-dna-error-sent-wrong-man-to-prison-resigns/ ........................... 10

Laura Wilkinson & Claire Gwinnett, *An International Survey into the Analysis and Interpretation of Microscopic Hair Evidence by Forensic Hair Examiners*, 308 Forensic Sci. Int'l 110158 (2020) .......................... 6

Lawrence D. Papsidero et al., *A Prostate Antigen in Sera of Prostatic Cancer Patients*, 40 Cancer Rsch. 2428 (1980) ...................................... 15

Linda A. Henkel et al., *A Survey of People's Attitudes and Beliefs About False Confessions*, 26 Behav. Sci. & L. 555 (2008) ................................ 12

Lori J. Sokoll & Daniel W. Chan, *Prostate-Specific Antigen: Its Discovery and Biochemical Characteristics*, 24 Urologic Clinic N. Am. 253 (1997) ........................................................................ 15

Michael B. Smith, *The Forensic Analysis of Footwear Impression Evidence*, 11 Forensic Sci. Commc'ns, no. 3 (July 2009), https://archives.fbi.gov/archives/about-us/lab/forensic-science-communications/fsc/july2009/review/2009_07_review02.htm ............................. 18

Nat'l Rsch. Council, *Strengthening Forensic Science in the United States: A Path Forward* (2009), https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf .....................................*passim*

*Polymerase Chain Reaction (PCR) Fact Sheet*, Nat'l Hum. Genome Rsch. Inst., https://www.genome.gov/about-genomics/fact-sheets/Polymerase-Chain-Reaction-Fact-Sheet (last updated Aug. 17, 2020)................................................................................................. 13

President's Council of Advisors on Sci. & Tech., *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf ....................................*passim*

Raul Sutton, *Crime Scene Management: Crime Scene Specific Methods* (1st ed. 2016)................................................................................................ 20

Richard J. Ablin, *Letter to the Editor: Prostate-Specific Antigen and the Female Prostate*, 35 Clinical Chemistry 507 (1989)............................................. 16

Sammed N. Mandape et al., *Dense Single Nucleotide Polymorphism Testing Revolutionizes Scope and Degree of Certainty for Source Attribution in Forensic Investigations*, 65 Croat. Med. J. 249 (2024)................... 13

Samuel R. Gross et al., *Race and Wrongful Convictions in the United States 2022*, Nat'l Registry of Exonerations (Sept. 2022), https://exonerationregistry.org/sites/exonerationregistry.org/files/documents/Updated%20CP%20-%20Race%20Report%20Preview.pdf................... 10

Scientific Working Group on DNA Analysis Methods (SWGDAM), *Contamination Prevention and Detection Guidelines for Forensic DNA Laboratories* (2017), https://www.swgdam.org/_files/ugd/4344b0_c4d4dbba84f1400a98eaa2e48f2bf291.pdf ................................................................................ 12

*Short Tandem Repeats (STR)*, Nat'l Inst. of Just. (June 16, 2023), https://nij.ojp.gov/nij-hosted-online-training-courses/crime-scene-and-dna-basics-forensic-analysts/history-and-types-forensic-dna-testing/short-tandem-repeats-str .......................................................... 13

Simon A. Cole & Troy Duster, *Microscopic Hair Comparison and the Sociology of Science*, 15 Contexts 28 (2016) ........................................... 6

Simon A. Cole et al., *Microscopic Hair Comparison Analysis and Convicting the Innocent*, Nat'l Registry of Exonerations (2023), https://exonerationregistry.org/sites/exonerationregistry.org/files/documents/NREReportMHCAv1.1.pdf ......................................................... 7

Stefan Schmidt et al., *Prostate-Specific Antigen in Female Urine: A Prospective Study Involving 217 Women*, 57 Urology 717 (2001) ....................... 16

Stephanie L. Smith & Charles A. Linch, *A Review of Major Factors Contributing to Errors in Human Hair Association by Microscopy*, 20 Am. J. Forensic Med. & Pathology 269 (1999) .................................... 5

U.S. Dep't of Just., *Proposed Uniform Language for Testimony and Reports for the Forensic Hair Examination Discipline* (2016), https://www.justice.gov/archives/dag/file/877736/dl?inline .................................... 8

U.S. Dep't of Just., *Uniform Language for Testimony and Reports for the Forensic Hair Discipline* (2018), https://www.justice.gov/d9/2024-01/final_hair_ultr_072418_for_posting.pdf ........................................... 8

William J. Bodziak, *Footwear Impression Evidence: Detection, Recovery & Examination* (2d ed. 2017) .......................................................*passim*

Xavier Filella et al., *Detection of Nonprostatic PSA in Serum and Nonserum Samples from Women*, 68 Int'l J. Cancer 424 (1996) ......................... 16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTERESTS OF AMICUS CURIAE**

*Amicus Curiae,* the Center for Integrity in Forensic Sciences ("CIFS"), by and through its attorneys, Squire Patton Boggs LLP, submits this brief in support of Petitioner Gregory Bolin.[1]

CIFS is a nonprofit organization dedicated to improving the reliability and safety of criminal prosecutions by strengthening the forensic sciences. CIFS was founded in 2017 by Professor Keith A. Findley, a co-founder of the Wisconsin Innocence Project, professor at the University of Wisconsin Law School, and former public defender, together with Dean Strang and Jerome Buting, long-time criminal defense practitioners who garnered national attention for their work exonerating Steven Avery. CIFS partners with scientists at the Wisconsin Institute for Discovery and is advised by a board of leading scientists, legal academics, and forensic science experts.

