UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

GREGORY BOLIN,

Petitioner,

v.

JEREMY BEAN,[1] et al.,

Respondents.

Case No. 3:07-cv-00481-ART-CLB

ORDER

In this habeas case under 28 U.S.C. § 2254, the petitioner, Gregory Bolin, seeks relief from a judgment of conviction imposing a sentence of death and two life terms that was entered in the Eighth Judicial District Court for Nevada (Clark County). Respondents move to dismiss Bolin's fifth amended habeas petition arguing that the petition is untimely and that claims in the petition are unexhausted, procedurally barred, and/or not cognizable in a federal habeas proceeding. Also pending before the court is Bolin's motion for evidentiary hearing. For reasons that follow, the court grants the motion to dismiss, in part, and denies it, in part, and denies the motion for evidentiary hearing.

### I.      PROCEDURAL BACKGROUND

In July 1995, Bolin was arrested in relation to the discovery of a woman at a residential construction site who had been bound, gagged, beaten, and stabbed multiple times with a sharp object. Shortly after being discovered, the woman died as a result of her wounds. In July 1996, a jury sitting in the state district court for Clark County, Nevada, returned a verdict finding Bolin guilty of first-degree kidnaping, sexual assault, and first-degree murder. At the conclusion of the penalty phase of Bolin's trial, the jury found three aggravating

[1] Because Mr. Bolin is currently incarcerated at Nevada's High Desert State Prison, the warden of that facility, Jeremy Bean, is automatically substituted for William Gittere as the primary respondent. *See* Fed. R. Civ. Pro. 25(d).

circumstances and no mitigating circumstances. Bolin was sentenced to death.

On May 19, 1998, Bolin's convictions and death sentence were affirmed on direct appeal. *Bolin v. State*, 960 P.2d 784 (Nev. 1998). Bolin timely filed a motion for rehearing which was denied by the Nevada Supreme Court. His subsequent petition for a writ of certiorari to the U.S. Supreme Court was also denied. *Bolin v. Nevada*, 525 U.S. 1179 (1999).

Bolin initiated state post-conviction proceedings in April 1999. In July 2005, the state district court entered an Amended Findings of Facts, Conclusions of Law and Order denying Bolin's state district court petition. The Nevada Supreme Court affirmed that denial of relief in June 2007. Bolin filed a petition for a writ of certiorari in the U.S. Supreme Court, which was denied in February 2008. *Bolin v. Nevada*, 552 U.S. 1231 (2008).

In October 2007, Bolin filed, pro se, a petition for writ of habeas corpus under 28 U.S.C § 2254 that initiated this federal proceeding. After this court appointed the Federal Public Defender's office (FPD) to represent him, Bolin filed an amended petition in April 2008. The FPD was subsequently relieved as counsel due to an irreconcilable conflict. In February 2009, Saor Stetler was appointed as new counsel.

In July 2009, Bolin filed a second amended petition. In response to the respondents' motion to dismiss based, in part, on lack of exhaustion, Bolin filed a motion for stay and abeyance to allow him to return to state court. This court denied that motion and, in September 2011, entered an order ruling upon the motion to dismiss. Confirming that numerous claims in the petition had not been exhausted in the state court, the order gave Bolin 20 days to abandon his unexhausted claims and warned him that failure to do so would result in the dismissal of his second amended petition pursuant *to Rose v. Lundy*, 455 U.S. 509 (1982).

That order precipitated a conflict between Stetler and Bolin, with Bolin

2

disagreeing with counsel's refusal to abandon the unexhausted claims. That conflict resulted in Stetler being dismissed as Bolin's counsel in June 2012. After appointment of new counsel, David Neidert and Michael Charlton, Bolin filed a notice abandoning unexhausted claims and a third amended petition in November 2012.

Those filings were followed by a motion to amend and a proposed fourth amended petition filed on December 15, 2012. This court granted the motion to amend. After briefing on that petition was completed, the court entered a final order denying Bolin habeas relief in February 2015. Bolin appealed that decision. In April 2021, the Ninth Circuit reversed and remanded the case, having concluded that this court erred when it denied Bolin's motion for a stay in 2011 because that decision ran contrary to the Ninth Circuit's subsequent holding in *Blake v. Baker*, 745 F.3d 977 (9th Cir. 2014).

When proceedings resumed in this court, Bolin was represented by Andrea A. Yamsuan and Laura Paul of the Federal Public Defender for the Central District of California. In September 2021, Bolin and the respondents stipulated to a stay for the purpose of returning to state court to exhaust unexhausted claims. In November 2021, Julie D. Cantor filed a motion seeking to replace Yamsuan and Paul, which this court granted in January 2022.

With Cantor as counsel, Bolin filed a petition for writ of habeas corpus (his second) in the state district court in June 2022. That proceeding concluded in December 2023 after the Nevada Supreme Court affirmed the district court's denial of Bolin's claims based on procedural bars. This case was re-opened in this court the following month and Bolin was given until February 19, 2024, to file a motion for leave to file a fifth amended petition. With leave of the court granted, Bolin filed a fifth amended petition in July 2024. In January 2025, respondents filed the motion to dismiss that is currently pending before the court.

## II.    DISCUSSION

### A.    Timeliness

#### 1.    Legal Standard

The Antiterrorism and Effective Death Penalty Act of 1996 imposes a one-year filing period for § 2254 habeas petitions in federal court. 28 U.S.C. § 2244(d)(1). The one-year period begins to run from the latest of four possible triggering dates, with the most common being the date on which the petitioner's state court conviction became final (by either the conclusion of direct appellate review or the expiration of time for seeking such review). *See id.* Statutory tolling of the one-year time limitation occurs while a "properly filed" state post-conviction proceeding or other collateral review is pending. *See* 28 U.S.C. § 2244(d)(2).

The Supreme Court's decision in *Mayle v. Felix*, 545 U.S. 644 (2005), limits a habeas petitioner's ability to have newly added claims "relate back" to the filing of an earlier petition and, therefore, be considered timely under 28 U.S.C. § 2244(d). Applying Federal Rule of Civil Procedure 15(c)(1)(B) in the habeas context, the Court held that an amended petition "does not relate back ... when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle*, 545 U.S. at 650. Instead, an amended claim in a habeas petition relates back for statute of limitations purposes only if it shares a "common core of operative facts" with claims contained in the original petition. *Id.* at 664. The common core of operative facts must not be viewed at too high a level of generality, and an "occurrence," for the purposes of Rule 15(c), will consist of each separate set of facts that supports a ground for relief. *Id.* at 661.