Today, CIFS's national strategy for improving forensic science integrity involves promoting scientific research into the reliability of various forensic disciplines; advocating for structural reforms that promote the integrity of forensic laboratories; educating future lawyers and scientists on sound forensic work; and engaging in direct representation, case consultation, and amicus brief support in cases where forensic scientific testimony was egregiously misused.

CIFS adheres to the principle that the public at large, and all criminal defendants, have a right to expect that valid scientific evidence, and only valid scientific evidence, makes its way into the courtroom. CIFS has an interest in this case because Mr. Bolin was convicted and sentenced to death based on forensic

---

[1] This brief has not been authored, in whole or in part, by counsel to any party in this habeas action. No party or counsel to any party contributed money intended to fund preparation or submission of this brief. No persons, other than the *amicus curiae,* its members, or their counsel, contributed money that was intended to fund preparation or submission of this brief.

evidence that was not just flawed, but categorically false and invalid. The prosecution's case against him relied on a unique combination of forensic science disciplines that were either grossly misused or have been entirely debunked by consensus reliability standards. This amicus brief accordingly addresses how the deceptive presentation of unreliable forensic evidence, including (i) hair microscopy, (ii) hair DNA testing, (iii) prostate-specific antigen testing, and (iv) footwear-impression analysis, created fundamentally unfair prejudice in Mr. Bolin's case.

## I.    Introduction

Integrity in forensic science is crucial to the fair administration of our criminal justice system. Over the past fifty years, with the advent of new technologies for identifying and testing crime-scene evidence, forensic science has become both a highly probative and popular feature of American criminal courtrooms. Jurors tend to give particular credence to forensic evidence, which lends a sense of objectivity and certainty to otherwise-contested issues of fact. *See* Devon E. LaBat et al., *Improving Juror Assessments of Forensic Testimony and Its Effects on Decision-Making and Evidence Evaluation*, 47 L. & Hum. Behav. 566, 567 (2023) ("[J]urors typically give substantial weight to forensic evidence when coming to a verdict.").

But forensic evidence is not always reliable, objective, or based in scientific fact. Breathtaking, fundamental scientific errors and flat-out false testimony have been exposed with discomfiting frequency. Approximately 29% of exonerations since 1989 involved false or misleading forensic evidence. *% Exonerations by Contributing Factor*, Nat'l Registry of Exonerations, https://exonerationregistry.org/exonerations-contributing-factor. Reports and studies informed by modern scientific knowledge have discredited entire fields of forensics that were once popular with the criminal bar and still likely support countless convictions. *See, e.g.*, *McCrory v. Alabama*, 144 S. Ct. 2483, 2485 (2024) (Sotomayor, J., respecting denial of certiorari) (discussing forensic dentists' testimony that they "once believed that bitemark evidence could be probative and now understood that it was not"); Kelly Sauerwein et al., *Bitemark Analysis: A NIST Scientific Foundation Review*, Nat'l Inst. of Standards & Tech., NIST IR 8352, 1–3 (2023), https://nvlpubs.nist.gov/nistpubs/ir/2023/NIST.IR.8352.pdf (identifying lack of support for key premises of bitemark analysis).

Two seminal reports on the forensic sciences are especially noteworthy. First is the National Academy of Sciences Report, which Congress commissioned in 2005

in response to a spate of disturbing exonerations. *See* Nat'l Rsch. Council, *Strengthening Forensic Science in the United States: A Path Forward* (2009), https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf (hereinafter, "NAS Report"). Released in 2009, the report scrutinized more than a dozen forensic fields and identified several major disciplines as wholly unreliable.

Then, in 2016, a second major report by the President's Council of Advisors on Science and Technology echoed concerns raised in the 2009 NAS Report. *See* President's Council of Advisors on Sci. & Tech., *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf (hereinafter, "PCAST Report"). The PCAST Report focused on "feature-comparison" disciplines, which involve methods like firearm toolmark analysis, latent fingerprint comparison, and DNA analysis (as well as, as is discussed further *infra*, certain methods squarely at issue in the instant case, like hair microscopy and footwear impressions). In addition to heavily criticizing the absence of scientific validation across some of these disciplines, the PCAST Report condemned exaggerated claims of precision made by forensic feature examiners. *See* George Fisher, *Evidence* 884–98 (4th ed. 2022) (describing the conclusions of the NAS and PCAST Reports).

Many of the concerns highlighted in these reports as undermining the integrity of forensic sciences are present in Mr. Bolin's case. For example, at Mr. Bolin's trial, the prosecution provided jurors with not just one but *multiple* glaringly unreliable presentations of forensic evidence, including: hair microscopy, hair DNA testing, prostate-specific antigen testing, and footwear-impression analysis. We describe the basic processes by which those analyses are performed and discuss the grave prejudicial effect of the introduction of such evidence at Mr. Bolin's trial.

## II.    Hair Microscopy Evidence

### A.    Microscopic Hair Comparison and Its Scientific Failures

Microscopic hair comparison, or "hair microscopy," is a forensic technique in which hair recovered from a crime scene is compared to a known sample, typically collected from a suspect. The process consists of two primary stages: a macroscopic review, where an examiner visually looks to assess general characteristics of the hairs, and a microscopic analysis, where the hairs are viewed under high magnification. NAS Report, *supra*, at 156. Hair characteristics are broadly categorized as "major" characteristics (*e.g.*, pigment distribution, shaft form, medulla appearance, and hair diameter) and "secondary" characteristics (*e.g.*, cuticular margin, pigment size, tip shape, and shaft diameter). *Id.* at 157.