#### 2.    Analysis

Respondents concede that Bolin filed his initial petition and first amended petition within the one-year filing period under 28 U.S.C. § 2244(d).

4

They argue, however, that his second, third, fourth, and fifth amended petitions were all filed after the period expired in May 2008. Bolin does not dispute this but argues that Claims 1, 2, 3(A)(1), 3(B), 3(C), 3(E)(2), and 4 all relate back to his timely petitions.

Claim 1 – In Claim 1, Bolin alleges that his judgment of conviction violates his constitutional right to due process because the trial court allowed the admission of an eyewitness identification obtained by an unnecessarily suggestive one-on-one show-up procedure. ECF No. 335 at 61-69. The claim shares a common core of operative facts with Claim 8 in Bolin's first amended petition. ECF No. 18 at 117-141. Thus, Claim 1 relates back to a timely filed petition.

Claim 2 – In Claim 2, Bolin alleges that his judgment of conviction violates his constitutional right to effective assistance of counsel because counsel failed to prevent the admission of invalid DNA evidence and flawed statistical analysis. ECF NO. 335 at 69-73. The claim shares a common core of operative facts with Claim 7 in Bolin's first amended petition. ECF No. 18 at 100-116. Thus, Claim 2 relates back to a timely filed petition.

Claim 3(A)(1) – In Claim3(A)(1), Bolin alleges that that his judgment of conviction violates his constitutional right to due process under *Napue v. Illinois*, 360 U.S. 264 (1959), because the prosecutors at his trial failed to correct false DNA evidence. ECF No. 335 at 74-77. Like Claim 2, this claim also shares a common court of operative facts with Claim 7 in Bolin's first amended petition.

Claim 3(B) – In Claim3(B), Bolin alleges that that his judgment of conviction violates his constitutional right to due process because the prosecutors at his trial improperly vouched for the State's key witness, Keith Sirevaag. ECF No. 335 at 84-85. The claim shares a common core of operative facts with Claim 20 in Bolin's first amended petition. ECF No. 18 at 218-222.

Thus, Claim 3(B) relates back to a timely filed petition.

Claim 3(C) – In Claim3(C), Bolin alleges that that his judgment of conviction violates his constitutional right to due process because prosecutors appealed to racial fear and prejudice throughout his trial. ECF No. 335 at 86-88. The claim shares a common core of operative facts with Claim 6 in Bolin's first amended petition. ECF No. 18 at 87-99. Thus, Claim 3(C) relates back to a timely filed petition.

Claim 3(E)(2) – In Claim3(E)(2), Bolin alleges that his judgment of conviction violates his constitutional right to due process because current scientific knowledge discredits the microscopic hair comparison evidence that prosecutors used to convict him at trial. ECF No. 335 at 96-97. The claim shares a common core of operative facts with Claim 7 in Bolin's first amended petition. ECF No. 18 at 110-113. Thus, Claim 3(E)(2) relates back to a timely filed petition.

Claim 4 – In Claim 4, Bolin alleges that his judgment of conviction violates his constitutional rights due to the cumulative effect of errors committed at his trial. ECF No. 335 at 97-100. The claim shares a common core of operative facts with Claim 34 in Bolin's first amended petition. ECF No. 18 at 312. Thus, Claim 4 relates back to a timely filed petition.

Bolin does not dispute that the following claims do not relate back to a timely filed petition: Claim 3(A)(2), Claim 3(A)(3), Claim 3(D)(1), Claim 3(D)(2), Claim 3(D)(3), and Claim 3(E)(1). ECF No. 357 at 25. He contends, however, that § 2244(d) does not bar the court's consideration of these claims because he can show that he is actually innocent of the crimes for which he was convicted. For reasons discussed below, this argument is without merit. Thus, those claims will be dismissed as untimely.

\ \ \

\ \ \

6

B.    Exhaustion

1.    Legal Standard

A federal court will not grant a state prisoner's petition for habeas relief until the prisoner has exhausted his available state remedies for all claims raised. *See Rose v. Lundy*, 455 U.S. 509 (1982); 28 U.S.C. § 2254(b). A petitioner must give the state courts a fair opportunity to act on each of his claims before he presents those claims in a federal habeas petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999). A claim remains unexhausted until the petitioner has given the highest available state court the opportunity to consider the claim through direct appeal or state collateral review proceedings. *See Casey v. Moore*, 386 F.3d 896, 916 (9th Cir. 2004); *Garrison v. McCarthey*, 653 F.2d 374, 376 (9th Cir. 1981).

A habeas petitioner must "present the state courts with the same claim he urges upon the federal court." *Picard v. Connor*, 404 U.S. 270, 276 (1971). A claim is not exhausted unless the petitioner has presented to the state court the same operative facts and legal theory upon which his federal habeas claim is based. *See Bland v. California Dept. of Corrections*, 20 F.3d 1469, 1473 (9th Cir. 1994). The exhaustion requirement is not met when the petitioner presents to the federal court facts or evidence which place the claim in a significantly different posture than it was in the state courts, or where different facts are presented at the federal level to support the same theory. *See Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988). On the other hand, new allegations that do not "fundamentally alter the legal claim already considered by the state courts" will not render a claim unexhausted. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *see also Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994).

2.    Analysis

Respondents argue that Claims 1 and 2 in Bolin's fifth amended petition are partially unexhausted and the remaining claims are totally unexhausted.

7

Claim 1 – Respondents acknowledge that Bolin presented similar claims to Claim 1 in his direct appeal and his first state habeas appeal but argue that the claim is partially unexhausted because in incorporates by reference "all preceding paragraphs" of Bolin fifth amended petition. ECF No. 356 at 16 (referring to ECF No. 335 at 61). According to respondents, the inclusion of factual allegations in those paragraphs that were not presented to the Nevada Supreme Court renders the claim partially unexhausted.

Claim 1 is essentially the same claim Bolin raised as Claim 10 in his first, second, third, and fourth amended petitions. ECF Nos. 18, 49, 133, and 138. This court has already concluded that the claim is exhausted. ECF No. 90 at 12. Rather than render the claim partially unexhausted, the provision in Claim 1 incorporating by reference "all preceding paragraphs" is a matter of inartful drafting. So Claim 1 is exhausted but, in deciding the claim, the court will consider only allegations that do not fundamentally alter the claim presented to the state court, while also recognizing limitations on the presentation of new evidence imposed by 28 U.S.C. § 2254(e)(2)54(e) and *Cullen v. Pinholster*, 563 U.S. 170 (2011).