Although once widely used in criminal investigations, the historical application of microscopic hair comparison has been broadly discredited. For over twenty-five years, scholars and scientists have criticized the discipline for lacking scientific rigor and contributing to wrongful convictions. *See, e.g.*, Stephanie L. Smith & Charles A. Linch, *A Review of Major Factors Contributing to Errors in Human Hair Association by Microscopy*, 20 Am. J. Forensic Med. & Pathology 269, 269–73 (1999).[2] The prejudice associated with this discipline is further exacerbated by hair microscopy witnesses' debunked practice of correlating hair form with race.

### 1.    Hair Microscopy's Scientific Unreliability Heightens Risk of Wrongful Convictions

Microscopic hair comparison is inherently unreliable for two primary reasons. First, there are no scientifically accepted data on the frequency with which particular

---

[2] Courts have also long expressed concern regarding the reliability of hair microscopy evidence. *See Williamson v. Reynolds*, 904 F. Supp. 1529, 1558 (E.D. Okla. 1995) (concluding that "the introduction into evidence of expert hair testimony at Petitioner's trial was irrelevant, imprecise and speculative, and its probative value was outweighed by its prejudicial effect").

hair characteristics appear in the population. NAS Report, *supra*, at 160. Without such data, it is impossible to estimate the probative value of microscopic hair comparison evidence. Simon A. Cole & Troy Duster, *Microscopic Hair Comparison and the Sociology of Science*, 15 Contexts 28, 31–32 (2016). Second, studies have found "a lack of standardised approach to interpretation [of microscopic hair evidence] in the form of the methods used and consideration of interpretation factors." Laura Wilkinson & Claire Gwinnett, *An International Survey into the Analysis and Interpretation of Microscopic Hair Evidence by Forensic Hair Examiners*, 308 Forensic Sci. Int'l 110158, 14 (2020). This makes sense, as "[t]here appear to be no uniform standards on the number of features on which hairs must agree before an examiner may declare a match." NAS Report, *supra*, at 160.

Nevertheless, for decades, hair microscopy analysts routinely provided testimony that misleadingly exaggerated or overstated the probative value of their analyses and "exceeded the limits of the science." *See* ABS Group, *Root and Cultural Cause Analysis of Report and Testimony Errors by FBI MHCA Examiners* 107–08 (Aug. 2018), https://vault.fbi.gov/root-cause-analysis-of-microscopic-hair-comparison-analysis/root-cause-analysis-of-microscopic-hair-comparison-analysis-part-01-of-01/view. Indeed, in 2015, a joint investigation between the Department of Justice, the FBI, the Innocence Project, and the National Association of Criminal Defense Lawyers revealed that FBI microscopic hair analysts made erroneous statements in at least 90% of trial transcripts they reviewed. *FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review*, FBI: Press Releases (Apr. 20, 2015), https://www.fbi.gov/news/press-releases/fbi-testimony-on-microscopic-hair-analysis-contained-errors-in-at-least-90-percent-of-cases-in-ongoing-review (hereinafter, "FBI Press Release"). While the investigation focused on cases involving FBI examiners, its findings also implicated state criminal cases, as the FBI had trained hundreds of state and local forensic examiners in

annual two-week training courses. *Id.* (discussing how the FBI urged states to conduct independent audits of their practices).

These findings have led to the vacatur of several convictions that were based in part on hair microscopy evidence that the government conceded was false. In fact, within the past two months, the District of Columbia Court of Appeals vacated a conviction that relied on an expert forensic witness's testimony that a hair found on the victim's bedsheet "contained all the same characteristics" as the petitioner's hair. *Redmond v. United States*, 339 A.3d 1274, 1277–78 (D.C. 2025). *See also United States v. Ausby*, 916 F.3d 1089, 1091, 1095 (D.C. Cir. 2019) (holding that the district court should have vacated the defendant's conviction because the examiner testified at trial that hairs found on the victim were "microscopically identical" to the defendant's hair); *United States v. Butler*, 955 F.3d 1052, 1055–56, 1064 (D.C. Cir. 2020) (same, where examiner testified that the hair samples at issue "match[ed] in all microscopic characteristics").

These cases suggest that many individuals are still viably challenging convictions that relied on flawed microscopic hair evidence. Setting any ongoing cases aside, existing data already make clear that such evidence contributed to a significant number of known wrongful convictions. A study following the FBI investigation revealed that "[a]t least 129 people have been falsely convicted based at least in part on [microscopic hair comparison analysis]." Simon A. Cole et al., *Microscopic Hair Comparison Analysis and Convicting the Innocent* 7, Nat'l Registry of Exonerations (2023), https://exonerationregistry.org/sites/exonerationregistry.org/files/documents/NREReportMHCAv1.1.pdf. Fifteen of those exonerees had been sentenced to death. *Id.*

### 2.    Flawed Race Conclusions in "Expert" Hair Microscopy Testimony

Forensic examiners have historically relied on racial classifications such as

"Caucasian," "Negroid," and "Mongoloid" in their analysis of hair samples.[3] However, this practice has been discredited by research showing "race does not provide an accurate representation of human biological variation." James Robertson & Elizabeth Brooks, *A Practical Guide to the Forensic Examination of Hair: From Crime Scene to Court* 71 (1st ed. 2021). While some studies still rely on terms relating to "three main geographic groups" (European, African, and Asian), even those classifications must be used with great caution, as "the relationship between geographic area and ethnicity is at best a loose relationship." *Id.* Indeed, "[t]he ability to differentiate hairs or assign them to a specific ethnic group is questionable, especially in an increasingly multicultural society." *Id.*

Notably, in 2018, the Department of Justice removed all references to racial or ancestral classification from its forensic guidelines. *Compare* U.S. Dep't of Just., *Proposed Uniform Language for Testimony and Reports for the Forensic Hair Examination Discipline* 1 (2016), https://www.justice.gov/archives/dag/file/877736/dl?inline, *with* U.S. Dep't of Just., *Uniform Language for Testimony and Reports for the Forensic Hair Discipline* (2018), https://www.justice.gov/d9/2024-01/final_hair_ultr_072418_for_posting.pdf.