Claim 2 – Respondents acknowledge that Bolin presented a similar claim to Claim 2 in his first state habeas appeal but argue that Bolin presents "discrete issues within this claim, which he failed to exhaust in the Nevada courts." ECF No. 356 at 17. In particular, respondents contend that Bolin's claim as presented in state court focused on his counsel's failure prevent the State from presenting faulty DNA evidence, but that Claim 2 in his federal petition also includes allegations that his trial counsel were ineffective for failing to correct their own expert's erroneous statements and for failing to address the contamination of DNA evidence during closing arguments.

In his opening brief appealing the state district's denial of his first habeas petition, Bolin presented a very comprehensive claim challenging his trial

counsel's performance with respect to the State's DNA evidence. ECF No. 169-4 at 53-63. While the specific allegations respondents cite may not have been included in that claim, those allegations do not fundamentally alter the claim presented in that proceeding. Thus, Claim 2 is exhausted.

Claims 3(A, B, D) – For Claims 3(A, B, D), respondents argue that Bolin presented a similar claim to the state court in his second state habeas proceeding but, as alleged in his fifth amended petition, each claim contains new factual and legal allegations that fundamentally alter the claim presented to the state court. Bolin challenges this argument but does not dispute that claims alleged for the first time in his second state habeas proceeding are procedurally defaulted. ECF No. 357 at 37. He further concedes that any claim in his petition that remains unexhausted would be procedurally barred if asserted in a third state post-conviction petition. *Id.* at 36. That being the case, Claims 3(A, B, D) are procedurally defaulted irrespective of whether they were fairly presented to the Nevada Supreme Court. *See Dickens v. Ryan,* 740 F.3d 1302, 1317, 1321 (9th Cir. 2014) ("An unexhausted claim will be procedurally defaulted, if state procedural rules would now bar the petitioner from bringing the claim in state court.") Thus, the question whether the claims were fairly presented to the state court for exhaustion purposes is academic.

Claim 3(C) – As noted above, Claim 3(C) is a claim that Bolin's judgment of conviction violates his constitutional right to due process because prosecutors appealed to racial fear and prejudice throughout his trial. This claim was fairly presented to the Nevada Supreme Court in Bolin's second state habeas proceeding. ECF No. 323 at 35-36.

Claim 3(E) – Bolin concedes that he has not exhausted Claim 3(E), which he characterizes as a claim based false expert testimony under *Gimenez v. Ochoa,* 821 F.3d 1136 (9th Cir. 2016). ECF No. 357 at 34. He acknowledges that that means the claim is procedurally defaulted. *Id.*

Claim 4 – Respondents argue that the cumulative error claim in Claim 4 is unexhausted because it alleges particular errors that were not included in the cumulative error claim presented to the Nevada courts in Bolin's second state habeas proceeding. This court disagrees. This claim was fairly presented to the Nevada Supreme Court in Bolin's second state habeas proceeding. ECF No. 323 at 197-99.

In summary, Bolin exhausted Claims 1 and 2 in this direct appeal of first state post-conviction proceeding. The sub-claims in Claim 3 are exhausted either because they were either presented in Bolin's second state post-conviction proceeding or because any sub-claim not presented is now barred by Nevada's procedural rules. Bolin exhausted Claim 4 in his second state post-conviction proceeding.

### C.   Procedural Default

#### 1.   Legal Standard

A federal court will not review a claim for habeas corpus relief if the state court's decision denying the claim rested on a state law ground that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 730-31 (1991)). If the federal court determines that the state court applied an adequate and independent procedural rule to deny the petitioner's claims, that procedural default bars federal review "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750; *see also Murray v. Carrier*, 477 U.S. 478, 485 (1986).

#### 2.   Analysis

Respondents argue that, to extent they were fairly presented in Bolin's second state post-conviction proceeding, Claims 3(A-D) and 4 are procedurally

defaulted because the Nevada Supreme Court determined that the claims presented in that proceeding were barred as untimely in violation of Nev. Rev. Stat. § 34.726(1), and the petition was successive and an abuse of the writ in violation of Nev. Rev. Stat. § 34.810(1)(b), (2). ECF No. 324 at 103-04. As noted above, Bolin makes no argument that Claims 3(A-D) are not procedurally defaulted. The same goes for Claim 4, and he admits that Claim 3(E) is procedurally defaulted as well. He claims, however, that the court's failure to consider the claims will result in a fundamental miscarriage of justice because he can show that he is actually innocent of the crimes for which he was convicted. For reasons discussed below, this argument is without merit. Thus, those claims will be dismissed as procedurally defaulted.[2]

D.    Actual Innocence

1.    Legal Standard

The Supreme Court has recognized that a showing of actual innocence allows a petitioner to overcome the procedural default of a claim or a statute of limitations bar of a claim. *See Schlup v. Delo*, 513 U.S. 298 (1995); *see also McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (application to statute of limitations bar). To demonstrate actual innocence under *Schlup*, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. He must also "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id*. at 327.

The *Schlup* standard is rarely met. *See Perkins*, 569 U.S.at 386 ("tenable

---

[2] While the cumulative error claim in Claim 4 will be dismissed as procedurally defaulted, this court is required by Ninth Circuit precedent to consider the cumulative impact of any substantial errors in determining whether Bolin is entitled to habeas relief, but only claims of error that are properly before the court. *See Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002).

actual-innocence gateway pleas are rare”); *House v. Bell*, 547 U.S. 518, 522 (2006) (noting that the *Schlup* exception is available only in “certain exceptional cases involving a compelling claim of actual innocence”); *Schlup*, 513 U.S. at 327 (observing that evidence sufficiently reliable to support a claim of actual innocence “is obviously unavailable in the vast majority of cases” and, therefore, “claims of actual innocence are rarely successful.”). The Ninth Circuit has observed that “precedents holding that a habeas petitioner satisfied its strictures have typically involved dramatic new evidence of innocence.” *Larsen v. Soto*, 742 F.3d 1083, 1096 (9th Cir. 2013); *see, e.g., House*, 547 U.S. at 540–41, 548 (*Schlup* standard met where defendant/petitioner presented new DNA evidence which established that semen found on the murder victim actually came from the victim's husband, which, together with evidence that victim's husband had a history of violence toward his wife, raised inference that husband, rather than petitioner/defendant, “could have been the murderer”); *Carriger v. Stewart*, 132 F.3d 463, 471-72 (9th Cir.1997) (*Schlup* standard met where chief prosecution witness confessed in open court that he (and not petitioner) committed the murder), *cert. denied*, 523 U.S. 1133 (1998)).