The use of racial classifications in forensic hair analysis has disproportionately harmed Black defendants. Since 1989, forensic analysts explicitly assigned racial classifications to hair samples in at least seven known exonerations—and in every

---

[3] Quotation marks are used here to indicate that even these specific racial classification terms are today considered defunct. In addition to scientifically discredited—contemporary scholarship recognizes race more generally as a social, not biological, construct—these terms promote prejudicial stereotypes and are widely viewed as offensive both in academic and everyday contexts. *See, e.g.*, Catherine Lewis et al., *Race and Ethnic Categories: A Brief Review of Global Terms and Nomenclature*, 15(7) Cureus (July 1, 2023), https://www.cureus.com/articles/164928-race-and-ethnic-categories-a-brief-review-of-global-terms-and-nomenclature#!/ (describing the term "Negro" as "considered derogatory and inappropriate for use").

single case, the defendant was Black. *See* Cole et al., *supra*, at 41 & n.117.

### B.    Flawed Hair Microscopy in Mr. Bolin's Case

Mr. Bolin's case exhibits several hallmarks common to wrongful convictions secured with discredited microscopic hair comparison testimony. At trial, Terry Cook, the prosecution's expert witness, provided misleading testimony by overstating the reliability of hair microscopy. He told the jury that one of the approximately thirty hairs collected from Mr. Bolin was "identical" to, "indistinguishable from," and "microscopically similar" to the hair found on the victim's body. *See, e.g.*, ECF No. 158-4 at 52:21–53:9, 97:15–20; 100:16–18. The prosecution amplified Mr. Cook's flawed testimony, emphasizing in closing arguments that he had conducted a microscopic "[s]ide-by-side analysis" and found a crime scene hair "indistinguishable" from and "microscopically similar" to Mr. Bolin's hair. ECF No. 161-3 at 155:22–156:2. As explained *supra*, this misleading language lacks any scientific basis, and courts have overturned convictions relying on similarly misleading testimony.

Perhaps unsurprisingly, Mr. Cook's only formal training in microscopic hair comparison consisted of a single two-week course provided by the FBI—only one week of which discussed hairs, the other of which covered fibers—that the FBI itself has since admitted "incorporated some of the same scientifically flawed language that the FBI's examiners had used," contributing to widespread errors. *See* ECF No. 156-2 at 31:8–16; FBI Press Release, *supra*. *See also Director Comey Letter to Additional Governors on State Reviews*, FBI: Documents (June 10, 2016), https://www.fbi.gov/file-repository/laboratory/second-governor-letter-061016.pdf/view (letter from FBI director alerting states to the possibility that these trainings "introduce[d] error into [] state and local lab work," and urging states "to take appropriate corrective action" if their examiners exceeded "the bounds of

science").[4]

Beyond dramatically overstating the certainty of the hair review, Mr. Cook improperly ascribed a racial classification to the hair sample, describing it as "Negroid" and having "Negro characteristics." ECF No. 158-4 at 32:10–13; ECF No. 156-1 at 96:21–97:5; *see also* ECF No. 155-1 at 22:6–10. Apart from being scientifically unsound, Mr. Cook's language was racially inflammatory—particularly given the racial and gender dynamics of the case: a Black male defendant accused of sexually assaulting and killing a white female victim. Studies suggest that those dynamics both heighten the risk of wrongful conviction, *see* Samuel R. Gross et al., *Race and Wrongful Convictions in the United States 2022* 1, 19, Nat'l Registry of Exonerations (Sept.                                                                                    2022), https://exonerationregistry.org/sites/exonerationregistry.org/files/documents/Update d%20CP%20-%20Race%20Report%20Preview.pdf (discussing data suggesting "that Black defendants convicted of raping white women are more than six times more likely to be innocent than white men convicted of raping women of their own race"), and lead to more severe sentences, *see* Anthony Walsh, *The Sexual Stratification Hypothesis and Sexual Assault in Light of the Changing Conceptions of Race*, 25 Criminology 153, 170 (1987) (finding that "[B]lacks who sexually assaulted whites . . . received significantly harsher penalties than did [B]lacks who sexually assaulted members of their own race"); Jefferson E. Holcomb, Marian R. Williams & Stephen

---

[4] Mr. Cook's poor forensic practices were not limited to Mr. Bolin's case. In 2011, an investigation revealed that his mishandling of DNA evidence had led to the wrongful imprisonment of an innocent man. *See* Lawrence Mower, *Police Technician Whose DNA Error Sent Wrong Man to Prison Resigns*, Las Vegas Rev.-J. (July 26, 2011), https://www.reviewjournal.com/crime/courts/police-technician-whose-dna-error-sent-wrong-man-to-prison-resigns/; *see also* Associated Press, *Vegas Police Sorry After Wrong Man Goes to Prison*, Deseret News (July 7, 2011), https://www.deseret.com/2011/7/7/20202517/vegas-police-sorry-after-wrong-man-goes-to-prison/.

Demuth, *White Female Victims and Death Penalty Disparity Research*, 21 Just. Q. 877, 891 (2004) (finding that defendants convicted of killing white female victims are significantly more likely to receive the death penalty than those convicted of killing victims from other race-gender groups).

The introduction of racialized, purportedly "scientific" language in Mr. Bolin's case not only compounded the unreliability of the already flawed hair comparison testimony in his case, but it also exacerbated systemic racial biases that have historically contributed to wrongful convictions and disproportionately harsh sentencing of Black defendants. The scientific discrediting of hair microscopy—combined with its legacy of racial bias in application—underscores the unreliability and prejudicial impact of this evidence in Mr. Bolin's trial.