### 2. Factual Background

In the early morning of July 15, 1995, a construction worker discovered Brooklyn Ricks, alive but unconscious, at a residential construction site in Las Vegas, Nevada. By the time emergency personnel arrived at the scene, Ricks was dead. She had been bound and gagged and, based on autopsy findings, had suffered approximately a dozen puncture wounds to the chest and back and multiple blunt force traumas to the head, neck, and extremities. In addition, an analysis of a vaginal swab taken from Ricks detected trace amounts of semen. The previous night, Ricks had worked at a video rental store (B & R Video) located in a strip mall. After closing the store with Ricks at midnight, a co-worker observed Ricks get into her pickup truck and drive past

an adjacent Albertson's grocery store. On July 18, 1995, Bolin was arrested and charged with Ricks' murder.

### 3.   Evidence Presented at Trial

At trial, the construction worker, Keith Sirevaag, testified that, upon arriving at the otherwise vacant construction site around 5:30 a.m., he observed a Black male walking away from a partially-constructed home where Sirevaag subsequently found Ricks. ECF No. 153-2 at 24, 33-34. In an interview with detectives that morning, Sirevaag had described the man as very clean cut and muscular and noted that he had a tattoo on his right arm.[3] ECF No. 154-2 at 33-34. Sirevaag also noted that the man was wearing tan shorts and a dark tank top. ECF No. 154-2 at 33-34. In a walk-through of the Clark County Detention Center (CCDC) the following day, Sirevaag identified Bolin as someone who resembled the person he saw leaving the construction site. *Id.* at 67-69. A little over an hour later, after arriving back home, Sirevaag called the police sergeant who had escorted him through the CCDC, Ken Hefner, to notify him that he felt more strongly about his identification and told the sergeant that he was ninety percent sure that the person he picked out at the CCDC was the same person he saw at the crime scene. *Id.* at 72-73; ECF No. 158-3 at 31. Sirevaag's testimony at trial included an affirmative identification of Bolin as the person he saw walking away from the partially-constructed home where he found Ricks, bound and gagged, a short time later. ECF No. 153-2 at 37-38.

Other evidence presented at Bolin's trial established the following facts. Bolin lived a short walk from B & R Video and had frequented the store often in the two weeks prior to the murder, asking about or expressing interest in Ricks and her two sisters, who also worked in the store. ECF No. 152-3 at 51-62, ECF No. 155-3 at 14-15, ECF No. 159-1 at 21. The testimony of one of the sisters,

---

[3] This description matched photographs of Bolin taken by police when he was arrested. ECF No. 217-1 at 16-23.

together with the surveillance video, establishes that Bolin came into the store at 9:50 p.m. on the night of July 14, 1995, wearing light colored shorts and a dark tank top, and that he left the store approximately ten minutes later heading toward an adjacent Albertson's grocery store. ECF No. 152-3 at 67-71, ECF No. 152-4 at 10-11. A co-worker at the video store who closed the store with Ricks that night watched Ricks leave in her pickup truck and drive past the Albertson's shortly after midnight. ECF No. 153-1 at 80-85.

Sirevaag noticed a pickup truck at the crime scene that matched the description of the truck Ricks was driving the night before. ECF No. 152-4 at 42, ECF No. 153-2 at 28-29. He observed the truck speeding away moments after seeing the man matching Bolin's description walk past him toward where the truck had been parked. ECF No. 153-2 at 38. The following day, Ricks' truck, containing a screwdriver smeared with blood matching her type, was found parked 4 to 5 blocks from where Bolin was living, but approximately five miles from the crime scene. ECF No. 154-2 at 101; ECF No. 155-1 at 33; ECF No. 156-1 at 118-19; ECF No. 156-3 at 114-17, 120-21.

Bolin's father, with whom Bolin was living at the time, testified that Bolin came home near daybreak on July 15, 1995. ECF No. 159-4 at 61. When questioned by the police, Bolin provided a vague and unsubstantiated account of his whereabouts on the night of the murder, told them that he was wearing a white t-shirt that night, and denied owning a dark tank top prior to the police finding one in his dryer. ECF No. 154-2 at 65-66, 88-89; ECF No. 154-3 at 18-19; ECF No. 156-3 at 70; ECF No. 158-1 at 38-40, 51-52. Shoe prints roughly matching Bolin's shoe size were found leading into the unfinished house where Ricks' body was found. ECF No. 156-3 at 101-07, ECF No. 157-4 at 12-20. An inmate who shared a cell with Bolin testified that Bolin had questioned him at length about fingerprints, with a particular focus on obtaining prints from the surfaces typically found in the interior of a truck and the handle of a

14

screwdriver. ECF No. 157-2 at 87-95.

#### 4. Bolin's New Evidence

Bolin cites the following as new evidence not presented at trial that proves his innocence:

(1)    A report from a forensic-biology expert (Dr. Rhonda C. Williams) and scientific research articles refuting the State's claim that the presence of P-30 in the victim's vagina was proof of the presence of semen (ECF No. 326 at 184-226 and ECF No. 327 at 10-138);

(2)    An affidavit from a population geneticist (Dr. Lisa F. Neall) who supervised the DNA expert who testified at Bolin's trial (Paula Yates), indicating that the foreign hair obtained from a pubic combing of the victim's body was contaminated, so the results of the DNA testing done on the hair were inconclusive and should not have been used at trial (ECF No. 324 at 184-92);

(3)    A 2015 FBI press release, a letter from FBI Director James C. Comey, and a 2016 report by the Executive Office of the President's Council of Advisors on Science and Technology, all of which formally acknowledge the lack of a reliable scientific basis for microscopic hair analysis (ECF No. 327 at 146-89);

(4)    A report from a forensic footwear expert (Dr. Alicia Wilcox) concluding that the detectives in Bolin's case used unsound methodologies to photograph footwear impressions at the scene of the crime and erred in attributing a shoe size to the impressions (ECF No. 327 at 190-203);

(5)    A declaration from an inmate incarcerated with Bolin and a jailhouse informant (Michael Seibert) discrediting Siebert's testimony at trial that Bolin had questioned Siebert about obtaining fingerprints from the interior of a truck and a screwdriver handle (ECF No. 327 at 204-08); and

(6)    New scientific sources explaining why Sirevaag's testimony identifying Bolin as the person he saw leaving the scene of the crime should have been excluded because it was the product of an impermissibly suggestive one-on-one show-up procedure (ECF No. 352).

ECF No. 357 at 38- 45.

The court briefly discusses the relevant evidence presented at trial before providing a more detailed description of the new evidence.