## III. DNA Testing of Hair Sample

### A. Jurors Ascribe Great Weight to DNA Analysis

DNA analysis holds a preeminent status in forensic science, widely regarded as the "gold standard" due to its low false-positive rates and ability to analyze small samples and distinguish between individuals. PCAST Report, *supra*, at 26; NAS Report, *supra*, at 130. Indeed, DNA evidence gained its reputation not only by enabling accurate identifications, but by exposing the failures of other forensic techniques. PCAST Report, *supra*, at 25.[5] Jurors and the public alike recognize DNA's superior probative power; surveys show they consistently rate DNA as the most accurate form of forensic evidence. *See, e.g.*, Joel D. Lieberman et al., *Gold Versus Platinum: Do Jurors Recognize the Superiority and Limitations of DNA Evidence Compared to Other Types of Forensic Evidence?*, 14 Psych. Pub. Pol'y & L. 27, 37

---

[5] Notably, of the 375 DNA-based exonerations recorded between 1989 and 2020, 43% of the convictions had involved false or misleading forensic evidence. *See DNA Exonerations in the United States* (1989-2020), Innocence Project, https://innocenceproject.org/dna-exonerations-in-the-united-states/.

(2008); *see also* Linda A. Henkel et al., *A Survey of People's Attitudes and Beliefs About False Confessions*, 26 Behav. Sci. & L. 555, 560–62 (2008) (in survey asking participants to assess probative value of different types of evidence, participants reported that "[t]he strongest indicator of guilt was if matching DNA evidence was found at the crime scene").

However, with great evidentiary power comes great responsibility. Because jurors place such faith in DNA evidence, forensic analysts must exercise exceptional care when handling, testing, and presenting DNA results. Contrary to popular perception, DNA analysis is fallible. It has an identifiable error rate—shown in one study focusing on quality failures related to Netherlands Forensic Institute casework to range from 0.3% to 0.4%. Ate Kloosterman et al., *Error Rates in Forensic DNA Analysis: Definition, Numbers, Impact, and Communication*, 12 Forensic Sci. Int'l Genetics 77, 80 (2014). This is several orders of magnitude higher than the median error rate estimates held by laypeople (one in a million to one in a billion). Jonathan J. Koehler, *Intuitive Error Rate Estimates for the Forensic Sciences*, 57 Jurimetrics J. 153, 164 (2017).

One common contributor to erroneous DNA results is contamination. Contamination can occur at virtually every stage—from the crime scene to the post-analytical phase in the lab—and includes both direct transfer (*e.g.*, coughing near a swab) and secondary transfer (*e.g.*, DNA transmitted via gloves or instruments). Scientific Working Group on DNA Analysis Methods (SWGDAM), *Contamination Prevention and Detection Guidelines for Forensic DNA Laboratories* 3 (2017), https://www.swgdam.org/_files/ugd/4344b0_c4d4dbba84f1400a98eaa2e48f2bf291.pdf. As the FBI's SWGDAM guidelines emphasize, contamination might not be completely avoidable, even with rigorous quality assurance systems. *Id.* at 2. Studies have shown that gross contamination of evidentiary samples can result in irreversible errors, and such incidents—though sometimes caught—can also lead to false convictions. *See*

Kloosterman et al., *supra*, at 77; *see also* Flynn McRoberts, Maurice Possley & Steve Mills, *Scandal Touches Even Elite Labs*, Chi. Trib. (Oct. 21, 2004), https://www.chicagotribune.com/2004/10/21/scandal-touches-even-elite-labs/.

In light of this risk of error, and jurors' tendency to overly credit the certainty of DNA evidence, analysts bear a burden to not only conduct their testing with scrupulous care but to also clearly and accurately communicate to jurors the limitations of their analysis.

### B.    DNA Results in Mr. Bolin's Case Were Unreliable

In Mr. Bolin's case, the prosecution introduced an unreliable DNA analysis of a hair collected from the victim. DNA from the hair sample was extracted and amplified using polymerase chain reaction ("PCR"), a method that allows forensic analysts to generate multiple copies of specific DNA sequences for comparison.[6] *See Polymerase Chain Reaction (PCR) Fact Sheet*, Nat'l Hum. Genome Rsch. Inst., https://www.genome.gov/about-genomics/fact-sheets/Polymerase-Chain-Reaction-Fact-Sheet (last updated Aug. 17, 2020).

Paula Yates, the molecular biologist who tested the hair sample in this case, testified at Mr. Bolin's trial: "DNA suitable for PCR, the kind of PCR testing that was done in this case, is not contained in the shaft of the hair. It's only contained in the

---

[6] The DQ-Alpha and Polymarker test kit used to test the foreign hair in Mr. Bolin's case was among the first available for forensic PCR DNA testing. *See* ECF No. 324 at 185, 191–92; *DQ-Alpha*, Nat'l Inst. of Just. (June 16, 2023), https://nij.ojp.gov/nij-hosted-online-training-courses/crime-scene-and-dna-basics-forensic-analysts/history-and-types-forensic-dna-testing/polymerase-chain-reaction-pcr/dq-alpha. Subsequently, short tandem repeat ("STR") PCR testing, which has much greater discriminatory power and reliability, gained overwhelming acceptance and became the primary methodology in forensic DNA testing. Sammed N. Mandape et al., *Dense Single Nucleotide Polymorphism Testing Revolutionizes Scope and Degree of Certainty for Source Attribution in Forensic Investigations*, 65 Croat. Med. J. 249, 250–52 (2024); *Short Tandem Repeats (STR)*, Nat'l Inst. of Just. (June 16, 2023), https://nij.ojp.gov/nij-hosted-online-training-courses/crime-scene-and-dna-basics-forensic-analysts/history-and-types-forensic-dna-testing/short-tandem-repeats-str.

root of the hair." ECF No. 156-1 at 179:25–180:3. Ms. Yates thus used the hair shaft as a control: if DNA was detected on the shaft, "that would mean that there was something on the hair such as skin, tissue, or blood, or something of that nature . . . on the hair that was responsible for those results and not the shaft itself." *Id.* at 180:14–19. In other words, Ms. Yates explained that where the PCR process detects DNA on the hair shaft, that means something foreign to the hair is present, or that the sample is contaminated.