#### P-30

At trial, a Las Vegas Metropolitan Police Department (LVMPD) criminalist,

Terry Cook, testified that he performed a P-30 test on vaginal swabs taken from the victim that revealed a trace amount of semen. ECF No. 156-1 at 75. He further testified that, depending on several variables, semen remains in the vaginal vault anywhere from a few hours to three days. *Id.* at 78. He opined that the "P30" detected on the vaginal swab was "proof positive" of the presence of semen. *Id.* at 99. During her testimony, Bolin's defense expert, Dr. Lisa Marie Calandro, a forensic scientist, confirmed that semen was present if P-30 was found on the vaginal swab and that the presence of P-30 was "proof positive" of the presence of ejaculate. ECF No. 160-4 at 54—55, 71-72. She further testified that menstruation could hasten the removal of semen from the vaginal vault, but that research supported Cook's timeframe of two hours to three days. *Id.* at 70-72. The victim's husband testified that, because Ricks was menstruating during the week prior to her murder, they had not had sexual intercourse with each other for about 7-8 days prior to the murder. ECF No. 152-2 at 68. The State also presented testimony from several witnesses indicating that it was highly unlikely that Ricks was involved in an extra-marital affair. ECF No. 152-3 at 85; ECF No. 152-4 at 12, 103-04.

The new evidence is Dr. Williams' report, which explains that the P-30 test, also known a Prostate-Specific Antigen (PSA) test, is not a confirmatory test for the presence of semen because PSA can be found in female biological fluids. ECF No. 326 at 186. Thus, "a positive test is a presumptive, not a conclusory, result." *Id.* Having reviewed Cook's trial testimony and a trial exhibit with his notes, she states that his statement that "a positive p30 finding is conclusive for male semen is now forensically invalid," and the absence sperm cells means that "there is no conclusive serological evidence for the existence of semen" in Bolin's case. *Id.* at 186-87.

DNA testing

With respect to the DNA evidence presented at trial, the State presented

the testimony of Paula Yates, a DNA analyst with Cellmark Diagnostics, and Jeffrey Hardcastle, a city planner for the Clark County Department of Comprehensive Planning. In her testimony, Yates explained that, while the Restriction Fragment Length Polyorphism (RFLP) testing technique can yield an "absolute identification," the Polymerase Chain Reaction (PCR) technique that Cellmark used to test the sample hair provided by Cook can "narrow it down to a very small number of people as being possible contributors." ECF No. 156-1 at 159-61.

Yates further explained that DNA suitable for PCR testing is found only on the root of a hair, but not the shaft portion. *Id.* at 179-80. Her testing revealed DNA on both the root and the shaft of the foreign hair taken from Ricks, which indicated that there was "something on the hair such as skin, tissue, or blood, or something of that nature, any other kind of biological tissue on the hair that was responsible for those results and not the shaft itself." *Id.* at 180. And, because the DNA profile from the root portion was the same as the DNA profile from shaft, she "could not tell whether or not that DNA that [she] typed was actually from the root itself or from what was on the hair." *Id.* at 190. She noted, however, that because the results were the same, the DNA from each portion was either from the same person or two people with exactly the same DNA types, with the latter consisting of "a very small percentage of the population." *Id.* at 193-94.

When Yates compared the DNA found on the hair to known samples from Ricks and Bolin, she was able to definitively exclude Ricks as the source of the DNA found on the hair, but not Bolin. *Id.* at 204-07. She also testified about how frequently the DNA profile she found on the hair occurs in three recognized population groups —Caucasians, African-Americans, and Hispanics. *Id.* at 212-13. According to Yates' testimony, the profile found on the hair can be found in one in 5,800 Caucasians, one in 2,600 African-Americans, and one in 15,000

17

Hispanics. *Id.* Thus, as to whether Bolin was the source of the DNA found on the hair, Yates testified that "the extent of [her] opinion is that he cannot be excluded and that the likelihood that another person possesses all these genetic traits is one in approximately 2,600 in the African-American population." ECF No. 157-1 at 92.

Hardcastle testified about population studies he had conducted on Clark County, including projections as to population numbers for a given race. According to his testimony, he estimated the total population of Clark County in July of 1995 to be 1,040,688. ECF No. 157-1 at 127. Based on his estimate that 9.5 percent of the population was African-American, he arrived at 98,856 as the number of African-Americans in Clark County at that time. ECF No. 157-2 at 18-19. Finally, his testimony included an estimate of 21,111 as the number of African-American males between the ages of 20 and 44. *Id.* at 49.

Bolin presented the testimony of Dr. Calandro and Dr. Thomas Carroll, a professor of economics. Dr. Calandro testified that the DNA testing employed by the State could not be used to determine the race, gender, or age of the sample source. ECF No. 160-4 at 30-31. She also objected to arriving at an absolute number of individuals in a given population who could have contributed a particular DNA type and to applying frequency numbers based on data from all over the country to a particular geographic location. *Id.* at 32-34. She did agree, however, that DNA found on the root and shaft of the hair was consistent with Bolin's DNA type. *Id.* at 34. With respect to the frequency numbers for the three groups identified by Yates, Dr. Calandro testified that her numbers were one in 7,800 for Caucasians, one in 2,400 for AfricanAmericans, and one in 17,000 for Hispanics. *Id.* at 35-36.

In his testimony, Dr. Carroll stated that Hardcastle's calculation as to the population percentage of African-Americans in Clark County was low and noted Hardcastle's failure to account for the significant number of tourists visiting Las

18

Vegas on a daily basis. ECF No. 160-3 at 70-72. He testified that, by his estimation, Hardcastle was "off by about 12 percent" with respect to the number of African-Americans in Clark County in July of 1995. *Id.* at 72.

The new evidence is an affidavit from Dr. Neall, a DNA expert, who states that the foreign hair sample Dr. Yates analyzed and testified about at trial was contaminated. In a nutshell, Dr. Neall makes the following points:

(1) The presence of DNA on the shaft of the foreign hair means that the hair was contaminated from another biological source, and the contamination could have come at any time, even during the PCR analysis at the laboratory.

(2) Because the shaft was contaminated, we cannot rule out the possibility that the root was also contaminated.

(3) Thus, there is no way to know whether DNA results from the hair root testing reflected the profile of the hair root itself or something that was on the hair root from the same biological source that contaminated the adjacent hair shaft.

(4) Since contamination of the hair root cannot be ruled out, the DNA results it yielded were inconclusive as to the donor of the hair and, as such, yielded no evidence that could be used in any probative way.