Ms. Yates went on to testify that in Mr. Bolin's case, the same DNA profile was in fact found on both the root *and the shaft* of the hair. *Id.* at 182:6–9, 189:16–18. As Ms. Yates explained, the presence of the DNA profile on the hair shaft indicated contamination because she "could not [] tell whether or not that DNA that [she] typed was actually from the root itself or from what was on the hair." *Id.* at 190:16–21. Given these results, and the opportunities for DNA to have been transferred to the hair shaft, or to both the hair shaft and root, during the evidence collection and testing stages, there was no way to determine the provenance of the matching profile. The DNA evidence was thus scientifically inconclusive and, in turn, lacked any probative value.

Nevertheless, the prosecutor elicited testimony from Ms. Yates that Mr. Bolin "could not [be] exclude[d]" from the DNA result from the hair analysis. *See id.* at 206:6–207:5. But given Ms. Yates's testimony that the control failed, it was entirely improper to draw any conclusions from the DNA testing. *See* ECF No. 324 at 192 (Cellmark Report stating "no conclusion can be made regarding the donor of the hair"); *see also* ECF No. 325 at 41–42 (Las Vegas Metropolitan Police Department Forensic Laboratory Biology/DNA Detail Procedures Manual, dated May 26, 2022, stating that where contamination occurs, the "Results, Opinions, and Interpretations" should state that "no conclusions will be made").

But conclusions about the donor of the hair *were* made. And the prosecution

- 14 -

introduced yet further error regarding the DNA testing. That is, the prosecutor presented through Ms. Yates that the DNA profile found in the hair was shared by one in 2,600 African American individuals. ECF No. 157-1 at 76:12–16. In its closing, the State then multiplied the estimated DNA profile frequency by the number of African American men within a specified age range in Las Vegas at the time, claiming there was a one in nine, ten, or eleven chance that the DNA belonged to Mr. Bolin. ECF No. 161-2 at 173:12–22. The State thus compounded the misimpression that the DNA result carried some relevance. From a scientific perspective, the result is flatly irrelevant. Beyond that, this testimony is not an accepted means of conveying the chance of a coincidental match—the only relevant statistic for DNA testing—further prejudicing Mr. Bolin.

## IV.    Prostate-Specific Antigen (or "P-30") Testing

### A.    P-30 Testing and Its Limitations for Indicating the Presence of Semen

Prostate-specific antigen ("PSA"), commonly known as P-30, is an enzyme, or protein, produced by the human body. Herbert Yu & Hans Berkel, *Prostate-Specific Antigen (PSA) in Women*, 151 J. La. State Med. Soc. 209, 210 (1999). P-30 was first identified in the early 1970s in adult male semen. Lori J. Sokoll & Daniel W. Chan, *Prostate-Specific Antigen: Its Discovery and Biochemical Characteristics*, 24 Urologic Clinic N. Am. 253, 253–54 (1997). By 1980, researchers discovered that P-30 detection was associated with prostatic tumors, which laid the groundwork for the development of P-30 blood tests to screen for prostate cancer. *See* Lawrence D. Papsidero et al., *A Prostate Antigen in Sera of Prostatic Cancer Patients*, 40 Cancer Rsch. 2428, 2429–30 (1980). Initially believed to be exclusive to male physiology, P-30 testing was also adopted for use in the forensic sciences in the 1980s, particularly for detecting semen in sexual assault cases. Howard C.B. Graves et al., *Postcoital Detection of a Male-Specific Semen Protein: Application to the Investigation of Rape*, 312 N. Engl. J. Med.

338, 342 (1985) (recommending PSA screening in sexual assault investigations because "the finding of any p30 in vaginal fluid establishes that semen is present").

However, the premise on which such forensic use relied is incorrect; P-30 is not exclusive to males and is also expressed in various female tissues. *See* Jeffrey J. Pollen & Anna Dreilinger, *Immunohistochemical Identification of Prostatic Acid Phosphatase and Prostate Specific Antigen in Female Periurethral Glands*, 23 Urology 303, 303–04 (1984). It is well-established that female paraurethral glands (also known as Skene's glands), as well as breast tissue, produce P-30. *See* Yu & Berkel, *supra*, at 210–11; Florian Wimpissinger et al., *The Female Prostate Revisited: Perineal Ultrasound and Biochemical Studies of Female Ejaculate*, 4 J. Sexual Med. 1388, 1391 (2007). P-30 has also been detected in numerous biological fluids of women, including: blood and saliva, Ferdinando Mannello et al., *Immunoreactivity of Prostate-Specific Antigen in Plasma and Saliva of Healthy Women*, 42 Clinical Chemistry 1110, 1111 (1996); amniotic fluid and serum, Xavier Filella et al., *Detection of Nonprostatic PSA in Serum and Nonserum Samples from Women*, 68 Int'l J. Cancer 424, 424 (1996); urine, Stefan Schmidt et al., *Prostate-Specific Antigen in Female Urine: A Prospective Study Involving 217 Women*, 57 Urology 717, 718 (2001); and breast secretions, Yu & Berkel, *supra*, at 211. Simply put, the term "*prostate*-specific antigen" is a misnomer.