(5) It was also complete error to use the population statistics in the Cellmark report to draw inferences or conclusions about the hair and/or its origin.

ECF No. 324 at 185-89

Hair comparison

At trial, the State's hair analysis evidence consisted of the testimony from LVMPD criminalist Cook. Cook testified that, based on his analysis, the hair found in the pubic combing of the victim was obviously dissimilar from Ricks' hair and had "Negro characteristics." ECF No. 156-1 at 96-97. He concluded that the hair was "microscopically similar" to hairs taken from Bolin and that he could not exclude Bolin as the source of the hair. *Id.* at 108. He further testified that, because Bolin could not be excluded as the source, the hair was a "candidate for DNA analysis, and that would be another chance at exclusion."

*Id.* at 113.

Dr. John Thornton, a director of a forensics laboratory who testified for the defense at Bolin's trial, impugned Cook's methodology and failure to document his findings. ECF No. 161-2 at 18-21. He also noted that hair analysis is highly subjective and very limited in terms of being able to identify the source of a given hair or the race of the hair's donor. ECF No. 160-5 at 33-53. He further testified that, when compared to hairs obtained from Bolin, the hair found in the pubic combing of Ricks was "not a particularly good match," but he also testified that he could not "eliminate the possibility that Mr. Bolin is the person that delivered up that hair." ECF No. 161-2 at 33, 35.

The new evidence calling into question the reliability of hair analysis is a 2015 FBI press release, a letter from FBI Director James C. Comey, and a 2016 report by the Executive Office of the President's Council of Advisors on Science and Technology. The FBI press release Bolin relies upon as new evidence reported the results of a review of criminal cases worked prior to 2000 which found that the FBI microscopic hair analyst's testimony in at least 90 percent of the trial transcripts the FBI analyzed contained erroneous statements. ECF No. 327 at 147-50. The press release also notes that prosecutors throughout the country routinely relied on microscopic hair comparison to link a criminal defendant to a crime, but the practice was deemed "highly unreliable" in a 2009 National Academy of Sciences report on forensic science. *Id.*

The Comey letter, which is dated June 10, 2016, is addressed to state governors and acknowledges that, in a large number of cases, FBI examiners "made statements that went too far in explaining the significance of a hair comparison and could have misled a jury or judge." ECF No. 327 at 153. The letter also encourages governors "to ask [their] state and local labs to ensure their examiners were staying within the bounds of science and, if they weren't, to take appropriate corrective action." *Id.* The 2016 report by the Executive

20

Office of the President's Council of Advisors on Science and Technology criticizes the notion promulgated by the DOJ that microscopic hair comparison had been demonstrated to be a valid and reliable scientific methodology. *Id* at 186-89. Among the criticisms, the report notes that the DOJ ignored a 2002 FBI study that found that 1 out of 9 times when hair examiners concluded in casework that two hair samples are microscopically indistinguishable, the hairs came from different sources. *Id.*

Footwear impressions

At trial, an LVMPD crime scene analyst, Daniel Ford, testified that he found two sets of footwear impressions located about eighteen inches apart leading to the partially-constructed home where the victim was found, with one set showing a pattern similar to the shoes the victim was wearing and the other set being smooth from heel to toe. ECF No. 156-3 at 101. He testified that the smooth impressions "measured out approximately eleven inches." *Id.* at 102.

Torrey Johnson, an LVMPD criminalist, testified that, based on his measurements, the smooth impressions were "about eleven and a half inches long." ECF No. 157-4 at 13. He further testified that he measured two pairs of shoes (dress shoes and sandals, both size 10.5) recovered from Bolin by the police and determined that they were approximately the same length as the footwear impressions. *Id.* at 16. Based on that, he opined that the footwear impressions were left by shoes "in the same order of size" as Bolin's shoes. *Id.* He acknowledged, however, that "you can have a wide range of shoe size to actual shoe length and the impression, so we have to be very careful." *Id.* at 17. He also pointed out "some constraints in the measurements of the photographs of the impressions" that could impact accuracy, such as the fact that the scale could be off because "the angle from which the photograph was taken is not perfectly straight down on the impression." *Id.* at 18.

Dr. Thornton testified for the defense that, while the length of Bolin's

21

shoes could be measured precisely, the footwear impressions in evidence could not be and that a measurement "a quarter inch off could extend over about four shoe sizes." ECF No. 161-2 at 43.

The new evidence is Dr. Wilcox's report challenging the investigative methods that detectives used to photograph and analyze footwear impressions at the scene of the crime. Dr. Wilcox's report makes the following points:

1) The camera that took the photographs was not set up correctly for examination quality photographs.

2) There is no scientific basis for measuring the length of a featureless crime scene foot impression and assigning it a shoe size.

3) The measurement of eleven inches does not fall within the range of U.S. men's size 10, 10.5 or 11, and, instead, based on data published in 1990 for particular brands of athletic shoes, falls within the range of 6.5 to 8.

4) None of the individuals who testified at trial was an expert on forensic footwear comparisons.

5) A three-dimensional cast of the footwear impressions, the best practice for capturing the actual size of the shoe, was not used in this case.

6) The prosecution erred by displaying a demonstrative poster during closing argument that included a statement that the footwear impressions were the "same size as defendant."

ECF No. 327 at 192-93.

Jailhouse informant

At trial, Michael Siebert, who briefly shared a cell with Bolin at the CCDC, testified that, after he told Bolin that he had studied criminal investigation, Bolin asked him whether fingerprints could be identified on various surfaces in a car or truck, or from a screwdriver. ECF No. 157-2 at 85-88. Siebert further testified that he had no independent information about the relevance of a truck or screwdriver to Bolin's case. *Id.* at 92-93.

The new evidence is a declaration from an inmate that discredits Siebert's

22

testimony. While the declarant's name is redacted, the declaration includes the following facts:

1) The declarant was housed in the same unit as Bolin and Siebert at the CCDC.

2) The declarant had previously been incarcerated with Bolin's brother, so one day he struck up a conversation with Bolin.

3) During that conversation, Bolin told him that his lawyer had advised him that "if there was no evidence of [Bolin] being in that truck, like his fingerprints on the radio knob or dashboard or steering wheel or other places inside the vehicle, then the State had no case."

4) The declarant then told Bolin to look behind him because Siebert was looking down at Bolin's legal paperwork from his top bunk.

ECF No. 327 at 205-08.