As early as 1989, scientists cautioned against interpreting a positive P-30 test as definitive proof of semen or sexual intercourse. *See* Richard J. Ablin, *Letter to the Editor: Prostate-Specific Antigen and the Female Prostate*, 35 Clinical Chemistry 507, 507–08 (1989). These concerns are especially relevant given that P-30 has been detected in female urine, *see* Schmidt et al., *supra*, at 718, and serum, Filella et al., *supra*, at 424—two substances that may be present in forensic samples from sexual assault exams due to menstruation, trauma, or normal bodily functions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.    P-30 Evidence in Mr. Bolin's Case

In Mr. Bolin's case, expert witness Terry Cook testified that he did not detect sperm cells on slides created from vaginal swabs taken from the victim, but that the vaginal swabs produced a positive P-30 result. ECF No. 156-1 at 73:15–74:25. Rather than acknowledge that P-30 is produced by both male and female bodies and that the P-30 detected here, particularly in the absence of sperm cells, could have come from the victim herself, the prosecution's expert provided the jury with a series of materially false and misleading statements regarding the import of the presence of P-30, and the State relied on those statements to argue that the victim was sexually assaulted. ECF No. 161-2 at 130:20–131:12.

Specifically, Mr. Cook told the jury that: (1) the P-30 test is "a test that we use to identify semen because [P-30] is a protein in semen that's specific to semen," ECF No. 156-1 at 74:2–5; (2) a positive P-30 result meant "that a trace amount of semen" and "a very small quantity of semen . . . [were] in fact, present," *id.* at 75:3–7; (3) P-30 is a "seminal protein," *id.* at 78:22–79:5; (4) finding P-30 constituted "proof positive of semen," *id.* at 99:10–15; (5) "just [P-]30 alone . . . would identify semen conclusively," ECF No. 156-2 at 47:11–13; and (6) "P[-]30 . . . is tantamount to semen," *id.* at 54:12–14.

These assertions—and, even more pointedly, any reliance on them in support of a theory that a victim was sexually assaulted—are demonstrably false. As discussed *supra*, the presence of P-30 alone is never proof of semen, much less proof of sexual assault.

## V.    Footwear Impression Analysis

### A.    The Unreliability of Footwear Impression Evidence

As a general matter, footwear impression analysis "involves comparing a known object, such as a shoe, to a complete or partial impression found at a crime scene, to assess whether the object is likely to be the source of the impression." PCAST

Report, *supra*, at 114. The quality of impressions discovered in the field is highly variable and beyond a technician's control, but careful use of well-established methods to document, collect, and preserve the impressions is nevertheless crucial to maintaining evidence suitable for comparative analysis. NAS Report, *supra*, at 146.

Once an impression has been preserved, the footwear impression analysis process involves two steps. First, an examiner compares the "class characteristics" of the impression and sample shoe, which include design, physical size, general wear, and tell-tale markers of brand manufacturing processes. *Id.* at 146–47. If there are no inconsistencies in class characteristics, the examiner moves on to the second step, which involves identifying and comparing "randomly acquired characteristics," which "are accidental, unpredictable characteristics that result from wear." PCAST Report, *supra*, at 114; Michael B. Smith, *The Forensic Analysis of Footwear Impression Evidence*, 11 Forensic Sci. Commc'ns, no. 3 (July 2009), https://archives.fbi.gov/archives/about-us/lab/forensic-science-communications/fsc/july2009/review/2009_07_review02.htm; William J. Bodziak, *Footwear Impression Evidence: Detection, Recovery & Examination* 335 (2d ed. 2017).

Footwear impression analysis has long been subject to ongoing criticism regarding its unreliability and inherent subjectivity. *See, e.g.*, PCAST Report, *supra*, at 116. As explained in the NAS Report, "there is no consensus regarding the number of individual characteristics needed to make a positive identification, and the committee is not aware of any data about the variability of class or individual characteristics or about the validity or reliability of the method." NAS Report, *supra*, at 149.

**B.    The Footprint Analysis in this Case Was Flawed**

Two analysts testified for the prosecution about footwear comparisons in this case: Daniel Ford, who took the photographs of the footwear impressions at the crime scene, and Torrey Johnson, who reviewed and drew conclusions from the footwear

impression photographs.[7]

While footwear impression analysis "typically involves comparing" an impression to a known object "to assess whether the object is likely to be the source of the impression," PCAST Report, *supra*, at 12, in Mr. Bolin's case, Mr. Johnson concluded that the dress shoes and sandals seized from Mr. Bolin's residence were *not* the source of the impressions at the crime scene. *See* ECF No. 157-4 at 15:7–16. Nevertheless, Mr. Johnson went on to analyze whether the shoes taken from Mr. Bolin's home "were of similar size . . . as the impressions depicted in the photographs." *Id.* at 14:12–14. He determined that the crime scene impressions were "approximately the same leng[th] as the shoes [taken from Mr. Bolin's home], and so they would have been of a similar size shoe." *Id.* at 17:19–21.

As a threshold matter, this analysis is inherently flawed because "different shoes of the same shoe size, by virtue of their design, construction, purpose, and different origins, will vary in the physical shape and size of both their inner dimensions and outsole dimensions." Bodziak, *supra,* at 184–85. In other words, as Mr. Johnson himself recognized, outsole length is an unreliable indicator for shoe size.[8] ECF No. 157-4 at 16:20–17:18. As a result, his conclusion that the shoes "would have been of a similar size shoe" because they were "approximately the same leng[th]," *id.* at 17:12–14, lacks an established scientific foundation. But even putting

---

[7] To the extent footwear impression analysis involves any "scientific, technical, or other specialized knowledge," Fed. R. Evid. 702(a), Mr. Ford and Mr. Johnson appeared to lack such knowledge; neither discussed having any expertise in footwear impression analysis.