Eyewitness ID

At trial, the prosecution presented evidence of an eyewitness who identified Bolin. In the hours following Sirevaag's discovery of Ricks' body, an LVMPD detective, Dwayne Morgan, conducted a taped interview with Sirevaag in which Sirevaag reported seeing a Black male walking by him at an angle as he (Sirevaag) was seated in his truck. ECF No. 200 at 129-30. In that interview, Sirevaag described the man as very clean cut ("short hair" and "clean shaven") and very muscular ("built like a body builder"). ECF No. 154-2 at 33. He also noted that the man was wearing tan shorts and a dark tank top and that he had a tattoo on his right arm. *Id.* at 34. He estimated the man's age as 20 to 30 years old, his height as six feet, and his weight as 230 pounds. ECF No. 200 at 130-31.

The next day, the Las Vegas police conducted an identification procedure that the Nevada Supreme Court recounted as follows:

At the conclusion of their search, Dets. Morgan and Tremel escorted Bolin to the Clark County Detention Center (detention center) to take his photographs and fingerprints and administer a serology kit. . . . Additionally, Det. Morgan arranged to have

23

Sirvaag[4] conduct a walkthrough identification session at the detention center during the time that Bolin would be present.

While Dets. Morgan and Tremel were executing the search warrant at Bolin's residence, Sirvaag arrived at the detention center to prepare for his walk-through identification session. Sgt. Hefner conducted an interview with Sirvaag and informed him that some of the inmates had been dressed in police uniforms and some undercover police officers had been placed in the holding cells in order to test Sirvaag's memory. Additionally, Sirvaag drew two pictures of the tattoo he saw on the right arm of the man at the construction site.

After conducting the interview, Sgt. Hefner escorted Sirvaag through the detention center. During the identification procedure, Sirvaag observed six holding cells containing approximately seventy inmates of various races in each cell. Additionally, Sirvaag observed numerous people in the detention center's booking area. After approximately fifteen minutes, Sirvaag proceeded to the detention center's main entrance area where Bolin, who was dressed in casual attire, had just entered. Because Sirvaag knew that Dets. Morgan and Tremel were conducting the investigation into Ricks' death, they entered the detention center separately from Bolin to ensure that Sirvaag would not be improperly influenced in his attempts to identify a suspect.

After observing Bolin for several minutes, Sirvaag informed Sgt. Hefner that due to Bolin's clean-shaven facial appearance, his neatly trimmed hairstyle, and his rather large muscular build, Bolin resembled the man that he saw at the construction site. Dets. Morgan and Tremel then took Bolin approximately twenty feet down an adjacent hallway for photographing and fingerprinting. As Bolin was being photographed, Sirvaag observed him with his shirt off, at a distance of approximately twenty feet, for about five to ten minutes. Because of the presence of a tattoo on Bolin's upper right arm near his bicep, Sirvaag became more convinced that Bolin was the man that he had seen at the construction site.

Although he identified many similarities between Bolin and the man he saw at the construction site, Sirvaag told Sgt. Hefner that he was not completely certain that Bolin was the same man. After completing the walk-through identification session, Sirvaag departed the detention center at approximately 12:30 p.m. However, approximately one hour after his departure, Sirvaag telephoned Sgt. Hefner and stated that he was ninety percent sure that the man he saw at the detention center was the same person he saw leaving the crime scene.

*Bolin*, 960 P.2d at 789-90 (footnote added).

---

[4] Inasmuch as it conflicts with spelling the court reporter recorded when Sirevaag was sworn as a witness at trial (as well as the spelling indicated throughout the state court record), the spelling of Sirevaag's name in the Nevada Supreme Court's opinion on direct appeal appears to be incorrect.

The defense's case at trial included the testimony of a forensic psychologist, Robert Shomer, who testified at length about the safeguards against a false positive identification that were lacking from the procedure used in Bolin's case. ECF No. 159-3 at 19-26. He also discussed other factors that might undermine the accuracy of an eyewitness identification, such as using instructions that emphasize the witness' responsibility, the diminishment of memory over time, and lineups in which the suspect appears differently than other persons in the lineup. *Id.* at 30-40.

The new scientific sources explaining why Sirevaag's testimony should have been excluded are contained in an amicus brief filed by the Innocence Project and the Wilson Center for Science and Justice. ECF No. 352. The brief makes the following points based on scientific research:

1) Mistaken identifications are one of the leading causes of wrongful convictions.

2) Jurors place inordinate weight on eyewitness identification testimony.

3) Single-suspect show-ups like the one used in Bolin's case, as opposed to a photographic or corporeal lineup, are inherently suggestive and produce unreliable identifications.

4) The police signaled that Bolin was suspected of the crime by having the two detectives Sirevaag met at the crime scene book Bolin like an arrestee, fingerprinting him and drawing his blood, then making him remove his shirt and photographing him and his tattoo.

5) Police pressure and post-identification feedback amplified the likelihood that Sirevaag made an inaccurate identification.

6) Repeated viewings, as occurred in this case, produces a confident witness but unreliable evidence.

ECF No. 352.

//
//

25

#### 5.    Analysis

Reviewing Bolin's proffered evidence under the *Schlup* standard, the court concludes that he falls short of meeting the standard and, even if granted an evidentiary hearing, he would not be able to demonstrate his actual innocence. Clearly, none of the new evidence exonerates him. He argues that a petitioner need not affirmatively show that he did not commit the crime to meet the *Schlup* standard, but can, instead, promulgate evidence that dismantles the prosecution's case against him. ECF No. 362 at 5-6. That may be so, but the cases Bolin cites to support this position—*House v. Bell*, 547 U.S. 518 (2006) and *Gable v. Williams*, 49 F.4th 1315, 1322-23 (9th Cir. 2022) —are more compelling than his. As noted above, the petitioner in *House* presented new DNA evidence which established that semen found on the murder victim actually came from the victim's husband. *House*, 547 U.S. at 540–41. Other evidence established that the victim's husband "regularly abused his wife," had asked a friend to lie about his whereabouts at the time of the murder, and had confessed the crime to other people. *Id.* at 548-50. In *Gable*, "nearly all the State's key witnesses" recanted and another person gave multiple "detailed and compelling confessions." *Gable*, 49 F.4th at 1328.

Here, Bolin's new evidence would have unquestionably strengthened the case for reasonable doubt, but that is not the actual innocence standard. *See Schlup*, 513 U.S. at 329 ("The meaning of actual innocence ... does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty.") The evidence of Bolin's guilt is just too weighty for the court to find that he can meet this standard. Much of the incriminating evidence against Bolin is either not undermined by his proffered new evidence or it is only minimally undermined.