[8] The prosecution extrapolated from this testimony to characterize the crime scene impressions as "consistent with a 10-1/2"—Mr. Bolin's shoe size, ECF No. 161-2 at 165:3–9, 166:23–24, and asked the jury to consider how many individuals with the relevant DNA profile "are going to have . . . a [size] 10-1/2 shoe?" *Id.* at 173:23–174:2. Those improper statements—which misrepresent Mr. Johnson's testimony—lack any scientific basis.

that aside, Mr. Johnson's conclusions are unreliable given the flawed methodology utilized to preserve the footwear impressions.

To start, shoeprints are most often preserved for comparison through photography, followed by casting, if the location and durability of the print allow. Raul Sutton, *Crime Scene Management: Crime Scene Specific Methods* 186–88 (1st ed. 2016). Casting is important because "casts are capable of capturing additional qualities that are present in three-dimensional footwear impressions but are not revealed through photography." Bodziak, *supra*, at 60. Moreover, with casts, "[t]here are no focus problems or lighting problems" or "size or perspective problems," "as is often the case with photography." *Id.* Yet in Mr. Bolin's case, the crime scene technicians failed to use casting—instead relying exclusively on photography. As a result, they did not "recover[] the maximum amount of detail from [the] impression[s]." *Id.* at 61.

To make matters worse, when capturing photographs of the impressions, Mr. Ford violated principles that are essential to taking "examination quality" photographs. *Id.* at 30. For example, a footwear impression photograph must include a scale placed on the same plane as the print to ensure accurate measurement. *Id.* at 35–39. The mere presence of a scale does not inherently ensure accuracy—its placement is equally important. Here, the scales used in at least some of the crime scene photographs suffered from multiple critical deficiencies. For example, they (1) did not extend the full length of the print, (2) were not parallel to the impression, and/or (3) lacked sufficient subdivisions for exact measurement. *Id.* at 36–38.

///

///

///

///



*Figure 2. Alleged Footwear Impressions Captured at the Scene.* Defendant's Trial Exhibit QQ.



*Figure 2. Alleged Footwear Impressions Captured at the Scene.* Defendant's Trial Exhibit JJJ.

Additionally, to avoid problems with perspective, it is "very important" to use a tripod, with the film plane parallel to the impression. *See* Bodziak, *supra*, at 40–41. But no tripod appears to have been used here. Indeed, as Mr. Johnson testified, "in the case of some of the[] photographs, the angle from which the photograph was taken is not perfectly straight down on the impression." ECF No. 157-4 at 18:8–12. He explained that, while there is a scale in the picture, "if you take [a] ruler and you measure how long an inch is at one side and how long the inch is at the other side, there is a slight variation." *Id.* at 18:13–17. Accordingly, Mr. Johnson testified that he had to use a "slight variation" to measure the impressions. *Id.* at 18:18–22. While he did not explain what techniques he used to overcome the distortions, even computer enhancement procedures will "never provide the same information that

- 21 -

would be present had the photograph been properly taken from directly over the top of the impression with a scale next to it." Bodziak, *supra*, at 178.

Mr. Johnson's reliance on these improperly preserved photographs thus rendered his measurements—and any subsequent analysis based on those measurements—unreliable and scientifically unsound.

## VI.  Conclusion

Mr. Bolin was tried, convicted, and sentenced to death based on grossly misused forensic scientific evidence, some of which had little, if any, basis in science. Indeed, every major aspect of the forensic case against Mr. Bolin was either flawed, misleading, or based on "science" that is now completely discredited: the prosecution's hair microscopist, who learned his craft from a program the FBI now admits was catastrophically flawed and led to wrongful convictions, gave false and misleading testimony; the prosecution's use of the DNA expert's testimony regarding the DNA result was entirely improper given her conclusion that the control failed; the State repeatedly misled the jury by introducing erroneous testimony that the presence of P-30 is proof positive of semen; and the prosecution's footwear evidence was misleading and violated basic standards of the field. Because the prosecution's case was predicated on such unreliable and prejudicial evidence, Mr. Bolin's petition to vacate his convictions should be granted.

DATED this 19th day of September 2025.

Squire Patton Boggs (US) LLP

By:  /s/  Krishna Prasad

Krishna Prasad
Nevada State Bar No. 15308
Prasad Law
274 Hill Street, Suite 248
Reno, NV 89501
775.224.8014
krishna@prasad-law.com

Carine Williams*
Squire Patton Boggs (US) (LLP)
1120 Avenue of the Americas, 3rd Fl.
New York, NY  10036
212.872.9800
*Pro Hac Vice Forthcoming
carine.williams@squirepb.com

George Kendall*
Squire Patton Boggs (US) (LLP)
1120 Avenue of the Americas, 3rd Fl.
New York, NY  10036
212.872.9800
*Pro Hac Vice Forthcoming
george.kendall@squirepb.com

Nicola Cohen*
Squire Patton Boggs (US) (LLP)
1120 Avenue of the Americas, 3rd Fl.
New York, NY  10036
212.872.9800
*Pro Hac Vice Forthcoming
nicola.cohen@squirepb.com

Alexandra Daniels*
Squire Patton Boggs (US) (LLP)
1120 Avenue of the Americas, 3rd Fl.
New York, NY 10036
212.872.9800
*Pro Hac Vice Forthcoming
ally.daniels@squirepb.com

- 23 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Counsel for Amici, Center for Integrity in Forensic Sciences*