Dr. Williams' report regarding the P-30 test is probably the most

compelling piece of new evidence, but even if the test is no longer considered a conclusive test for the presence of semen, it is still recognized as a presumptive test. Also, the sexual assault in this case bore significant similarities to a sexual assault Bolin committed in 1975. ECF No. 227 at 6-12. Bolin tries to downplay the probative value of this by referring to it as a "decades-old rape conviction," but ignores that, when he committed the crimes in this case, he had just been released from prison after spending nearly all of the intervening twenty years in prison for the prior rape. Other evidence of sexual assault included testimony that, when the victim was found, her underwear was on inside out (ECF No. 155-2 at 61-62) and that a used sanitary napkin was found on the ground nearby (ECF No. 156-3 at 9-11).

Bolin's new evidence demonstrates the unreliability of the DNA and hair comparison evidence presented at his trial, but Bolin's jury was informed of many of the limitations surrounding that evidence. Similarly, the jury was also made aware that the shoe impression evidence was far from an exact science. Dr. Wilcox's report focuses on Ford's testimony that the foot impressions were eleven inches (which Ford prefaced with "approximately") but does not mention Johnson's measurement of eleven and a half inches. Johnson testified that the shoes obtained from Bolin measured eleven and three-quarters of an inch and eleven and seven-eighth of an inch. ECF No. 157-4 at 31. In addition, there is no evidence that Bolin was wearing any of the types of shoes Dr. Wilcox considered in claiming that eleven inches corresponds to men's size 6.5 to 8. As for the inmate declaration, it is dated April 2022, more than 25 years after the events it discusses.

The reliability of Sirevaag's identification has been extensively litigated, both in state court and this court.[5] The jury was presented with several reasons

_____

[5] Bolin filed a pretrial motion seeking to have Sirevaag's testimony suppressed, with

to question the accuracy of the identification and still chose to convict Bolin. And, as respondents point out, the amicus brief "leaves out key details that are not in [Bolin's] favor" including:

> [T]hat Sirevaag indicated that he did not want merely a photo lineup because he wanted to observe the suspects' mannerisms and build; that Sirevaag was warned that he would be looking at many people in varying attire, from undercover officers in jail clothing, to employees, to people in civilian clothing, and that the suspect could be any one of them; that Sergeant Hefner did not direct Sirevaag where to go in the jail; that Sirevaag saw over 100 individuals during the identification process; that Sirevaag was told there may not be anyone to actually identify at all and instead the identification attempt could just be a dry run; and that Sirevaag had already noticed and was studying Bolin before Bolin was singled out for photographs, etc.

ECF No. 360 at 25 (citing ECF No. 158-3 at 7-25).

Because Bolin has not made a sufficient threshold showing to warrant further inquiry of his claimed actual innocence, his motion for an evidentiary hearing will be denied. In addition, there is the question whether 28 U.S.C. § 2254(e)(2) restricts the court's ability to hold an evidentiary hearing if it were so inclined. The Supreme Court in *House* held that section 2254(e)(2) does not present an obstacle to holding an evidentiary hearing on claims of actual innocence because the provision is "inapplicable" to such claims. *House*, 547 U.S. at 539. More recently, however, the Court in *Shinn v. Ramirez* held that "when a federal habeas court convenes an evidentiary hearing *for any purpose*, or otherwise admits or reviews new evidence *for any purpose*, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied." *Shinn v. Ramirez*, 596 U.S. 366, 389 (2022) (emphasis added).

---

the trial court conducting an evidentiary hearing on the motion before denying it. ECF No. 226. Bolin also raised the issue on direct appeal and again his first state post-conviction proceeding. 960 P.2d at 796-97; ECF No. 170-6 at 18-19. In addition, this court addressed the issue in denying Bolin's fourth amended petition. ECF No. 227 at 31-41.

The Court in *Ramirez* was addressing evidentiary hearings to establish cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012), but the foregoing language suggests that the Court's holding may also apply to actual innocence claims. And, although Nevada law recognizes a colorable claim of actual innocence as a ground to excuse procedural defaults (*see Rippo v. State*, 423 P.3d 1084, 1112 (Nev. 2018), Bolin made no effort to make such a claim in his second state habeas proceeding. ECF No. 323 at 11-155. Instead, he merely attached his new evidence to his state court petition without moving for an evidentiary hearing or making any argument that the evidence should excuse his procedural defaults. ECF No. 157-3 at 29-30. Thus, he arguably failed to develop the factual basis of his claim in state court as required by § 2254(e)(2).

E.      Cognizability

Finally, Respondents argue that Claim 4 should be dismissed because cumulative-error claims are not cognizable in federal habeas proceedings. ECF No. 356 at 27-28. The court rejects this argument because the Ninth Circuit has consistently interpreted the Supreme Court's opinion in *Chambers v. Mississippi* to establish the basis for a cumulative-error claim. *See Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) ("The Supreme Court has clearly established that the combined effect of multiple trial-court errors violates due process where it renders the resulting criminal trial fundamentally unfair.") (quoting *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) (cleaned up)); *see also, e.g.*, *Michaels v. Davis*, 51 F.4th 904, 935–36 (9th Cir. 2022) (analyzing cumulative-error claim on habeas review); *Noguera v. Davis*, 5 F.4th 1020, 1051–52 (9th Cir. 2021) (same). Thus, Claim 4 is cognizable as a federal habeas claim.

**III.   CONCLUSION**

IT IS THEREFORE ORDERED that the respondents' motion to dismiss (ECF No. 356) is GRANTED in part and DENIED in part. The following claims

are dismissed as untimely: Claim 3(A)(2), Claim 3(A)(3), Claim 3(D)(1), Claim 3(D)(2), Claim 3(D)(3), and Claim 3(E)(1). In addition, all the sub-claims in Claim 3 and Claim 4 are barred by the doctrine of procedural default. In all other respects, the motion to dismiss is denied.

IT IS FURTHER ORDERED that Bolin's motion for evidentiary hearing (ECF No. 358) is DENIED.

IT IS FURTHER ORDERED the Bolin's motion to seal document (ECF No. 364) and respondents' motions to extend time (ECF Nos. 359/370), all unopposed, are GRANTED *nunc pro tunc* as of their respective filing dates.

IT IS FURTHER ORDERED that respondents have 60 days from the date this order is entered to file an answer responding to the remaining claims in Bolin's fifth amended habeas corpus petition (ECF No. 335). In all other respects, the schedule set forth in the court's July 2, 2024, order (ECF No. 334) remains in effect.

DATED THIS 5th day of February, 2026.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE